**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Partners Pharmacy Services, LLC, *et al.*,[1] | Case No. 25-34698 |
| Debtors. | (Joint Administration Requested)<br>(Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND
USE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; AND
(III) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on August 14, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (the "Motion"):

## RELIEF REQUESTED

The Debtors seek entry of interim and final orders, substantially in the forms attached

hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," and collectively,

the "DIP Orders"):

> (i) authorizing the Debtors to obtain a secured post-petition financing facility
> (the "DIP Facility"), in an aggregate principal amount of no less than
> $6.5 million, plus interest, costs, fees and other expenses and amounts

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C. (4578); and Solutions Homecare, L.L.C. (1583). The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

provided for in, and under the terms and conditions set forth in that certain DIP Term Sheet attached hereto as **Exhibit C** (the "DIP Term Sheet"),[2] by and between the Debtors and CS One, LLC ("CS One" and in such capacity, the "DIP Lender");[3]

(ii)     authorizing the Debtors to execute, deliver and perform such other and further acts as may be required in furtherance of the DIP Facility and the DIP Term Sheet;

(iii)    authorizing the Debtors to draw on the DIP Facility, as needed on an interim basis up to $2.3 million and as needed on a final basis of no less than $6.5 million, subject to the conditions precedent set forth in the DIP Term Sheet, and to use proceeds of the DIP Facility to pay for the Debtors' working capital needs and other administrative expenses necessary for the administration of these chapter 11 cases;

(iv)    granting the DIP Lender automatically perfected first-priority security interests in and priming liens on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations arising thereunder (collectively, the "DIP Obligations");

(v)     granting the DIP Lender superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code;

(vi)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide the DIP Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Term Sheet;

(vii)   authorizing the Debtors to use cash collateral[4] within the agreed upon budget (the "Budget");

(viii)  granting adequate protection in the form of (a) the Pre-Petition Adequate Protection Lien (defined below) under sections 361 and 363(e) of the Bankruptcy Code and (b) the Pre-Petition Adequate Protection Claim (defined below) under section 507(b) of the Bankruptcy Code;

(ix)    under Bankruptcy Rule 4001, holding an interim hearing on this DIP Motion before the Court to consider entry of the Interim Order; and

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Term Sheet, the DIP Orders, or the First Day Declaration (defined below), as applicable.

[3]  For avoidance of doubt, CS One is also the Debtors' "Pre-Petition Lender" and proposed "Stalking Horse Bidder."

[4]  For purposes of this Motion, the term "cash collateral" means "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest" as defined in section 363(a) of the Bankruptcy Code.  11 U.S.C. § 363(a).

4925-5729-2365

    (x)    scheduling a final hearing (the "Final Hearing") on or before September 10, 2025, to consider entry of the Final Order authorizing the balance of the credit available under the DIP Facility and any requested relief not granted under the Interim Order on a final basis, all as set forth in this Motion and to be set forth in the Final Order.

In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Ronald M. Winters in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").

## PRELIMINARY STATEMENT

1.    The Debtors commenced these chapter 11 cases with the goal of running a robust marketing and sale process to sell substantially all of their assets. The Debtors have secured a stalking horse bid from their senior secured pre-petition lender who is also providing, subject to court approval, post-petition financing to fund operations and administrative costs during the sale process. Cardinal Health 110, LLC and Cardinal Health 112, LLC (collectively, "Cardinal"), the Debtors' primary vendor with a junior lien on the Debtors' assets, has also consented to the Debtors' use of cash collateral. The consensual use of cash collateral and proposed financing ensure that the Debtors remain current on their post-petition obligations while they conduct a prompt and orderly sale process aimed at continuing operations, while also maximizing the value of their assets. As the Debtors have been unable to find another party willing to provide DIP financing, much less on better terms, CS One's proposal represents the only viable option for the Debtors to preserve their going concern value and effectuate a sale in chapter 11.

## JURISDICTION AND VENUE

2.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

4925-5729-2365

The Debtors consent to entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.　　　Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.　　　The bases for the relief requested are sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules").

<u>BACKGROUND</u>

**A.　　The Debtors' Chapter 11 Cases**

1.　　　On August 13, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these cases.

2.　　　The Debtors serve the medication management needs of residents at skilled nursing facilities, assisted living communities, long-term care residences, long-term acute care hospitals, and institutional care facilities across the United States. These services are delivered through a network of in-house pharmacies and supported by a range of advanced technologies and capabilities, including automation systems, infusion therapy technologies, compounding services, clinical decision-support tools, and a dedicated team offering clinical support services.

5.　　　Additional information about the Debtors, including their business operations, corporate and capital structure, and the events leading to the filing of these cases is detailed in First Day Declaration.

4

### B.     The Debtors' Capital Structure

#### i.     The Revolving Credit Facility

6.      On July 2, 2019, the Debtors entered into a Credit Agreement (as amended, restated, supplemented or modified, the "Pre-Petition Credit Agreement") with CIT Bank, N.A., as administrative agent ("CIT"), certain lenders party thereto, and Care Solutions, as guarantor, that provided the Debtors with a revolving credit facility of up to $60 million (the "Revolving Credit Facility"). First Day Decl. ¶ 20. The Revolving Credit Facility is secured by a lien on substantially all of the Debtors' assets (the "Senior Pre-Petition Liens") and originally bore interest at a variable interest rate equal to LIBOR plus 2.95–3.45%. Under the Revolving Credit Facility, the Debtors' cash receipts are supposed to be swept daily. *Id.*

7.      As of July 2022, the Debtors were in breach of certain covenants under the Pre-Petition Credit Agreement. *Id.* ¶ 21. As a result, on July 25, 2022, CIT agreed to amend the Pre-Petition Credit Agreement to, among other things, temporarily waive certain defaults and change the interest rate to Adjusted Term SOFR (as defined in the amendment) plus 3.45%. *Id.* The then outstanding principal balance of the Revolving Credit Facility was $37,637,676.23. *Id.*

8.      Soon after, the Debtors again defaulted on the Revolving Credit Facility. *Id.* ¶ 22. As a result of continuing defaults and the looming maturity date of July 2, 2023, CS One purchased all then outstanding obligations under the Pre-Petition Credit Agreement pursuant to an Omnibus Assignment and Assumption Agreement and Waiver, dated as of February 23, 2023. *Id.*

9.      Since then, the Pre-Petition Lender has ceased daily sweeps of the Debtors' cash receipts, and no payments have been made toward the balance of the Revolving Credit Facility. *Id.* ¶ 23. The Pre-Petition Credit Agreement has also been amended to temporarily waive defaults and extend the maturity date to January 2, 2026. *Id.* As of the Petition Date, the outstanding balance under the Revolving Credit Facility is approximately $44,524,814, which includes

$1.5 million in bridge financing provided on August 8, 2025. *Id.* The Debtors used this bridge financing to fund retainers for professionals and pay certain operating expenses in the lead-up to the filing of these chapter 11 cases. *Id.*

### ii. The Prime Vendor Agreement

10.     Under the Prime Vendor Agreement, the Debtors purchase 95% of their pharmaceuticals from Cardinal. *Id.* ¶ 24. The Debtors' obligations under the Prime Vendor Agreement are secured by liens on substantially all of the Debtors' assets (the "Junior Pre-Petition Liens" and together with the Senior Pre-Petition Liens, the "Pre-Petition Liens") pursuant to various security agreements between the Debtors and Cardinal dated as of May 8, 2017, December 14, 2022, and January 13, 2023 (each as subsequently amended and restated). *Id.* As of August 4, 2025, the Debtors owed Cardinal $20,443,593. *Id.*

### iii. The Intercreditor Agreement

11.     On July 2, 2019, Cardinal 110 and CIT, as the then-administrative agent under the Pre-Petition Credit Agreement, entered into an Intercreditor Agreement pursuant to which Cardinal 110 agreed to subordinate certain of the Junior Pre-Petition Liens in favor of Cardinal 110 to the Senior Pre-Petition Liens. *Id.* ¶ 25.

### C.     The Debtors' Need for Financing

12.     The Debtors lack the resources to continue to operate and have had to seek protection under chapter 11 to run a process to sell their businesses free and clear of liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code. The Debtors' previous negotiations with SRX to provide a DIP loan and serve as stalking horse bidder were unsuccessful. *Id.* ¶¶ 43–46. Fortunately, the Debtors have been able to secure a stalking horse bid for their assets from their Pre-Petition Lender who is providing, subject to court approval, post-petition financing to fund the Debtors' operations while the sale process proceeds. *Id.* ¶ 6.

13.     Given the unsuccessful pre-petition search for alternatives, the Debtors firmly believe they will be unable to obtain financing on terms more favorable than those offered by CS One under the DIP Facility (either unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit under section 364(c) of the Bankruptcy Code). *Id.* ¶¶ 94–95.  Indeed, CS One is making the DIP Facility available only if the Debtors agree to grant (a) the DIP Liens, subject to the Carve Out (each defined below), and (b) the other protections in the DIP Orders. *Id.* ¶ 96.  CS One is ultimately priming its own Pre-Petition Liens, which is justified because the value of its collateral (*i.e.*, all of the Debtors' assets) is insufficient to satisfy its secured claim in a liquidation scenario. *Id.*

14.     Moreover, none of the parties Gibbins contacted were willing to extend financing to the Debtors on a junior basis to the Pre-Petition Liens, particularly since the proposed stalking horse purchase price is insufficient to pay in full the outstanding obligations under the Pre-Petition Loan and the Prime Vendor Agreement. *Id.* ¶ 97.  As the Debtors have been unable to find another party willing to provide DIP financing, CS One's proposal represents the only viable option for the Debtors to preserve their going concern value and effectuate a sale in chapter 11. *Id.*  Notably, the terms of the DIP Facility are substantially similar to the terms previously offered by SRX, but more favorable because it has no exit fee and less aggressive milestones. *Id.*

15.     As a condition to extending credit under the DIP Facility, the DIP Lender, Cardinal, and the Debtors have agreed that proceeds of any advance under the DIP Facility and the Debtors' cash collateral will be used exclusively in a manner consistent with the agreed upon Budget. *See id.* ¶ 99.  A copy of the Budget is attached to the proposed Interim Order as **Exhibit 1**.

**D.     Concise Statement Under Bankruptcy Rule 4001 and the Complex Case Procedures**

16.     Pursuant to Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures"), below is a concise statement of the material terms of the DIP Term Sheet and the Interim Order:

| Material Term | Summary Description[5] |
|---|---|
| **Parties to DIP Facility:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Borrower: The Debtors<br>DIP Lender: CS One, LLC |
| **Parties with an Interest in Cash Collateral:**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | CS One, LLC, Cardinal Health 112, LLC, and Cardinal Health 110, LLC<br>*See* Interim Order ¶ I. |
| **Stipulations:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)* | The Debtors make certain customary stipulations with respect to, among other things, the amounts outstanding under the Pre-Petition Credit Agreement, the Prime Vendor Agreement, and the validity, perfection, enforceability, and priority of liens and security interests securing the Pre-Petition Liens.<br>*See* Interim Order ¶¶ G, H. |
| **DIP Facility and Borrowing Limits:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | After entry of the Interim Order, the DIP Facility will consist of a consolidated, delayed, multi-draw term loan in the aggregate principal amount of no less than $6.5 million (the "DIP Loan Commitment").<br>All new advances under the DIP Facility shall be limited by the Budget.<br>*See* DIP Term Sheet at 1. |
| **Interest Rates:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | "Non-Default Interest Rate:" Interest on all outstanding advances under the DIP Facility shall accrue from and after the Petition Date at a per annum rate of 12%.<br>Effective immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Lender, interest on the outstanding loans under the DIP Facility shall accrue at a per annum rate of 15%.<br>*See* DIP Term Sheet at 3–4. |
| **Fees:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Lender shall be paid from the proceeds of the DIP Facility, legal fees and expenses incurred by the DIP Lender in connection with the negotiation and preparation of this DIP Term Sheet, the pleadings in connection with the Interim Order and the Final Order, and any other legal fees incurred by the DIP Lender in connection with the Chapter 11 Case (excluding any legal fees and expenses incurred |

---

5   The summaries in this Motion are qualified in their entirety by reference to the provisions of the DIP Term Sheet and the DIP Orders.  In the event of any inconsistency between the descriptions in this Motion and the actual terms of the DIP Term Sheet or DIP Orders, the terms of the DIP Term Sheet or the DIP Orders, as applicable, shall govern.

| Material Term | Summary Description[5] |
|---|---|
| | in connection with the Stalking Horse Asset Purchase Agreement). |
| | *See* DIP Term Sheet at 5–6; Interim Order ¶ 7. |
| **Budget and Permitted Variances:** *Bankruptcy Rule 4001(c)(1)(B)* | The use of the proceeds of the DIP Facility shall be in compliance with the Budget, a copy of which is attached to the proposed Interim Order as **Exhibit 1**. Actual amounts for each cash receipt and cash disbursement from operations line items (which do not include any Professional Fees) may not vary from the applicable Budget (including any amounts deemed to roll over from a previous week due to not being spent) by (i) more than ten percent (10%) by line item on a trailing three-week basis, or (ii) ten percent (10%) on a cumulative basis. *See* DIP Term Sheet at 2; Interim Order ¶¶ 3–4. |
| **Use of Proceeds and Cash Collateral:** *Bankruptcy Rule 4001(c)(1)(B)* *Bankruptcy Rule 4001(b)(1)(B)(ii)* | Proceeds of the DIP Facility shall be used solely for the following purposes (and to the extent identified in the Budget): (a) to fund, after application of all other available cash, ordinary course post-petition operating expenses and working capital needs of the Debtors; (b) to pay interest, fees and expenses to the DIP Lender in accordance with this DIP Term Sheet (whether or not such amounts are reflected in the Budget); (c) to fund court-approved fees and expenses incurred in connection with the 363 Sale; (d) to pay court-approved permitted pre-petition claims and adequate protection payments, if any; (e) to pay court-approved professional fees provided for in the Budget, including the funding of the Carve Out; and (f) to pay other ordinary course costs and expenses of administration of these chapter 11 cases. *See* DIP Term Sheet at 4; Interim Order ¶ 5. |
| **Maturity Date and Termination:** *Bankruptcy Rule 4001(c)(1)(B)* | The "<u>Maturity Date</u>" is the date that is one-hundred and thirty (130) days after the Petition Date, or such later date to which the DIP Lender consents in writing. The "<u>Termination Date</u>" is the earliest to occur of: the earliest to occur of: (a) the Maturity Date; (b) thirty (30) days after the Petition Date if the Final Order has not been entered; (c) acceleration of the obligations under the DIP Facility; (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and is otherwise acceptable to the DIP Lender in its sole but commercially reasonable discretion; (e) the date which is the closing date of any sale of all or substantially all of the Debtors' assets; (f) the entry of an order by the Court (i) granting relief from the automatic stay permitting foreclosure of any assets of the Debtors with a value in excess of $100,000 in the aggregate, (ii) granting any motion by the DIP Lender to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) appointing a trustee or an examiner with special powers, or (iv) dismissing or converting these chapter 11 cases; (g) the filing or support by the Debtors of a plan of reorganization or liquidation that (i) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and (ii) is not otherwise acceptable to the DIP Lender in its sole but commercially reasonable discretion; (h) the entry of an order by the Bankruptcy Court granting liens or claims that are senior or *pari passu* to the liens securing the DIP Facility; (i) the date a Termination Event occurs; and (j) any of the Milestones do not occur on or prior to its Milestone Date. *See* DIP Term Sheet at 3, 16. |
| **DIP Collateral and DIP Liens:** | All of the Debtors' property, including all of Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting |

| Material Term | Summary Description[5] |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)* | obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtors, excluding only Avoidance Actions, but including Avoidance Proceeds. *See* DIP Term Sheet at 5; Interim Order ¶ 8. |
| **Superpriority Administrative Claim Status:** *Bankruptcy Rule 4001(c)(1)(B)* | Amounts owed by the Debtors under the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, a claim having priority over any or all administrative expenses of the kind specified in, among other sections, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, subject to payment of the Carve Out (such claim, the "<u>DIP Superpriority Claim</u>"). *See* DIP Term Sheet at 5; Interim Order ¶ 6. |
| **Automatic Perfection of a Lien:** *Bankruptcy Rule 4001(c)(1)(vii)* | The Debtors and the holders of any DIP Liens or Pre-Petition Adequate Protection Lien shall not be required to enter into any additional security agreements to create, memorialize, or perfect any such liens, or to file UCC financing statements, mortgages, or other instruments with any other filing authority or take any other action to perfect any such Liens, which shall be and are deemed valid, binding, enforceable and automatically perfected by the docket entry of the Interim Order by the Clerk of the Court. *See* DIP Term Sheet at 5; Interim Order ¶¶ 14, 22. |
| **Milestones:** *Bankruptcy Rule 4001(c)(1)(B)(vi); Complex Case Procedures ¶ 8.a* | As a condition to entering into the Stalking Horse Asset Purchase Agreement and making the DIP Loan, the Debtors are required to comply with the following "<u>Sale Milestones</u>": |
|  | (a) On or within two (2) days of the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Debtors shall file a motion, in form and substance acceptable to the DIP Lender, requesting entry of the Sale Procedure Order and seeking approval of the sale in accordance with the Stalking Horse Asset Purchase Agreement to the Stalking Horse Bidder, or such higher bidder as may be identified through the procedures approved in the Sale Procedure Order as the Winning Bidder. |
|  | (b) On or before the date that is thirty (30) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have entered the Sale Procedure Order. |
|  | (c) On or before the date that is sixty (60) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, all competing binding bids under the Sale Procedure Order shall have been submitted. |
|  | (d) On or before the date that is seventy (70) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, an auction under the Sale Procedure Order shall have occurred (as applicable). |
|  | (e) On or before the date that is one-hundred and eighty (80) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have conducted a hearing to approve the 363 Sale to the winning bidder. |

