**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Partners Pharmacy Services, LLC, *et al.*,[1] | Case No. 25-34698 |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF RONALD M. WINTERS IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Ronald M. Winters, the Chief Restructuring Officer of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Partners Pharmacy"), hereby declare under penalty of perjury:

**PRELIMINARY STATEMENT**

1.      Partners Pharmacy serves the medication needs of residents at skilled nursing facilities, assisted-living communities, long-term care residences, long-term acute care facilities, and institutional facilities throughout the United States.  Founded in 1998, Partners Pharmacy became the third largest long-term care pharmacy company in the United States serving up to 48,000 residents at facilities in sixteen states and the District of Columbia.  Today, Partners Pharmacy serves approximately 17,000 residents at facilities in seven states.

2.      In recent years, Partners Pharmacy has faced mounting challenges stemming from industry headwinds, including the Covid-19 pandemic, inflation, changes to Medicare, declining

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C. (4578); and Solutions Homecare, L.L.C. (1583).  The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

reimbursement rates, and unfavorable industry consolidation.  By November 2022, Partners Pharmacy had accrued a $29 million balance with its primary pharmaceutical supplier, which resulted in a drastic change to payment terms—from flexible 47-day terms to cash on delivery for all new orders.  This change further strained Partners Pharmacy's financial condition, as the company was required to purchase approximately $500,000 worth of pharmaceuticals daily to meet customer demands.  Unable to generate sufficient cash to satisfy these daily payment requirements, Partners Pharmacy lost business and was ultimately forced to downsize operations.

3.      As a result, in late 2022, Partners Pharmacy began exploring restructuring initiatives, ultimately closing six pharmacies and selling one.  Despite these efforts and ceasing payments on its revolving credit facility, Partners Pharmacy remained cash flow negative leading to multiple amendments to its revolving credit facility to temporarily waive defaults and extend the maturity date.  The Debtors' financial difficulties were further exacerbated by the filing of multiple lawsuits against them and mounting payment demands from vendors, all of which added pressure to an already strained liquidity position.  In response, the Debtors began actively pursuing a potential sale of their business.

4.      In June 2024, Partners Pharmacy and PharMerica, one of the largest institutional pharmacy companies in the United States, began negotiating an asset purchase agreement under which PharMerica would acquire substantially all of Partners Pharmacy's assets.  Although the parties set an aggressive closing target, the closing date slipped multiple times, ultimately to April 15, 2025, all as Partners Pharmacy's financial condition continued to deteriorate.  In April 2025, PharMerica withdrew from negotiations.

5.      After the transaction with PharMerica fell through, Specialty RX, another pharmacy company focused on serving long-term care facilities, emerged as a potential purchaser.

On May 9, 2025, Partners Acquisition SRX LLC ("SRX"), a Specialty RX affiliate, and the Debtors executed a term sheet outlining the principal terms under which the parties would negotiate an asset purchase agreement for the sale of substantially all of the Debtors' assets. Despite efforts to agree on the terms of an asset purchase agreement, the parties failed to do so.

6.      The Debtors are now filing these chapter 11 cases with the support of their pre-petition lender and the goal of running a robust marketing and sale process to sell substantially all of their assets.  The Debtors have secured a stalking horse bid from their pre-petition lender who is also providing, subject to court approval, post-petition financing to fund operations and administrative costs during the sale process. The proposed financing ensures that the Debtors remain current on post-petition obligations while they conduct a sale process aimed at maximizing the value of their assets.

<u>BACKGROUND AND QUALIFICATIONS</u>

7.      I am the Chief Restructuring Officer of the Debtors.  I am also the co-founder and Principal of Gibbins Advisors, LLC ("Gibbins").

8.      I have over twenty-five years of experience specializing in restructuring, with more than twenty years focused on the healthcare industry.  During that time, I have advised clients on business strategy and planning, financial analysis, cash management, crisis management, market analysis, and operational improvement, both in and out of court.  Prior to co-founding Gibbins, I was a managing director at Healthcare Management Partners and before that a managing director in the healthcare industry group at Alvarez & Marsal.  Prior engagements include serving as (a) chief restructuring officer of Comprehensive Pain Specialists, Forest Park Medical Center at Fort Worth, Jack Hughston Memorial Hospital (out of court restructuring), and Little River Healthcare; (b) chief executive and chief wind-down officer of Central Iowa Healthcare; (c) executive vice

3

president for restructuring and treasury for Saint Vincent Catholic Medical Centers; (d) court-appointed receiver of Medical Development International; (e) the liquidation trustee of QHC Facilities; and (f) financial and restructuring advisor to various debtors and creditor committees nationally.  I am also currently the plan administrator of Absolut Facilities Management.

9.      On December 19, 2023, Gibbins was engaged by the Debtors as financial advisor to help manage their liquidity and evaluate strategic alternatives, and on August 7, 2025, I was appointed as the Debtors' Chief Restructuring Officer.  On August 13, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Texas (the "Court").  Gibbins is the proposed financial advisor to the Debtors.

10.      Through my pre-petition engagement with the Debtors, I have become knowledgeable and familiar with the Debtors' day-to-day operations, business, financial affairs, and the circumstances leading to the commencement of these chapter 11 cases.  Except as otherwise indicated, the statements in this Declaration are based on my personal knowledge, my review of relevant documents, information provided to me by the Debtors or their employees, advisors or professionals, or my opinion based on my experience, knowledge and information concerning the Debtors' operations and the industry in which they operate.  I am over the age of eighteen.  I am authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

11.      To minimize any disruption or other adverse effect resulting from the filing of these chapter 11 cases, on the Petition Date, the Debtors filed various motions with their chapter 11 petitions (collectively, the "First Day Motions").  I am familiar with the factual predicates of the First Day Motions and believe that the relief requested is necessary for the Debtors to smoothly

4920-2950-8430

transition into chapter 11 and to continue their ordinary course operations on a post-petition basis. I submit this Declaration in support of the First Day Motions and to assist the Court and parties-in-interest in understanding the Debtors, their businesses, and the circumstances leading to these chapter 11 cases.  To that end, this Declaration is organized as follows:

- <u>Part I</u> provides an overview of the Debtors' corporate history and organizational structure;

- <u>Part II</u> describes the Debtors' business operations;

- <u>Part III</u> describes the Debtors' capital structure;

- <u>Part IV</u> describes the circumstances leading to these chapter 11 cases; and

- <u>Part V</u> provides support for the relief requested in the First Day Motions.