10

| Material Term | Summary Description[5] |
|---|---|
| | (f) On or before the date that is one-hundred and eighty (80) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale.<br><br>(g) On or before the date that is ten (10) days after entry of the Sale Order, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the 363 Sale shall close.<br><br>*See* DIP Term Sheet at 8–9; Interim Order ¶ 19. |
| **Events of Default:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Usual and customary events of default for financings of this type, including (a) nonpayment of principal, interest and fees; (b) the filing or confirmation of a chapter 11 plan that does not provide for the indefeasible payment in full and in cash of Debtors' obligations outstanding under the DIP Facility; (c) entry of an order (or failure of the Debtors to oppose a motion) amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order, or Final Order, without the prior written consent of the DIP Lender; (d) any attempt by Debtors to obtain, or if any other party in interest obtains, an order or other judgment, that invalidates, reduces or otherwise impairs the obligations under the DIP Facility; (e) the Debtors requesting any post-petition financing, other than the DIP Facility, that would not immediately repay all DIP Facility obligations other than with respect to the Carve Out; (f) entry of an order granting liens or claims that are senior or *pari passu* to the liens granted on the DIP Collateral in favor of the DIP Lender under the DIP Financing Documents, except as set forth in the Budget; (g) judgments or orders granting relief from the automatic stay exceeding a certain threshold; (h) a breach of any covenant set forth in any DIP Financing Documents; (i) termination of the Debtors' exclusivity; (j) if the Sale Procedure Order or the Sale Order cease to be in full force and effect, reversed, stayed, vacated or subject to stay pending appeal or have been modified or amended without the prior written consent of the DIP Lender; (k) certain bankruptcy-related defaults, including dismissal, conversion, or the appointment of a trustee or examiner; and (l) failure to meet any of the Sale Milestones.<br><br>*See* DIP Term Sheet at 9–10; Interim Order ¶ 18. |
| **Adequate Protection:**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(iv); and 4001(c)(1)(B)(ii)* | As adequate protection and in consideration for being primed by the DIP Lender's claims and liens, to the extent of diminution in the Pre-Petition Lender's interests in the Debtors' collateral securing the amounts due under the Pre-Petition Credit Agreement, the Pre-Petition Lender (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to payment of the Carve Out and subject to the superpriority administrative claims of the DIP Lender under the DIP Facility; and (b) shall have valid, binding, enforceable and perfected liens in the DIP Collateral, subject to payment of the Carve Out and the DIP Liens.<br><br>As adequate protection and in consideration for being primed by the DIP Lender's claims and liens, to the extent of diminution in Cardinal's interests in the Debtors' collateral securing the amounts due under the Prime Vendor Agreement, Cardinal (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to payment of the Carve Out and subject to the superpriority administrative claims of the DIP Lender and the Pre- |

| Material Term | Summary Description[5] |
|---|---|
| | Petition Lender, and (b) shall have valid, binding, enforceable and perfected liens in the DIP Collateral, subject to payment of the Carve Out, the DIP Liens, and the Senior Pre-Petition Liens.<br><br>*See* Interim Order ¶¶ 11–12. |
| **Carve Out:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | "Carve Out" means the sum of:<br><br>(a) all fees required to be paid to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (collectively, the "Statutory Fees");<br><br>(b) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code;<br><br>(c) all unpaid post-petition fees and expenses of the professionals retained by the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and by the Committee (if any) pursuant to Sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals"), but only to the extent that such fees and expenses are (i) incurred before or on the first Business Day after delivery by the DIP Lender of a notice of a Termination Event; (ii) within the cumulative amounts set forth in the Budget approved by the DIP Lender for such Chapter 11 Professional as of the date of the Termination Event; and (iii) allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code; and<br><br>(d) post-petition fees and expenses of (i) the Debtor Professionals incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $250,000 to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code and (ii) the Committee Professionals incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $15,000, to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code.<br><br>*See* DIP Term Sheet at 13–14; Interim Order ¶ 15. |
| **Modification of Automatic Stay:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The DIP Orders provide for the modification of the automatic stay to the extent necessary to permit (a) the Debtors and the DIP Lender to implement and perform the DIP Facility and the DIP Financing Documents; (b) the creation and perfection of all Liens granted or permitted by the DIP Orders; and (c) the DIP Lender to exercise certain rights and remedies against the DIP Collateral upon the occurrence of an Event of Default.<br><br>*See* DIP Term Sheet at 6; Interim Order ¶ 14. |
| **Section 506(c) Waiver:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x)* | Subject to the entry of the Final Order, the Debtors waive irrevocably any right to surcharge the DIP Collateral, whether pursuant to sections 506(c) or 105(a) of the Bankruptcy Code or any other applicable law.<br><br>*See* Interim Order ¶¶ 17(A), (B). |
| **Waiver of Marshaling Doctrine and Equities of Case Exception:** | Subject to the entry of the Final Order, the DIP Lender shall not be subject to the "equities of the case" exception of section 552(b) of the Bankruptcy Code, the equitable doctrine of "marshaling," or any similar claim or doctrine with respect to |

4925-5729-2365

| Material Term | Summary Description[5] |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)(viii)* | any DIP Collateral.<br><br>*See* Interim Order ¶ 17(D). |
| **Lien on Avoidance Actions:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi)*<br><br>*Complex Case Procedures ¶ 8.d* | Subject to entry of the Final Order, the DIP Orders provide for a lien on the proceeds of any causes of action that could be brought pursuant to sections 544, 545, 547, or 548 of the Bankruptcy Code or any applicable state fraudulent transfer statutes (the "<u>Avoidance Actions</u>").<br><br>*See* DIP Term Sheet at 5; Interim Order ¶ 8. |
| **Indemnification:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtors shall indemnify and hold the DIP Lender and its officers, directors, employees and formally engaged agents (including all of their professionals) (each an "<u>Indemnified Party</u>") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, fraud, or willful misconduct.<br><br>*See* DIP Term Sheet at 12. |

### <u>S</u>TATEMENT <u>R</u>EGARDING <u>S</u>IGNIFICANT <u>P</u>ROVISIONS

17.     The Interim Order contains certain of the provisions (the "<u>Significant Provisions</u>")

identified in paragraph 8 of the Complex Case Procedures as set forth below:

a.  ***Sale or Plan Confirmation Milestones***.   The DIP Term Sheet contains milestones regarding the sale of the Debtors' assets, as outlined above in the summary of material terms.  *See* DIP Term Sheet at 8–9.  The DIP Lender is unwilling to make the DIP Facility available unless the Debtors run an accelerated sale process pursuant to which the DIP Lender is approved as the Stalking Horse Bidder.  Consequently, the sale milestones are appropriate.

b.  ***No-Cross Collateralization***.  The DIP Orders do not authorize, and the DIP Facility does not provide for, any cross-collateralization of the Debtors' debt.

c.  ***Roll Up***.  The DIP Orders do not authorize, and the DIP Facility does not provide for, any roll up of the Debtors' pre-petition debt.

d.  ***Liens on Avoidance Actions or Proceeds of Avoidance Actions***.  The Interim Order does not grant any liens on any Avoidance Actions or Avoidance Actions Proceeds.  Subject only to entry of the Final Order, the DIP Lender will receive

13

4925-5729-2365

liens on Avoidance Actions Proceeds, but in no event shall the DIP Lender receive liens on Avoidance Actions. *See* Interim Order ¶ 8. Granting liens on the proceeds of Avoidance Actions is appropriate because the DIP Facility provides the Debtors with the liquidity they need to fund a sale process, allowing the Debtors to maximize value for their estates. Moreover, the liens were required by the DIP Lender as a condition to extending credit. The Debtors submit that granting liens on the proceeds of Avoidance Actions is appropriate under the circumstances and particularly because the liens are subject to entry of the Final Order giving parties in interest the opportunity to object.

e.  ***Default Provisions and Remedies***. The Interim Order provides that, within five (5) business days following the Debtors' receipt of a default notice, the DIP Lender will have customary remedies, including the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Court unless the Court enters an order to the contrary during the five-day notice period. These provisions are customary and allow the Debtors to seek emergency relief within the five-day notice period. Additionally, there is no limit as to what parties may raise at an emergency hearing scheduled during the five-day notice period. *See* Interim Order ¶ 19.

f.  ***Release of Claims***. The Interim Order does not release any claims.

g.  ***Limitations on Use of Cash Collateral or DIP Proceeds to Pay Fees for Advisors to Official Committees***. Neither the DIP Orders nor the DIP Facility limit the use of cash collateral or the proceeds of the DIP Facility to pay the fees of advisors to any statutory committee of creditors appointed in these cases.

h.  ***Non-Consensual Priming Liens***. The DIP Orders grant the DIP Lender fully perfected first priority priming liens on the DIP Collateral, which is subject to the Pre-Petition Liens held by the Pre-Petition Lender and Cardinal. *See* Interim Order ¶ 9. Both the Pre-Petition Lender and Cardinal have consented to the priming DIP Liens.

i.  ***No Limitations on the Ability of Estate Fiduciaries to Fulfill Their Duties***. The DIP Orders do not limit the ability of the estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

18.  As required by paragraph 8 of the Complex Case Procedures, the inclusion of each of the Significant Provisions in the DIP Orders is appropriate and necessary to permit the Debtors' access to the DIP Facility. The terms and conditions of each of the Significant Provisions are the result of arm's-length and hard-fought negotiations between the Debtors and the DIP Lender, who

14

is unwilling to provide the DIP Facility absent the inclusion of these provisions.  Further, no other existing stakeholder or third party has presented a lower cost or otherwise better DIP financing proposal.  As set forth herein and in the First Day Declaration granting the relief requested is critical to the continued operation of the Debtors' businesses and will permit the Debtors to smoothly transition into chapter 11, run an accelerated and orderly sale process, and preserve the value of the Debtors' estates for all parties in interest.  Consequently, the Significant Provisions in the Interim Order are appropriate and necessary under the facts and circumstances of these cases and should be approved.

### BASIS FOR RELIEF

### A.    Financing Under Section 364 of the Bankruptcy Code

19.    The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assocs.)*, 89 B.R. 328, 333 (Bankr. S.D.N.Y. 1988) (section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim).

20.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

     i.    the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

    ii.    the credit transaction is necessary to preserve the assets of the estate; and

iii.    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991) (applying test and finding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere").

### i.    Credit Was Not Available on Better Terms

21.    In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Say. & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).  A debtor need only demonstrate "a good faith effort that credit was not available without" the protections of section 364(c).  *In re Snowshoe*, 789 F.2d. at 1088.  When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

22.    The Debtors do not believe that alternative sources of financing are reasonably available given the Debtors' unsuccessful solicitation of alternative financing proposals.  *See* First Day Decl. ¶¶ 94, 97. As noted above, none of the parties Gibbins contacted were willing to extend financing to the Debtors, much less on terms as favorable as those offered by CS One or on a junior basis to the Pre-Petition Liens.  *Id.*  Moreover, the terms of the DIP Facility offered by CS One are

4925-5729-2365

superior to the terms previously offered by SRX because it has no exit fee and less aggressive milestones.  *Id.*  Consequently, the DIP Facility represents the best, and only, option for post-petition financing.  *Id.* ¶ 99.  Accordingly, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable is satisfied.

ii.  **The DIP Facility Is Necessary to Preserve the Debtors' Assets**

23.  Post-petition financing is necessary to fund the Debtors' ongoing operations and the administration of these chapter 11 cases and, therefore, will benefit all parties in interest. *Id.* ¶ 94.  Indeed, it is critical that the Debtors obtain financing to continue operating their businesses while they run a sale process and complete a sale of substantially all of their assets. *Id.* ¶ 98.  In addition to providing critical funding, the DIP Facility will also provide the Debtors' stakeholders, including customers, employees, and vendors, with confidence in the Debtors' ability to complete a successful sale process and continue operating until the Debtors close on the sale. *Id.*

iii.  **The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate and Represent the Debtors' Sound Business Judgment**

24.  The Debtors have concluded that the DIP Lender's proposal is the best alternative available for post-petition financing and that credit cannot be obtained from another party on more favorable terms.  *Id.* ¶ 99.  The terms of the DIP Facility, including the interest rates, are also fair, reasonable, and adequate under the circumstances.  *Id.*  As noted, the terms of the DIP Facility are based on the same terms previously offered by SRX, but more favorable because it has no exit fee and less aggressive milestones.  *Id.* ¶ 97.  As contemplated by the policies underlying the Bankruptcy Code, the purpose of the DIP Facility is to enable the Debtors to maximize the value of their estates while providing them with the resources necessary to formulate a confirmable plan. *See generally In re First S. Sav. Ass'n,* 820 F.2d 700, 710–15 (5th Cir. 1987).

17

25.     As security for the advances and other post-petition costs payable under the DIP Financing Documents, the Debtors propose to provide the DIP Lender with the following security interests and liens (the "DIP Liens"), pursuant to sections 363, 364(c), and 364(d) of the Bankruptcy Code, in all of the Debtors' presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof, including, subject to entry of the Final Order, the proceeds of any chapter 5 causes of action ultimately asserted by the Debtors' estates (the "DIP Collateral").

26.     Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *See In re Estrada*, No. 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.") (citation omitted); *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Doc. No. 21) (order approving post-petition financing on an interim basis as exercise of debtors' business judgment); *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors").

27.     Indeed, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311

(5th Cir. 1985); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("[B]usiness judgments should be left to the boardroom and not to this Court"); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 511–14 (Bankr. D. Utah 1981) (holding that, in general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious). For this reason, courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513–14 (footnotes omitted).

28. *Here*, the Debtors' decision to move forward with the DIP Facility—with the guidance of experienced advisors and after searching for alternatives—is a sound exercise of their business judgment. Given the nature of the Debtors' pre-petition capital structure and absence of unencumbered assets, the DIP Lender surfaced as the best, and only, financing source that would commit to post-petition financing while the Debtors run an accelerated sale process and close on a sale of substantially all of their assets. *See* First Day Decl. ¶ 97. The Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these chapter 11 cases while they pursue a value-maximizing sale strategy. Accordingly, the Court should authorize the Debtors' entry into the DIP Financing Documents as a reasonable exercise of the Debtors' business judgment.

**B.     Use of Cash Collateral and Proposed Adequate Protection Is Appropriate**

29. Section 363(c)(2) and 363(e) of the Bankruptcy Code provide that a debtor is not authorized to use cash collateral without the consent of a pre-petition secured creditor unless such creditor receives adequate protection of its interest in the cash collateral.

30. *Here*, both the Pre-Petition Lender and Cardinal have consented to the Debtors' use of cash collateral pursuant to the agreed upon Budget attached to the proposed Interim Order. *See*

19

*Id.* ¶ 99.  As additional adequate protection, the Debtors propose to provide the Pre-Petition Lender and Cardinal with: (a) a lien in all DIP Collateral (the "Pre-Petition Adequate Protection Lien") junior only to (i) the Carve Out and (ii) the DIP Liens; and (b) a post-petition superpriority administrative expense claim (the "Pre-Petition Adequate Protection Claim") against the Debtors with recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent the Pre-Petition Adequate Protection Lien does not adequately protect against the diminution in value (if any) of the Pre-Petition Liens, which shall have priority in payment over any other indebtedness and obligations now in existence or incurred hereafter by the Debtors or their estates and over all other administrative expenses of any kind, subject and junior only to the Carve Out and the DIP Superpriority Claim.

31.     Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361.  What constitutes adequate protection must be decided on a case-by-case basis. *See Resolution Trust Corp. v. Swedeland Dev. Grp (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397 (10th Cir. 1987)); *Martin v. U.S. (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003).  The goal is to protect a secured creditor from diminution in the value of its interest in the collateral during the period of use.  *See Swedeland Dev. Grp., Inc.*, 16 F.3d at 564 ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." (internal citations omitted)).  As noted above, the Debtors propose to provide the DIP Lender with priming liens on the DIP Collateral.  Without access to the proposed DIP Financing and use of cash

20

collateral, the Debtors will have no liquidity and will be forced to cease operations immediately, destroying the value of their business to the detriment of all creditors and rendering impossible the consummation of a successful going concern sale.  *See* First Day Decl. ¶¶ 55, 99.  In contrast, the value of the Pre-Petition Lender's and Cardinal's interest in the collateral will be preserved, if not increased, by access to the DIP Facility to allow the Debtors to run a sale process and close on the sale of their business.  *See generally In re Pine Lake Village Apartment*, 19 B.R. 819, 826 (Bankr. S.D.N.Y 1982) (creditor had adequate protection where the debtor used cash collateral to maintain and preserve the value of the collateral).[6]

32.     The adequate protection offered to the Pre-Petition Lender and Cardinal will, taken together, sufficiently protect their interest in the DIP Collateral.  Consequently, the proposed adequate protection is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code.

### C.     The DIP Facility Was Negotiated in Good Faith and Should Be Afforded the Protection of Section 364(e) of the Bankruptcy Code

33.     Under section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of the debt incurred or priority of the lien granted as long as the entity that extended credit "extended such credit in good faith."  *See* 11 U.S.C. § 364(e).

---

[6] *See also* Hr'g Tr. 15–18, *In re Aeropostale, Inc.*, No. 16-11275 (CSS), (Bankr. S.D.N.Y. May 5, 2016) (Doc. No. 113) (finding that secured lenders were adequately protected where liquidity was anticipated to increase slightly, allowing the debtors to pursue a sale of their assets, as opposed to forcing an immediate liquidation); *In re Yellowstone Mtn. Club, LLC*, No. 08-61570-11, 2008 WL 5875547, at *9, *17 (Bankr. D. Mont. Dec. 17, 2008) (considering adequate protection in terms of "maintain[ing] the debtors' going concern value" and finding that a post-petition financing would provide a "net economic benefit" because it would be used to finance operation of the debtor's business rather than allowing it to "go dark" while it pursued a sale).

4925-5729-2365

34. Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).