## I.      The Debtors' Corporate History and Organizational Structure

12.     The Debtors are a family owned and operated pharmacy company founded in 1998 in New Jersey under the name Partners Healthcare, L.L.C.  The Debtors are affiliated with CareOne Management, LLC and its affiliated operators of senior care facilities (collectively, "<u>CareOne</u>"), a leading operator of senior care facilities in the Northeast United States.

13.     Care Solutions, LLC ("<u>Care Solutions</u>") owns 100% of the membership interest in Partners Pharmacy Services, LLC and Arrow Envoy Holdings, LLC.  Partners Pharmacy Services, LLC owns 100% of the membership interest in each of the other Debtors except for Arrow Pharmacy Holdings, LLC, which is wholly owned by Arrow Envoy Holdings, LLC.  Mr. Daniel E. Straus indirectly owns all of the interests in the Debtors, CareOne, and CS One, LLC, the Debtors' pre-petition lender ("<u>CS One</u>" or the "<u>Pre-Petition Lender</u>").    The following organizational chart depicts the Debtors' organizational structure:

4920-2950-8430



## II.    The Debtors' Business Operations

### A.    Nature of the Business

14.    The Debtors serve the medication management needs of residents at health care facilities using automation technologies, infusion therapy technologies, compounding, advanced clinical systems, clinical support services, and multiple "in-house" pharmacies. The Debtors' primary assets consist of (a) designated pharmacy services agreements with long-term care facilities (b) medical equipment, (c) pharmaceutical inventories at the Debtors' pharmacies, and (d) receivables.

15.    The Debtors' pharmacies are licensed as retail closed-door pharmacies and do not serve the public generally. Consumers consist of residents at long-term care facilities such as skilled nursing facilities, assisted-living communities, and institutional facilities with various payors including Medicare and Medicaid. The Debtors work closely with their health care facility clients to provide customized, comprehensive, cost-effective medication management with several

"in-house" pharmacies at the facilities.  As a result, the Debtors' services are not easily replaceable, and any disruption in their provision of pharmaceuticals and related services would severely impact patients at the facilities they serve.

16.    The Debtors' largest group of customers are CareOne affiliates, who serve approximately 8,000 residents at senior care facilities.  The Debtors second largest group of customers are divisions and departments of the State of New Jersey that operate institutional health care facilities for veterans, the developmentally disabled, and psychiatric patients.

### B.    Pharmacy Locations and Staff

17.    The Debtors operate entirely within the United States.  The Debtors' largest pharmacy is in Springfield Township, New Jersey, with additional pharmacies in Connecticut, Massachusetts, and Texas.

18.    At their peak, the Debtors had approximately 800 employees.  Today, the Debtors have approximately 284 employees, including approximately 239 full-time employees, 1 part-time employee with benefits, 4 part-time employees without benefits, and 40 per diem employees (employees working less than 30 hours per week).  The Debtors' employees include pharmacists, pharmacy technicians, billing representatives, reimbursement specialists, maintenance staff, and administrative staff.

### C.    Key Suppliers and Vendors

19.    The Debtors' primary pharmaceutical suppliers are Cardinal Health 110, LLC ("Cardinal 110") and Cardinal Health 112, LLC (collectively, "Cardinal").  The Debtors purchase 95% of their pharmaceuticals from Cardinal under a Prime Vendor Agreement with Cardinal, dated as of December 1, 2019 (as amended, the "Prime Vendor Agreement").  Over time, and as the Debtors' financial condition deteriorated, their outstanding balance with Cardinal increased to $29 million by November 2022.  As a result, Cardinal changed its payment terms from flexible

47-day terms to cash on delivery for all new orders.  Although the Debtors have made payments to reduce their balance with Cardinal, they still owed approximately $20,443,593 as of August 4, 2025.

### III.   The Debtors' Capital Structure

#### A.   The Revolving Credit Facility

20.     On July 2, 2019, the Debtors entered into a Credit Agreement (as amended, restated, supplemented or modified, the "Pre-Petition Credit Agreement") with CIT Bank, N.A., as administrative agent ("CIT"), certain lenders party thereto, and Care Solutions, as guarantor, that provided the Debtors with a revolving credit facility of up to $60 million (the "Revolving Credit Facility").  The Revolving Credit Facility is secured by a lien on substantially all of the Debtors' assets (the "Senior Pre-Petition Liens") and originally bore interest at a variable interest rate equal to LIBOR plus 2.95–3.45%, depending on the Debtors' average daily net availability for the most recently completed fiscal quarter.  Under the Revolving Credit Facility, the Debtors' cash receipts are supposed to be swept daily.

21.     As of July 2022, the Debtors were in breach of certain covenants under the Pre-Petition Credit Agreement.  As a result, on July 25, 2022, CIT agreed to amend the Pre-Petition Credit Agreement to, among other things, temporarily waive certain defaults and change the interest rate to Adjusted Term SOFR (as defined in the amendment) plus 3.45%.  The then outstanding principal balance of the Revolving Credit Facility was $37,637,676.23.

22.     Soon after, the Debtors again defaulted on the Revolving Credit Facility.  As a result of continuing defaults and the looming maturity date of July 2, 2023, CS One purchased all then outstanding obligations under the Pre-Petition Credit Agreement pursuant to an Omnibus Assignment and Assumption Agreement and Waiver, dated as of February 23, 2023.

23.     Since then, the Pre-Petition Lender has ceased daily sweeps of the Debtors' cash receipts, and no payments have been made toward the balance of the Revolving Credit Facility. The Pre-Petition Credit Agreement has also been amended to temporarily waive defaults and extend the maturity date to January 2, 2026.  As of the Petition Date, the outstanding balance under the Revolving Credit Facility is approximately $44,524,814, which includes $1.5 million in bridge financing provided on August 8, 2025.  The Debtors used this bridge financing to fund retainers for professionals and pay certain operating expenses in the lead-up to the filing of these chapter 11 cases.