35. *Here*, the terms of the DIP Facility were negotiated in good faith and at arm's length by separate representatives of, and counsel for, the Debtors and the DIP Lender, and reflect the most advantageous terms (including availability, pricing, and fees) available to the Debtors in light of their financial condition and need to move quickly in connection with the sale of substantially all of their assets. *See* First Day Decl. ¶¶ 97, 99. All of the DIP Obligations will be extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Term Sheet and in the Interim Order other than as set forth herein. Moreover, the DIP Facility has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. For these reasons, the DIP Lender is entitled to the full protection of section 364(e) of the Bankruptcy Code if the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**D.   Approval of the DIP Facility on an Interim Basis Is Necessary to Prevent Immediate and Irreparable Harm**

36. Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to incur post-petition debt and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

FED. R. BANKR. P. 4001(C)(2).

37.     Generally, courts find "immediate and irreparable harm" exists where loss of business threatens a debtor's ability to reorganize.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990).  Approval of a DIP Facility on an interim basis under Bankruptcy Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case.  *See In re Pan Am Corp.*, 1992 WL 154200, at *6 (S.D.N.Y. June 18, 1992).  There is no limit to the amount of funding that the court can approve on an interim basis.  *Id.*  After the fourteen-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business.  *Ames Dept. Stores*, 115 B.R. at 36.

38.     Immediate and irreparable harm would result if the relief requested is not granted on an interim basis.  First Day Decl. ¶¶ 99–100.  The Debtors need immediate access to the DIP Facility to fund ongoing operations and implement and ensure the success of the Debtors' sale efforts.  *Id.* ¶ 99.  Consequently, the requirements of Bankruptcy Rule 4001(c)(2) are satisfied because immediate access to the DIP Facility is necessary to avoid immediate and irreparable harm to the Debtors' estates.

### E.     Modification of the Automatic Stay Is Appropriate Under the Circumstances

39.     The proposed DIP Orders provide that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to the extent necessary to (i) permit the creation and perfection of the DIP Liens, and (ii) permit the DIP Lender to enforce its rights under the DIP Financing Documents in the event of an Event of Default, subject to five business days' written notice to counsel to the Debtors, any statutory committee appointed in these cases, and the U.S. Trustee.  Stay modifications of this kind are ordinary and standard features for post-petition financings, and in the Debtors' business judgment, are reasonable and fair under the circumstances.

23

F.      **Request for a Final Hearing**

40.     Under Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, no sooner than twenty-one days after the date of this Motion and no later than twenty-eight days after the date of this Motion, to hold a hearing to consider entry of the Final Order and the final approval of the relief requested in this Motion.  The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to the relief requested in this Motion and the Final Order, by first class mail on the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the Final Hearing under Bankruptcy Rule 4001(c)(2).

## DEBTORS SATISFY REQUIREMENTS OF BANKRUPTCY RULE 6003

41.     Pursuant to Local Rule 9013-1, the Debtors request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first twenty-one days after the Petition Date to the extent necessary to avoid immediate and irreparable harm.  The relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11.  Accordingly, the requirements of Bankruptcy Rule 6003 are satisfied.

## REQUEST FOR WAIVER OF STAY IMPOSED BY BANKRUPTCY RULE 6004

42.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  As described above, the relief requested in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay

4925-5729-2365

imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the exigent nature of the relief requested justifies immediate relief.

### RESERVATION OF RIGHTS

43.     Nothing contained in this Motion is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors; (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim; (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law; (iv) a waiver of the obligation of any party in interest to file a proof of claim; (v) an agreement or obligation to pay any claims; (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (vii) an admission as to the validity of any liens satisfied pursuant to this Motion; or (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief requested, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

### NOTICE

44.     Notice of this Motion will be served on the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Debtors' thirty largest unsecured creditors (on a consolidated basis); (c) the Internal Revenue Service; (d) the United States Attorney's Office for the Southern District of Texas; (e) the state attorneys general for all states in which the Debtors conduct business; (f) Glenn Agre Bergman & Fuentes LLP, as counsel to CS One, LLC; (g) Allen Stovall Neuman & Ashton LLP, as counsel to Cardinal Health 110, LLC and Cardinal Health 112, LLC; and (h) any party entitled to notice

pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(d).  Given the nature of the relief requested, no other or further notice need be given.

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors' entry into the DIP Facility and scheduling a Final Hearing, and (ii) grant such other and further relief as the Court deems just and proper.

*(Remainder of page intentionally left blank)*

4925-5729-2365

Dated: August 13, 2025            Respectfully submitted,
      Washington, DC

*/s/ Patrick J. Potter*
Patrick J. Potter (S.D. Tex. Fed. No. 3089812)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 Seventeenth Street, NW
Washington, DC 20036
Telephone:(202) 663-8928
Facsimile: (202) 663-8007
Email: patrick.potter@pillsburylaw.com

-and-

Dania Slim (S.D. Tex. Fed. No. 3049178)
Amy West (*pro hac vice* pending)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
Email: dania.slim@pillsburylaw.com
       amy.west@pillsburylaw.com

-and-

L. James Dickinson (Tex. Bar. No. 24105805)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
609 Main Street, Suite 2000
Houston, TX 77002
Telephone: (713) 276-7654
Facsimile: (713) 276-7373
Email: james.dickinson@pillsburylaw.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

4925-5729-2365

**<u>Exhibit A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Partners Pharmacy Services, LLC, *et al.*,[1] | Case No. 25-34698 |
| Debtors. | (Joint Administration Requested) |

**ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN
POST-PETITION FINANCING AND USE CASH COLLATERAL; (II) GRANTING
ADEQUATE PROTECTION; (III) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>") of the above-captioned debtors (the "<u>Debtors</u>") seeking, among other things:

(1)   authority pursuant to sections 363 and 364(c) and (d) of the Bankruptcy Code to obtain debtor-in-possession secured financing (the "<u>DIP Facility</u>") pursuant to the following terms and agreements (collectively, the "<u>DIP Facility Documents</u>"): (a) this Order, and any final order entered by the Court with respect to the Motion (the "<u>Final Order</u>") and (b) the *Partners Pharmacy Services, LLC Terms and Conditions of Proposed Senior Secured, Super-Priority Debtor-in-Possession Credit Facility*, attached hereto as <u>Exhibit 1</u>, as amended, modified, or supplemented (the "<u>DIP Term Sheet</u>"),[2] by and among the Debtors and CS One, LLC ("<u>CS One</u>" or the "<u>DIP Lender</u>");

(2)   the grant to the DIP Lender of superpriority administrative claim status pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code in accordance with the terms of this Order;

(3)   authorization for the Debtors use of cash collateral (as such term is defined in section 363(a)) whenever or wherever acquired, and the proceeds of all

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C. (4578); and Solutions Homecare, L.L.C. (1583).  The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion or the DIP Term Sheet.

4921-5081-3262

collateral pledged to the Pre-Petition Secured Parties (defined below), as contemplated by section 363 of the Bankruptcy Code in accordance with the terms set forth herein;

(4)     a grant of adequate protection to the Pre-Petition Secured Parties (defined below) in accordance with the terms set forth herein;

(5)     modification of the automatic stay to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 4001(a)(3) and 6004(h); and

(6)     a final hearing to consider entry of an order authorizing the DIP Facility and use of cash collateral on a final basis (the "Final Hearing").

The Court having considered the Motion, the exhibits attached thereto, the terms of the DIP Facility and the DIP Facility Documents, the *Declaration of Ronald M. Winters in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), and the evidence submitted at the hearing held before this Court on August 14, 2025 (the "Interim Hearing") to consider entry of this Order; and in accordance with the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and the Local Rules, due and proper notice of the Motion and the Interim Hearing having been given; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and essential for the continued operation of the Debtors' businesses; and any objections to the Motion and entry of this Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

4921-5081-3262

**BASED ON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND PURSUANT TO THE PAPERS FILED IN THESE CHAPTER 11 CASES, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[3]

A.      **Petition Date**.   On August 13, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[4]

B.      **Debtor in Possession**.  The Debtors are continuing to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

C.      **Jurisdiction and Venue**.  The Court has core jurisdiction over these chapter 11 cases, the Motion, and the parties and property affected by this Order pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      **Committee Formation**.  As of the date hereof, the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in this case pursuant to section 1102 (a "Statutory Committee").

E.      **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Order shall be required.

F.      **Cash Collateral**.  As used in this Order, the term "Cash Collateral" means all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes

---

[3]     To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052.

[4]     Unless otherwise noted, all statutory references are to the Bankruptcy Code.

4921-5081-3262

or will constitute "cash collateral" of any of the Pre-Petition Secured Parties (defined below) or the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code.

      G.    **Debtors' Stipulations Regarding Senior Pre-Petition Obligations**.  Subject to the limitations in Paragraph 27 of this Order, the Debtors admit, stipulate and agree that:

      (1)    *Pre-Petition Loan*.  The Debtors are party to (a) a Credit Agreement (as amended, restated, supplemented or modified, the "Pre-Petition Credit Agreement"), dated as of July 2, 2019, with CIT Bank, N.A., as administrative agent ("CIT"), certain lenders party thereto, and Care Solutions, LLC, as guarantor; (b) a Security Agreement, dated as of July 2, 2019, pursuant to which the Debtors pledged substantially all of their assets as collateral (the "Senior Pre-Petition Collateral") for their obligations under the Pre-Petition Credit Agreement; and (c) other documents, instruments, and agreements executed in connection with the Pre-Petition Credit Agreement (collectively, the documents described in the foregoing (a)–(c), the "Pre-Petition Loan Documents").

      (2)    *Assignment Agreement.*  Pursuant to that certain Omnibus Assignment and Assumption Agreement and Waiver (the "Assignment Agreement"), dated as of February 23, 2023, by and among First Citizens Bank & Trust Company, as successor administrative agent, CS One (in such capacity, the "Pre-Petition Lender") and the lenders under the Pre-Petition Credit Agreement as of the date immediately prior to the Assignment Agreement, CS One purchased all then outstanding obligations under the Pre-Petition Credit Agreement.

      (3)    *Senior Pre-Petition Obligations*.  As of the Petition Date, the Debtors were indebted to the Pre-Petition Lender, without defense, counterclaim, recoupment, or offset of any kind, in the approximate non-contingent liquidated amount of no less than

$44,524,814, plus fees, expenses, and other amounts arising in respect of the Pre-Petition Loan Documents obligations existing immediately prior to the Petition Date (such obligations, the "Senior Pre-Petition Obligations").

(4)    *Validity, Perfection and Priority of the Senior Pre-Petition Liens*. The Senior Pre-Petition Obligations are secured by valid, enforceable, properly perfected, first priority and unavoidable liens on and security interests (the "Senior Pre-Petition Liens") encumbering all or substantially all of the Debtors' assets existing immediately prior to the Petition Date.

(5)    *Validity of the Senior Pre-Petition Obligations*. The Senior Pre-Petition Obligations constitute valid, binding obligations of the Debtors, enforceable in accordance with their terms, and the Debtors will not assert any claims, counterclaims, setoffs, or defenses of any kind or nature, which in any way would affect the validity and enforceability of any of the Senior Pre-Petition Obligations or the Senior Pre-Petition Liens, or which would in any way reduce the obligation of the Debtors to pay in full all of the Senior Pre-Petition Obligations.

(6)    *No Claims or Causes of Action*. The Debtors have no claims, offsets, or other rights or causes of action against the Pre-Petition Lender that would in any manner impair, reduce or otherwise modify the Senior Pre-Petition Obligations or the validly perfected Senior Pre-Petition Liens.

H.    **Debtors' Stipulations Regarding Junior Pre-Petition Obligations**. Subject to the limitations in Paragraph 27 of this Order, the Debtors admit, stipulate and agree that (collectively, the stipulations in Paragraph G and Paragraph H of this Order, the "Stipulations"):

(1)     *Prime Vendor Agreement and Security Agreements*.  The Debtors are party to (a) a Prime Vendor Agreement with Cardinal Health 110, LLC ("Cardinal 110") and Cardinal Health 112, LLC (together with Cardinal 110, "Cardinal") dated as of December 1, 2019, as amended (the "Prime Vendor Agreement"), pursuant to which the Debtors agreed to purchase inventory and services from Cardinal on certain terms; and (b) Security Agreements dated as of (x) May 8, 2017 (as amended June 21, 2017, amended and restated December 14, 2022 and January 30, 2023), (y) December 14, 2022 (as amended and restated as of January 30, 2023), and (z) January 13, 2023 (as amended and restated January 30, 2023), pursuant to which the Debtors pledged substantially all of their assets as collateral (the "Junior Pre-Petition Collateral" and with the Senior Pre-Petition Collateral, the "Pre-Petition Collateral") for their obligations under the Prime Vendor Agreement.  Cardinal and the Pre-Petition Lender are hereinafter referred to collectively as the "Pre-Petition Secured Parties."

(2)     *Junior Pre-Petition Obligations*.  As of August 4, 2025, the Debtors were indebted to Cardinal, without defense, counterclaim, recoupment or offset of any kind, in the approximate non-contingent liquidated amount of no less than $20,443,593.14 (such obligations, the "Junior Pre-Petition Obligations").

(3)     *Validity, Perfection and Priority of the Junior Pre-Petition Liens*.  The Junior Pre-Petition Obligations were secured by valid, enforceable, properly perfected, junior liens on and security interests (the "Junior Pre-Petition Liens" and together with the Senior Pre-Petition Liens, the "Pre-Petition Liens") encumbering substantially all of the Debtors' assets existing immediately prior to the Petition Date.

4921-5081-3262

(4)     *Validity of the Junior Pre-Petition Obligations*. The Junior Pre-Petition Obligations constitute valid, binding obligations of the Debtors, enforceable in accordance with their terms, and the Debtors will not assert any claims, counterclaims, setoffs, or defenses of any kind or nature, which in any way would affect the validity and enforceability of any of the Junior Pre-Petition Obligations or the Junior Pre-Petition Liens, or which would in any way reduce the obligation of the Debtors to pay in full all of the Junior Pre-Petition Obligations.

I.     **Intercreditor Agreement**.  Pursuant to that certain Intercreditor Agreement (as amended, restated, supplemented or modified, the "Intercreditor Agreement"), dated as of July 2, 2019, by and among Cardinal 110 and CIT, as the then-administrative agent under the Pre-Petition Credit Agreement, Cardinal 110 agreed to, among other things, subordinate certain of the Junior Pre-Petition Liens in favor of Cardinal 110 to the Senior Pre-Petition Liens.

J.     **Immediate Need for Post-Petition Financing**.  The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Good cause has been shown for entry of this Order.  An immediate need exists for the Debtors to obtain funds and liquidity in order to continue operations, satisfy certain costs and expenses of administering these cases, and preserve and maximize the value of their estates.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and to maximize the return for all creditors requires the use of Cash Collateral and the availability of the DIP Facility. Without access to the DIP Facility and the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates would result.  Thus, the ability of the Debtors to preserve and maintain the value of

their assets and maximize the return for creditors requires the availability of working capital from the DIP Facility and the use of Cash Collateral.

K.     **No Credit Available on More Favorable Terms**.  The DIP Facility is the best and only source of debtor-in-possession financing available to the Debtors.  The Debtors have been unable to obtain: (i) unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or (ii) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code. The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claim (each as defined below) to the DIP Lender.

L.     **Use of Proceeds of the DIP Facility and the DIP Collateral**.  All proceeds of the DIP Collateral, including proceeds realized from a sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses payable pursuant to the DIP Facility Documents and authorized under this Order or the Final Order) shall be used and applied in accordance with the terms and conditions set forth in this Order and the Budget (subject to any approved variances) and the other DIP Facility Documents for the types of expenditures in the Budget and for no other purpose.

M.     **Business Judgment and Good Faith Pursuant to Section 364(e)**.  The DIP Lender has indicated a willingness to provide post-petition secured financing to the Debtors, but solely on the terms and conditions set forth in this Order and the DIP Facility Documents. Considering the lack of alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Facility represents the best financing presently available to the Debtors.  Based on the pleadings and record established at the Interim Hearing, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent

business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility and the use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Lender and the Pre-Petition Secured Parties, and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Lender have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, and in express and good faith reliance upon the protections offered by section 364(c) and 363(m) of the Bankruptcy Code and this Order.

N.     **Relief Essential; Best Interest**.  The relief requested in the Motion (and provided in this Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and property.  It is in the best interests of the Debtors' estates that the Debtors be allowed to enter into the DIP Facility and incur the DIP Obligations as contemplated herein.

O.     **Consent by Pre-Petition Secured Parties**.  The Pre-Petition Secured Parties have consented or are deemed to have consented to (i) the financing arrangements contemplated by this Order and the DIP Facility Documents and (ii) the use of Cash Collateral, on the terms and conditions set forth in this Order, and such consent is binding on the Pre-Petition Secured Parties.

P.     **Adequate Protection**.  The adequate protection provided to the Pre-Petition Secured Parties on account of the use of the Pre-Petition Secured Parties' Cash Collateral and any diminution in the value of such parties' respective interests in the Pre-Petition Collateral from and after the Petition Date, including resulting from the DIP Facility, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Pre-Petition Collateral in accordance with sections 361, 362 and 363 of the Bankruptcy Code.  The

4921-5081-3262

consent of the Pre-Petition Secured Parties to the use of Cash Collateral and the consent of the Pre-Petition Secured Parties to priming of their liens by the DIP Liens (i) does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Pre-Petition Secured Parties that their respective interests in the Pre-Petition Collateral are adequately protected pursuant to this Order or otherwise and (ii) is conditioned upon entry of this Order and does not and shall not be deemed to constitute consent other than pursuant to this Order and the terms set forth herein.  The adequate protection provided in this Order and other benefits and privileges contained in this Order are necessary (i) to protect the Pre-Petition Secured Parties from the diminution in value of their respective Pre-Petition Collateral, and (ii) to obtain the foregoing consents and agreements.  Nothing in this Order shall prevent the Pre-Petition Secured Parties from seeking additional adequate protection to the extent permitted by law.