**B.      The Prime Vendor Agreement**

24.     Under the Prime Vendor Agreement, the Debtors purchase 95% of their pharmaceuticals from Cardinal.  The Debtors' obligations under the Prime Vendor Agreement are secured by liens on substantially all of the Debtors' assets (the "Junior Pre-Petition Liens" and together with the Senior Pre-Petition Liens, the "Pre-Petition Liens") pursuant to various security agreements between the Debtors and Cardinal dated as of May 8, 2017, December 14, 2022, and January 13, 2023 (each as subsequently amended).  As of the Petition Date, the Debtors owe Cardinal no less than $20,443,593.

**C.      The Intercreditor Agreement**

25.     On July 2, 2019, Cardinal 110 and CIT, as the then-administrative agent under the Pre-Petition Credit Agreement, entered into an Intercreditor Agreement pursuant to which Cardinal 110 agreed to subordinate certain of the Junior Pre-Petition Liens in favor of Cardinal 110 to the Senior Pre-Petition Liens.

**D.      General Unsecured and Contingent Debts**

26.     In the ordinary course, the Debtors incur trade debt with suppliers and vendors for their business operations.  As of the Petition Date, the Debtors owe approximately $53 million in

4920-2950-8430

unsecured debt (including the amount owed to Cardinal), primarily to vendors who supply essential services, medical equipment, and pharmaceuticals. The Debtors also have contingent liabilities, including those related to pending litigation.

27. On February 28, 2024, McKesson Corporation, a former pharmaceutical supplier to the Debtors ("McKesson"), filed a lawsuit alleging breach of a Supply Agreement by Partners of Massachusetts, LLC and breach of a Guaranty by Partners Pharmacy, L.L.C. The complaint alleges damages of $10,812,039, plus interest, fees, and costs. McKesson also filed a UCC-1 financing statement asserting a security interest in the assets of Partners Pharmacy, L.L.C. Partners Pharmacy, L.L.C., however, is unaware of ever granting McKesson a security interest for the Guaranty or otherwise.[2]

28. Additionally, on May 30, 2024, McKesson Medical-Surgical Minnesota Supply Inc. commenced litigation against Partners Pharmacy Services, LLC alleging breach of a OneTrack Master Subscription and Services Agreement, and claiming compensatory damages of $146,085, unspecified consequential damages, attorneys' fees and costs, and pre- and post-judgment interest.

29. The Debtors are also defending three additional breach of contract lawsuits with other parties involving an aggregate disputed amount of approximately $700,000, as well as a professional liability lawsuit and an employment lawsuit.

**E.      Equity**

30. Mr. Daniel E. Straus indirectly owns 100% of the equity interests in the Debtors. No distributions have ever been made by the Debtors to Mr. Straus.

---

[2]  Certain of the Debtors executed "Customer Applications" with McKesson on September 28, 2023, which purport to grant McKesson a security interest in all assets and a purchase money security interest on goods or equipment sold under the Customer Applications. The Debtors, except for Partners of Massachusetts, LLC, however, never placed orders under the Customer Applications. With respect to Partners of Massachusetts, LLC, a lien search in Delaware did not reveal a filed UCC-1 financing statement in favor of McKesson as secured party and with respect to the other Debtors, lien searches did not reveal filed UCC-1 financing statements in favor of McKesson as secured party except with respect to Partners Pharmacy, L.L.C. in New Jersey.

4920-2950-8430

IV.   **Circumstances Leading to these Chapter 11 Cases**

   A.   **The Debtors' Growth and Expansion**

   31.   Since their founding and until the Covid-19 pandemic, the Debtors experienced rapid growth, becoming the third largest long-term care pharmacy company in the United States. This was achieved through significant investments in new locations and infrastructure to support their customer base, which at its peak served approximately 48,000 residents at health care facilities throughout the United States.[3]

   32.   In 2014, the Debtors were awarded a contract with the State of New Jersey to run in-house pharmacies at various facilities throughout the State.  To fulfill this contract, the Debtors undertook a significant and costly infrastructure buildout.  As a result, the Debtors' Springfield, New Jersey location now serves as a hub for ten state-operated facilities in New Jersey.  Notably, during the most recent bid cycle, no competing bids were submitted to the State of New Jersey, underscoring the unique nature of the Debtors' services at these facilities and highlighting the heightened risk to patients from any disruption in the Debtors' operations.

   B.   **Impact of Covid-19 and Industry Headwinds**

   33.   In addition to inflationary pressures and a tightening labor market, the Covid-19 pandemic had an extraordinary impact on the healthcare sector because of higher mortality rates, fewer elective procedures, a shift toward outpatient rather than inpatient care, and a significant decline in occupied beds at health care facilities, all of which adversely affected the Debtors' revenue.

   34.   At the same time, changes in Medicare policy and declining reimbursement rates further strained the Debtors' financial performance. A significant portion of the Debtors' business

---

[3]   During this time, the Debtors also invested heavily in their infusion therapy technology, which delivers medications, nutrients, or fluids directly into a patient's bloodstream through controlled infusion.

is ultimately funded through Medicare and Medicaid programs. However, an increasing number of Americans are enrolling in Medicare Part C (Medicare Advantage) plans rather than traditional Medicare Part A and B.  As of 2024, over 54% of Medicare beneficiaries are enrolled in Medicare Advantage plans, up from about 19% in 2007.[4]



Figure 1

**Total Medicare Advantage Enrollment, 2007-2024**

Note: Enrollment data are from March of each year. Includes Medicare Advantage plans: HMOs, PPOs (local and regional), PFFS, and MSAs. About 61.2 million people are enrolled in Medicare Parts A and B in 2024.
Source: KFF analysis of CMS Medicare Advantage Enrollment Files, 2010-2024; Medicare Chronic Conditions (CCW) Data Warehouse from 5 percent of beneficiaries, 2010-2016; CCW data from 20 percent of beneficiaries, 2017-2020; CCW data from 100 percent of beneficiaries, 2021-2022, and Medicare Enrollment Dashboard 2023-2024.