Q.      **No Liability to Third Parties**.  The Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in accepting the Budget or any future Budget or in taking any other actions permitted by this Order or the DIP Facility Documents, none of the DIP Lender or the Pre-Petition Secured Parties shall be deemed to be in control of the Debtors' operations or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

R.      **Findings Regarding Corporate Authority**.  Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Facility Documents to which it is a party and to perform its obligations thereunder.

S.      **Immediate Entry**.  Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      **Motion Granted**.  The Motion is granted on an interim basis on the terms and conditions set forth in this Order and the DIP Facility Documents.  Any objections to the Motion with respect to entry of this Order, to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled.

2.      **Approval of DIP Facility Documents; Authority Thereunder**.  The Debtor is authorized, pursuant to sections 363 and 364, to enter into the DIP Facility and DIP Facility Documents, to execute such other and additional documents necessary or desired to implement the DIP Facility and DIP Facility Documents, to obtain post-petition secured financing from the DIP Lender, and to use the Pre-Petition Collateral, Cash Collateral, and the proceeds and products thereof, pursuant to the terms and conditions of the DIP Facility Documents and this Order to avoid immediate and irreparable harm to the Debtors' estates pending the Final Hearing.

3.      **Authorization to Borrow and Use Cash Collateral**.  Subject to the terms and conditions of this Order and the DIP Facility Documents, the Debtors are authorized to immediately borrow under the DIP Facility a maximum principal amount not to exceed $2.3 million.  The Debtors shall use the advances obtained under the DIP Facility and the DIP Collateral (including Cash Collateral) only for the purposes and in the amounts set forth in the DIP Term Sheet attached hereto as Exhibit 1 and the Budget attached hereto as Exhibit 2, subject to the terms and conditions set forth in the DIP Facility Documents. The DIP Lender shall have no obligation to make DIP Facility advances in excess of the amounts and times set forth in the Budget and DIP Facility Documents.

4921-5081-3262

4.      **Budget and Variances**.  With respect to the Budget:

(a)  the Debtors' actual cash receipts and cash disbursements from operations line items (other than Professional Fees) shall each be adhered to, by line item, on a weekly basis and a cumulative basis for the Budget period then ending, subject to the Budget Variances described below, provided, however, that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks;

(b) actual cash receipt and cash disbursement from operations line items (which do not include Professional Fees) shall not vary from the applicable Budget (including any amounts deemed to roll over from a previous week due to not being spent) by (i) more than ten percent (10%) by line item on a trailing three-week basis or (ii) more than ten percent (10%) on a cumulative basis (such variances, the "Budget Variances"); and

(c) subject to the Budget Variances, for all Professional Fees within the Budget, the Debtors shall not allow actual disbursements for each Professional Fee line item (and for the avoidance of doubt, each professional receiving Professional Fees shall be reflected on its own line item) to exceed the budgeted disbursements for such line item during the cumulative period from the Petition Date to the end of the period on the Budget attached as Exhibit 2.

5.      **Restriction on Use of Proceeds**.  No proceeds of the DIP Facility or Cash Collateral shall be used to (a) permit the Debtors or any other party-in-interest to challenge or institute any proceeding to determine (i) the validity, perfection, or priority of any security interests in favor of the DIP Lender or (ii) the enforceability of the Debtors' obligations under the DIP Facility Documents; (b) investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the DIP Lender or any of their agents, attorneys, advisors or

12

representatives, including claims or causes of action relating to lender liability or subordination claims; (c) investigate, commence, prosecute, or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations of the Debtors under the DIP Facility Documents; or (d) fund any acquisitions, capital expenditures, capital leases, or similar expenditures other than those specifically set forth in the Budget.

6.     **Superpriority Administrative Claim Status**.  Pursuant to sections 363 and 364(c) and (d), the DIP Facility funds advanced pursuant to the terms of this Order (collectively, the "Interim DIP Advances") shall be allowed administrative expenses of the Debtors' estates, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtors and over all administrative expenses or charges against property arising in the Debtors' chapter 11 cases and any superseding chapter 7 case including, without limitation, and to the extent authorized by the Bankruptcy Code, those specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114, subject and junior only to the Carve Out (defined below) (such claim, the "DIP Superpriority Claim").  The time of payment of the Interim DIP Advances shall not be altered, extended or impaired without the consent of the DIP Lender by any plan or plans of reorganization that may hereafter be accepted or confirmed or any further orders of the Court which hereafter may be entered.

7.     **DIP Fees and Expenses**.  The DIP Lender shall be entitled to reasonable fees and expenses incurred in connection with the negotiation and preparation of the DIP Term Sheet, the pleadings in connection with this Order and the Final Order, and any other legal fees incurred by

13

the DIP Lender in connection with these chapter 11 cases (excluding any legal fees and expenses incurred in connection with the Stalking Horse Asset Purchase Agreement).

8.     **DIP Liens**.  Pursuant to sections 363, 364(c), and 364(d), as security for the Interim DIP Advances and other post-petition costs payable under the DIP Facility Documents, the Debtors are hereby authorized to and are hereby deemed to grant to the DIP Lender a valid, binding and enforceable lien, mortgage and security interest (a "Lien," and as so granted to the DIP Lender, the "DIP Liens") in all of the Debtors' presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature whatsoever, whether real or personal, tangible or intangible, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, or tax refunds of the Debtor, wherever located, and the proceeds and products thereof (collectively, the "DIP Collateral"), excluding any causes of action that could be brought pursuant to sections 544, 545, 547, 548 of the Bankruptcy Code, or any applicable state fraudulent transfer, fraudulent conveyance or voidable transaction statutes (the "Avoidance Actions"), but, subject to entry of the Final Order granting such relief, including proceeds of and property received in respect of Avoidance Actions ("Avoidance Proceeds"); *provided*, however, that the DIP Lender shall use commercially reasonable efforts to first obtain recoveries from DIP Collateral other than Avoidance Proceeds.

9.     **Priority of DIP Liens**.  Pursuant to sections 364(c) and (d), the DIP Liens shall be first priority senior and priming liens on the DIP Collateral, subject and junior only to (a) the Carve Out and (b) valid, enforceable, properly perfected, and unavoidable pre-petition Liens (including any Liens that are perfected after the Petition Date that are afforded priority due to the express

14

relation back of the perfection of such lien to a date prior to the Petition Date as permitted by section 546(b)) that are senior to the Pre-Petition Liens ("Senior Third Party Liens"). The DIP Liens shall not be subject or subordinate to any Lien which is avoided and which would otherwise be preserved for the benefit of the Debtors' estates under section 551, and in no event shall any person or entity who pays (or causes to be paid) any of the obligations under the DIP Facility Documents be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of, or conferred upon, the DIP Lender by the terms of the DIP Facility Documents until such time as the obligations under the DIP Facility Documents and this Order are indefeasibly paid in full, in cash. The DIP Liens shall not be subject or subordinate to Liens arising after the Petition Date, other than Liens granted pursuant to this Order to the extent set forth in this Order.

10. **Use of Cash Collateral**. All rents, income, profits, cash in accounts and deposits derived from the Pre-Petition Collateral constitute Cash Collateral. Provided that each of the conditions set forth in this Paragraph are satisfied, the Debtors shall be authorized to use Cash Collateral only in accordance with the terms of the Budget, this Order, and the DIP Facility Documents. The satisfaction of each of the following conditions shall constitute a condition to the Debtors' authorization to use any Cash Collateral: (i) no Event of Default under (and as defined in the DIP Term Sheet) shall exist or be continuing; and (ii) the Termination Date (as defined in the DIP Term Sheet) shall not have occurred. If, on any date, any of such conditions is not satisfied, then the Debtors shall not be authorized to use any Cash Collateral unless and until such use is consented to by the DIP Lender in its reasonable discretion. Subject to entry of a Final Order granting such relief, absent further order of the Court, if the Termination Date occurs, then the Debtors shall remit to the DIP Lender, subject to payment of the Carve Out, any Cash Collateral

15

then in the Debtors' possession for application to the DIP Obligations in a manner selected by the DIP Lender in its sole discretion.

11. **Pre-Petition Lender's Adequate Protection**.  Until the indefeasible payment in full of the Senior Pre-Petition Obligations, the Pre-Petition Lender is entitled to adequate protection of its interest in the Senior Pre-Petition Collateral (including Cash Collateral) solely to the extent of the diminution in value of the Senior Pre-Petition Collateral as a result of (a) the provisions of this Order granting first priority and priming liens on the Senior Pre-Petition Collateral to the DIP Lender, (b) the Debtors' use of the Senior Pre-Petition Collateral (including Cash Collateral), (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or (d) otherwise, pursuant to sections 361(a), 363(c), and 364(d)(1) of the Bankruptcy Code. The Pre-Petition Lender is hereby granted, solely to the extent of diminution in value of the Senior Pre-Petition Liens in the Senior Pre-Petition Collateral from and after the Petition Date the following:

A.      a Lien in all DIP Collateral (the "Pre-Petition Loan Adequate Protection Lien") junior only to (i) the Carve Out, (ii) the DIP Liens, and (iii) Senior Third Party Liens; and

B.      a post-petition superpriority administrative expense claim (the "Pre-Petition Loan Adequate Protection Claim") against the Debtors with recourse to all pre-petition and post-petition property of the Debtors and all proceeds[5] thereof under sections 503 and 507 against the Debtors' estates to the extent the Pre-Petition Loan Adequate Protection Lien does not adequately protect against the diminution in value of the Senior Pre-Petition Liens, which shall have priority in payment over any other indebtedness and obligations now in

---

[5]      Recourse to Avoidance Proceeds shall be subject to entry of the Final Order.

existence or incurred hereafter by the Debtors or their estates and over all other administrative expenses of any kind, including, to the extent authorized by the Bankruptcy Code, those specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of these chapter 11 cases pursuant to section 1112 of the Bankruptcy Code, subject and junior only to the Carve Out and the DIP Superpriority Claim.

12.     **Cardinal's Adequate Protection**.  Until the indefeasible payment in full of the Junior Pre-Petition Obligations, Cardinal is entitled to adequate protection of its interest in the Junior Pre-Petition Collateral (including Cash Collateral) solely to the extent of the diminution in value (if any) of the Junior Pre-Petition Collateral as a result of (a) the provisions of this Order granting first priority and priming liens on the Junior Pre-Petition Collateral to the DIP Lender, (b) the Debtors' use of the Junior Pre-Petition Collateral (including Cash Collateral), (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or (d) otherwise, pursuant to sections 361(a), 363(c), and 364(d)(1) of the Bankruptcy Code.  Cardinal is hereby granted, solely to the extent of diminution in value (if any) of the Junior Pre-Petition Liens in the Junior Pre-Petition Collateral from and after the Petition Date the following:

A.      a Lien in all DIP Collateral (the "Cardinal Adequate Protection Lien" and with the Pre-Petition Loan Adequate Protection Claim, the "Pre-Petition Adequate Protection Liens") junior only to (i) the Carve Out, (ii) the DIP Liens, (iii) Senior Third Party Liens, and (iv) the Pre-Petition Loan Adequate Protection Lien; and

B.      a post-petition superpriority administrative expense claim (the "Cardinal Adequate Protection Claim" and with the Pre-Petition Loan Adequate Protection Claim,

17

the "Pre-Petition Adequate Protection Claims") against the Debtors with recourse to all

pre-petition and post-petition property of the Debtors and all proceeds[6] thereof under

sections 503 and 507 against the Debtors' estates to the extent the Cardinal Adequate

Protection Lien does not adequately protect against the diminution in value of the Junior

Pre-Petition Liens, which shall have priority in payment over any other indebtedness and

obligations now in existence or incurred hereafter by the Debtors or their estates and over

all other administrative expenses of any kind, including, to the extent authorized by the

Bankruptcy Code, those specified in sections 105, 326, 328, 330, 331, 503(b), 506(c)

(subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy

Code, or otherwise and including those resulting from the conversion of these chapter 11

cases pursuant to section 1112 of the Bankruptcy Code, subject and junior only to the Carve

Out, the DIP Superpriority Claim, and the Pre-Petition Loan Adequate Protection Claim.

13.     **No Waiver by Pre-Petition Secured Parties**.  Nothing herein shall be deemed to

be a waiver by any Pre-Petition Secured Party of its right to request additional or further protection

of its interests in any property of the Debtors, to move for relief from the automatic stay (if such

relief is required), to seek the appointment of a trustee or examiner or the dismissal of any of the

Debtors' bankruptcy case, or to request any other relief.

14.     **Modification of the Automatic Stay**.   The automatic stay provisions of

section 362 are hereby modified to permit (a) the Debtors and the DIP Lender to implement and

perform the DIP Facility and the DIP Facility Documents, and (b) the creation and perfection of

all Liens granted or permitted by this Order.  The Debtors and the holders of any DIP Liens or Pre-

Petition Adequate Protection Liens shall not be required to enter into any additional security

---

[6]     Recourse to Avoidance Proceeds shall be subject to entry of the Final Order.

18

agreements to create, memorialize, or perfect any such liens, or to file UCC financing statements, mortgages, or other instruments with any other filing authority or take any other action to perfect any such Liens, which shall be and are deemed valid, binding, enforceable and automatically perfected by the docket entry of this Order by the Clerk of the Court.  If, however, the holder of any DIP Liens or Pre-Petition Adequate Protection Liens in its sole and absolute discretion elects for any reason to enter into, file, record or serve any such financing statements or other documents with respect to any such Lien, then the Debtors shall execute same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time and on the date of the docket entry of this Order by the Clerk of the Court or at such other time as the applicable recording offices are authorized to deem the recording to have been made.  The DIP Lender is hereby relieved of any requirement to file a proof of claim in the Debtors' bankruptcy cases with respect to any such Liens and the claims secured thereby, but the DIP Lender may in its sole and absolute discretion file any such proof of claim.

15.  **Carve Out**.  The DIP Liens, DIP Superpriority Claims, Pre-Petition Adequate Protection Liens, and Pre-Petition Adequate Protection Claims shall be subject to right of payment of the following expenses (the following subparagraphs, collectively, the "Carve Out"):

A.  all fees required to be paid to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (collectively, the "Statutory Fees"), which Statutory Fees shall not be limited by any Budget;

B.  all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b);

C.  all unpaid post-petition fees and expenses of the professionals retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtors'

19

Professionals") and by a Statutory Committee (if any) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtors' Professionals, the "Chapter 11 Professionals"), but only to the extent that such fees and expenses are (i) incurred before or on the first Business Day after delivery by the DIP Lender of a notice of a Termination Event, (ii) within the cumulative amounts set forth in the Budget approved by the DIP Lender for such Chapter 11 Professional as of the date of the Termination Event, and (iii) allowed at any time by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code; and

D.      post-petition fees and expenses of (i) the Debtors' Professionals incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $250,000 to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code and (ii) the Committee Professionals incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $15,000, to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code;

provided, however, that in no event shall the Carve Out for each Chapter 11 Professional exceed the cumulative amounts for post-petition fees set forth for such Chapter 11 Professional in the Budget as of the applicable date of determination.  Any amounts paid from the DIP Collateral or the proceeds thereof, or funded by the DIP Lender with respect to the Carve Out prior to the entry of the Final Order shall be Interim DIP Advances and such obligations shall be secured by the DIP Liens.  As used in this Order, the term "Termination Event" shall mean the occurrence of the earlier

20

of: (i) an Event of Default under the DIP Facility; or (ii) the Debtors' failure to comply with the terms of the DIP Facility Documents (including their failure to comply with the Budget, subject to any approved variances).  Further, the payment of the fees or costs of any Professional or Statutory Committee (if any) shall be subject to court approval, and the DIP Lender reserves the right to object to any Chapter 11 Professional's application for payment.

16.     **Restriction on Use of Professional Fees and Carve Out**.  Neither the payment of any Chapter 11 Professional fees, nor the Carve Out shall include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:

A.     the initiation, joinder or prosecution of any action contesting the indebtedness owed to DIP Lender or the validity of the DIP Liens;

B.     preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by the DIP Lender of any of its rights and remedies under this Order, the Final Order, or the DIP Facility Documents;

C.     the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including any attempt to recover or avoid any claim or interest from the DIP Lender under Chapter 5 of the Bankruptcy Code;

D.     any request to borrow money other than pursuant to the terms of this Order, the Final Order, or the DIP Facility Documents;

21

E.      with respect to the Debtors, any of the Debtors' Professionals, or any of their successors or assigns (including any trustee, responsible officer, examiner, estates administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter to be released, waived or specified as not subject to challenge by the Debtors pursuant to this Order or the Final Order; or

F.      For any other purpose for which proceeds of the DIP Facility may not be used pursuant to the DIP Term Sheet.

17.      **Waiver of Section 506(c) Claims and Section 552**.  Subject to the entry of the Final Order granting such relief, effective as of the time of commencement of the Debtors' chapter 11 cases on the Petition Date:

A.      the Debtors waive irrevocably all claims and rights, if any, they or their estates might otherwise assert against the DIP Collateral pursuant to section 506(c), section 105(a), or any other applicable law;

B.      except from and pursuant to the terms of the Carve Out, no entity in the course of the Debtors' bankruptcy case shall be permitted to recover from the DIP Collateral (whether directly or through the grant of derivative or equitable standing in the name of the Debtors or the Debtors' estates) any cost or expense of preservation or disposition of the DIP Collateral, including expenses and charges as provided in section 506(c), section 105(a), or any other applicable law;

C.      except from and pursuant to the terms of the Carve Out, no entity shall be permitted to recover from the DIP Collateral, or assert against any DIP Lender, any claim

22

with respect to any unpaid administrative expense of the Debtors' bankruptcy case, whether or not the Debtors' payment of such administrative claim was contemplated by or included in the Budget; and

   D. the DIP Lender shall not be subject to the "equities of the case" exception of section 552(b), the equitable doctrine of "marshaling," or any similar claim or doctrine, with respect to any DIP Collateral.