**KFF**

This shift has resulted in a decline in enrollment in stand-alone Medicare Part D plans, as many beneficiaries now receive drug coverage through Medicare Advantage. As a result, pharmacies that depend on the more regulated and predictable reimbursement structure of stand-alone Medicare Part D plans—such as the Debtors—have been adversely impacted by narrower provider networks and less predictable payment terms associated with Medicare Advantage plans.  In addition, the low-interest rate environment resulted in a wave of consolidation and acquisition in the nursing home industry.  The Debtors lost many customers who were acquired by nursing home

---

[4]  *See* Meredith Freed et al., *Medicare Advantage in 2024: Enrollment Update and Key Trends*, KAISER FAMILY FOUNDATION, Aug. 8, 2024, available at <u>Medicare Advantage in 2024: Enrollment Update and Key Trends | KFF</u>.

operators that either worked with other pharmacies or had their own affiliated long-term care pharmacies.

35.     As a result of these and other factors, the Debtors incurred net losses of $6.7 million in 2024, $7.5 million in 2023, and $10.4 million in 2022.

### C.     Liquidity Crisis and Downsizing

36.     During the Covid-19 pandemic, most of the Debtors' customers faced census challenges, except for CareOne—their largest customer—which generated positive cash flow. Once normal business conditions resumed, the Debtors experienced a material decline in business, losing significant customer contracts accounting for approximately 6,500 patients from Q4 2021 through the end of 2022.  This contraction in business occurred concurrently with the return of CareOne volumes to pre-pandemic levels, exacerbating the financial and operational challenges facing the Debtors.  The daily cash sweeps by CIT under the Revolving Credit Facility combined with decreased business volume created cash flow problems that led to defaults under the Prime Vendor Agreement with Cardinal.

37.     By November 2022, the Debtors had accrued a $29 million balance with Cardinal, in addition to approximately $37 million owed under the Revolving Credit Facility.  In response, Cardinal changed its payment terms to cash on delivery for all new orders and began withholding monthly rebates to offset the outstanding balance.  This change further strained the Debtors' financial condition, as daily pharmaceutical orders are necessary to meet customer demand.  In November 2022, Cardinal was supplying approximately $500,000 worth of pharmaceuticals daily. Unable to generate sufficient cash to satisfy these daily payment requirements and maintain a consistent flow of inventory for customers, the Debtors lost additional business and were ultimately forced to downsize.

38.     As a result, beginning in late 2022, the Debtors undertook a series of restructuring initiatives to improve their financial stability and streamline operations.  Since then, the Debtors have closed six locations:

- On December 30, 2022, the Debtors closed their Columbia, Maryland location.

- On January 19, 2023, the Debtors closed their Dallas, Texas location.

- On March 21, 2023, the Debtors closed their Richmond, Virginia location.

- On July 15, 2024, the Debtors closed their East Windsor, Connecticut location.

- On October 3, 2024, the Debtors closed their Bethlehem, Pennsylvania location.

- On January 1, 2025, the Debtors closed their Lake Mary, Florida location.

39.     Most recently, on May 6, 2025, the Debtors sold their Fort Myers, Florida location to an unaffiliated buyer for $850,000.  The sale proceeds were used by the Debtors to pay operating expenses, including amounts owed to Cardinal.

40.     After downsizing, the Debtors' daily pharmaceutical needs decreased from approximately $500,000 to approximately $260,000, and the outstanding balance owed to Cardinal was reduced to approximately $21 million.  Liquidity, however, remained a persistent challenge as the Debtors receive payments from third-party insurers only twice per week, and overall cash flow remained negative.

41.     The Debtors' financial difficulties were further exacerbated by the filing of multiple lawsuits against them and mounting payment demands from vendors, all of which added pressure to an already strained liquidity position.  In partial response, the Debtors engaged Gibbins as their financial advisor in December 2023 to assist with liquidity management and to evaluate strategic alternatives.  In parallel, the Debtors began actively pursuing a potential sale of their entire business.

### D.     The Debtors' Pre-Petition Sale Efforts

#### i.     *Unsuccessful Sale to PharMerica*

42.     The Debtors secured a letter of interest from PharMerica, and in June 2024 commenced negotiations for the sale of substantially all of the Debtors' assets.  An aggressive target closing date was set for the end of 2024.  As due diligence and negotiations progressed, the anticipated closing date moved multiple times, ultimately to April 15, 2025.  In April 2025, PharMerica withdrew from negotiations.

#### ii.     *Specialty RX Emerges as a Potential Buyer*

43.     Shortly thereafter, Specialty RX, another pharmacy company focused on serving long-term care facilities, emerged as a potential purchaser.  On May 9, 2025, SRX and the Debtors executed a term sheet outlining the principal terms under which the parties would negotiate an asset purchase agreement for the sale of substantially all of the Debtors' assets (as amended or otherwise modified, the "SRX Term Sheet").

44.     In May and June of 2025, SRX paid deposits to the Debtors totaling $5 million (collectively, the "SRX Deposit").  The Debtors were permitted to use the SRX Deposit for operational and other expenses and did so.  Certain guarantees of the SRX Deposit were provided by CS One and Mr. Straus.  CS One and the Debtors amended the Pre-Petition Credit Agreement to ensure that CS One's liability (if any) on its guaranty constitutes obligations under the Pre-Petition Credit Agreement.

45.     In the weeks leading up to the Petition Date, the Debtors and their advisors engaged in negotiations with SRX, although an asset purchase agreement was never signed.  The purchase agreement that was being negotiated between the Debtors and SRX was conditioned on "bid protections," including a breakup fee and a sixty-day sale process.

46.     On August 5, 2025, SRX issued a letter terminating the SRX Term Sheet and demanding immediate return of the SRX Deposit.