  18. **Events of Default**.  So long as the DIP Obligations remain outstanding, unless consented to in writing by the DIP Lender, it shall be an Event of Default for the Debtors to seek entry of any further orders in their chapter 11 cases which authorize (a) under section 363, the use of Cash Collateral; (b) the obtaining of credit or the incurring of indebtedness pursuant to sections 364(c) or 364(d) that does not repay the DIP Facility in full, in cash; (c) the return of goods pursuant to section 546(h) to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to section 553 or otherwise; or (d) any other grant of rights against the Debtors or their estates that is secured by a Lien on the DIP Collateral or is entitled to superpriority administrative status that does not repay the DIP Facility in full, in cash.

  19. **Rights and Remedies Upon Event of Default**.  Upon the occurrence of: (i) an Event of Default (as such term is defined in the DIP Term Sheet); (ii) the Debtors' failure to comply with the terms of this Order or the Final Order (including their failure to comply with the Budget, subject to any approved variances); or (iii) the Debtors' failure to comply with any of the Milestones in the DIP Term Sheet, and the giving of written notice thereof by the DIP Lender to counsel to the Debtors, the Statutory Committee (if any), and the U.S. Trustee (which notice may be given by any manner of electronic transmission, the automatic stay being deemed lifted for such

purpose) (the "Default Notice"), then the DIP Lender shall be fully authorized, in its sole discretion to (i) cease making DIP Facility advances to the Debtors; (ii) terminate the Debtors' use of Cash Collateral pursuant to this Order and the Budget; and (iii) immediately terminate the DIP Facility and demand repayment of the DIP Obligations then outstanding.  Further, upon the occurrence of an Event of Default and transmission of a Default Notice or upon the Termination Date:

> A.     with respect to an Event of Default as to which a Default Notice has been given, the Debtors, the Statutory Committee (if any), and the U.S. Trustee shall have five (5) business days from the date of the Default Notice (the "Remedy Notice Period") to seek an emergency hearing with the Court on notice to the DIP Lender (a) enjoining or restraining the DIP Lender from taking action or exercising rights and remedies based upon the Event of Default specified in the Default Notice; or (b) challenging whether an Event of Default in the Default Notice has occurred or is continuing without cure (a "Restraint on Remedies"); *provided, however*, that if an emergency hearing is requested to be heard before the end of the Remedy Notice Period but is scheduled for a later date by the Court, then the Remedy Notice Period shall be automatically extended until the Court issues an order or other ruling with respect thereto.  During the Remedy Notice Period, including as extended pursuant to the immediately preceding sentence of this Order, the DIP Lender shall refrain from exercising its rights and remedies. Immediately upon expiration of the Remedy Notice Period unless a Restraint on Remedies has timely been obtained from the Court, or with respect to and upon the Maturity Date:

> > (1)     the DIP Lender shall have the right, free of the restrictions of section 362 or under any other section of the Bankruptcy Code or Bankruptcy Rules (including Bankruptcy Rule 4001(a)), to exercise contractual, legal and equitable

rights and remedies as to all or such part of the DIP Collateral as it shall elect, and to apply the Proceeds (defined below) of the DIP Collateral to the repayment of the DIP Obligations; and

> (2) subject to applicable law, the DIP Lender, should it so elect in its sole and absolute discretion as exercised by the filing of an appropriate statement with the Court, shall be deemed to have been granted by the Debtors "peaceful possession" of, and right of access to, all or any portion of the DIP Collateral.

20. **Financial Reporting**. The Debtors shall provide the DIP Lender with (i) all financial statements, certificates, and reports required pursuant to the DIP Term Sheet in accordance with the timeframes specified therein and (ii) such additional information as the DIP Lender shall request from the Debtors. The DIP Lender and its representatives shall have reasonable access during ordinary business hours and following reasonable advance notice to the Debtors' business premises and to the DIP Collateral in order to review and evaluate the physical condition of any of the DIP Collateral or to inspect the financial records and other records of the Debtors concerning the operation of the Debtors' business.

21. **Cash Management**. The Debtors' cash management system shall at all times be maintained in accordance with any order of this Court approving the maintenance of the Debtors' cash management system.

22. **Perfection in Cash**. Subject to the Carve Out, and subject to the remedies procedures outlined in Paragraph 19 of this Order, all financial institutions with which the Debtors maintain accounts containing any of the DIP Lender's Cash Collateral are authorized and directed to comply with any request of the DIP Lender to turn over to the DIP Lender all Cash Collateral therein without offset or deduction of any kind. The DIP Lender shall be entitled to all of the rights

and benefits of all deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which any of the Debtors may be a party, without the need to enter into any such agreements.  Notwithstanding and without limiting the foregoing, the Debtors are authorized to enter into, and cause the financial institutions servicing or maintaining the Debtors' deposit accounts (or other accounts) to enter into, such deposit account control agreements and other collateral agreements with the DIP Lender and such financial institutions as the DIP Lender may reasonably request.

23.    **Proceeds from the Disposition of DIP Collateral**.  The Debtors and any successors to the Debtors, including any successor trustee or trustees, shall assign or direct to the DIP Lender any and all Proceeds[7] realized in any Disposition of any DIP Collateral, and immediately deliver any and all such Proceeds which come into their possession to the DIP Lender in the form received; <u>provided, however</u>, that the foregoing shall be subject in all respects to (a) the Budget, (b) payment of the Carve Out, and (c) the priorities of the DIP Liens granted by this Order.  The foregoing is without prejudice to the rights of (a) the DIP Lender, the Statutory Committee (if any), or any other party to object to any proposed Disposition, (b) any third party with respect to the allocated Proceeds of any Disposition of Collateral encumbered by a Senior Third Party Lien, or (c) the rights of third parties set forth below with respect to a Challenge Action and the remedies that may result from a successful Challenge Action.

---

[7]    For purposes of this Order, (a) "Proceeds" shall mean both (i) proceeds (as defined in the Uniform Commercial Code of the State of New York) and (ii) any and all payments, proceeds or other consideration realized upon the sale, liquidation, realization, collection or other manner of disposition of the DIP Collateral, whether in the ordinary course of the Debtors' business (including accounts, receivables, and other proceeds arising from the Debtors' sales of goods or performance of services) or other than in the ordinary course of the Debtors' business, and (b) "Disposition" shall mean any sale, liquidation, realization, collection or other manner of disposition of DIP Collateral other than in the ordinary course of the Debtors' business, including without limitation any sale authorized pursuant to section 363.

4921-5081-3262

24. **Credit Bid Rights**.  In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code, the DIP Lender (as provided in and consistent with the DIP Facility Documents) shall have the right to credit bid the full amount of the DIP Obligations, in whole or in part, pursuant to section 363(k) of the Bankruptcy Code, in connection with any sale or disposition of assets of the Debtors, a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any debtor under section 725 of the Bankruptcy Code, and shall not be prohibited or limited from making any such credit bid "for cause" under section 363(k) or otherwise.

25. **Application of Proceeds**.  All Proceeds retained by the DIP Lender shall be applied to the repayment of the DIP Obligations, in a manner selected by the DIP Lender, until such obligations are paid in full; provided, however, that the foregoing shall be subject in all respects to the terms and the priorities of liens under this Order.  Such applications of Proceeds shall be free and clear of any claim, charge, assessment or other liability.

26. **Stipulations**.  Subject to the right to bring a Challenge Action as set forth in Paragraph 27 below, upon entry of this Order:

    A.    the Stipulations shall be binding upon the Debtors and all other persons, entities, and parties in all circumstances;

    B.    the validity, extent, priority, perfection, enforceability and non-avoidability of the Pre-Petition Secured Parties' validly perfected pre-petition claims and liens against the Debtors and the Pre-Petition Collateral shall not be subject to challenge by the Debtors or any other person, entity, or party; and

27

C.      neither the Debtors, nor any other person, entity, or party shall seek to avoid or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtors to or for the benefit of the Pre-Petition Lender prior to the Petition Date.

27.    **Investigation Rights**.  Notwithstanding any other provisions of this Order, any interested party (other than the Debtors or the Debtors' Professionals) in this case, including the Statutory Committee (if any), shall have until sixty (60) calendar days after entry of this Order (such period, the "Challenge Period"), to commence an adversary proceeding or contested matter against the Pre-Petition Lender or Cardinal (as applicable) for the purpose (collectively, a "Challenge Action") of:

A.      challenging the validity, extent, priority, perfection, enforceability and non-avoidability of the Pre-Petition Liens against the Debtors;

B.      seeking to avoid or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtors to or for the benefit of the Pre-Petition Lender or Cardinal prior to the Petition Date;

C.      seeking damages or equitable relief against the Pre-Petition Lender or Cardinal arising from or related to their pre-petition business and lending relationships with the Debtors, including equitable subordination, recharacterization, lender liability and deepening insolvency claims and causes of action; or

D.      challenging any other matter to be waived or released pursuant to this Order or any stipulations contained therein.

If a chapter 7 or chapter 11 trustee is appointed or elected during the Challenge Period, then such period with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period

28

and (ii) the date that is thirty (30) calendar days after the date on which such trustee is appointed or elected.  For the avoidance of doubt, any chapter 7 or chapter 11 trustee appointed or elected in these cases shall, until the expiration of the applicable Challenge Period, and thereafter for the duration of any Challenge Action commenced pursuant to this Paragraph (whether commenced by such trustee or by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such Challenge Action, be bound by the acknowledgements, admissions, confirmations and stipulations of the Debtors in this Order.

28.     **Binding Effect**.  All parties in interest, including the Statutory Committee (if any), that fail to act in accordance with the time periods set forth in the preceding Paragraph shall be, and hereby are, barred forever from commencing a Challenge Action and shall be bound by the waivers, Stipulations, and terms set forth in this Order.  Any Challenge Action filed shall prohibit application of this Paragraph only to the extent of the specific matters set forth in such Challenge Action on the date of filing.

29.     **Preservation of Defenses to Challenge Actions**.   The respective legal and equitable claims, counterclaims, defenses and rights of offset and setoff of the Pre-Petition Secured Parties in response to any Challenge Action are reserved, and the ability of a party to commence a Challenge Action shall in no event revive, renew or reinstate any applicable statute of limitations that may have expired before the date of commencement of such Challenge Action.

30.     **Distribution of 363 Sale Proceeds**.  Upon closing of the 363 Sale to a party other than the DIP Lender, the net proceeds of the 363 Sale, *less* amounts required to fund the Debtors' plan of liquidation and the wind down of the Debtors' estates (including the Carve Out), shall be paid directly to the DIP Lender and the Pre-Petition Lender for immediate application to the DIP Obligations and the Senior Pre-Petition Obligations, which application shall become indefeasible

with respect to the DIP Obligations and any Senior Pre-Petition Obligations that are not subject to a timely Challenge Action commenced before the expiration of the Challenge Period.

31.    **Limitation of Liability**.  In making decisions to advance any extensions of credit to the Debtors pursuant to the DIP Facility (including the exercise of its approval rights with respect to any budget), the DIP Lender shall have no liability to any third party and, subject to entry of a Final Order granting such relief, shall not be deemed to be in control of the operations of the Debtors or to be acting as a "control person," "responsible person" or other "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response Compensation and Liability Act, as amended, or any similar Federal or state statute) by virtue of providing the DIP Facility, and the DIP Lender's relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the DIP Lender and the Debtors.

32.    **Binding Effect of Order**.  This Order shall be binding upon and inure to the benefit of the DIP Lender, the Pre-Petition Lender, Cardinal, the Debtors, and their respective successors and assigns, including, without limitation, any trustee, responsible officer, examiner, estates administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code.

33.    **No Third-Party Rights**.  Except as set forth herein with respect to a Challenge Action and the Carve Out, no rights are created under this Order for the benefit of any creditor of the Debtors, any other party in interest in the Debtors' bankruptcy case, or any other persons or entities, or any direct, indirect or incidental beneficiaries thereof.

34.     **Effect of Dismissal of Chapter 11 Cases**.  Any order dismissing this chapter 11 case under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) the DIP Liens shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full, in cash and (b) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claim, the DIP Liens, the Pre-Petition Adequate Protection Liens, and the Pre-Petition Adequate Protection Claims.

35.     **Controlling Effect of this Order**.  To the extent that any of the provisions of this Order conflict with any provisions of the DIP Term Sheet, this Order shall control and supersede the conflicting provisions therein.

36.     **Waiver of Any Applicable Stay**.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Order.

37.     **Modifications to DIP Term Sheet**.  The Debtors and the DIP Lender may implement non-material modifications of the DIP Term Sheet without the need for notice or further approval of the Court, <u>provided, however</u>, that copies of such amendments will be provided to the U.S. Trustee and any Statutory Committee.  Any material modification of the DIP Term Sheet shall only be permitted upon notice and further order of the Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material amendment, modification, waiver, or supplement on an expedited basis.

38.     **Necessary Action**.  The Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents, and to pay all fees and expenses that may be required or necessary for the Debtors' performance under this Order or the DIP Facility

Documents, including (a) the execution of the DIP Facility Documents, (b) the payment of the fees and other expenses described herein or in the DIP Facility Documents as such become due, including, without limitation, agent fees, commitment fees, letter of credit fees, and facility fees.

39.    **Protection Under Section 346(e)**.  The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on terms and conditions to which the Debtors and the DIP Lender have agreed.  Thus, each of the terms and conditions constitutes a part of the authorization under sections 364 of the Bankruptcy Code, and is, therefore, subject to the protections in section 364(e) of the Bankruptcy Code, regardless of (i) any stay, modification, amendment, vacating, or reversal of this Order or the DIP Facility Documents or any term hereunder or thereunder, (ii) the failure to obtain a final order pursuant to Bankruptcy Rule 4001(c)(2), or (iii) the dismissal or conversion of this chapter 11 case.

40.    **Subsequent Final Order, Reversal or Modification**.  Nothing in this Order shall preclude the Court from entering a Final Order containing provisions inconsistent with or contrary to the provisions of this Order, _provided, however_, that the DIP Lender and the Pre-Petition Secured Parties shall be entitled to the benefits and protections of this Order, including (a) the adequate protection afforded to the Pre-Petition Secured Parties set forth in this Order, and (b) the protections afforded pursuant to section 364(e), with respect to all loans, advances, and other financial, accommodations made by them pursuant to this Order.  The DIP Liens, the priority afforded the Interim DIP Advances, and the adequate protection afforded to the Pre-Petition Secured Parties, as set forth in this Order, shall be binding on the Debtors and any successor trustee or trustees even if this Order is reversed or modified on appeal with respect to all loans, advances, and other financial accommodations made by them pursuant to this Order.  Except as provided

4921-5081-3262

herein, no Proceeds, Cash Collateral or Carve Out may be used by any party in interest seeking to modify any of the rights granted to the DIP Lender hereunder or in the DIP Facility Documents.

41.     **Professional Fee Escrow**.  The Debtors are directed to open a new bank account that shall function as a segregated account held in trust for and exclusively available for the payment of fees and expenses of Chapter 11 Professionals pursuant to this Order (the "Professional Fees Escrow Account") in the amount equal to, but not to exceed, the professional fees budgeted for professionals retained by the Debtor and a Statutory Committee, if any (the "Budgeted Professional Expenses").  The Debtors are directed to fund the Professional Fees Escrow Account on a weekly basis in an amount up to, but not to exceed, the Budgeted Professional Expenses for that week.  Such funds shall be held in an identifiable segregated account for the benefit of the Professionals to be applied to the professional fees of the Chapter 11 Professionals that are approved for payment pursuant to one or more orders of this Court.  Any professional fees payable to the Chapter 11 Professionals shall be paid first out of the Professional Fees Escrow Account.  Any excess amounts in the Professional Fees Escrow Account after payment of such professional fees shall be subject in all respects to the DIP Liens.  The funds in the Professional Fees Escrow Account shall remain DIP Collateral (subject to the Carve Out) unless and until such funds are paid to the Chapter 11 Professionals.

42.     **Final Hearing**.  The Final Hearing on the Motion shall be held on September __ 2025, at __:__ _.m., Central Time.  The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing) to the parties served with notice of the Interim Hearing and to any other party that has filed a Rule 2002 request for service.  Any objections or responses to entry of a final order on the Motion shall be filed with the Court, and served so as to be **received** by the following parties, **by no later than 4:00 p.m., Central Time, on September 3,**

**2025**: (a) proposed counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 1200 Seventeenth Street, NW, Washington, DC 20036 (Attn: Patrick J. Potter (patrick.potter@pillsburylaw.com)), Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, NY 10019 (Attn: Dania Slim (dania.slim@pillsburylaw.com), Amy West (amy.west@pillsburylaw.com)), and Pillsbury Winthrop Shaw Pittman LLP, 609 Main Street, Suite 2000, Houston, TX 77002 (Attn: L. James Dickinson (james.dickinson@pillsburylaw.com)); (b) the Office of the United States Trustee, 515 Rusk Street, Suite 3516, Houston, TX 77002; (c) counsel for any Statutory Committee; (d) counsel for the DIP Lender and the Pre-Petition Lender, Glenn Agre Bergman & Fuentes, 1185 Avenue of the Americas, 22nd Floor, New York, NY 10036 (Attn: Andrew Glenn (aglenn@glennagre.com) and Malak Doss (mdoss@glennagre.com)); and (e) counsel for Cardinal, Allen Stovall Neuman & Ashton LLP, 10 W. Broad Street, Suite 2400, Columbus, OH 43215 (Attn: Richard K. Stovall (stovall@asnalaw.com)).