### iii.     CS One Emerges as a Stalking Horse Bidder

47.     Following the failed transaction with PharMerica, the Debtors decided to file chapter 11 to pursue a sale of their assets to SRX.  When an asset purchase agreement between the Debtors and SRX was not executed, the Debtors engaged in discussions with CS One.  Those negotiations culminated in the negotiation of an asset purchase agreement (the "Stalking Horse Agreement") pursuant to which CS One is agreeing to:  (a) acquire substantially all of the Debtors' assets as a going concern by credit bidding approximately $51 million; (b) assume certain liabilities and pay the cure costs of any contracts assumed and assigned to CS One; and (c) subject its bid to higher and better offers through a competitive auction process (collectively, the "Stalking Horse Bid").  The Stalking Horse Bid is not subject to a breakup fee, expense reimbursement or other bid protections.

48.     The Stalking Horse Bid represents the current highest and best offer for the Debtors' assets.  Through the Stalking Horse Agreement, CS One is giving the Debtors and their stakeholders significant operational comfort by standing ready, willing, and able to purchase the Debtors' assets on a going-concern basis.  The Stalking Horse Bid also enhances the sale process by establishing a floor that prospective bidders must exceed, which will help ensure that only serious, financially capable bidders participate in the auction.

49.     With the benefit of the Stalking Horse Bid, the Debtors intend to run a marketing and sale process, including an auction, subject to the Court's approval of bidding procedures to govern that sale process. The proposed bidding procedures are designed to allow the Debtors to conduct a market check of the Stalking Horse Bid to ensure that the Debtors secure the highest or otherwise best offer—or combination of offers—for their assets.

50.     To that end, before the Petition Date, the Debtors engaged SSG Capital Advisors, LLC ("SSG") as investment banker to lead the marketing process and continue discussions with any parties expressing an interest in the Debtors' assets, with the goal of having as many bidders as possible participate in an auction and ensure a competitive process that maximizes the value of the Debtors' assets.

51.     CS One has also agreed to provide, subject to court approval, $6.5 million in post-petition financing ("DIP Facility") to fund the Debtors' operations and administrative expenses during the sale process.  Under the Stalking Horse Agreement, the DIP Facility obligations will be included in the credit bid by CS One towards the "Purchase Price."

**E.     Sale Process**

52.     Time is of the essence in these chapter 11 cases.  Although the Debtors have the support of their staff, critical supplier, and pre-petition lender, the circumstances require a reasonably expedited, robust, sale process, balanced against the process costs (measured in part by the DIP Facility, which will increase with the passage of time).  Reasonable speed and certainty are critical, as access to the DIP Facility is subject to sale milestones.  Given that the Debtors remain cash flow negative, the Debtors simply do not have the liquidity to support an unnecessarily protracted sale process.  An expedited timeline will allow the Debtors to satisfy post-petition obligations during the sale process with a $6.5 million DIP Facility.  A reasonably expedited sale process is essential to protect the business and operations from further erosion and deterioration that could endanger the enterprise and potentially disrupt the supply of pharmaceuticals to seniors, the disabled, veterans, and psychiatric residents at the health care facilities the Debtors serve.

4920-2950-8430

53.     Consequently, the Debtors will be proposing the following timeline, which complies with the milestones in the DIP Facility:[5]

| Milestones | |
|---|---|
| **September 9, 2025** | *Proposed* Bid Procedures Hearing |
| **September 29, 2025** | Sale Objection Deadline, Cure Objection Deadline, and Contract Objection Deadline |
| **October 7, 2025** | Bid Deadline |
| **October 9, 2025** | Auction (if necessary) |
| **October 13, 2025** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline (if necessary) |
| **October 17, 2025** | Deadline to reply to any Sale Objections or Supplemental Sale Objections |
| **October 21, 2025** | *Proposed* Sale Hearing |

54.     The proposed timeline affords adequate time to solicit and evaluate competing bids that may offer a higher or otherwise better value for the Debtors' assets and ensures that no parties in interest are prejudiced.  The marketing and sale efforts undertaken by the Debtors before the Petition Date support the feasibility of completing the sale process on the proposed timeline. Additionally, the number of pharmacy companies focused on serving health care facilities is limited.  Given this, the Debtors are confident that the parties most likely to participate in the sale process are already aware of the Debtors' marketing efforts or will have ample opportunity to engage in the process now.

55.     Finally, the proposed timeline and process is in the best interest of all stakeholders and is more likely to yield a greater recovery than a piecemeal liquidation of the Debtors' assets— which, at present, appears to represent the only other alternative.

---

[5]  Promptly after the Petition Date, the Debtors will be filing a motion to approve bid procedures, to designate CS One as the stalking horse bidder, and for related relief.

V.      **Evidentiary Basis for the Relief Requested in the First Day Motions**

56.     The Debtors have filed the First Day Motions to facilitate a smooth transition into chapter 11 and minimize disruptions to the Debtors' business operations.  The First Day Motions seek authority to, among other things, secure post-petition financing, honor work-force related compensation and benefit obligations, pay certain pre-petition claims, continue using the Debtors' bank accounts, and continue other operations in the ordinary course of business.

57.     The Debtors have narrowly tailored the relief requested in the First Day Motions to meet their goals of: (a) continuing their operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of their vendors, customers, employees, and other key constituencies; (c) providing adequate runway for the Debtors to effectuate a successful sale process; and (d) establishing procedures for the efficient administration of these chapter 11 cases.

58.     I am familiar with each First Day Motion and believe that the relief requested in each (a) is necessary for the Debtors to (i) minimize disruption and loss of productivity to their business; (ii) effectuate a smooth transition into and operate in chapter 11; and (iii) avoid immediate and irreparable harm; (b) is in the best interests of the Debtors' creditors, estates, and other stakeholders; and (c) constitutes a critical element in preserving value during these chapter 11 cases until a successful sale can occur.

59.     Additionally, several of the First Day Motions request authority to pay certain pre-petition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") provides that the Court shall not consider motions to pay pre-petition claims during the first 21 days after the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm."  Given this requirement, the Debtors have narrowly tailored their requests for immediate authority to those circumstances where the failure to pay pre-petition claims would cause immediate and irreparable harm to the Debtors' estates.