## **Exhibit 1**

**DIP Term Sheet**

**Partners Pharmacy Services, LLC**
**Terms and Conditions of**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Credit Facility**

*The terms outlined below in these Terms and Conditions (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession credit facility (hereinafter referred to as the "**DIP Facility**") to be made available to the Debtors (as defined below). This DIP Term Sheet, the Interim Order (as defined below), and the Final Order (as defined below) shall collectively constitute the exclusive and definitive documentation and agreement among the parties for the DIP Facility (the "**DIP Financing Documents**").*

| | |
|---|---|
| **Borrowers:** | Arrow Envoy Holdings, LLC; Arrow Pharmacy Holdings, LLC; Partners of Connecticut, LLC; Partners of Massachusetts, LLC; Partners of New York, LLC; Partners of Pennsylvania, LLC; Partners Pharmacy of Florida, LLC; Partners Pharmacy of Maryland, LLC; Partners Pharmacy of Texas, LLC; Partners Pharmacy of Virginia, LLC; Partners Pharmacy Services, LLC; Partners Pharmacy Shell Point, LLC; Partners Pharmacy, L.L.C.; and Solutions Homecare, L.L.C. (collectively, the "**Debtors**"), who shall all have simultaneously filed the Chapter 11 Case (as defined below) in the Bankruptcy Court (as defined below). |
| **Amount and Type of Facility:** | After entry of the Interim Order (as defined below), the DIP Facility will consist of a consolidated, delayed, multi-draw term loan to the Debtors on a joint and several basis in the aggregate maximum principal amount not to exceed $6.5 million, (the "**DIP Loan Commitment**"). |
| **DIP Lender:** | CS One, LLC (the "**DIP Lender**"). |
| **Borrowing Availability:** | So long as the Termination Date has not occurred, advances will be made available under the DIP Facility but shall be limited in all respects by the Budget and the Draw Schedule.<br><br>Within this term sheet, the "**Draw Schedule**" shall mean:<br><br>from the Petition Date through September 12, 2025 a maximum principal amount not to exceed $2.3 million, with the remainder of the DIP Loan Commitment available after entry of the Final Order, subject to all of the terms and conditions herein.<br><br>The Draw Schedule may be modified and amended from |

|                        |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                       |
|------------------------|---|
|                        | time to time only with the consent of the DIP Lender and the Debtors. |
| **Budget and Variances:** | Subject to the Budget Variances (as defined below) (i) the Debtors' Budget line items for cash receipts and cash disbursements (excluding fees and expenses of third party professionals engaged by or for the benefit of Debtors and, if appointed, the Committee (collectively, "**Professional Fees**")) shall each be adhered to, by line item, on a weekly basis and a cumulative basis for the Budget (as defined below) period then ending as described below, provided, however, that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks and (ii) the Debtors' disbursements for Professional Fees (which shall be reported in a manner so that Professional Fees for each retained professional shall be reflected on its own line item) shall be adhered to on a cumulative basis for that portion of the Budget period then ending. |
|                        | Actual amounts for each cash receipt and cash disbursement from operations line items (which shall not include any Professional Fees) shall not vary from the applicable Budget (including any amounts deemed to roll over from a previous week due to not being spent) by (i) more than ten percent (10%) by line item on a trailing three-week basis; or (ii) ten percent (10%) on a cumulative basis (collectively, the "**Budget Variances**"). |
|                        | On or before the third Business Day (as defined below) of each week, commencing with the first week following the Petition Date, the Debtors shall deliver to the DIP Lender a Budget Variance Report. |
| **Professional Fee Escrow:** | The Debtors shall, on the dates set forth in the Budget, establish and fund an escrow account with cash equal to the sum of the Debtors' Budget line items for Professional Fees (such account, the "**Professional Fee Escrow Account**"). For the avoidance of doubt, (i) the Professional Fees of each Chapter 11 Professional remain subject to approval by the Bankruptcy Court on appropriate notice and hearing to all parties-in-interest and (ii) the amount funded into the Professional Fee Escrow Account shall not limit the amount of fees and expenses that are the subject of a Chapter 11 Professional's request for payment with the Bankruptcy Court. |

**Termination Date:** The earliest to occur of: (a) the Maturity Date (as defined below); (b) thirty (30) days after the Petition Date (as defined below) if the Final Order has not been entered; (c) the DIP Lender's written notice to Debtors' counsel of the acceleration of the obligations under the DIP Facility as a result of an Event of Default (as defined below); (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and is otherwise acceptable to the DIP Lender in its commercially reasonable discretion; (e) the date which is the closing date of any sale of all or substantially all of the Debtors' assets; (f) the entry of an order by the Bankruptcy Court (as defined below) (i) granting relief from the automatic stay permitting foreclosure of any assets of the Debtors with a value in excess of $100,000 in the aggregate, (ii) granting any motion by the DIP Lender to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) appointing a trustee or an examiner with special powers, or (iv) dismissing or converting the Chapter 11 Case; (g) the filing or support by the Debtors of a plan of reorganization or liquidation that (i) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and (ii) is not otherwise acceptable to the DIP Lender in its commercially reasonable discretion; (h) other than with respect to the Carve Out (as defined below), the entry of an order by the Bankruptcy Court granting liens or claims that are senior or *pari passu* to the liens securing the DIP Facility; (i) the date a Termination Event occurs, and (j) any of the Milestones do not occur on or prior to its Milestone Date. The date on which the earliest of clauses (a) through (j) above occurs and the DIP Lender provides notice thereof to the Debtors being referred to hereinafter as the "**Termination Date**." On the Termination Date, the DIP Facility shall be deemed terminated, and the DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility or the DIP Financing Documents, except for funding of the Carve Out.

**Non-Default Interest Rate:** Interest on all outstanding advances under the DIP Facility shall accrue from and after the Petition Date at a fixed rate per annum equal to twelve percent (12%) and will be payable in kind.

4926-1988-6411

| | |
|---|---|
| **Default Interest Rate:** | Effective immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Lender, interest on the outstanding loans under the DIP Facility shall accrue at a fixed rate per annum equal to fifteen percent (15%). |
| **Loan Payments:** | The Debtors promise and agree to pay to the DIP Lender all DIP Facility advances, together with interest thereon accruing pursuant to the DIP Financing Documents, in full, in cash, at the times set forth in the DIP Financing Documents, but no later than the Termination Date. |
| | All unpaid principal, interest, fees, costs and expenses on the DIP Facility shall be due and payable in full by the Debtors on the Termination Date, whether at maturity, upon acceleration or otherwise and if such amounts are not paid in full in cash, interest, fees, costs, and expenses in respect of the DIP Facility shall continue to accrue until paid in full. |
| **Use of Proceeds:** | Proceeds of the DIP Facility shall be used solely for the following purposes (solely to the extent identified and limited in the Budget, subject to the Budget Variances as permitted hereunder): (a) to fund, after application of all other available cash, ordinary course post-petition operating expenses and working capital needs of the Debtors; (b) to fund Bankruptcy Court approved fees and expenses incurred in connection with the 363 Sale (as defined below); (c) to pay Bankruptcy Court approved pre-petition claims as approved by the DIP Lender in its commercially reasonable discretion; (d) to pay Bankruptcy Court approved Professional Fees provided for in the Budget, including the funding of the Carve Out; and (e) to pay other ordinary course costs and expenses of administration of the Chapter 11 Case which do not require Bankruptcy Court approval. |
| **Cash Management Collections and Remittances:** | The Debtors shall use a cash management system that is the same as or substantially similar to their pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to the DIP Lender in its commercially reasonable discretion. The Interim Order and Final Order shall provide the DIP Lender with a valid and enforceable first priority senior secured |

4

|                                          | priming lien and security interest (subject and subordinate to the Carve Out) on the cash held in the Debtors' bank accounts. |
|------------------------------------------|---|

**Super-Priority Administrative Claim:**    In accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), amounts owed by the Debtors to the DIP Lender pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, subject and subordinate to the Carve Out, a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113, or 1114 of the Bankruptcy Code (the "**DIP Superpriority Administrative Claim**").

**Collateral Security:**    Subject and subordinate to the Carve Out, the DIP Facility (including accrued interest, fees, costs and expenses) shall be secured by valid and perfected first priority senior secured and priming liens and security interests in favor of the DIP Lender superior to all other liens, claims or security interests that any party in interest or any creditor of the Debtors' may have (the "**DIP Liens**") in all of the Debtors' pre-petition and post-petition property and assets and all proceeds thereof, including, without limitation, all of the Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtors, excluding only Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds (collectively, the "**DIP Collateral**").

**Lien Validation and Perfection:**    The DIP Liens granted on the DIP Collateral pursuant to the Interim Order or the Final Order approving the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.

**DIP Lender Fees and Expenses:**    The DIP Lender shall be entitled to legal fees and expenses incurred by the DIP Lender in connection with the negotiation and preparation of this DIP Term Sheet, the

pleadings in connection with the Interim Order and the Final Order, and any other legal fees incurred by the DIP Lender in connection with the Chapter 11 Case (excluding any legal fees and expenses incurred in connection with the Stalking Horse Asset Purchase Agreement).

**Conditions Precedent to Initial DIP Facility Advance:**

The funding of the initial DIP Facility advance (not to exceed an aggregate principal amount of $2.3 million absent entry of the Final Order) shall be subject to the following conditions precedent: (a) a Termination Date not having occurred, (b) no Event of Default having occurred (or event that would constitute an Event of Default with the giving of notice or lapse of time), (c) approval of the Budget by the DIP Lender in its commercially reasonable discretion, (d) entry of an Interim Order approving the DIP Facility, the DIP Superpriority Administrative Claim (subject and subordinate to the Carve Out), the DIP Liens granted on the DIP Collateral (subject and subordinate to the Carve Out), and containing such other orders and findings as the DIP Lender may require, including automatic modification of the automatic stay upon the occurrence of an Event of Default enabling the DIP Lender to exercise all rights and remedies against the DIP Collateral without further order of the Bankruptcy Court, which Interim Order shall not have been modified or amended without the DIP Lender's approval, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to the DIP Lender in its commercially reasonable discretion, (e) the DIP Lender's approval of all material motions and orders filed in the Chapter 11 Case requiring the expenditure of cash, and (f) continuation of the Debtors' present cash management system.

**Additional Conditions to Each Borrowing Under the DIP Facility:**

The funding of each additional DIP Facility advance shall be subject to the following conditions precedent: (a) a Termination Date not having occurred, (b) no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) having occurred under any of the DIP Financing Documents, and the representations and warranties therein shall be true and correct in all material respects when made; (c) no material adverse change in the Debtors' operations (financial, environmental, or otherwise), performance, or properties (other than as a result of the commencement of the Chapter 11 Case), since the date of this DIP Term Sheet,

6

that has or could be expected to have a Material Adverse Effect on the rights and remedies of the DIP Lender or on the ability of the Debtors to perform their obligations under the DIP Facility; (d) entry of the Interim Order and the Final Order (as applicable); and (e) the DIP Financing Documents and the Interim and Final Orders shall include such waivers, indemnities, and other provisions as are acceptable to the DIP Lender in its commercially reasonable discretion.

**Affirmative and Negative Covenants:**

The Debtors shall comply with the following affirmative and negative covenants: (a) compliance with Budget covenants consistent with the section titled "Budget and Variances," (b) the Debtors shall, from and after the Petition Date, satisfy the Milestones; (c) the Debtors shall, contemporaneously with closing a sale of substantially all of their assets to a party other than the DIP Lender, remit the portion of the proceeds of such sale to the DIP Lender for immediate application to the obligations owed to the DIP Lender, subject to payment of the Carve Out and other amounts set forth in the Budget; and (d) the Debtors shall not take (or refrain from taking) any action that could reasonably be expected to have a Material Adverse Effect.

**Bankruptcy Court Filings:**

As soon as practicable in advance of filing with the Bankruptcy Court, the Debtors shall furnish to the DIP Lender (i) the motion seeking approval of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance satisfactory to the DIP Lender and the Debtors, (ii) the motions seeking approval of the bidding procedures and the 363 Sale, and the proposed forms of the orders related thereto, which shall be in form and substance satisfactory to the DIP Lender and the Debtors, (iii) all other proposed orders and pleadings related to the DIP Facility and the 363 Sale, which orders and pleadings shall be in form and substance satisfactory to the DIP Lender and the Debtors, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which shall be in form and substance satisfactory to the DIP Lender and the Debtors, (v) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods in Section 1121 of the Bankruptcy Code, (vi) any motion seeking approval of any sale of the Debtors' assets and any proposed form of a

7

related bidding procedures order and sale order (other than those with respect to the bidding procedures and the 363 Sale), and (vii) any other motion filed seeking approval of any matter requiring material expenditures of the DIP Collateral must comply with the Budget (each of which must be in form and substance satisfactory to the DIP Lender and the Debtors).

**Sale Process:**   The Debtors shall conduct a sale process for the sale of substantially all of their assets in accordance with the Milestones defined below.

<u>Milestones</u>. The Debtors shall be required to comply with the following (the "**Milestones**") on or prior to the respective date set forth below for each of the Milestones (each such date, the "**Milestone Date**"):

(a)     On or within two (2) days of the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Debtors shall file a motion, in form and substance acceptable to the DIP Lender, requesting entry of the Sale Procedure Order (as defined below) and seeking approval of the sale in accordance with the Stalking Horse Asset Purchase Agreement to the Stalking Horse Bidder, or such higher bidder as may be identified through the procedures approved in the Sale Procedure Order as the Winning Bidder;

(b)     On or before the date that is thirty (30) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have entered the Sale Procedure Order;

(c)     On or before the date that is sixty (60) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, all competing binding bids under the Sale Procedure Order shall have been submitted;

(d)     On or before the date that is seventy (70) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, an auction under the Sale Procedure Order shall have occurred (if necessary);

8

(e)      On or before the date that is eighty (80) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have conducted a hearing to approve the 363 Sale to the Winning Bidder (as defined below);

(f)      On or before the date that is eighty (80) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale; and

(g)      On or before the date that is ten (10) days after entry of the Sale Order, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the 363 Sale shall close.

Notwithstanding anything to the contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension.

The DIP Lender shall have the right to "credit bid" in any sale of the Debtors' assets up to the aggregate amount due to the DIP Lender under the DIP Facility.

**Remedies:**      Following the Termination Date and provided that the Bankruptcy Court does not enter any order to the contrary, within five (5) Business Days following the Debtors' receipt of a notice of the occurrence of a Termination Event, the DIP Lender shall have all customary remedies, including the right to foreclose or otherwise realize on all of the DIP Collateral, the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court. Consistent with the foregoing sentence, relief from the Bankruptcy Code's automatic stay in favor of the DIP Lender shall be embodied in any order approving the DIP Facility.

**Events of Default:**      The term "**Default**" and "**Event of Default**" shall mean the

occurrence of any of the following:

- Any of the Milestones does not occur on or prior to its Milestone Date.

- The Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed which the Debtors fail to timely oppose.

- Filing or support of a proposed plan of reorganization by the Debtors that does not provide for the indefeasible payment in full and in cash of the Debtors' obligations outstanding under the DIP Facility, unless otherwise agreed in writing by the DIP Lender in its commercially reasonable discretion.

- Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible repayment in full, in cash of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by the DIP Lender in its commercially reasonable discretion.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the DIP Lender, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of the DIP Lender, or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order, or Final Order, without the prior written consent of the DIP Lender or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Any attempt by the Debtors to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or

10

judgment is to, invalidate, reduce or otherwise impair the DIP Facility obligations or the DIP Liens granted on the DIP Collateral.

- The Debtors shall request approval of any post-petition financing, other than the DIP Facility, that would not immediately repay all DIP Facility obligations, in full, in cash, on the date of the closing of such post-petition financing.

- The Debtors shall apply for an order substituting any assets (other than cash) for all or any portion of the DIP Collateral.

- Other than with respect to the Carve Out, entry of an order granting liens or claims that are senior or *pari passu* to the DIP Liens granted on the DIP Collateral.

- The Debtors shall assert that any of the DIP Liens are invalid, or any DIP Liens granted to the DIP Lender shall be determined to be invalid.

- A final order is entered granting any secured creditor (other than the DIP Lender) with a claim in excess of $100,000 relief from the automatic stay.

- Failure to make any payments under the DIP Facility when due.

- Failure to pay any post-petition material indebtedness when due (and after giving effect to any applicable grace period).

- Debtors' failure to comply with the terms of the DIP Financing Documents (including their failure to comply with the Budget, subject to the Budget Variances and any other approved variances).

- Breach of any covenant set forth in any DIP Financing Document.

- Exclusivity shall have been terminated by the Debtors or the Debtors shall have agreed to any such termination.

- After entry thereof, either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal, shall have been modified or amended without the prior written consent of the DIP Lender.

- The commencement of an action or filing of a motion

by the Debtors challenging the rights and remedies of the DIP Lender under the DIP Financing Documents or that is otherwise inconsistent with the DIP Financing Documents.

**Indemnification:** The Debtors shall indemnify and hold the DIP Lender and its officers, directors, employees and formally engaged agents (including all of their professionals) (each an "**Indemnified Party**") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, fraud or willful misconduct.

**Governing Law:** The DIP Financing Documents shall be governed by the laws of the State of New York, subject to applicable federal bankruptcy laws.

**Other Definitions:** "**363 Sale**" means the sale of all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code.

"**Auction**" means an auction held in connection with the 363 Sale and in accordance with the terms of the Sale Procedure Order.

"**Avoidance Actions**" means any claims or causes of action that could be brought under Section 5 or Section 724(a) of the Bankruptcy Code or any applicable state fraudulent transfer or similar statute.

"**Avoidance Proceeds**" means the proceeds received from, or property recovered in respect of, Avoidance Actions.

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. §§ 101–1532), as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas presiding over the Chapter 11 Case.