4920-2950-8430

<u>**Procedural Motions and Applications**</u>

A.      **Notice of Designation as Complex Chapter 11 Bankruptcy Case (the "<u>Notice of Complex Case Designation</u>")**

60.      Pursuant to the Notice of Complex Case Designation, the Debtors seek to designate these cases as complex chapter 11 cases.  These cases qualify as complex chapter 11 cases because (a) the Debtors' total liabilities exceed $10 million and (b) there are over 50 parties in interest in these cases.  Consequently, designating these cases as complex cases is appropriate and will enable the efficient administration of these cases.

B.      **Debtors' Emergency Motion for an Order Directing Joint Administration of Chapter 11 Cases (the "<u>Joint Administration Motion</u>")**

61.      Pursuant to the Joint Administration Motion, the Debtors seek to jointly administer these chapter 11 cases for procedural purposes only.  Given the Debtors' affiliation with one another, joint administration is appropriate and will promote administrative convenience and efficiency for all involved without harming the substantive rights of any party.  By jointly administering these cases, the Debtors can avoid the unnecessary duplication of notices, applications, orders, and related filings, thereby saving the Debtors' considerable expenses.

62.      Joint administration will also relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The U.S. Trustee and other parties in interest will similarly benefit from joint administration as it will spare them the time and effort of reviewing duplicative filings.  Accordingly, I believe that joint administration is warranted and will preserve the value of the Debtors' estates by avoiding duplicative expenses.

4920-2950-8430

C.      **Debtors' Emergency Motion for an Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors, and (B) Redact Certain Personal Identification Information; (II) Authorizing Service By Email; and (III) Approving Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information ("<u>Creditor Matrix Motion</u>")**

63.      Pursuant to the Creditor Matrix Motion, the Debtors seek (i) authority to (a) file a consolidated creditor matrix ("<u>Consolidated Creditor Matrix</u>") and a consolidated list of their 30 largest unsecured creditors ("<u>Consolidated Top 30 Creditors List</u>") and (b) redact certain personal identifying information and sensitive business information from documents filed in these chapter 11 cases; (ii) authority to serve creditors by email; and (iii) approval of the form and manner of notice to creditors of the commencement of these chapter 11 cases.

64.      The Debtors have a significant number of overlapping creditors which supports allowing them to file the Consolidated Top 30 Creditors List. The Consolidated Top 30 Creditors List will help alleviate administrative burden, costs, and duplicative service. For the avoidance of doubt, the Debtors are not requesting authority to (i) file consolidated schedules of assets and liabilities and statements of financial affairs or (ii) substantively consolidate the Debtors.

65.      Additionally, redacting the personal identifying information—including e-mail and home addresses—of individuals who are listed on the Consolidated Creditor Matrix, Consolidated Top 30 Creditors List, schedules of assets and liabilities, and any other filings in these chapter 11 cases is appropriate and necessary to protect individuals[6] from identity theft and to protect their privacy and physical safety (by not publishing their home addresses). The disclosure of mailing and email addresses of individuals is not necessary for purposes of disclosing or reviewing the amount owed to creditors as part of the chapter 11 process.

---

[6] Individuals include the Debtors' current and former employees, directors, interest holders, contractors, creditors, customers, and other parties in interest.

66.     Cause exists to authorize the Debtors to serve their creditors by email, where an email account is available to the Debtors.  Although I understand that the Bankruptcy Rules generally require notices to be served on creditors at their addresses, I also understand that bankruptcy courts have significant discretion to modify this general rule, and that bankruptcy courts have explicit authority to modify the manner in which notice is given.  Not only is email service likely the most efficient and cost-effective manner by which service of all interested parties can be completed, it is also more likely to facilitate creditor responses and will help alleviate administrative burdens and costs on the Debtors' estates.

67.     Finally, I understand that, in compliance with Bankruptcy Rule 2002(a), the Debtors, through their proposed claims and noticing agent, propose to serve the notice of commencement of these chapter 11 cases on all parties entitled to notice of the commencement of these chapter 11 cases, to advise them of the filing of these chapter 11 cases and the section 341 meeting of creditors (the "Notice of Commencement").  Service of the Notice of Commencement as proposed will not only prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Consolidated Creditor Matrix, but will also prevent creditor confusion through the efficient service of critical information.

68.     Accordingly, the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors, their estates, and all other parties and should be approved.

   **D.     Debtors' *Ex Parte* Application for an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent (the "Kroll Retention Application")**

69.     Pursuant to the Kroll Retention Application, the Debtors request that the Court appoint Kroll Restructuring Administration LLC as the claims and noticing agent in these chapter 11 cases.  Kroll's duties will include preparing and serving required notices and documents

4920-2950-8430

in these cases in accordance with the Bankruptcy Code and the Bankruptcy Rules as directed by the Debtors and the Court.

70.     I understand that Kroll is a leading chapter 11 administrator with significant experience in large, complex chapter 11 cases.  I also understand that Kroll's professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases and that Kroll's rates are competitive and reasonable given the quality of Kroll's services and expertise.  In view of the number of parties in interest in these cases, I understand that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of the Debtors' estates.

71.     Based on the foregoing, the relief requested in the Kroll Retention Application should be approved.

### **Substantive Motions**

**E.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Pre-petition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs; and (II) Granting Related Relief (the "Wages Motion")**

72.     Pursuant to the Wages Motion, the Debtors seek authority to (i) pay pre-petition wages, salaries, compensation, reimbursable expenses, incentives, and certain severance obligations to employees and remit amounts withheld from compensation to applicable taxing authorities and third party benefits administrators and (ii) continue providing employees with benefits pursuant to the Debtors' employee benefits programs in the ordinary course of business, including payment of certain pre-petition obligations related thereto.

73.     The Debtors request authority to satisfy the following pre-petition employee-related obligations: (i) $947,000 for employee compensation; (ii) $655,000 for employer payroll taxes; (iii) $484,054.25 for employee benefits; and (iv) $103,283.16 for outstanding Workers'

4920-2950-8430

Compensation claims (collectively, the "Employee Obligations"), which will not exceed $2,189,337.41 in the aggregate.