"**Budget**" means a budget for the Debtors' operations during the Chapter 11 Case for any fiscal period, as delivered to the DIP Lender in form and substance satisfactory to the DIP Lender.  A Budget for the first 13 weeks of the Chapter 11 Case must be approved by the DIP Lender and must be attached to the Interim Order.  A Budget covering the period from the date of entry of the Final Order through the Maturity Date must be delivered by the Debtors to the DIP Lender (and approved by the DIP Lender in its commercially reasonable discretion) at least two (2) Business Days before any hearing related to final approval of the DIP Facility and must be attached to the Final Order.

"**Budget Variance Report**" means a current report that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Budget (on a weekly and cumulative basis), (ii) compares such actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Budget for such period, and (iii) provides an explanation for all variances between budgeted and actual amounts.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York, or is a day on which banking institutions located in the State of New York are required or authorized by law or other governmental action to close.

"**Carve Out**" means the sum of:

(a)      all fees required to be paid to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate;

(b)      all reasonable fees and expenses up to $10,000 incurred by a trustee under Section 726(b) of the

13

4926-1988-6411

Bankruptcy Code;

(c)        all unpaid post-petition fees and expenses of the professionals retained by the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and by the Committee (if any) pursuant to Sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Chapter 11 Professionals**"), but only to the extent that such fees and expenses are (i) incurred before or on the first Business Day after delivery by the DIP Lender of a notice of the occurrence of a Termination Event, (ii) within the cumulative amounts set forth in the Budget approved by the DIP Lender for such Chapter 11 Professional as of the date of the Termination Event, and (iii) allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code; and

(d)        post-petition fees and expenses of (i) the Debtor Professionals incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $250,000 to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code and (ii) the Committee Professionals (if any) incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $15,000, to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code.

The Carve Out shall not include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:

(i) the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to the DIP Lender or the validity of any liens granted to the DIP Lender;

(ii) preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by the DIP Lender of any of its

14

rights and remedies under the DIP Financing Documents;

(iii) the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Lender or any of its officers, directors, employees, agents, attorneys, affiliates, successors or assigns;

(iv) any request to borrow money other than pursuant to the terms of the DIP Financing Documents;

(v) with respect to the Debtors, any of the Debtor Professionals, or any of their successors or assigns (including any trustee, responsible officer, examiner, estate administrator or representative or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter released or to be released, waived, or to be waived, or specified as not subject to challenge by the Debtors pursuant to the Interim Order or Final Order; or

(vi) for any other purpose for which proceeds of the DIP Facility may not be used pursuant to this DIP Term Sheet.

"**Chapter 11 Case**" means collectively, the jointly administered voluntary Chapter 11 cases commenced simultaneously by the Debtors in the Bankruptcy Court.

"**Committee**" means any statutory committee appointed in the Chapter 11 Case.

"**Final Order**" means a final, non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, on terms satisfactory to the DIP Lender in its commercially reasonable discretion.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing the Debtors, among other things, to obtain interim financing and incur post-petition indebtedness on terms satisfactory to the DIP Lender in its commercially reasonable discretion.

"**Material Adverse Effect**" means (a) a material adverse

15

change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or financial condition of the Debtors, (b) a material impairment of the rights and remedies of the DIP Lender under the DIP Financing Documents, (c) a material impairment of the DIP Collateral, (d) a material adverse effect on the Debtors' ability to perform any of its obligations under the DIP Financing Documents, or (e) a material adverse effect upon the legality, validity, binding effect, or enforceability against the Debtors of any of the DIP Financing Documents.

"**Maturity Date**" means the date that is one hundred thirty (130) days after the Petition Date, or such later date to which the DIP Lender consents in writing.

"**Petition Date**" means the date on which the Chapter 11 Case is filed with the Bankruptcy Court.

"**Sale Order**" means the order entered by the Bankruptcy Court that is either (i) in form and substance satisfactory to the DIP Lender and the Debtors or (ii) that pays in full the DIP Facility obligations, and that, among other things, approves the 363 Sale, the results of the Auction (if applicable) and the Winning Bidder's bid.

"**Sale Procedure Order**" means an order in form and substance satisfactory to the DIP Lender approving the bidding procedures for the 363 Sale.

"**Stalking Horse Asset Purchase Agreement**" means an asset purchase agreement by and among the Debtors and the Stalking Horse Bidder that provides for the purchase and sale of substantially all of the assets of the Debtors.

"**Stalking Horse Bidder**" shall mean CS One, LLC or its designee.

"**Termination Event**" means the occurrence of the earlier of:

(i) an Event of Default under the DIP Facility; or

(ii) the Debtors' failure to comply with the terms of the DIP Financing Documents (including their failure to comply with the Budget, subject to the Budget Variances and any

16

other approved variances).

"**Winning Bidder**" means the bidder that agrees (at the Auction if applicable) to purchase all or substantially all of the Debtors' assets.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**BORROWERS:**

**PARTNERS OF CONNECTICUT, LLC**

By: _Ronald M. Winters_

Name: Ronald M. Winters
Title:  Chief Restructuring Officer

**PARTNERS OF MASSACHUSETTS, LLC**

By: _Ronald M. Winters_

Name: Ronald M. Winters
Title:  Chief Restructuring Officer

**PARTNERS OF NEW YORK, LLC**

By: _Ronald M. Winters_

Name: Ronald M. Winters
Title:  Chief Restructuring Officer

**PARTNERS OF PENNSYLVANIA, LLC**

By: _Ronald M. Winters_

Name: Ronald M. Winters
Title:  Chief Restructuring Officer

**PARTNERS PHARMACY OF FLORIDA, LLC**

By: _Ronald M. Winters_

Name: Ronald M. Winters
Title:  Chief Restructuring Officer

**PARTNERS PHARMACY OF MARYLAND, LLC**

By: _Ronald M. Winters_

Name: Ronald M. Winters
Title:  Chief Restructuring Officer

4926-1988-6411

**PARTNERS PHARMACY OF TEXAS, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:  Chief Restructuring Officer

**PARTNERS PHARMACY OF VIRGINIA, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:  Chief Restructuring Officer

**PARTNERS PHARMACY SERVICES, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:  Chief Restructuring Officer

**PARTNERS PHARMACY SHELL POINT, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:  Chief Restructuring Officer

**PARTNERS PHARMACY, L.L.C.**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:  Chief Restructuring Officer

**SOLUTIONS HOMECARE, L.L.C.**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:  Chief Restructuring Officer

4926-1988-6411

**LENDER:**

**CS One, LLC**

By: _____
Name:  Daniel E. Straus
Title:   Chief Officer

## Exhibit 2

**Interim Approved Budget**

| | Week Beginning<br>Week Ending<br>Budget | 8/9/2025<br>8/15/2025<br>Budget | 8/16/2025<br>8/22/2025<br>Budget | 8/23/2025<br>8/29/2025<br>Budget | 8/30/2025<br>9/5/2025<br>Budget | 9/6/2025<br>9/12/2025<br>Budget | 9/13/2025<br>9/19/2025<br>Budget | 9/20/2025<br>9/26/2025<br>Budget | 9/27/2025<br>10/3/2025<br>Budget | 10/4/2025<br>10/10/2025<br>Budget | 10/11/2025<br>10/17/2025<br>Budget | 10/18/2025<br>10/24/2025<br>Budget | 10/25/2025<br>10/31/2025<br>Budget | 11/1/2025<br>11/7/2025<br>Budget | 8/9/2025<br>11/7/2025<br>Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | $ (104,984) | 92,561 | 152,561 | 146,919 | 259,919 | 429,277 | 552,983 | 643,983 | 653,341 | 820,120 | 843,826 | 934,826 | 1,069,184 | $ (104,984) |
| Collections | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 27,846,000 |
| Avantum | 350,000 | - | 350,000 | - | 350,000 | - | 350,000 | - | 350,000 | - | 350,000 | - | 350,000 | 2,450,000 |
| **Total Receipts** | **2,492,000** | **2,142,000** | **2,492,000** | **2,142,000** | **2,492,000** | **2,142,000** | **2,492,000** | **2,142,000** | **2,492,000** | **2,142,000** | **2,492,000** | **2,142,000** | **2,492,000** | **30,296,000** |
| Payroll & Benefits | 96,000 | 910,000 | 96,000 | 857,000 | 96,000 | 839,000 | 96,000 | 839,000 | 96,000 | 839,000 | 96,000 | 839,000 | 96,000 | 5,795,000 |
| Pharmacy Costs | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 18,850,000 |
| Delivery Costs | 203,000 | 100,000 | 203,000 | 100,000 | 203,000 | 100,000 | 203,000 | 100,000 | 203,000 | 100,000 | 203,000 | 100,000 | 203,000 | 2,021,000 |
| Other | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 3,575,000 |
| InterchangeRx | 230,000 | - | 230,000 | - | 230,000 | - | 230,000 | - | 230,000 | - | 230,000 | - | 230,000 | 1,610,000 |
| Omnicell payment program | 44,000 | - | - | - | - | - | - | - | - | - | - | - | - | 44,000 |
| Rent | 107,294 | - | 71,642 | - | 71,642 | 107,294 | - | 71,642 | - | 107,294 | - | 71,642 | - | 608,450 |
| **Total Operating Costs** | **2,405,294** | **2,735,000** | **2,325,642** | **2,682,000** | **2,325,642** | **2,771,294** | **2,254,000** | **2,735,642** | **2,254,000** | **2,771,294** | **2,254,000** | **2,735,642** | **2,254,000** | **32,503,450** |
| **Operating Cashflow** | **86,706** | **(593,000)** | **166,358** | **(540,000)** | **166,358** | **(629,294)** | **238,000** | **(593,642)** | **238,000** | **(629,294)** | **238,000** | **(593,642)** | **238,000** | **(2,207,450)** |
| **Restructuring Costs** | | | | | | | | | | | | | | |
| Adequate Assurance | 135,000 | - | - | - | - | - | - | - | - | - | - | - | - | 135,000 |
| Debtor Counsel | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,300,000 |
| Debtor Financial Advisor | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 611,000 |
| Independent Manager | 57,161 | - | - | - | - | - | - | 25,000 | - | - | - | - | 25,000 | 107,161 |
| Investment Banker | 50,000 | - | - | - | 50,000 | - | - | - | 50,000 | - | - | - | 425,000 | 575,000 |
| Claims Agent | - | - | 25,000 | - | - | - | 25,000 | - | - | - | 25,000 | - | - | 75,000 |
| US Trustee | - | - | - | - | - | - | - | - | 174,221 | - | - | - | - | 174,221 |
| **Total Restructuring Costs** | **389,161** | **147,000** | **172,000** | **147,000** | **197,000** | **147,000** | **147,000** | **197,000** | **371,221** | **147,000** | **147,000** | **172,000** | **597,000** | **2,977,383** |
| **Net Cash Flow** | **(302,455)** | **(740,000)** | **(5,642)** | **(687,000)** | **(30,642)** | **(776,294)** | **91,000** | **(790,642)** | **(133,221)** | **(776,294)** | **91,000** | **(765,642)** | **(359,000)** | **(5,184,833)** |
| **Ending Cash (Before Draws)** | **(407,439)** | **(647,439)** | **146,919** | **(540,081)** | **229,277** | **(347,017)** | **643,983** | **(146,659)** | **520,120** | **43,826** | **934,826** | **169,184** | **710,184** | **(5,289,816)** |
| DIP Draws | 500,000 | 800,000 | - | 800,000 | 200,000 | 900,000 | - | 800,000 | 300,000 | 800,000 | - | 900,000 | 500,000 | 6,500,000 |
| **Ending Cash (After Draws)** | $ 92,561 | $ 152,561 | $ 146,919 | $ 259,919 | $ 429,277 | $ 552,983 | $ 643,983 | $ 653,341 | $ 820,120 | $ 843,826 | $ 934,826 | $ 1,069,184 | $ 1,210,184 | $ 1,210,184 |

**<u>Exhibit B</u>**

**Proposed Final Order**

(To be filed)

## **Exhibit C**

**DIP Term Sheet**

**Partners Pharmacy Services, LLC**
**Terms and Conditions of**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Credit Facility**

*The terms outlined below in these Terms and Conditions (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession credit facility (hereinafter referred to as the "**DIP Facility**") to be made available to the Debtors (as defined below). This DIP Term Sheet, the Interim Order (as defined below), and the Final Order (as defined below) shall collectively constitute the exclusive and definitive documentation and agreement among the parties for the DIP Facility (the "**DIP Financing Documents**").*

| | |
|---|---|
| **Borrowers:** | Arrow Envoy Holdings, LLC; Arrow Pharmacy Holdings, LLC; Partners of Connecticut, LLC; Partners of Massachusetts, LLC; Partners of New York, LLC; Partners of Pennsylvania, LLC; Partners Pharmacy of Florida, LLC; Partners Pharmacy of Maryland, LLC; Partners Pharmacy of Texas, LLC; Partners Pharmacy of Virginia, LLC; Partners Pharmacy Services, LLC; Partners Pharmacy Shell Point, LLC; Partners Pharmacy, L.L.C.; and Solutions Homecare, L.L.C. (collectively, the "**Debtors**"), who shall all have simultaneously filed the Chapter 11 Case (as defined below) in the Bankruptcy Court (as defined below). |
| **Amount and Type of Facility:** | After entry of the Interim Order (as defined below), the DIP Facility will consist of a consolidated, delayed, multi-draw term loan to the Debtors on a joint and several basis in the aggregate maximum principal amount not to exceed $6.5 million, (the "**DIP Loan Commitment**"). |
| **DIP Lender:** | CS One, LLC (the "**DIP Lender**"). |
| **Borrowing Availability:** | So long as the Termination Date has not occurred, advances will be made available under the DIP Facility but shall be limited in all respects by the Budget and the Draw Schedule. |
| | Within this term sheet, the "**Draw Schedule**" shall mean: |
| | from the Petition Date through September 12, 2025 a maximum principal amount not to exceed $2.3 million, with the remainder of the DIP Loan Commitment available after entry of the Final Order, subject to all of the terms and conditions herein. |
| | The Draw Schedule may be modified and amended from |

time to time only with the consent of the DIP Lender and the Debtors.

| | |
|---|---|
| **Budget and Variances:** | Subject to the Budget Variances (as defined below) (i) the Debtors' Budget line items for cash receipts and cash disbursements (excluding fees and expenses of third party professionals engaged by or for the benefit of Debtors and, if appointed, the Committee (collectively, "**Professional Fees**")) shall each be adhered to, by line item, on a weekly basis and a cumulative basis for the Budget (as defined below) period then ending as described below, provided, however, that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks and (ii) the Debtors' disbursements for Professional Fees (which shall be reported in a manner so that Professional Fees for each retained professional shall be reflected on its own line item) shall be adhered to on a cumulative basis for that portion of the Budget period then ending. |

Actual amounts for each cash receipt and cash disbursement from operations line items (which shall not include any Professional Fees) shall not vary from the applicable Budget (including any amounts deemed to roll over from a previous week due to not being spent) by (i) more than ten percent (10%) by line item on a trailing three-week basis; or (ii) ten percent (10%) on a cumulative basis (collectively, the "**Budget Variances**").

On or before the third Business Day (as defined below) of each week, commencing with the first week following the Petition Date, the Debtors shall deliver to the DIP Lender a Budget Variance Report.

| | |
|---|---|
| **Professional Fee Escrow:** | The Debtors shall, on the dates set forth in the Budget, establish and fund an escrow account with cash equal to the sum of the Debtors' Budget line items for Professional Fees (such account, the "**Professional Fee Escrow Account**"). For the avoidance of doubt, (i) the Professional Fees of each Chapter 11 Professional remain subject to approval by the Bankruptcy Court on appropriate notice and hearing to all parties-in-interest and (ii) the amount funded into the Professional Fee Escrow Account shall not limit the amount of fees and expenses that are the subject of a Chapter 11 Professional's request for payment with the Bankruptcy Court. |

**Termination Date:** The earliest to occur of: (a) the Maturity Date (as defined below); (b) thirty (30) days after the Petition Date (as defined below) if the Final Order has not been entered; (c) the DIP Lender's written notice to Debtors' counsel of the acceleration of the obligations under the DIP Facility as a result of an Event of Default (as defined below); (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and is otherwise acceptable to the DIP Lender in its commercially reasonable discretion; (e) the date which is the closing date of any sale of all or substantially all of the Debtors' assets; (f) the entry of an order by the Bankruptcy Court (as defined below) (i) granting relief from the automatic stay permitting foreclosure of any assets of the Debtors with a value in excess of $100,000 in the aggregate, (ii) granting any motion by the DIP Lender to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) appointing a trustee or an examiner with special powers, or (iv) dismissing or converting the Chapter 11 Case; (g) the filing or support by the Debtors of a plan of reorganization or liquidation that (i) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and (ii) is not otherwise acceptable to the DIP Lender in its commercially reasonable discretion; (h) other than with respect to the Carve Out (as defined below), the entry of an order by the Bankruptcy Court granting liens or claims that are senior or *pari passu* to the liens securing the DIP Facility; (i) the date a Termination Event occurs, and (j) any of the Milestones do not occur on or prior to its Milestone Date. The date on which the earliest of clauses (a) through (j) above occurs and the DIP Lender provides notice thereof to the Debtors being referred to hereinafter as the "**Termination Date**." On the Termination Date, the DIP Facility shall be deemed terminated, and the DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility or the DIP Financing Documents, except for funding of the Carve Out.