74.     Paying the Employee Obligations and continuing the Debtors' employee benefits programs is necessary because the Debtors need employees for ongoing operations while they run a sale process and maximize value for all stakeholders.  The relief requested in the Wages Motion will also minimize any hardship on the Debtors' employees from the commencement of these cases.  It is imperative that the Debtors retain employees and bolster morale to preserve and maximize the value of their estates.

**F.      Debtors' Emergency Motion for an Order (I) Authorizing Debtors to Pay Certain Pre-petition Taxes and Fees; and (II) Granting Related Relief ("Taxes Motion")**

75.     Pursuant to the Taxes Motion, the Debtors seek authority to satisfy all taxes and fees due and owing to various federal, state, and local taxing authorities that arose before the Petition Date, including all taxes and fees subsequently determined by audit or otherwise to be owed for periods before the Petition Date, and to pay any post-petition amounts that become due and owing to taxing and regulatory authorities in the ordinary course during these cases.

76.     To the best of my knowledge, the taxes and fees generally consist of current tax and fee obligations, and are not in respect of catch-up payments, other than any pre-petition payments that were interrupted by the commencement of these chapter 11 cases.

77.     The Debtors estimate that they have accrued approximately $573,399 in pre-petition taxes and fees.  The following chart identifies the pre-petition taxes and fees that the Debtors expect will become payable during these chapter 11 cases:

| Category | Description | Estimated Annual Total | Approximate Amount Accrued and Unpaid as of Petition Date |
|---|---|---|---|
| Franchise Taxes | Taxes required to conduct business in the ordinary course, payable on an annual basis. | $174,000 | $87,762 |
| Sales and Use Taxes | Taxes in connection with the purchase, sale, or use of a variety of equipment, materials, and supplies, payable on an annual basis. | $38,000 | $18,947 |
| Property Taxes | Taxes and Fees related to real and personal property holdings, payable as such taxes come due in the ordinary course, payable on an annual basis. | $936,000 | $466,690 |
| **Total** | | $1,148,000 | $573,399 |

78.     Payment of pre-petition taxes and fees is essential to the Debtors' continued operations.

79.     *First*, the Debtors are required to pay pre-petition taxes and fees to maintain good standing in the jurisdictions in which they do business.  If taxes are not paid, state and local authorities may refuse to issue good standing certificates or to take other actions requested by the Debtors during these chapter 11 cases.  The inability to obtain these documents may disrupt the Debtors' operations and thereby diminish value to the detriment of all stakeholders.

80.     *Second*, I understand that some of these state and local authorities may initiate audits if the Debtors fail to pay the pre-petition taxes and fees promptly.  Any such audits would further divert the Debtors' attention and resources from the Debtors' sale process and the administration of these chapter 11 cases.

81.     *Third*, the Debtors' directors and officers may be subject to personal liability if certain pre-petition taxes and fees are not paid.  At a minimum, failure to pay taxes may cause distractions and potentially diminish the Debtors' value as a going concern.

82.     For these reasons, payment of pre-petition taxes and fees is warranted.

G.     **Debtors' Emergency Motion for an Order (I) Approving Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief (the "<u>Utilities Motion</u>")**

83.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (i) approving the proposed form of adequate assurance of payment to the Debtors' utility companies; (ii) establishing procedures for resolving objections by utility companies relating to the Debtors' proposed adequate assurance; and (iii) prohibiting utility companies from altering, refusing, or discontinuing services.  In connection with the normal operations of the Debtors' businesses, the Debtors use electricity, gas, water, waste management, fire protection, telephone, telecommunications, security, and similar services.

84.     The Debtors propose to hold adequate assurance deposits totaling $135,000 (rounded up) in a segregated account for the benefit of their utility companies during these chapter 11 cases.  The proposed adequate assurance deposit includes: (i) $5,300 for providers of electricity; (ii) $2,500 for the utility company providing waste services; (iii) $500 for the utility company providing fire safety services; (iv) $860 for the utility companies providing water; (v) $16,000 for the Debtors' internet service provider; (vi) $12,500 for the Debtors' phone provider; (vii) $3,300 for the utility companies providing gas to the Debtors; (viii) $2,300 for the utility company proving gas and electric; (ix) $90,000 for the Debtors' IT services provider; and (x) $1,250 for the utility company providing security services.

85.     The relief requested in the Utilities Motion is warranted because utility services are essential for ongoing business operations and therefore the overall success of these cases.  Additionally, the proposed adequate assurance payment and procedures for resolving any objections by the utility companies are reasonable and should be approved.  The utility companies should also be prohibited from altering, refusing, or discontinuing service to the Debtors.  Should

26

any utility company refuse or discontinue service, even for a brief period, the Debtors' business operations would be disrupted.  The relief sought in the Utilities Motion is necessary to ensure that the Debtors maintain continued services from their utility service providers to allow the Debtors to continue operating in the normal course during these chapter 11 cases.

> **H.      Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, and (B) Continue to Perform Intercompany Transactions; and (II) Granting Related Relief (the "Cash Management Motion")**

86.      Pursuant to the Cash Management Motion, the Debtors seek authority to (i) operate their cash management system and maintain their existing bank accounts, including honoring certain pre-petition and post-petition obligations related thereto and (ii) continue intercompany transactions and funding consistent with the Debtors' historical practice.

87.      The Debtors operate an integrated system of bank accounts to facilitate the collection and disbursement of funds across the debtor entities.  A diagram illustrating the flow of funds through the Debtors' cash management system is attached as Exhibit C to the Cash Management Motion.

88.      As of the Petition Date, the Debtors maintain a total of 24 bank accounts, all of which are held at First Citizens Bank.  The Debtors also make payments to a payroll and benefits account at Bank of America maintained by non-debtor affiliate Care Solutions (the sole owner of all Debtors).  A description of each of the Debtors' bank accounts is provided under paragraph 10 of the Cash Management Motion.

89.      In the ordinary course of business, each bank charges certain service fees, which are automatically deducted from the bank accounts.  The Debtors pay approximately $11,000 per month in bank fees to First Citizens Bank, all of which are generally due and paid monthly.