**Non-Default Interest Rate:** Interest on all outstanding advances under the DIP Facility shall accrue from and after the Petition Date at a fixed rate per annum equal to twelve percent (12%) and will be payable in kind.

| | |
|---|---|
| **Default Interest Rate:** | Effective immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Lender, interest on the outstanding loans under the DIP Facility shall accrue at a fixed rate per annum equal to fifteen percent (15%). |
| **Loan Payments:** | The Debtors promise and agree to pay to the DIP Lender all DIP Facility advances, together with interest thereon accruing pursuant to the DIP Financing Documents, in full, in cash, at the times set forth in the DIP Financing Documents, but no later than the Termination Date. |
| | All unpaid principal, interest, fees, costs and expenses on the DIP Facility shall be due and payable in full by the Debtors on the Termination Date, whether at maturity, upon acceleration or otherwise and if such amounts are not paid in full in cash, interest, fees, costs, and expenses in respect of the DIP Facility shall continue to accrue until paid in full. |
| **Use of Proceeds:** | Proceeds of the DIP Facility shall be used solely for the following purposes (solely to the extent identified and limited in the Budget, subject to the Budget Variances as permitted hereunder): (a) to fund, after application of all other available cash, ordinary course post-petition operating expenses and working capital needs of the Debtors; (b) to fund Bankruptcy Court approved fees and expenses incurred in connection with the 363 Sale (as defined below); (c) to pay Bankruptcy Court approved pre-petition claims as approved by the DIP Lender in its commercially reasonable discretion; (d) to pay Bankruptcy Court approved Professional Fees provided for in the Budget, including the funding of the Carve Out; and (e) to pay other ordinary course costs and expenses of administration of the Chapter 11 Case which do not require Bankruptcy Court approval. |
| **Cash Management Collections and Remittances:** | The Debtors shall use a cash management system that is the same as or substantially similar to their pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to the DIP Lender in its commercially reasonable discretion. The Interim Order and Final Order shall provide the DIP Lender with a valid and enforceable first priority senior secured |

priming lien and security interest (subject and subordinate to the Carve Out) on the cash held in the Debtors' bank accounts.

**Super-Priority Administrative Claim:** In accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), amounts owed by the Debtors to the DIP Lender pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, subject and subordinate to the Carve Out, a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113, or 1114 of the Bankruptcy Code (the "**DIP Superpriority Administrative Claim**").

**Collateral Security:** Subject and subordinate to the Carve Out, the DIP Facility (including accrued interest, fees, costs and expenses) shall be secured by valid and perfected first priority senior secured and priming liens and security interests in favor of the DIP Lender superior to all other liens, claims or security interests that any party in interest or any creditor of the Debtors' may have (the "**DIP Liens**") in all of the Debtors' pre-petition and post-petition property and assets and all proceeds thereof, including, without limitation, all of the Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtors, excluding only Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds (collectively, the "**DIP Collateral**").

**Lien Validation and Perfection:** The DIP Liens granted on the DIP Collateral pursuant to the Interim Order or the Final Order approving the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.

**DIP Lender Fees and Expenses:** The DIP Lender shall be entitled to legal fees and expenses incurred by the DIP Lender in connection with the negotiation and preparation of this DIP Term Sheet, the

5

|  | pleadings in connection with the Interim Order and the Final Order, and any other legal fees incurred by the DIP Lender in connection with the Chapter 11 Case (excluding any legal fees and expenses incurred in connection with the Stalking Horse Asset Purchase Agreement). |
|---|---|
| **Conditions Precedent to Initial DIP Facility Advance:** | The funding of the initial DIP Facility advance (not to exceed an aggregate principal amount of $2.3 million absent entry of the Final Order) shall be subject to the following conditions precedent: (a) a Termination Date not having occurred, (b) no Event of Default having occurred (or event that would constitute an Event of Default with the giving of notice or lapse of time), (c) approval of the Budget by the DIP Lender in its commercially reasonable discretion, (d) entry of an Interim Order approving the DIP Facility, the DIP Superpriority Administrative Claim (subject and subordinate to the Carve Out), the DIP Liens granted on the DIP Collateral (subject and subordinate to the Carve Out), and containing such other orders and findings as the DIP Lender may require, including automatic modification of the automatic stay upon the occurrence of an Event of Default enabling the DIP Lender to exercise all rights and remedies against the DIP Collateral without further order of the Bankruptcy Court, which Interim Order shall not have been modified or amended without the DIP Lender's approval, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to the DIP Lender in its commercially reasonable discretion, (e) the DIP Lender's approval of all material motions and orders filed in the Chapter 11 Case requiring the expenditure of cash, and (f) continuation of the Debtors' present cash management system. |
| **Additional Conditions to Each Borrowing Under the DIP Facility:** | The funding of each additional DIP Facility advance shall be subject to the following conditions precedent: (a) a Termination Date not having occurred, (b) no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) having occurred under any of the DIP Financing Documents, and the representations and warranties therein shall be true and correct in all material respects when made; (c) no material adverse change in the Debtors' operations (financial, environmental, or otherwise), performance, or properties (other than as a result of the commencement of the Chapter 11 Case), since the date of this DIP Term Sheet, |

6

that has or could be expected to have a Material Adverse Effect on the rights and remedies of the DIP Lender or on the ability of the Debtors to perform their obligations under the DIP Facility; (d) entry of the Interim Order and the Final Order (as applicable); and (e) the DIP Financing Documents and the Interim and Final Orders shall include such waivers, indemnities, and other provisions as are acceptable to the DIP Lender in its commercially reasonable discretion.

|  |  |
|---|---|
| **Affirmative and Negative Covenants:** | The Debtors shall comply with the following affirmative and negative covenants: (a) compliance with Budget covenants consistent with the section titled "Budget and Variances," (b) the Debtors shall, from and after the Petition Date, satisfy the Milestones; (c) the Debtors shall, contemporaneously with closing a sale of substantially all of their assets to a party other than the DIP Lender, remit the portion of the proceeds of such sale to the DIP Lender for immediate application to the obligations owed to the DIP Lender, subject to payment of the Carve Out and other amounts set forth in the Budget; and (d) the Debtors shall not take (or refrain from taking) any action that could reasonably be expected to have a Material Adverse Effect. |
| **Bankruptcy Court Filings:** | As soon as practicable in advance of filing with the Bankruptcy Court, the Debtors shall furnish to the DIP Lender (i) the motion seeking approval of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance satisfactory to the DIP Lender and the Debtors, (ii) the motions seeking approval of the bidding procedures and the 363 Sale, and the proposed forms of the orders related thereto, which shall be in form and substance satisfactory to the DIP Lender and the Debtors, (iii) all other proposed orders and pleadings related to the DIP Facility and the 363 Sale, which orders and pleadings shall be in form and substance satisfactory to the DIP Lender and the Debtors, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which shall be in form and substance satisfactory to the DIP Lender and the Debtors, (v) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods in Section 1121 of the Bankruptcy Code, (vi) any motion seeking approval of any sale of the Debtors' assets and any proposed form of a |

7

related bidding procedures order and sale order (other than those with respect to the bidding procedures and the 363 Sale), and (vii) any other motion filed seeking approval of any matter requiring material expenditures of the DIP Collateral must comply with the Budget (each of which must be in form and substance satisfactory to the DIP Lender and the Debtors).

**Sale Process:**                The Debtors shall conduct a sale process for the sale of substantially all of their assets in accordance with the Milestones defined below.

<u>Milestones</u>. The Debtors shall be required to comply with the following (the "**Milestones**") on or prior to the respective date set forth below for each of the Milestones (each such date, the "**Milestone Date**"):

(a)        On or within two (2) days of the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Debtors shall file a motion, in form and substance acceptable to the DIP Lender, requesting entry of the Sale Procedure Order (as defined below) and seeking approval of the sale in accordance with the Stalking Horse Asset Purchase Agreement to the Stalking Horse Bidder, or such higher bidder as may be identified through the procedures approved in the Sale Procedure Order as the Winning Bidder;

(b)        On or before the date that is thirty (30) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have entered the Sale Procedure Order;

(c)        On or before the date that is sixty (60) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, all competing binding bids under the Sale Procedure Order shall have been submitted;

(d)        On or before the date that is seventy (70) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, an auction under the Sale Procedure Order shall have occurred (if necessary);

8

(e)     On or before the date that is eighty (80) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have conducted a hearing to approve the 363 Sale to the Winning Bidder (as defined below);

(f)     On or before the date that is eighty (80) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale; and

(g)     On or before the date that is ten (10) days after entry of the Sale Order, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the 363 Sale shall close.

Notwithstanding anything to the contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension.

The DIP Lender shall have the right to "credit bid" in any sale of the Debtors' assets up to the aggregate amount due to the DIP Lender under the DIP Facility.

**Remedies:**

Following the Termination Date and provided that the Bankruptcy Court does not enter any order to the contrary, within five (5) Business Days following the Debtors' receipt of a notice of the occurrence of a Termination Event, the DIP Lender shall have all customary remedies, including the right to foreclose or otherwise realize on all of the DIP Collateral, the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court. Consistent with the foregoing sentence, relief from the Bankruptcy Code's automatic stay in favor of the DIP Lender shall be embodied in any order approving the DIP Facility.

**Events of Default:**

The term "**Default**" and "**Event of Default**" shall mean the

9

occurrence of any of the following:

- Any of the Milestones does not occur on or prior to its Milestone Date.

- The Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed which the Debtors fail to timely oppose.

- Filing or support of a proposed plan of reorganization by the Debtors that does not provide for the indefeasible payment in full and in cash of the Debtors' obligations outstanding under the DIP Facility, unless otherwise agreed in writing by the DIP Lender in its commercially reasonable discretion.

- Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible repayment in full, in cash of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by the DIP Lender in its commercially reasonable discretion.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the DIP Lender, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of the DIP Lender, or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order, or Final Order, without the prior written consent of the DIP Lender or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Any attempt by the Debtors to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or

10

judgment is to, invalidate, reduce or otherwise impair the DIP Facility obligations or the DIP Liens granted on the DIP Collateral.

- The Debtors shall request approval of any post-petition financing, other than the DIP Facility, that would not immediately repay all DIP Facility obligations, in full, in cash, on the date of the closing of such post-petition financing.

- The Debtors shall apply for an order substituting any assets (other than cash) for all or any portion of the DIP Collateral.

- Other than with respect to the Carve Out, entry of an order granting liens or claims that are senior or *pari passu* to the DIP Liens granted on the DIP Collateral.

- The Debtors shall assert that any of the DIP Liens are invalid, or any DIP Liens granted to the DIP Lender shall be determined to be invalid.

- A final order is entered granting any secured creditor (other than the DIP Lender) with a claim in excess of $100,000 relief from the automatic stay.

- Failure to make any payments under the DIP Facility when due.

- Failure to pay any post-petition material indebtedness when due (and after giving effect to any applicable grace period).

- Debtors' failure to comply with the terms of the DIP Financing Documents (including their failure to comply with the Budget, subject to the Budget Variances and any other approved variances).

- Breach of any covenant set forth in any DIP Financing Document.

- Exclusivity shall have been terminated by the Debtors or the Debtors shall have agreed to any such termination.

- After entry thereof, either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal, shall have been modified or amended without the prior written consent of the DIP Lender.

- The commencement of an action or filing of a motion

11

<table>
<tr><td></td><td>by the Debtors challenging the rights and remedies of the DIP Lender under the DIP Financing Documents or that is otherwise inconsistent with the DIP Financing Documents.</td></tr>
<tr><td>**Indemnification:**</td><td>The Debtors shall indemnify and hold the DIP Lender and its officers, directors, employees and formally engaged agents (including all of their professionals) (each an "**Indemnified Party**") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, fraud or willful misconduct.</td></tr>
<tr><td>**Governing Law:**</td><td>The DIP Financing Documents shall be governed by the laws of the State of New York, subject to applicable federal bankruptcy laws.</td></tr>
<tr><td>**Other Definitions:**</td><td>"**363 Sale**" means the sale of all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code.

"**Auction**" means an auction held in connection with the 363 Sale and in accordance with the terms of the Sale Procedure Order.

"**Avoidance Actions**" means any claims or causes of action that could be brought under Section 5 or Section 724(a) of the Bankruptcy Code or any applicable state fraudulent transfer or similar statute.

"**Avoidance Proceeds**" means the proceeds received from, or property recovered in respect of, Avoidance Actions.</td></tr>
</table>

12

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. §§ 101–1532), as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas presiding over the Chapter 11 Case.

"**Budget**" means a budget for the Debtors' operations during the Chapter 11 Case for any fiscal period, as delivered to the DIP Lender in form and substance satisfactory to the DIP Lender. A Budget for the first 13 weeks of the Chapter 11 Case must be approved by the DIP Lender and must be attached to the Interim Order. A Budget covering the period from the date of entry of the Final Order through the Maturity Date must be delivered by the Debtors to the DIP Lender (and approved by the DIP Lender in its commercially reasonable discretion) at least two (2) Business Days before any hearing related to final approval of the DIP Facility and must be attached to the Final Order.

"**Budget Variance Report**" means a current report that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Budget (on a weekly and cumulative basis), (ii) compares such actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Budget for such period, and (iii) provides an explanation for all variances between budgeted and actual amounts.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York, or is a day on which banking institutions located in the State of New York are required or authorized by law or other governmental action to close.

"**Carve Out**" means the sum of:

(a)      all fees required to be paid to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate;

(b)      all reasonable fees and expenses up to $10,000 incurred by a trustee under Section 726(b) of the

13

Bankruptcy Code;

(c)      all unpaid post-petition fees and expenses of the professionals retained by the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and by the Committee (if any) pursuant to Sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Chapter 11 Professionals**"), but only to the extent that such fees and expenses are (i) incurred before or on the first Business Day after delivery by the DIP Lender of a notice of the occurrence of a Termination Event, (ii) within the cumulative amounts set forth in the Budget approved by the DIP Lender for such Chapter 11 Professional as of the date of the Termination Event, and (iii) allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code; and

(d)      post-petition fees and expenses of (i) the Debtor Professionals incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $250,000 to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code and (ii) the Committee Professionals (if any) incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $15,000, to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code.

The Carve Out shall not include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:

(i) the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to the DIP Lender or the validity of any liens granted to the DIP Lender;

(ii) preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by the DIP Lender of any of its

14

rights and remedies under the DIP Financing Documents;

(iii) the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Lender or any of its officers, directors, employees, agents, attorneys, affiliates, successors or assigns;

(iv) any request to borrow money other than pursuant to the terms of the DIP Financing Documents;

(v) with respect to the Debtors, any of the Debtor Professionals, or any of their successors or assigns (including any trustee, responsible officer, examiner, estate administrator or representative or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter released or to be released, waived, or to be waived, or specified as not subject to challenge by the Debtors pursuant to the Interim Order or Final Order; or

(vi) for any other purpose for which proceeds of the DIP Facility may not be used pursuant to this DIP Term Sheet.

"**Chapter 11 Case**" means collectively, the jointly administered voluntary Chapter 11 cases commenced simultaneously by the Debtors in the Bankruptcy Court.

"**Committee**" means any statutory committee appointed in the Chapter 11 Case.

"**Final Order**" means a final, non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, on terms satisfactory to the DIP Lender in its commercially reasonable discretion.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing the Debtors, among other things, to obtain interim financing and incur post-petition indebtedness on terms satisfactory to the DIP Lender in its commercially reasonable discretion.

"**Material Adverse Effect**" means (a) a material adverse

15

change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or financial condition of the Debtors, (b) a material impairment of the rights and remedies of the DIP Lender under the DIP Financing Documents, (c) a material impairment of the DIP Collateral, (d) a material adverse effect on the Debtors' ability to perform any of its obligations under the DIP Financing Documents, or (e) a material adverse effect upon the legality, validity, binding effect, or enforceability against the Debtors of any of the DIP Financing Documents.

"**Maturity Date**" means the date that is one hundred thirty (130) days after the Petition Date, or such later date to which the DIP Lender consents in writing.

"**Petition Date**" means the date on which the Chapter 11 Case is filed with the Bankruptcy Court.

"**Sale Order**" means the order entered by the Bankruptcy Court that is either (i) in form and substance satisfactory to the DIP Lender and the Debtors or (ii) that pays in full the DIP Facility obligations, and that, among other things, approves the 363 Sale, the results of the Auction (if applicable) and the Winning Bidder's bid.

"**Sale Procedure Order**" means an order in form and substance satisfactory to the DIP Lender approving the bidding procedures for the 363 Sale.

"**Stalking Horse Asset Purchase Agreement**" means an asset purchase agreement by and among the Debtors and the Stalking Horse Bidder that provides for the purchase and sale of substantially all of the assets of the Debtors.

"**Stalking Horse Bidder**" shall mean CS One, LLC or its designee.

"**Termination Event**" means the occurrence of the earlier of:

(i) an Event of Default under the DIP Facility; or

(ii) the Debtors' failure to comply with the terms of the DIP Financing Documents (including their failure to comply with the Budget, subject to the Budget Variances and any

other approved variances).

"**Winning Bidder**" means the bidder that agrees (at the Auction if applicable) to purchase all or substantially all of the Debtors' assets.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**BORROWERS:**

**PARTNERS OF CONNECTICUT, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS OF MASSACHUSETTS, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS OF NEW YORK, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS OF PENNSYLVANIA, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY OF FLORIDA, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY OF MARYLAND, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

4926-1988-6411

**PARTNERS PHARMACY OF TEXAS, LLC**

By: _Ronald M. Winters_

Name: Ronald M. Winters

Title:   Chief Restructuring Officer

**PARTNERS PHARMACY OF VIRGINIA, LLC**

By: _Ronald M. Winters_

Name: Ronald M. Winters

Title:   Chief Restructuring Officer

**PARTNERS PHARMACY SERVICES, LLC**

By: _Ronald M. Winters_

Name: Ronald M. Winters

Title:   Chief Restructuring Officer

**PARTNERS PHARMACY SHELL POINT, LLC**

By: _Ronald M. Winters_

Name: Ronald M. Winters

Title:   Chief Restructuring Officer

**PARTNERS PHARMACY, L.L.C.**

By: _Ronald M. Winters_

Name: Ronald M. Winters

Title:   Chief Restructuring Officer

**SOLUTIONS HOMECARE, L.L.C.**

By: _Ronald M. Winters_

Name: Ronald M. Winters

Title:   Chief Restructuring Officer

4926-1988-6411

**LENDER:**

**CS One, LLC**

By: _____
Name:  Daniel E. Straus
Title:    Chief Officer