90.     Additionally, the Debtors use corporate credit cards issued by Bank of America. As of the Petition Date, eight employees, each a director of their respective sites, hold corporate credit cards, which are typically used to cover expenses incurred in the ordinary course of business. The Debtors repay the amounts outstanding on the corporate credit cards directly to the card issuer. The average monthly balance on the corporate credit cards is approximately $60,000.

91.     In the ordinary course of business, the Debtors maintain business relationships with each other and the non-debtor affiliates and regularly engage in intercompany transactions.  At any given time, intercompany balances may be owing between the Debtors and between the Debtors and their non-debtor affiliates.  These intercompany transactions arise, among other ways, pursuant to: (a) the provision of corporate services by certain entities for the benefit of other entities and (b) arrangements by which certain entities satisfy ordinary course obligations of other entities.

92.     The relief sought in the Cash Management Motion is necessary.  The cash management system provides material benefits to the Debtors, including the ability to control corporate funds, ensure the availability of funds when necessary, and reduce costs and administrative expenses by facilitating the quick movement of funds.  Disruptions to the Debtors' cash management system could lead to delays in satisfying the Debtors' obligations to employees, vendors, and suppliers.  To avoid the potential erosion of value that could ensue from any such disruptions, it is imperative that the Debtors continue using their cash management system consistent with historical practice.

I.      **Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing and Use Cash Collateral; (II) Granting Adequate Protection; and (III) Granting Related Relief (the "<u>DIP Motion</u>")**

93.     Pursuant to the DIP Motion, the Debtors seek authority to (i) obtain a secured post-petition financing facility, in an aggregate amount of no less than $6.5 million, plus interest, costs,

28

fees and other expenses and amounts provided for in, and under the terms and conditions set forth in that certain term sheet, attached as Exhibit C to the DIP Motion, by and between the Debtors and the CS One (the "DIP Term Sheet"); (ii) to draw on the DIP Facility, as needed on an interim basis up to $2.3 million and as needed on a final basis of no less than $6.5 million, subject to the conditions precedent set forth in the DIP Term Sheet, and to use proceeds of the DIP Facility to pay for the Debtors' working capital needs and other administrative expenses necessary for the administration of these chapter 11 cases; (iii) grant CS One automatically perfected first-priority security interests in and priming liens on substantially all of the Debtors' assets to secure the DIP Facility and the obligations thereunder; (iv) grant CS One superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code; (v) modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide CS One with the relief necessary to implement and effectuate the terms and provisions of the DIP Term Sheet; (vi) use cash collateral within the Budget; and (vii) grant adequate protection in the form of (a) adequate protection liens under sections 361 and 363(e) of the Bankruptcy Code and (b) adequate protection claims under section 507(b) of the Bankruptcy Code.

94.     Post-petition financing is necessary to fund the Debtors' ongoing operations and the administration of these chapter 11 cases. The Debtors believe they cannot obtain new financing, let alone on terms more favorable than those offered by CS One under the DIP Facility (either unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit under section 364(c) of the Bankruptcy Code).

95.     As evidence, before the Petition Date, SRX conditioned payment of the SRX Deposit on obtaining guarantees from CS One and Mr. Straus. I understand that this was partly because SRX's proposed purchase price of approximately $50 million ($25 million of which would

be paid over time) was less than the sum of (a) the Debtors' senior secured obligations to CS One, which then totaled approximately $43 million, and (b) the funding the Debtors needed from May 2025 through the consummation of a sale, which would likely exceed $10 million.

96.     CS One is making the DIP Facility available only if the Debtors agree to grant (a) the priming liens, subject to the Carve Out (as defined in the DIP Motion) and (b) the other protections described in the DIP Motion.  CS One is ultimately priming its own Pre-Petition Liens, which is justified because the value of its pre-petition collateral (*i.e.*, all of the Debtors' assets) is insufficient to satisfy its secured claim in a liquidation scenario.

97.     Moreover, none of the parties Gibbins contacted were willing to extend financing to the Debtors on a junior basis to the Pre-Petition Liens or otherwise.  The Debtors have been unable to find another party willing to provide DIP financing, and CS One's proposal represents the only viable option for the Debtors to preserve their going concern value and effectuate a sale in chapter 11.  Notably, the terms of CS One's DIP Facility are substantially similar to the terms offered by SRX, but more favorable because it has no exit fee and less aggressive milestones.

98.     The DIP Facility will benefit all creditors and stakeholders.  It is critical that the Debtors obtain financing to continue operating their businesses while they run a comprehensive sale process and complete a sale of substantially all of their assets.  In addition to providing critical funding, the DIP Facility will also provide the Debtors' stakeholders, including customers, employees, and vendors, with confidence in the Debtors' ability to complete a successful sale process and continue operating until the Debtors close on the sale.

99.     The Debtors have concluded that CS One's proposal is the best alternative available for post-petition financing and that credit cannot be obtained from another party on more favorable terms.  The terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.

4920-2950-8430

Moreover, immediate and irreparable harm would result if the DIP Facility is not approved on an interim basis.  The Debtors need immediate access to the DIP Facility for the necessary liquidity to implement and ensure the success of these chapter 11 cases and the Debtors' sale efforts.  The Debtors also require access to cash collateral, which CS One and Cardinal consent in accordance with the Budget.

100.    Accordingly, it is appropriate for the Court to authorize the Debtors to (a) use cash collateral and (b) draw on the DIP Facility on an interim basis and in amounts necessary to avoid immediate and irreparable harm pending a final hearing on the DIP Motion.

***

101.    The success of these chapter 11 cases depends on the Debtors' ability to preserve their operations while they complete a sale.  The relief requested in the First Day Motions is a critical component of maintaining the confidence of key constituencies necessary to implement that strategy.

102.    I respectfully request that the Court grant the relief requested in the First Day Motions and such other and further relief as may be just and proper.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: August 13, 2025                By:     */s/ Ronald M. Winters*
      New York, New York           Name: Ronald M. Winters
                                  Title:  Chief Restructuring Officer

4920-2950-8430