United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 14, 2025
Nathan Ochsner, Clerk

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Partners Pharmacy Services, LLC, *et al.*,[1] | Case No. 25-34698 |
| Debtors. | (Jointly Administered) |

### ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND USE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of the above-captioned debtors (the "Debtors") seeking, among other things:

(1) authority pursuant to sections 363 and 364(c) and (d) of the Bankruptcy Code to obtain debtor-in-possession secured financing (the "DIP Facility") pursuant to the following terms and agreements (collectively, the "DIP Facility Documents"): (a) this Order, and any final order entered by the Court with respect to the Motion (the "Final Order") and (b) the *Partners Pharmacy Services, LLC Terms and Conditions of Proposed Senior Secured, Super-Priority Debtor-in-Possession Credit Facility*, attached hereto as Exhibit 1, as amended, modified, or supplemented (the "DIP Term Sheet"),[2] by and among the Debtors and CS One, LLC ("CS One" or the "DIP Lender");

(2) the grant to the DIP Lender of superpriority administrative claim status pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code in accordance with the terms of this Order;

(3) authorization for the Debtors use of cash collateral (as such term is defined in section 363(a)) whenever or wherever acquired, and the proceeds of all

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C. (4578); and Solutions Homecare, L.L.C. (1583). The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion or the DIP Term Sheet.

collateral pledged to the Pre-Petition Secured Parties (defined below), as contemplated by section 363 of the Bankruptcy Code in accordance with the terms set forth herein;

(4)     a grant of adequate protection to the Pre-Petition Secured Parties (defined below) in accordance with the terms set forth herein;

(5)     modification of the automatic stay to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 4001(a)(3) and 6004(h); and

(6)     a final hearing to consider entry of an order authorizing the DIP Facility and use of cash collateral on a final basis (the "Final Hearing").

The Court having considered the Motion, the exhibits attached thereto, the terms of the DIP Facility and the DIP Facility Documents, the *Declaration of Ronald M. Winters in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), and the evidence submitted at the hearing held before this Court on August 14, 2025 (the "Interim Hearing") to consider entry of this Order; and in accordance with the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and the Local Rules, due and proper notice of the Motion and the Interim Hearing having been given; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and essential for the continued operation of the Debtors' businesses; and any objections to the Motion and entry of this Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

4921-5081-3262

**BASED ON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND
PURSUANT TO THE PAPERS FILED IN THESE CHAPTER 11 CASES, THE COURT
MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[3]

A.      **Petition Date**.   On August 13, 2025 (the "Petition Date"), the Debtors filed
voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the
"Bankruptcy Code").[4]

B.      **Debtor in Possession**.   The Debtors are continuing to operate their businesses and
manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the
Bankruptcy Code.   No trustee or examiner has been appointed in these cases.

C.      **Jurisdiction and Venue**.   The Court has core jurisdiction over these chapter 11
cases, the Motion, and the parties and property affected by this Order pursuant to 28 U.S.C.
§§ 157(b) and 1334.   Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      **Committee Formation**.   As of the date hereof, the United States Trustee (the "U.S.
Trustee") has not appointed an official committee of unsecured creditors in this case pursuant to
section 1102 (a "Statutory Committee").

E.      **Notice**.   Proper, timely, adequate, and sufficient notice of the Motion and the
Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy
Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief
requested at the Interim Hearing or the entry of this Order shall be required.

F.      **Cash Collateral**.   As used in this Order, the term "Cash Collateral" means all of
the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes

---

[3]     To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant
to Fed. R. Bankr. P. 7052.

[4]     Unless otherwise noted, all statutory references are to the Bankruptcy Code.

4921-5081-3262

or will constitute "cash collateral" of any of the Pre-Petition Secured Parties (defined below) or the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code.

G.     **Debtors' Stipulations Regarding Senior Pre-Petition Obligations**.  Subject to the limitations in Paragraph 27 of this Order, the Debtors admit, stipulate and agree that:

(1)     *Pre-Petition Loan*.  The Debtors are party to (a) a Credit Agreement (as amended, restated, supplemented or modified, the "Pre-Petition Credit Agreement"), dated as of July 2, 2019, with CIT Bank, N.A., as administrative agent ("CIT"), certain lenders party thereto, and Care Solutions, LLC, as guarantor; (b) a Security Agreement, dated as of July 2, 2019, pursuant to which the Debtors pledged substantially all of their assets as collateral (the "Senior Pre-Petition Collateral") for their obligations under the Pre-Petition Credit Agreement; and (c) other documents, instruments, and agreements executed in connection with the Pre-Petition Credit Agreement (collectively, the documents described in the foregoing (a)–(c), the "Pre-Petition Loan Documents").

(2)     *Assignment Agreement.*  Pursuant to that certain Omnibus Assignment and Assumption Agreement and Waiver (the "Assignment Agreement"), dated as of February 23, 2023, by and among First Citizens Bank & Trust Company, as successor administrative agent, CS One (in such capacity, the "Pre-Petition Lender") and the lenders under the Pre-Petition Credit Agreement as of the date immediately prior to the Assignment Agreement, CS One purchased all then outstanding obligations under the Pre-Petition Credit Agreement.

(3)     *Senior Pre-Petition Obligations*.  As of the Petition Date, the Debtors were indebted to the Pre-Petition Lender, without defense, counterclaim, recoupment, or offset of any kind, in the approximate non-contingent liquidated amount of no less than

$44,524,814, plus fees, expenses, and other amounts arising in respect of the Pre-Petition Loan Documents obligations existing immediately prior to the Petition Date (such obligations, the "Senior Pre-Petition Obligations").

(4)     *Validity, Perfection and Priority of the Senior Pre-Petition Liens*.   The Senior Pre-Petition Obligations are secured by valid, enforceable, properly perfected, first priority and unavoidable liens on and security interests (the "Senior Pre-Petition Liens") encumbering all or substantially all of the Debtors' assets existing immediately prior to the Petition Date.

(5)     *Validity of the Senior Pre-Petition Obligations*. The Senior Pre-Petition Obligations constitute valid, binding obligations of the Debtors, enforceable in accordance with their terms, and the Debtors will not assert any claims, counterclaims, setoffs, or defenses of any kind or nature, which in any way would affect the validity and enforceability of any of the Senior Pre-Petition Obligations or the Senior Pre-Petition Liens, or which would in any way reduce the obligation of the Debtors to pay in full all of the Senior Pre-Petition Obligations.

(6)     *No Claims or Causes of Action*.   The Debtors have no claims, offsets, or other rights or causes of action against the Pre-Petition Lender that would in any manner impair, reduce or otherwise modify the Senior Pre-Petition Obligations or the validly perfected Senior Pre-Petition Liens.

H.     **Debtors' Stipulations Regarding Junior Pre-Petition Obligations**.  Subject to the limitations in Paragraph 27 of this Order, the Debtors admit, stipulate and agree that (collectively, the stipulations in Paragraph G and Paragraph H of this Order, the "Stipulations"):

(1)     *Prime Vendor Agreement and Security Agreements*.  The Debtors are party to (a) a Prime Vendor Agreement with Cardinal Health 110, LLC ("Cardinal 110") and Cardinal Health 112, LLC (together with Cardinal 110, "Cardinal") dated as of December 1, 2019, as amended (the "Prime Vendor Agreement"), pursuant to which the Debtors agreed to purchase inventory and services from Cardinal on certain terms; and (b) Security Agreements dated as of (x) May 8, 2017 (as amended June 21, 2017, amended and restated December 14, 2022 and January 30, 2023), (y) December 14, 2022 (as amended and restated as of January 30, 2023), and (z) January 13, 2023 (as amended and restated January 30, 2023), pursuant to which the Debtors pledged substantially all of their assets as collateral (the "Junior Pre-Petition Collateral" and with the Senior Pre-Petition Collateral, the "Pre-Petition Collateral") for their obligations under the Prime Vendor Agreement.  Cardinal and the Pre-Petition Lender are hereinafter referred to collectively as the "Pre-Petition Secured Parties."

(2)     *Junior Pre-Petition Obligations*.  As of August 4, 2025, the Debtors were indebted to Cardinal, without defense, counterclaim, recoupment or offset of any kind, in the approximate non-contingent liquidated amount of no less than $20,443,593.14 (such obligations, the "Junior Pre-Petition Obligations").

(3)     *Validity, Perfection and Priority of the Junior Pre-Petition Liens*.  The Junior Pre-Petition Obligations were secured by valid, enforceable, properly perfected, junior liens on and security interests (the "Junior Pre-Petition Liens" and together with the Senior Pre-Petition Liens, the "Pre-Petition Liens") encumbering substantially all of the Debtors' assets existing immediately prior to the Petition Date.

(4)     *Validity of the Junior Pre-Petition Obligations*. The Junior Pre-Petition Obligations constitute valid, binding obligations of the Debtors, enforceable in accordance with their terms, and the Debtors will not assert any claims, counterclaims, setoffs, or defenses of any kind or nature, which in any way would affect the validity and enforceability of any of the Junior Pre-Petition Obligations or the Junior Pre-Petition Liens, or which would in any way reduce the obligation of the Debtors to pay in full all of the Junior Pre-Petition Obligations.

I.      **Intercreditor Agreement**.  Pursuant to that certain Intercreditor Agreement (as amended, restated, supplemented or modified, the "Intercreditor Agreement"), dated as of July 2, 2019, by and among Cardinal 110 and CIT, as the then-administrative agent under the Pre-Petition Credit Agreement, Cardinal 110 agreed to, among other things, subordinate certain of the Junior Pre-Petition Liens in favor of Cardinal 110 to the Senior Pre-Petition Liens.

J.      **Immediate Need for Post-Petition Financing**.  The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Good cause has been shown for entry of this Order.  An immediate need exists for the Debtors to obtain funds and liquidity in order to continue operations, satisfy certain costs and expenses of administering these cases, and preserve and maximize the value of their estates.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and to maximize the return for all creditors requires the use of Cash Collateral and the availability of the DIP Facility. Without access to the DIP Facility and the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates would result.  Thus, the ability of the Debtors to preserve and maintain the value of

4921-5081-3262

their assets and maximize the return for creditors requires the availability of working capital from the DIP Facility and the use of Cash Collateral.

        K.      **No Credit Available on More Favorable Terms**.  The DIP Facility is the best and only source of debtor-in-possession financing available to the Debtors.  The Debtors have been unable to obtain: (i) unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or (ii) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code. The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claim (each as defined below) to the DIP Lender.

        L.      **Use of Proceeds of the DIP Facility and the DIP Collateral**.  All proceeds of the DIP Collateral, including proceeds realized from a sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses payable pursuant to the DIP Facility Documents and authorized under this Order or the Final Order) shall be used and applied in accordance with the terms and conditions set forth in this Order and the Budget (subject to any approved variances) and the other DIP Facility Documents for the types of expenditures in the Budget and for no other purpose.

        M.      **Business Judgment and Good Faith Pursuant to Section 364(e)**.  The DIP Lender has indicated a willingness to provide post-petition secured financing to the Debtors, but solely on the terms and conditions set forth in this Order and the DIP Facility Documents. Considering the lack of alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Facility represents the best financing presently available to the Debtors.  Based on the pleadings and record established at the Interim Hearing, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent

8

business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility and the use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Lender and the Pre-Petition Secured Parties, and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Lender have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, and in express and good faith reliance upon the protections offered by section 364(c) and 363(m) of the Bankruptcy Code and this Order.

N.      **Relief Essential; Best Interest**.  The relief requested in the Motion (and provided in this Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and property.  It is in the best interests of the Debtors' estates that the Debtors be allowed to enter into the DIP Facility and incur the DIP Obligations as contemplated herein.

O.      **Consent by Pre-Petition Secured Parties**.  The Pre-Petition Secured Parties have consented or are deemed to have consented to (i) the financing arrangements contemplated by this Order and the DIP Facility Documents and (ii) the use of Cash Collateral, on the terms and conditions set forth in this Order, and such consent is binding on the Pre-Petition Secured Parties.

P.      **Adequate Protection**.   The adequate protection provided to the Pre-Petition Secured Parties on account of the use of the Pre-Petition Secured Parties' Cash Collateral and any diminution in the value of such parties' respective interests in the Pre-Petition Collateral from and after the Petition Date, including resulting from the DIP Facility, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Pre-Petition Collateral in accordance with sections 361, 362 and 363 of the Bankruptcy Code.  The

consent of the Pre-Petition Secured Parties to the use of Cash Collateral and the consent of the Pre-Petition Secured Parties to priming of their liens by the DIP Liens (i) does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Pre-Petition Secured Parties that their respective interests in the Pre-Petition Collateral are adequately protected pursuant to this Order or otherwise and (ii) is conditioned upon entry of this Order and does not and shall not be deemed to constitute consent other than pursuant to this Order and the terms set forth herein.  The adequate protection provided in this Order and other benefits and privileges contained in this Order are necessary (i) to protect the Pre-Petition Secured Parties from the diminution in value of their respective Pre-Petition Collateral, and (ii) to obtain the foregoing consents and agreements.  Nothing in this Order shall prevent the Pre-Petition Secured Parties from seeking additional adequate protection to the extent permitted by law.

Q.     **No Liability to Third Parties**.  The Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in accepting the Budget or any future Budget or in taking any other actions permitted by this Order or the DIP Facility Documents, none of the DIP Lender or the Pre-Petition Secured Parties shall be deemed to be in control of the Debtors' operations or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

R.     **Findings Regarding Corporate Authority**.  Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Facility Documents to which it is a party and to perform its obligations thereunder.

S.     **Immediate Entry**.  Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. **Motion Granted**.  The Motion is granted on an interim basis on the terms and conditions set forth in this Order and the DIP Facility Documents.  Any objections to the Motion with respect to entry of this Order, to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled.

2. **Approval of DIP Facility Documents; Authority Thereunder**.  The Debtor is authorized, pursuant to sections 363 and 364, to enter into the DIP Facility and DIP Facility Documents, to execute such other and additional documents necessary or desired to implement the DIP Facility and DIP Facility Documents, to obtain post-petition secured financing from the DIP Lender, and to use the Pre-Petition Collateral, Cash Collateral, and the proceeds and products thereof, pursuant to the terms and conditions of the DIP Facility Documents and this Order to avoid immediate and irreparable harm to the Debtors' estates pending the Final Hearing.

3. **Authorization to Borrow and Use Cash Collateral**.  Subject to the terms and conditions of this Order and the DIP Facility Documents, the Debtors are authorized to immediately borrow under the DIP Facility a maximum principal amount not to exceed $2.3 million.  The Debtors shall use the advances obtained under the DIP Facility and the DIP Collateral (including Cash Collateral) only for the purposes and in the amounts set forth in the DIP Term Sheet attached hereto as <u>Exhibit 1</u> and the Budget attached hereto as <u>Exhibit 2</u>, subject to the terms and conditions set forth in the DIP Facility Documents. The DIP Lender shall have no obligation to make DIP Facility advances in excess of the amounts and times set forth in the Budget and DIP Facility Documents.

4921-5081-3262

4.       **Budget and Variances**.  With respect to the Budget:

(a)  the Debtors' actual cash receipts and cash disbursements from operations line items (other than Professional Fees) shall each be adhered to, by line item, on a weekly basis and a cumulative basis for the Budget period then ending, subject to the Budget Variances described below, provided, however, that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks;

(b) actual cash receipt and cash disbursement from operations line items (which do not include Professional Fees) shall not vary from the applicable Budget (including any amounts deemed to roll over from a previous week due to not being spent) by (i) more than ten percent (10%) by line item on a trailing three-week basis or (ii) more than ten percent (10%) on a cumulative basis (such variances, the "Budget Variances"); and

(c) subject to the Budget Variances, for all Professional Fees within the Budget, the Debtors shall not allow actual disbursements for each Professional Fee line item (and for the avoidance of doubt, each professional receiving Professional Fees shall be reflected on its own line item) to exceed the budgeted disbursements for such line item during the cumulative period from the Petition Date to the end of the period on the Budget attached as Exhibit 2.

5.       **Restriction on Use of Proceeds**.  No proceeds of the DIP Facility or Cash Collateral shall be used to (a) permit the Debtors or any other party-in-interest to challenge or institute any proceeding to determine (i) the validity, perfection, or priority of any security interests in favor of the DIP Lender or (ii) the enforceability of the Debtors' obligations under the DIP Facility Documents; (b) investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the DIP Lender or any of their agents, attorneys, advisors or

representatives, including claims or causes of action relating to lender liability or subordination claims; (c) investigate, commence, prosecute, or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations of the Debtors under the DIP Facility Documents; or (d) fund any acquisitions, capital expenditures, capital leases, or similar expenditures other than those specifically set forth in the Budget.

6.  **Superpriority Administrative Claim Status**.  Pursuant to sections 363 and 364(c) and (d), the DIP Facility funds advanced pursuant to the terms of this Order (collectively, the "Interim DIP Advances") shall be allowed administrative expenses of the Debtors' estates, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtors and over all administrative expenses or charges against property arising in the Debtors' chapter 11 cases and any superseding chapter 7 case including, without limitation, and to the extent authorized by the Bankruptcy Code, those specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114, subject and junior only to the Carve Out (defined below) (such claim, the "DIP Superpriority Claim").  The time of payment of the Interim DIP Advances shall not be altered, extended or impaired without the consent of the DIP Lender by any plan or plans of reorganization that may hereafter be accepted or confirmed or any further orders of the Court which hereafter may be entered.

7.  **DIP Fees and Expenses**.  The DIP Lender shall be entitled to reasonable fees and expenses incurred in connection with the negotiation and preparation of the DIP Term Sheet, the pleadings in connection with this Order and the Final Order, and any other legal fees incurred by

4921-5081-3262

the DIP Lender in connection with these chapter 11 cases (excluding any legal fees and expenses incurred in connection with the Stalking Horse Asset Purchase Agreement).

8.       **DIP Liens**.  Pursuant to sections 363, 364(c), and 364(d), as security for the Interim DIP Advances and other post-petition costs payable under the DIP Facility Documents, the Debtors are hereby authorized to and are hereby deemed to grant to the DIP Lender a valid, binding and enforceable lien, mortgage and security interest (a "Lien," and as so granted to the DIP Lender, the "DIP Liens") in all of the Debtors' presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature whatsoever, whether real or personal, tangible or intangible, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, or tax refunds of the Debtor, wherever located, and the proceeds and products thereof (collectively, the "DIP Collateral"), excluding any causes of action that could be brought pursuant to sections 544, 545, 547, 548 of the Bankruptcy Code, or any applicable state fraudulent transfer, fraudulent conveyance or voidable transaction statutes (the "Avoidance Actions"), but, subject to entry of the Final Order granting such relief, including proceeds of and property received in respect of Avoidance Actions ("Avoidance Proceeds"); *provided*, however, that the DIP Lender shall use commercially reasonable efforts to first obtain recoveries from DIP Collateral other than Avoidance Proceeds.

9.       **Priority of DIP Liens**.  Pursuant to sections 364(c) and (d), the DIP Liens shall be first priority senior and priming liens on the DIP Collateral, subject and junior only to (a) the Carve Out and (b) valid, enforceable, properly perfected, and unavoidable pre-petition Liens (including any Liens that are perfected after the Petition Date that are afforded priority due to the express

relation back of the perfection of such lien to a date prior to the Petition Date as permitted by section 546(b)) that are senior to the Pre-Petition Liens ("Senior Third Party Liens"). The DIP Liens shall not be subject or subordinate to any Lien which is avoided and which would otherwise be preserved for the benefit of the Debtors' estates under section 551, and in no event shall any person or entity who pays (or causes to be paid) any of the obligations under the DIP Facility Documents be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of, or conferred upon, the DIP Lender by the terms of the DIP Facility Documents until such time as the obligations under the DIP Facility Documents and this Order are indefeasibly paid in full, in cash. The DIP Liens shall not be subject or subordinate to Liens arising after the Petition Date, other than Liens granted pursuant to this Order to the extent set forth in this Order.

10. **Use of Cash Collateral**. All rents, income, profits, cash in accounts and deposits derived from the Pre-Petition Collateral constitute Cash Collateral. Provided that each of the conditions set forth in this Paragraph are satisfied, the Debtors shall be authorized to use Cash Collateral only in accordance with the terms of the Budget, this Order, and the DIP Facility Documents. The satisfaction of each of the following conditions shall constitute a condition to the Debtors' authorization to use any Cash Collateral: (i) no Event of Default under (and as defined in the DIP Term Sheet) shall exist or be continuing; and (ii) the Termination Date (as defined in the DIP Term Sheet) shall not have occurred. If, on any date, any of such conditions is not satisfied, then the Debtors shall not be authorized to use any Cash Collateral unless and until such use is consented to by the DIP Lender in its reasonable discretion. Subject to entry of a Final Order granting such relief, absent further order of the Court, if the Termination Date occurs, then the Debtors shall remit to the DIP Lender, subject to payment of the Carve Out, any Cash Collateral

then in the Debtors' possession for application to the DIP Obligations in a manner selected by the DIP Lender in its sole discretion.

11.     **Pre-Petition Lender's Adequate Protection**.  Until the indefeasible payment in full of the Senior Pre-Petition Obligations, the Pre-Petition Lender is entitled to adequate protection of its interest in the Senior Pre-Petition Collateral (including Cash Collateral) solely to the extent of the diminution in value of the Senior Pre-Petition Collateral as a result of (a) the provisions of this Order granting first priority and priming liens on the Senior Pre-Petition Collateral to the DIP Lender, (b) the Debtors' use of the Senior Pre-Petition Collateral (including Cash Collateral), (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or (d) otherwise, pursuant to sections 361(a), 363(c), and 364(d)(1) of the Bankruptcy Code. The Pre-Petition Lender is hereby granted, solely to the extent of diminution in value of the Senior Pre-Petition Liens in the Senior Pre-Petition Collateral from and after the Petition Date the following:

A.     a Lien in all DIP Collateral (the "Pre-Petition Loan Adequate Protection Lien") junior only to (i) the Carve Out, (ii) the DIP Liens, and (iii) Senior Third Party Liens; and

B.     a post-petition superpriority administrative expense claim (the "Pre-Petition Loan Adequate Protection Claim") against the Debtors with recourse to all pre-petition and post-petition property of the Debtors and all proceeds[5] thereof under sections 503 and 507 against the Debtors' estates to the extent the Pre-Petition Loan Adequate Protection Lien does not adequately protect against the diminution in value of the Senior Pre-Petition Liens, which shall have priority in payment over any other indebtedness and obligations now in

---

[5]     Recourse to Avoidance Proceeds shall be subject to entry of the Final Order.

existence or incurred hereafter by the Debtors or their estates and over all other administrative expenses of any kind, including, to the extent authorized by the Bankruptcy Code, those specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of these chapter 11 cases pursuant to section 1112 of the Bankruptcy Code, subject and junior only to the Carve Out and the DIP Superpriority Claim.

12.     **Cardinal's Adequate Protection**.  Until the indefeasible payment in full of the Junior Pre-Petition Obligations, Cardinal is entitled to adequate protection of its interest in the Junior Pre-Petition Collateral (including Cash Collateral) solely to the extent of the diminution in value (if any) of the Junior Pre-Petition Collateral as a result of (a) the provisions of this Order granting first priority and priming liens on the Junior Pre-Petition Collateral to the DIP Lender, (b) the Debtors' use of the Junior Pre-Petition Collateral (including Cash Collateral), (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or (d) otherwise, pursuant to sections 361(a), 363(c), and 364(d)(1) of the Bankruptcy Code.  Cardinal is hereby granted, solely to the extent of diminution in value (if any) of the Junior Pre-Petition Liens in the Junior Pre-Petition Collateral from and after the Petition Date the following:

A.     a Lien in all DIP Collateral (the "Cardinal Adequate Protection Lien" and with the Pre-Petition Loan Adequate Protection Claim, the "Pre-Petition Adequate Protection Liens") junior only to (i) the Carve Out, (ii) the DIP Liens, (iii) Senior Third Party Liens, and (iv) the Pre-Petition Loan Adequate Protection Lien; and

B.     a post-petition superpriority administrative expense claim (the "Cardinal Adequate Protection Claim" and with the Pre-Petition Loan Adequate Protection Claim,

17

the "Pre-Petition Adequate Protection Claims") against the Debtors with recourse to all pre-petition and post-petition property of the Debtors and all proceeds[6] thereof under sections 503 and 507 against the Debtors' estates to the extent the Cardinal Adequate Protection Lien does not adequately protect against the diminution in value of the Junior Pre-Petition Liens, which shall have priority in payment over any other indebtedness and obligations now in existence or incurred hereafter by the Debtors or their estates and over all other administrative expenses of any kind, including, to the extent authorized by the Bankruptcy Code, those specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of these chapter 11 cases pursuant to section 1112 of the Bankruptcy Code, subject and junior only to the Carve Out, the DIP Superpriority Claim, and the Pre-Petition Loan Adequate Protection Claim.

13.     **No Waiver by Pre-Petition Secured Parties**.  Nothing herein shall be deemed to be a waiver by any Pre-Petition Secured Party of its right to request additional or further protection of its interests in any property of the Debtors, to move for relief from the automatic stay (if such relief is required), to seek the appointment of a trustee or examiner or the dismissal of any of the Debtors' bankruptcy case, or to request any other relief.

14.     **Modification of the Automatic Stay**.   The automatic stay provisions of section 362 are hereby modified to permit (a) the Debtors and the DIP Lender to implement and perform the DIP Facility and the DIP Facility Documents, and (b) the creation and perfection of all Liens granted or permitted by this Order.  The Debtors and the holders of any DIP Liens or Pre-Petition Adequate Protection Liens shall not be required to enter into any additional security

---

[6]     Recourse to Avoidance Proceeds shall be subject to entry of the Final Order.

4921-5081-3262

agreements to create, memorialize, or perfect any such liens, or to file UCC financing statements, mortgages, or other instruments with any other filing authority or take any other action to perfect any such Liens, which shall be and are deemed valid, binding, enforceable and automatically perfected by the docket entry of this Order by the Clerk of the Court.  If, however, the holder of any DIP Liens or Pre-Petition Adequate Protection Liens in its sole and absolute discretion elects for any reason to enter into, file, record or serve any such financing statements or other documents with respect to any such Lien, then the Debtors shall execute same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time and on the date of the docket entry of this Order by the Clerk of the Court or at such other time as the applicable recording offices are authorized to deem the recording to have been made.  The DIP Lender is hereby relieved of any requirement to file a proof of claim in the Debtors' bankruptcy cases with respect to any such Liens and the claims secured thereby, but the DIP Lender may in its sole and absolute discretion file any such proof of claim.

15.    **Carve Out**.  The DIP Liens, DIP Superpriority Claims, Pre-Petition Adequate Protection Liens, and Pre-Petition Adequate Protection Claims shall be subject to right of payment of the following expenses (the following subparagraphs, collectively, the "Carve Out"):

A.    all fees required to be paid to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (collectively, the "Statutory Fees"), which Statutory Fees shall not be limited by any Budget;

B.    all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b);

C.    all unpaid post-petition fees and expenses of the professionals retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtors'

19

Professionals") and by a Statutory Committee (if any) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtors' Professionals, the "Chapter 11 Professionals"), but only to the extent that such fees and expenses are (i) incurred before or on the first Business Day after delivery by the DIP Lender of a notice of a Termination Event, (ii) within the cumulative amounts set forth in the Budget approved by the DIP Lender for such Chapter 11 Professional as of the date of the Termination Event, and (iii) allowed at any time by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code; and

        D.       post-petition fees and expenses of (i) the Debtors' Professionals incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $250,000 to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code and (ii) the Committee Professionals incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $15,000, to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code;

provided, however, that in no event shall the Carve Out for each Chapter 11 Professional exceed the cumulative amounts for post-petition fees set forth for such Chapter 11 Professional in the Budget as of the applicable date of determination.  Any amounts paid from the DIP Collateral or the proceeds thereof, or funded by the DIP Lender with respect to the Carve Out prior to the entry of the Final Order shall be Interim DIP Advances and such obligations shall be secured by the DIP Liens.  As used in this Order, the term "Termination Event" shall mean the occurrence of the earlier

of: (i) an Event of Default under the DIP Facility; or (ii) the Debtors' failure to comply with the terms of the DIP Facility Documents (including their failure to comply with the Budget, subject to any approved variances). Further, the payment of the fees or costs of any Professional or Statutory Committee (if any) shall be subject to court approval, and the DIP Lender reserves the right to object to any Chapter 11 Professional's application for payment.

16.     **Restriction on Use of Professional Fees and Carve Out**. Neither the payment of any Chapter 11 Professional fees, nor the Carve Out shall include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:

A.     the initiation, joinder or prosecution of any action contesting the indebtedness owed to DIP Lender or the validity of the DIP Liens;

B.     preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by the DIP Lender of any of its rights and remedies under this Order, the Final Order, or the DIP Facility Documents;

C.     the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including any attempt to recover or avoid any claim or interest from the DIP Lender under Chapter 5 of the Bankruptcy Code;

D.     any request to borrow money other than pursuant to the terms of this Order, the Final Order, or the DIP Facility Documents;

4921-5081-3262

E.      with respect to the Debtors, any of the Debtors' Professionals, or any of their successors or assigns (including any trustee, responsible officer, examiner, estates administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter to be released, waived or specified as not subject to challenge by the Debtors pursuant to this Order or the Final Order; or

F.      For any other purpose for which proceeds of the DIP Facility may not be used pursuant to the DIP Term Sheet.

17.     **Waiver of Section 506(c) Claims and Section 552**.  Subject to the entry of the Final Order granting such relief, effective as of the time of commencement of the Debtors' chapter 11 cases on the Petition Date:

A.      the Debtors waive irrevocably all claims and rights, if any, they or their estates might otherwise assert against the DIP Collateral pursuant to section 506(c), section 105(a), or any other applicable law;

B.      except from and pursuant to the terms of the Carve Out, no entity in the course of the Debtors' bankruptcy case shall be permitted to recover from the DIP Collateral (whether directly or through the grant of derivative or equitable standing in the name of the Debtors or the Debtors' estates) any cost or expense of preservation or disposition of the DIP Collateral, including expenses and charges as provided in section 506(c), section 105(a), or any other applicable law;

C.      except from and pursuant to the terms of the Carve Out, no entity shall be permitted to recover from the DIP Collateral, or assert against any DIP Lender, any claim

22

with respect to any unpaid administrative expense of the Debtors' bankruptcy case, whether or not the Debtors' payment of such administrative claim was contemplated by or included in the Budget; and

D.      the DIP Lender shall not be subject to the "equities of the case" exception of section 552(b), the equitable doctrine of "marshaling," or any similar claim or doctrine, with respect to any DIP Collateral.

18.     **Events of Default**.  So long as the DIP Obligations remain outstanding, unless consented to in writing by the DIP Lender, it shall be an Event of Default for the Debtors to seek entry of any further orders in their chapter 11 cases which authorize (a) under section 363, the use of Cash Collateral; (b) the obtaining of credit or the incurring of indebtedness pursuant to sections 364(c) or 364(d) that does not repay the DIP Facility in full, in cash; (c) the return of goods pursuant to section 546(h) to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to section 553 or otherwise; or (d) any other grant of rights against the Debtors or their estates that is secured by a Lien on the DIP Collateral or is entitled to superpriority administrative status that does not repay the DIP Facility in full, in cash.

19.     **Rights and Remedies Upon Event of Default**.  Upon the occurrence of: (i) an Event of Default (as such term is defined in the DIP Term Sheet); (ii) the Debtors' failure to comply with the terms of this Order or the Final Order (including their failure to comply with the Budget, subject to any approved variances); or (iii) the Debtors' failure to comply with any of the Milestones in the DIP Term Sheet, and the giving of written notice thereof by the DIP Lender to counsel to the Debtors, the Statutory Committee (if any), and the U.S. Trustee (which notice may be given by any manner of electronic transmission, the automatic stay being deemed lifted for such

23

purpose) (the "<u>Default Notice</u>"), then the DIP Lender shall be fully authorized, in its sole discretion to (i) cease making DIP Facility advances to the Debtors; (ii) terminate the Debtors' use of Cash Collateral pursuant to this Order and the Budget; and (iii) immediately terminate the DIP Facility and demand repayment of the DIP Obligations then outstanding.  Further, upon the occurrence of an Event of Default and transmission of a Default Notice or upon the Termination Date:

      A.     with respect to an Event of Default as to which a Default Notice has been given, the Debtors, the Statutory Committee (if any), and the U.S. Trustee shall have five (5) business days from the date of the Default Notice (the "<u>Remedy Notice Period</u>") to seek an emergency hearing with the Court on notice to the DIP Lender (a) enjoining or restraining the DIP Lender from taking action or exercising rights and remedies based upon the Event of Default specified in the Default Notice; or (b) challenging whether an Event of Default in the Default Notice has occurred or is continuing without cure (a "<u>Restraint on Remedies</u>"); *provided, however*, that if an emergency hearing is requested to be heard before the end of the Remedy Notice Period but is scheduled for a later date by the Court, then the Remedy Notice Period shall be automatically extended until the Court issues an order or other ruling with respect thereto.  During the Remedy Notice Period, including as extended pursuant to the immediately preceding sentence of this Order, the DIP Lender shall refrain from exercising its rights and remedies. Immediately upon expiration of the Remedy Notice Period unless a Restraint on Remedies has timely been obtained from the Court, or with respect to and upon the Maturity Date:

      (1)    the DIP Lender shall have the right, free of the restrictions of section 362 or under any other section of the Bankruptcy Code or Bankruptcy Rules (including Bankruptcy Rule 4001(a)), to exercise contractual, legal and equitable

rights and remedies as to all or such part of the DIP Collateral as it shall elect, and to apply the Proceeds (defined below) of the DIP Collateral to the repayment of the DIP Obligations; and

(2)     subject to applicable law, the DIP Lender, should it so elect in its sole and absolute discretion as exercised by the filing of an appropriate statement with the Court, shall be deemed to have been granted by the Debtors "peaceful possession" of, and right of access to, all or any portion of the DIP Collateral.

20.     **Financial Reporting**.  The Debtors shall provide the DIP Lender with (i) all financial statements, certificates, and reports required pursuant to the DIP Term Sheet in accordance with the timeframes specified therein and (ii) such additional information as the DIP Lender shall request from the Debtors.  The DIP Lender and its representatives shall have reasonable access during ordinary business hours and following reasonable advance notice to the Debtors' business premises and to the DIP Collateral in order to review and evaluate the physical condition of any of the DIP Collateral or to inspect the financial records and other records of the Debtors concerning the operation of the Debtors' business.

21.     **Cash Management**.  The Debtors' cash management system shall at all times be maintained in accordance with any order of this Court approving the maintenance of the Debtors' cash management system.

22.     **Perfection in Cash**.  Subject to the Carve Out, and subject to the remedies procedures outlined in Paragraph 19 of this Order, all financial institutions with which the Debtors maintain accounts containing any of the DIP Lender's Cash Collateral are authorized and directed to comply with any request of the DIP Lender to turn over to the DIP Lender all Cash Collateral therein without offset or deduction of any kind. The DIP Lender shall be entitled to all of the rights

25

and benefits of all deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which any of the Debtors may be a party, without the need to enter into any such agreements.  Notwithstanding and without limiting the foregoing, the Debtors are authorized to enter into, and cause the financial institutions servicing or maintaining the Debtors' deposit accounts (or other accounts) to enter into, such deposit account control agreements and other collateral agreements with the DIP Lender and such financial institutions as the DIP Lender may reasonably request.

23.     **Proceeds from the Disposition of DIP Collateral**.  The Debtors and any successors to the Debtors, including any successor trustee or trustees, shall assign or direct to the DIP Lender any and all Proceeds[7] realized in any Disposition of any DIP Collateral, and immediately deliver any and all such Proceeds which come into their possession to the DIP Lender in the form received; provided, however, that the foregoing shall be subject in all respects to (a) the Budget, (b) payment of the Carve Out, and (c) the priorities of the DIP Liens granted by this Order.  The foregoing is without prejudice to the rights of (a) the DIP Lender, the Statutory Committee (if any), or any other party to object to any proposed Disposition, (b) any third party with respect to the allocated Proceeds of any Disposition of Collateral encumbered by a Senior Third Party Lien, or (c) the rights of third parties set forth below with respect to a Challenge Action and the remedies that may result from a successful Challenge Action.

---

[7]     For purposes of this Order, (a) "Proceeds" shall mean both (i) proceeds (as defined in the Uniform Commercial Code of the State of New York) and (ii) any and all payments, proceeds or other consideration realized upon the sale, liquidation, realization, collection or other manner of disposition of the DIP Collateral, whether in the ordinary course of the Debtors' business (including accounts, receivables, and other proceeds arising from the Debtors' sales of goods or performance of services) or other than in the ordinary course of the Debtors' business, and (b) "Disposition" shall mean any sale, liquidation, realization, collection or other manner of disposition of DIP Collateral other than in the ordinary course of the Debtors' business, including without limitation any sale authorized pursuant to section 363.

24.     **Credit Bid Rights**.  In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code, the DIP Lender (as provided in and consistent with the DIP Facility Documents) shall have the right to credit bid the full amount of the DIP Obligations, in whole or in part, pursuant to section 363(k) of the Bankruptcy Code, in connection with any sale or disposition of assets of the Debtors, a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any debtor under section 725 of the Bankruptcy Code, and shall not be prohibited or limited from making any such credit bid "for cause" under section 363(k) or otherwise.

25.     **Application of Proceeds**.  All Proceeds retained by the DIP Lender shall be applied to the repayment of the DIP Obligations, in a manner selected by the DIP Lender, until such obligations are paid in full; provided, however, that the foregoing shall be subject in all respects to the terms and the priorities of liens under this Order.  Such applications of Proceeds shall be free and clear of any claim, charge, assessment or other liability.

26.     **Stipulations**.  Subject to the right to bring a Challenge Action as set forth in Paragraph 27 below, upon entry of this Order:

A.     the Stipulations shall be binding upon the Debtors and all other persons, entities, and parties in all circumstances;

B.     the validity, extent, priority, perfection, enforceability and non-avoidability of the Pre-Petition Secured Parties' validly perfected pre-petition claims and liens against the Debtors and the Pre-Petition Collateral shall not be subject to challenge by the Debtors or any other person, entity, or party; and

27

       C.       neither the Debtors, nor any other person, entity, or party shall seek to avoid or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtors to or for the benefit of the Pre-Petition Lender prior to the Petition Date.

27.    **Investigation Rights**.  Notwithstanding any other provisions of this Order, any interested party (other than the Debtors or the Debtors' Professionals) in this case, including the Statutory Committee (if any), shall have until sixty (60) calendar days after entry of this Order (such period, the "Challenge Period"), to commence an adversary proceeding or contested matter against the Pre-Petition Lender or Cardinal (as applicable) for the purpose (collectively, a "Challenge Action") of:

       A.       challenging the validity, extent, priority, perfection, enforceability and non-avoidability of the Pre-Petition Liens against the Debtors;

       B.       seeking to avoid or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtors to or for the benefit of the Pre-Petition Lender or Cardinal prior to the Petition Date;

       C.       seeking damages or equitable relief against the Pre-Petition Lender or Cardinal arising from or related to their pre-petition business and lending relationships with the Debtors, including equitable subordination, recharacterization, lender liability and deepening insolvency claims and causes of action; or

       D.       challenging any other matter to be waived or released pursuant to this Order or any stipulations contained therein.

If a chapter 7 or chapter 11 trustee is appointed or elected during the Challenge Period, then such period with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period

4921-5081-3262

and (ii) the date that is thirty (30) calendar days after the date on which such trustee is appointed or elected.  For the avoidance of doubt, any chapter 7 or chapter 11 trustee appointed or elected in these cases shall, until the expiration of the applicable Challenge Period, and thereafter for the duration of any Challenge Action commenced pursuant to this Paragraph (whether commenced by such trustee or by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such Challenge Action, be bound by the acknowledgements, admissions, confirmations and stipulations of the Debtors in this Order.

28.     **Binding Effect**.  All parties in interest, including the Statutory Committee (if any), that fail to act in accordance with the time periods set forth in the preceding Paragraph shall be, and hereby are, barred forever from commencing a Challenge Action and shall be bound by the waivers, Stipulations, and terms set forth in this Order.  Any Challenge Action filed shall prohibit application of this Paragraph only to the extent of the specific matters set forth in such Challenge Action on the date of filing.

29.     **Preservation of Defenses to Challenge Actions**.   The respective legal and equitable claims, counterclaims, defenses and rights of offset and setoff of the Pre-Petition Secured Parties in response to any Challenge Action are reserved, and the ability of a party to commence a Challenge Action shall in no event revive, renew or reinstate any applicable statute of limitations that may have expired before the date of commencement of such Challenge Action.

30.     **Distribution of 363 Sale Proceeds**.  Upon closing of the 363 Sale to a party other than the DIP Lender, the net proceeds of the 363 Sale, *less* amounts required to fund the Debtors' plan of liquidation and the wind down of the Debtors' estates (including the Carve Out), shall be paid directly to the DIP Lender and the Pre-Petition Lender for immediate application to the DIP Obligations and the Senior Pre-Petition Obligations, which application shall become indefeasible

with respect to the DIP Obligations and any Senior Pre-Petition Obligations that are not subject to a timely Challenge Action commenced before the expiration of the Challenge Period.

31.    **Limitation of Liability**.  In making decisions to advance any extensions of credit to the Debtors pursuant to the DIP Facility (including the exercise of its approval rights with respect to any budget), the DIP Lender shall have no liability to any third party and, subject to entry of a Final Order granting such relief, shall not be deemed to be in control of the operations of the Debtors or to be acting as a "control person," "responsible person" or other "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response Compensation and Liability Act, as amended, or any similar Federal or state statute) by virtue of providing the DIP Facility, and the DIP Lender's relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the DIP Lender and the Debtors.

32.    **Binding Effect of Order**.  This Order shall be binding upon and inure to the benefit of the DIP Lender, the Pre-Petition Lender, Cardinal, the Debtors, and their respective successors and assigns, including, without limitation, any trustee, responsible officer, examiner, estates administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code.

33.    **No Third-Party Rights**.  Except as set forth herein with respect to a Challenge Action and the Carve Out, no rights are created under this Order for the benefit of any creditor of the Debtors, any other party in interest in the Debtors' bankruptcy case, or any other persons or entities, or any direct, indirect or incidental beneficiaries thereof.

4921-5081-3262

34.     **Effect of Dismissal of Chapter 11 Cases**.  Any order dismissing this chapter 11 case under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) the DIP Liens shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full, in cash and (b) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claim, the DIP Liens, the Pre-Petition Adequate Protection Liens, and the Pre-Petition Adequate Protection Claims.

35.     **Controlling Effect of this Order**.  To the extent that any of the provisions of this Order conflict with any provisions of the DIP Term Sheet, this Order shall control and supersede the conflicting provisions therein.

36.     **Waiver of Any Applicable Stay**.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Order.

37.     **Modifications to DIP Term Sheet**.  The Debtors and the DIP Lender may implement non-material modifications of the DIP Term Sheet without the need for notice or further approval of the Court, <u>provided, however,</u> that copies of such amendments will be provided to the U.S. Trustee and any Statutory Committee.  Any material modification of the DIP Term Sheet shall only be permitted upon notice and further order of the Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material amendment, modification, waiver, or supplement on an expedited basis.

38.     **Necessary Action**.  The Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents, and to pay all fees and expenses that may be required or necessary for the Debtors' performance under this Order or the DIP Facility

4921-5081-3262

Documents, including (a) the execution of the DIP Facility Documents, (b) the payment of the fees and other expenses described herein or in the DIP Facility Documents as such become due, including, without limitation, agent fees, commitment fees, letter of credit fees, and facility fees.

39.     **Protection Under Section 346(e)**.  The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on terms and conditions to which the Debtors and the DIP Lender have agreed.  Thus, each of the terms and conditions constitutes a part of the authorization under sections 364 of the Bankruptcy Code, and is, therefore, subject to the protections in section 364(e) of the Bankruptcy Code, regardless of (i) any stay, modification, amendment, vacating, or reversal of this Order or the DIP Facility Documents or any term hereunder or thereunder, (ii) the failure to obtain a final order pursuant to Bankruptcy Rule 4001(c)(2), or (iii) the dismissal or conversion of this chapter 11 case.

40.     **Subsequent Final Order, Reversal or Modification**.  Nothing in this Order shall preclude the Court from entering a Final Order containing provisions inconsistent with or contrary to the provisions of this Order, <u>provided, however</u>, that the DIP Lender and the Pre-Petition Secured Parties shall be entitled to the benefits and protections of this Order, including (a) the adequate protection afforded to the Pre-Petition Secured Parties set forth in this Order, and (b) the protections afforded pursuant to section 364(e), with respect to all loans, advances, and other financial, accommodations made by them pursuant to this Order.  The DIP Liens, the priority afforded the Interim DIP Advances, and the adequate protection afforded to the Pre-Petition Secured Parties, as set forth in this Order, shall be binding on the Debtors and any successor trustee or trustees even if this Order is reversed or modified on appeal with respect to all loans, advances, and other financial accommodations made by them pursuant to this Order.  Except as provided

4921-5081-3262

herein, no Proceeds, Cash Collateral or Carve Out may be used by any party in interest seeking to modify any of the rights granted to the DIP Lender hereunder or in the DIP Facility Documents.

41.     **Professional Fee Escrow**.  The Debtors are directed to open a new bank account that shall function as a segregated account held in trust for and exclusively available for the payment of fees and expenses of Chapter 11 Professionals pursuant to this Order (the "Professional Fees Escrow Account") in the amount equal to, but not to exceed, the professional fees budgeted for professionals retained by the Debtor and a Statutory Committee, if any (the "Budgeted Professional Expenses").  The Debtors are directed to fund the Professional Fees Escrow Account on a weekly basis in an amount up to, but not to exceed, the Budgeted Professional Expenses for that week.  Such funds shall be held in an identifiable segregated account for the benefit of the Professionals to be applied to the professional fees of the Chapter 11 Professionals that are approved for payment pursuant to one or more orders of this Court.  Any professional fees payable to the Chapter 11 Professionals shall be paid first out of the Professional Fees Escrow Account.  Any excess amounts in the Professional Fees Escrow Account after payment of such professional fees shall be subject in all respects to the DIP Liens.  The funds in the Professional Fees Escrow Account shall remain DIP Collateral (subject to the Carve Out) unless and until such funds are paid to the Chapter 11 Professionals.

42.     **Final Hearing**.  The Final Hearing on the Motion shall be held on **September 10, 2025, at 1:00 p.m., Central Time**.  The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing) to the parties served with notice of the Interim Hearing and to any other party that has filed a Rule 2002 request for service.  Any objections or responses to entry of a final order on the Motion shall be filed with the Court, and served so as to be **received** by the following parties, **by no later than 4:00 p.m., Central Time, on September 3,**

**2025**: (a) proposed counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 1200 Seventeenth Street, NW, Washington, DC 20036 (Attn: Patrick J. Potter (patrick.potter@pillsburylaw.com)), Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, NY 10019 (Attn: Dania Slim (dania.slim@pillsburylaw.com), Amy West (amy.west@pillsburylaw.com)), and Pillsbury Winthrop Shaw Pittman LLP, 609 Main Street, Suite 2000, Houston, TX 77002 (Attn: L. James Dickinson (james.dickinson@pillsburylaw.com)); (b) the Office of the United States Trustee, 515 Rusk Street, Suite 3516, Houston, TX 77002; (c) counsel for any Statutory Committee; (d) counsel for the DIP Lender and the Pre-Petition Lender, Glenn Agre Bergman & Fuentes, 1185 Avenue of the Americas, 22nd Floor, New York, NY 10036 (Attn: Andrew Glenn (aglenn@glennagre.com) and Malak Doss (mdoss@glennagre.com)); and (e) counsel for Cardinal, Allen Stovall Neuman & Ashton LLP, 10 W. Broad Street, Suite 2400, Columbus, OH 43215 (Attn: Richard K. Stovall (stovall@asnalaw.com)).


Signed: August 14, 2025

Christopher Lopez
United States Bankruptcy Judge

**Exhibit 1**

**DIP Term Sheet**

**Partners Pharmacy Services, LLC**
**Terms and Conditions of**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Credit Facility**

---

*The terms outlined below in these Terms and Conditions (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession credit facility (hereinafter referred to as the "**DIP Facility**") to be made available to the Debtors (as defined below). This DIP Term Sheet, the Interim Order (as defined below), and the Final Order (as defined below) shall collectively constitute the exclusive and definitive documentation and agreement among the parties for the DIP Facility (the "**DIP Financing Documents**").*

---

| | |
|---|---|
| **Borrowers:** | Arrow Envoy Holdings, LLC; Arrow Pharmacy Holdings, LLC; Partners of Connecticut, LLC; Partners of Massachusetts, LLC; Partners of New York, LLC; Partners of Pennsylvania, LLC; Partners Pharmacy of Florida, LLC; Partners Pharmacy of Maryland, LLC; Partners Pharmacy of Texas, LLC; Partners Pharmacy of Virginia, LLC; Partners Pharmacy Services, LLC; Partners Pharmacy Shell Point, LLC; Partners Pharmacy, L.L.C.; and Solutions Homecare, L.L.C. (collectively, the "**Debtors**"), who shall all have simultaneously filed the Chapter 11 Case (as defined below) in the Bankruptcy Court (as defined below). |
| **Amount and Type of Facility:** | After entry of the Interim Order (as defined below), the DIP Facility will consist of a consolidated, delayed, multi-draw term loan to the Debtors on a joint and several basis in the aggregate maximum principal amount not to exceed $6.5 million, (the "**DIP Loan Commitment**"). |
| **DIP Lender:** | CS One, LLC (the "**DIP Lender**"). |
| **Borrowing Availability:** | So long as the Termination Date has not occurred, advances will be made available under the DIP Facility but shall be limited in all respects by the Budget and the Draw Schedule.<br><br>Within this term sheet, the "**Draw Schedule**" shall mean:<br><br>from the Petition Date through September 12, 2025 a maximum principal amount not to exceed $2.3 million, with the remainder of the DIP Loan Commitment available after entry of the Final Order, subject to all of the terms and conditions herein.<br><br>The Draw Schedule may be modified and amended from |

|                              |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                            |
|------------------------------|---|
|                              | time to time only with the consent of the DIP Lender and the Debtors. |
| **Budget and Variances:**    | Subject to the Budget Variances (as defined below) (i) the Debtors' Budget line items for cash receipts and cash disbursements (excluding fees and expenses of third party professionals engaged by or for the benefit of Debtors and, if appointed, the Committee (collectively, "**Professional Fees**")) shall each be adhered to, by line item, on a weekly basis and a cumulative basis for the Budget (as defined below) period then ending as described below, <u>provided</u>, <u>however</u>, that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks and (ii) the Debtors' disbursements for Professional Fees (which shall be reported in a manner so that Professional Fees for each retained professional shall be reflected on its own line item) shall be adhered to on a cumulative basis for that portion of the Budget period then ending. |

Actual amounts for each cash receipt and cash disbursement from operations line items (which shall not include any Professional Fees) shall not vary from the applicable Budget (including any amounts deemed to roll over from a previous week due to not being spent) by (i) more than ten percent (10%) by line item on a trailing three-week basis; or (ii) ten percent (10%) on a cumulative basis (collectively, the "**Budget Variances**").

On or before the third Business Day (as defined below) of each week, commencing with the first week following the Petition Date, the Debtors shall deliver to the DIP Lender a Budget Variance Report.

**Professional Fee Escrow:** The Debtors shall, on the dates set forth in the Budget, establish and fund an escrow account with cash equal to the sum of the Debtors' Budget line items for Professional Fees (such account, the "**Professional Fee Escrow Account**"). For the avoidance of doubt, (i) the Professional Fees of each Chapter 11 Professional remain subject to approval by the Bankruptcy Court on appropriate notice and hearing to all parties-in-interest and (ii) the amount funded into the Professional Fee Escrow Account shall not limit the amount of fees and expenses that are the subject of a Chapter 11 Professional's request for payment with the Bankruptcy Court.

2

| | |
|---|---|
| **Termination Date:** | The earliest to occur of: (a) the Maturity Date (as defined below); (b) thirty (30) days after the Petition Date (as defined below) if the Final Order has not been entered; (c) the DIP Lender's written notice to Debtors' counsel of the acceleration of the obligations under the DIP Facility as a result of an Event of Default (as defined below); (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and is otherwise acceptable to the DIP Lender in its commercially reasonable discretion; (e) the date which is the closing date of any sale of all or substantially all of the Debtors' assets; (f) the entry of an order by the Bankruptcy Court (as defined below) (i) granting relief from the automatic stay permitting foreclosure of any assets of the Debtors with a value in excess of $100,000 in the aggregate, (ii) granting any motion by the DIP Lender to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) appointing a trustee or an examiner with special powers, or (iv) dismissing or converting the Chapter 11 Case; (g) the filing or support by the Debtors of a plan of reorganization or liquidation that (i) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and (ii) is not otherwise acceptable to the DIP Lender in its commercially reasonable discretion; (h) other than with respect to the Carve Out (as defined below), the entry of an order by the Bankruptcy Court granting liens or claims that are senior or *pari passu* to the liens securing the DIP Facility; (i) the date a Termination Event occurs, and (j) any of the Milestones do not occur on or prior to its Milestone Date. The date on which the earliest of clauses (a) through (j) above occurs and the DIP Lender provides notice thereof to the Debtors being referred to hereinafter as the "**Termination Date**." On the Termination Date, the DIP Facility shall be deemed terminated, and the DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility or the DIP Financing Documents, except for funding of the Carve Out. |
| **Non-Default Interest Rate:** | Interest on all outstanding advances under the DIP Facility shall accrue from and after the Petition Date at a fixed rate per annum equal to twelve percent (12%) and will be payable in kind. |

| | |
|---|---|
| **Default Interest Rate:** | Effective immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Lender, interest on the outstanding loans under the DIP Facility shall accrue at a fixed rate per annum equal to fifteen percent (15%). |
| **Loan Payments:** | The Debtors promise and agree to pay to the DIP Lender all DIP Facility advances, together with interest thereon accruing pursuant to the DIP Financing Documents, in full, in cash, at the times set forth in the DIP Financing Documents, but no later than the Termination Date. |
| | All unpaid principal, interest, fees, costs and expenses on the DIP Facility shall be due and payable in full by the Debtors on the Termination Date, whether at maturity, upon acceleration or otherwise and if such amounts are not paid in full in cash, interest, fees, costs, and expenses in respect of the DIP Facility shall continue to accrue until paid in full. |
| **Use of Proceeds:** | Proceeds of the DIP Facility shall be used solely for the following purposes (solely to the extent identified and limited in the Budget, subject to the Budget Variances as permitted hereunder): (a) to fund, after application of all other available cash, ordinary course post-petition operating expenses and working capital needs of the Debtors; (b) to fund Bankruptcy Court approved fees and expenses incurred in connection with the 363 Sale (as defined below); (c) to pay Bankruptcy Court approved pre-petition claims as approved by the DIP Lender in its commercially reasonable discretion; (d) to pay Bankruptcy Court approved Professional Fees provided for in the Budget, including the funding of the Carve Out; and (e) to pay other ordinary course costs and expenses of administration of the Chapter 11 Case which do not require Bankruptcy Court approval. |
| **Cash Management Collections and Remittances:** | The Debtors shall use a cash management system that is the same as or substantially similar to their pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to the DIP Lender in its commercially reasonable discretion. The Interim Order and Final Order shall provide the DIP Lender with a valid and enforceable first priority senior secured |

|  | priming lien and security interest (subject and subordinate to the Carve Out) on the cash held in the Debtors' bank accounts. |
|---|---|
| **Super-Priority Administrative Claim:** | In accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), amounts owed by the Debtors to the DIP Lender pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, subject and subordinate to the Carve Out, a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113, or 1114 of the Bankruptcy Code (the "**DIP Superpriority Administrative Claim**"). |
| **Collateral Security:** | Subject and subordinate to the Carve Out, the DIP Facility (including accrued interest, fees, costs and expenses) shall be secured by valid and perfected first priority senior secured and priming liens and security interests in favor of the DIP Lender superior to all other liens, claims or security interests that any party in interest or any creditor of the Debtors' may have (the "**DIP Liens**") in all of the Debtors' pre-petition and post-petition property and assets and all proceeds thereof, including, without limitation, all of the Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtors, excluding only Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds (collectively, the "**DIP Collateral**"). |
| **Lien Validation and Perfection:** | The DIP Liens granted on the DIP Collateral pursuant to the Interim Order or the Final Order approving the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection. |
| **DIP Lender Fees and Expenses:** | The DIP Lender shall be entitled to legal fees and expenses incurred by the DIP Lender in connection with the negotiation and preparation of this DIP Term Sheet, the |

pleadings in connection with the Interim Order and the Final Order, and any other legal fees incurred by the DIP Lender in connection with the Chapter 11 Case (excluding any legal fees and expenses incurred in connection with the Stalking Horse Asset Purchase Agreement).

**Conditions Precedent to Initial DIP Facility Advance:**

The funding of the initial DIP Facility advance (not to exceed an aggregate principal amount of $2.3 million absent entry of the Final Order) shall be subject to the following conditions precedent: (a) a Termination Date not having occurred, (b) no Event of Default having occurred (or event that would constitute an Event of Default with the giving of notice or lapse of time), (c) approval of the Budget by the DIP Lender in its commercially reasonable discretion, (d) entry of an Interim Order approving the DIP Facility, the DIP Superpriority Administrative Claim (subject and subordinate to the Carve Out), the DIP Liens granted on the DIP Collateral (subject and subordinate to the Carve Out), and containing such other orders and findings as the DIP Lender may require, including automatic modification of the automatic stay upon the occurrence of an Event of Default enabling the DIP Lender to exercise all rights and remedies against the DIP Collateral without further order of the Bankruptcy Court, which Interim Order shall not have been modified or amended without the DIP Lender's approval, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to the DIP Lender in its commercially reasonable discretion, (e) the DIP Lender's approval of all material motions and orders filed in the Chapter 11 Case requiring the expenditure of cash, and (f) continuation of the Debtors' present cash management system.

**Additional Conditions to Each Borrowing Under the DIP Facility:**

The funding of each additional DIP Facility advance shall be subject to the following conditions precedent: (a) a Termination Date not having occurred, (b) no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) having occurred under any of the DIP Financing Documents, and the representations and warranties therein shall be true and correct in all material respects when made; (c) no material adverse change in the Debtors' operations (financial, environmental, or otherwise), performance, or properties (other than as a result of the commencement of the Chapter 11 Case), since the date of this DIP Term Sheet,

6

that has or could be expected to have a Material Adverse Effect on the rights and remedies of the DIP Lender or on the ability of the Debtors to perform their obligations under the DIP Facility; (d) entry of the Interim Order and the Final Order (as applicable); and (e) the DIP Financing Documents and the Interim and Final Orders shall include such waivers, indemnities, and other provisions as are acceptable to the DIP Lender in its commercially reasonable discretion.

| | |
|---|---|
| **Affirmative and Negative Covenants:** | The Debtors shall comply with the following affirmative and negative covenants: (a) compliance with Budget covenants consistent with the section titled "Budget and Variances," (b) the Debtors shall, from and after the Petition Date, satisfy the Milestones; (c) the Debtors shall, contemporaneously with closing a sale of substantially all of their assets to a party other than the DIP Lender, remit the portion of the proceeds of such sale to the DIP Lender for immediate application to the obligations owed to the DIP Lender, subject to payment of the Carve Out and other amounts set forth in the Budget; and (d) the Debtors shall not take (or refrain from taking) any action that could reasonably be expected to have a Material Adverse Effect. |
| **Bankruptcy Court Filings:** | As soon as practicable in advance of filing with the Bankruptcy Court, the Debtors shall furnish to the DIP Lender (i) the motion seeking approval of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance satisfactory to the DIP Lender and the Debtors, (ii) the motions seeking approval of the bidding procedures and the 363 Sale, and the proposed forms of the orders related thereto, which shall be in form and substance satisfactory to the DIP Lender and the Debtors, (iii) all other proposed orders and pleadings related to the DIP Facility and the 363 Sale, which orders and pleadings shall be in form and substance satisfactory to the DIP Lender and the Debtors, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which shall be in form and substance satisfactory to the DIP Lender and the Debtors, (v) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods in Section 1121 of the Bankruptcy Code, (vi) any motion seeking approval of any sale of the Debtors' assets and any proposed form of a |

7

related bidding procedures order and sale order (other than those with respect to the bidding procedures and the 363 Sale), and (vii) any other motion filed seeking approval of any matter requiring material expenditures of the DIP Collateral must comply with the Budget (each of which must be in form and substance satisfactory to the DIP Lender and the Debtors).

**Sale Process:**

The Debtors shall conduct a sale process for the sale of substantially all of their assets in accordance with the Milestones defined below.

<u>Milestones</u>. The Debtors shall be required to comply with the following (the "**Milestones**") on or prior to the respective date set forth below for each of the Milestones (each such date, the "**Milestone Date**"):

(a)      On or within two (2) days of the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Debtors shall file a motion, in form and substance acceptable to the DIP Lender, requesting entry of the Sale Procedure Order (as defined below) and seeking approval of the sale in accordance with the Stalking Horse Asset Purchase Agreement to the Stalking Horse Bidder, or such higher bidder as may be identified through the procedures approved in the Sale Procedure Order as the Winning Bidder;

(b)      On or before the date that is thirty (30) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have entered the Sale Procedure Order;

(c)      On or before the date that is sixty (60) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, all competing binding bids under the Sale Procedure Order shall have been submitted;

(d)      On or before the date that is seventy (70) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, an auction under the Sale Procedure Order shall have occurred (if necessary);

8

(e) On or before the date that is eighty (80) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have conducted a hearing to approve the 363 Sale to the Winning Bidder (as defined below);

(f) On or before the date that is eighty (80) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale; and

(g) On or before the date that is ten (10) days after entry of the Sale Order, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the 363 Sale shall close.

Notwithstanding anything to the contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension.

The DIP Lender shall have the right to "credit bid" in any sale of the Debtors' assets up to the aggregate amount due to the DIP Lender under the DIP Facility.

**Remedies:**

Following the Termination Date and provided that the Bankruptcy Court does not enter any order to the contrary, within five (5) Business Days following the Debtors' receipt of a notice of the occurrence of a Termination Event, the DIP Lender shall have all customary remedies, including the right to foreclose or otherwise realize on all of the DIP Collateral, the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court. Consistent with the foregoing sentence, relief from the Bankruptcy Code's automatic stay in favor of the DIP Lender shall be embodied in any order approving the DIP Facility.

**Events of Default:**

The term "**Default**" and "**Event of Default**" shall mean the

9

occurrence of any of the following:

- Any of the Milestones does not occur on or prior to its Milestone Date.

- The Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed which the Debtors fail to timely oppose.

- Filing or support of a proposed plan of reorganization by the Debtors that does not provide for the indefeasible payment in full and in cash of the Debtors' obligations outstanding under the DIP Facility, unless otherwise agreed in writing by the DIP Lender in its commercially reasonable discretion.

- Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible repayment in full, in cash of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by the DIP Lender in its commercially reasonable discretion.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the DIP Lender, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of the DIP Lender, or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order, or Final Order, without the prior written consent of the DIP Lender or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Any attempt by the Debtors to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or

10

judgment is to, invalidate, reduce or otherwise impair the DIP Facility obligations or the DIP Liens granted on the DIP Collateral.

- The Debtors shall request approval of any post-petition financing, other than the DIP Facility, that would not immediately repay all DIP Facility obligations, in full, in cash, on the date of the closing of such post-petition financing.

- The Debtors shall apply for an order substituting any assets (other than cash) for all or any portion of the DIP Collateral.

- Other than with respect to the Carve Out, entry of an order granting liens or claims that are senior or *pari passu* to the DIP Liens granted on the DIP Collateral.

- The Debtors shall assert that any of the DIP Liens are invalid, or any DIP Liens granted to the DIP Lender shall be determined to be invalid.

- A final order is entered granting any secured creditor (other than the DIP Lender) with a claim in excess of $100,000 relief from the automatic stay.

- Failure to make any payments under the DIP Facility when due.

- Failure to pay any post-petition material indebtedness when due (and after giving effect to any applicable grace period).

- Debtors' failure to comply with the terms of the DIP Financing Documents (including their failure to comply with the Budget, subject to the Budget Variances and any other approved variances).

- Breach of any covenant set forth in any DIP Financing Document.

- Exclusivity shall have been terminated by the Debtors or the Debtors shall have agreed to any such termination.

- After entry thereof, either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal, shall have been modified or amended without the prior written consent of the DIP Lender.

- The commencement of an action or filing of a motion

11

by the Debtors challenging the rights and remedies of the DIP Lender under the DIP Financing Documents or that is otherwise inconsistent with the DIP Financing Documents.

**Indemnification:** The Debtors shall indemnify and hold the DIP Lender and its officers, directors, employees and formally engaged agents (including all of their professionals) (each an "**Indemnified Party**") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, fraud or willful misconduct.

**Governing Law:** The DIP Financing Documents shall be governed by the laws of the State of New York, subject to applicable federal bankruptcy laws.

**Other Definitions:** "**363 Sale**" means the sale of all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code.

"**Auction**" means an auction held in connection with the 363 Sale and in accordance with the terms of the Sale Procedure Order.

"**Avoidance Actions**" means any claims or causes of action that could be brought under Section 5 or Section 724(a) of the Bankruptcy Code or any applicable state fraudulent transfer or similar statute.

"**Avoidance Proceeds**" means the proceeds received from, or property recovered in respect of, Avoidance Actions.

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. §§ 101–1532), as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas presiding over the Chapter 11 Case.

"**Budget**" means a budget for the Debtors' operations during the Chapter 11 Case for any fiscal period, as delivered to the DIP Lender in form and substance satisfactory to the DIP Lender. A Budget for the first 13 weeks of the Chapter 11 Case must be approved by the DIP Lender and must be attached to the Interim Order. A Budget covering the period from the date of entry of the Final Order through the Maturity Date must be delivered by the Debtors to the DIP Lender (and approved by the DIP Lender in its commercially reasonable discretion) at least two (2) Business Days before any hearing related to final approval of the DIP Facility and must be attached to the Final Order.

"**Budget Variance Report**" means a current report that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Budget (on a weekly and cumulative basis), (ii) compares such actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Budget for such period, and (iii) provides an explanation for all variances between budgeted and actual amounts.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York, or is a day on which banking institutions located in the State of New York are required or authorized by law or other governmental action to close.

"**Carve Out**" means the sum of:

(a)       all fees required to be paid to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate;

(b)       all reasonable fees and expenses up to $10,000 incurred by a trustee under Section 726(b) of the

Bankruptcy Code;

(c)     all unpaid post-petition fees and expenses of the professionals retained by the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and by the Committee (if any) pursuant to Sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Chapter 11 Professionals**"), but only to the extent that such fees and expenses are (i) incurred before or on the first Business Day after delivery by the DIP Lender of a notice of the occurrence of a Termination Event, (ii) within the cumulative amounts set forth in the Budget approved by the DIP Lender for such Chapter 11 Professional as of the date of the Termination Event, and (iii) allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code; and

(d)     post-petition fees and expenses of (i) the Debtor Professionals incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $250,000 to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code and (ii) the Committee Professionals (if any) incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $15,000, to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code.

The Carve Out shall not include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:

(i) the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to the DIP Lender or the validity of any liens granted to the DIP Lender;

(ii) preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by the DIP Lender of any of its

14

rights and remedies under the DIP Financing Documents;

(iii) the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Lender or any of its officers, directors, employees, agents, attorneys, affiliates, successors or assigns;

(iv) any request to borrow money other than pursuant to the terms of the DIP Financing Documents;

(v) with respect to the Debtors, any of the Debtor Professionals, or any of their successors or assigns (including any trustee, responsible officer, examiner, estate administrator or representative or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter released or to be released, waived, or to be waived, or specified as not subject to challenge by the Debtors pursuant to the Interim Order or Final Order; or

(vi) for any other purpose for which proceeds of the DIP Facility may not be used pursuant to this DIP Term Sheet.

"**Chapter 11 Case**" means collectively, the jointly administered voluntary Chapter 11 cases commenced simultaneously by the Debtors in the Bankruptcy Court.

"**Committee**" means any statutory committee appointed in the Chapter 11 Case.

"**Final Order**" means a final, non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, on terms satisfactory to the DIP Lender in its commercially reasonable discretion.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing the Debtors, among other things, to obtain interim financing and incur post-petition indebtedness on terms satisfactory to the DIP Lender in its commercially reasonable discretion.

"**Material Adverse Effect**" means (a) a material adverse

15

change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or financial condition of the Debtors, (b) a material impairment of the rights and remedies of the DIP Lender under the DIP Financing Documents, (c) a material impairment of the DIP Collateral, (d) a material adverse effect on the Debtors' ability to perform any of its obligations under the DIP Financing Documents, or (e) a material adverse effect upon the legality, validity, binding effect, or enforceability against the Debtors of any of the DIP Financing Documents.

"**Maturity Date**" means the date that is one hundred thirty (130) days after the Petition Date, or such later date to which the DIP Lender consents in writing.

"**Petition Date**" means the date on which the Chapter 11 Case is filed with the Bankruptcy Court.

"**Sale Order**" means the order entered by the Bankruptcy Court that is either (i) in form and substance satisfactory to the DIP Lender and the Debtors or (ii) that pays in full the DIP Facility obligations, and that, among other things, approves the 363 Sale, the results of the Auction (if applicable) and the Winning Bidder's bid.

"**Sale Procedure Order**" means an order in form and substance satisfactory to the DIP Lender approving the bidding procedures for the 363 Sale.

"**Stalking Horse Asset Purchase Agreement**" means an asset purchase agreement by and among the Debtors and the Stalking Horse Bidder that provides for the purchase and sale of substantially all of the assets of the Debtors.

"**Stalking Horse Bidder**" shall mean CS One, LLC or its designee.

"**Termination Event**" means the occurrence of the earlier of:

(i) an Event of Default under the DIP Facility; or

(ii) the Debtors' failure to comply with the terms of the DIP Financing Documents (including their failure to comply with the Budget, subject to the Budget Variances and any

other approved variances).

"**Winning Bidder**" means the bidder that agrees (at the Auction if applicable) to purchase all or substantially all of the Debtors' assets.

4926-1988-6411

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**BORROWERS:**

**PARTNERS OF CONNECTICUT, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS OF MASSACHUSETTS, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS OF NEW YORK, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS OF PENNSYLVANIA, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY OF FLORIDA, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY OF MARYLAND, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

18

**PARTNERS PHARMACY OF TEXAS, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY OF VIRGINIA, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY SERVICES, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY SHELL POINT, LLC**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY, L.L.C.**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**SOLUTIONS HOMECARE, L.L.C.**

By: _Ronald M. Winters_
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

4926-1988-6411

**LENDER:**

**CS One, LLC**

By: _____
Name: Daniel E. Straus
Title:   Chief Officer

20

**<u>Exhibit 2</u>**

**Interim Approved Budget**

| | **Petition Week** | | | | | | | | | | | | | **13 Weeks** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 8/9/2025 | 8/16/2025 | 8/23/2025 | 8/30/2025 | 9/6/2025 | 9/13/2025 | 9/20/2025 | 9/27/2025 | 10/4/2025 | 10/11/2025 | 10/18/2025 | 10/25/2025 | 11/1/2025 | 8/9/2025 |
| Week Ending | 8/15/2025 | 8/22/2025 | 8/29/2025 | 9/5/2025 | 9/12/2025 | 9/19/2025 | 9/26/2025 | 10/3/2025 | 10/10/2025 | 10/17/2025 | 10/24/2025 | 10/31/2025 | 11/7/2025 | 11/7/2025 |
| | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget |
| **Beginning Cash** | $ (104,984) | $ 92,561 | $ 152,561 | $ 146,919 | $ 259,919 | $ 429,277 | $ 552,983 | $ 643,983 | $ 653,341 | $ 820,120 | $ 843,826 | $ 934,826 | $ 1,069,184 | $ (104,984) |
| Collections | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 2,142,000 | 27,846,000 |
| Avantum | 350,000 | - | 350,000 | - | 350,000 | - | 350,000 | - | 350,000 | - | 350,000 | - | 350,000 | 2,450,000 |
| **Total Receipts** | **2,492,000** | **2,142,000** | **2,492,000** | **2,142,000** | **2,492,000** | **2,142,000** | **2,492,000** | **2,142,000** | **2,492,000** | **2,142,000** | **2,492,000** | **2,142,000** | **2,492,000** | **30,296,000** |
| Payroll & Benefits | 96,000 | 910,000 | 96,000 | 857,000 | 96,000 | 839,000 | 96,000 | 839,000 | 96,000 | 839,000 | 96,000 | 839,000 | 96,000 | 5,795,000 |
| Pharmacy Costs | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 1,450,000 | 18,850,000 |
| Delivery Costs | 203,000 | 100,000 | 203,000 | 100,000 | 203,000 | 100,000 | 203,000 | 100,000 | 203,000 | 100,000 | 203,000 | 100,000 | 203,000 | 2,021,000 |
| Other | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 3,575,000 |
| InterchangeRx | 230,000 | - | 230,000 | - | 230,000 | - | 230,000 | - | 230,000 | - | 230,000 | - | 230,000 | 1,610,000 |
| Omnicell payment program | 44,000 | - | - | - | - | - | - | - | - | - | - | - | - | 44,000 |
| Rent | 107,294 | - | 71,642 | - | 71,642 | 107,294 | - | 71,642 | - | 107,294 | - | 71,642 | - | 608,450 |
| **Total Operating Costs** | **2,405,294** | **2,735,000** | **2,325,642** | **2,682,000** | **2,325,642** | **2,771,294** | **2,254,000** | **2,735,642** | **2,254,000** | **2,771,294** | **2,254,000** | **2,735,642** | **2,254,000** | **32,503,450** |
| **Operating Cashflow** | **86,706** | **(593,000)** | **166,358** | **(540,000)** | **166,358** | **(629,294)** | **238,000** | **(593,642)** | **238,000** | **(629,294)** | **238,000** | **(593,642)** | **238,000** | **(2,207,450)** |
| **Restructuring Costs** | | | | | | | | | | | | | | |
| Adequate Assurance | 135,000 | - | - | - | - | - | - | - | - | - | - | - | - | 135,000 |
| Debtor Counsel | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,300,000 |
| Debtor Financial Advisor | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 47,000 | 611,000 |
| Independent Manager | 57,161 | - | - | - | - | - | - | 25,000 | - | - | - | - | 25,000 | 107,161 |
| Investment Banker | 50,000 | - | - | - | 50,000 | - | - | 50,000 | - | - | - | - | 425,000 | 575,000 |
| Claims Agent | - | - | 25,000 | - | - | - | 25,000 | - | - | - | - | 25,000 | - | 75,000 |
| US Trustee | - | - | - | - | - | - | - | - | 174,221 | - | - | - | - | 174,221 |
| **Total Restructuring Costs** | **389,161** | **147,000** | **172,000** | **147,000** | **197,000** | **147,000** | **147,000** | **197,000** | **371,221** | **147,000** | **147,000** | **172,000** | **597,000** | **2,977,383** |
| **Net Cash Flow** | **(302,455)** | **(740,000)** | **(5,642)** | **(687,000)** | **(30,642)** | **(776,294)** | **91,000** | **(790,642)** | **(133,221)** | **(776,294)** | **91,000** | **(765,642)** | **(359,000)** | **(5,184,833)** |
| **Ending Cash (Before Draws)** | **(407,439)** | **(647,439)** | **146,919** | **(540,081)** | **229,277** | **(347,017)** | **643,983** | **(146,659)** | **520,120** | **43,826** | **934,826** | **169,184** | **710,184** | **(5,289,816)** |
| DIP Draws | 500,000 | 800,000 | - | 800,000 | 200,000 | 900,000 | - | 800,000 | 300,000 | 800,000 | - | 900,000 | 500,000 | 6,500,000 |
| **Ending Cash (After Draws)** | $ 92,561 | $ 152,561 | $ 146,919 | $ 259,919 | $ 429,277 | $ 552,983 | $ 643,983 | $ 653,341 | $ 820,120 | $ 843,826 | $ 934,826 | $ 1,069,184 | $ 1,210,184 | $ 1,210,184 |

**<u>Exhibit B</u>**

**Proposed Final Order**

(To be filed)

**<u>Exhibit C</u>**

**DIP Term Sheet**

**Partners Pharmacy Services, LLC**
**Terms and Conditions of**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Credit Facility**

---

*The terms outlined below in these Terms and Conditions (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession credit facility (hereinafter referred to as the "**DIP Facility**") to be made available to the Debtors (as defined below). This DIP Term Sheet, the Interim Order (as defined below), and the Final Order (as defined below) shall collectively constitute the exclusive and definitive documentation and agreement among the parties for the DIP Facility (the "**DIP Financing Documents**").*

---

| | |
|---|---|
| **Borrowers:** | Arrow Envoy Holdings, LLC; Arrow Pharmacy Holdings, LLC; Partners of Connecticut, LLC; Partners of Massachusetts, LLC; Partners of New York, LLC; Partners of Pennsylvania, LLC; Partners Pharmacy of Florida, LLC; Partners Pharmacy of Maryland, LLC; Partners Pharmacy of Texas, LLC; Partners Pharmacy of Virginia, LLC; Partners Pharmacy Services, LLC; Partners Pharmacy Shell Point, LLC; Partners Pharmacy, L.L.C.; and Solutions Homecare, L.L.C. (collectively, the "**Debtors**"), who shall all have simultaneously filed the Chapter 11 Case (as defined below) in the Bankruptcy Court (as defined below). |
| **Amount and Type of Facility:** | After entry of the Interim Order (as defined below), the DIP Facility will consist of a consolidated, delayed, multi-draw term loan to the Debtors on a joint and several basis in the aggregate maximum principal amount not to exceed $6.5 million, (the "**DIP Loan Commitment**"). |
| **DIP Lender:** | CS One, LLC (the "**DIP Lender**"). |
| **Borrowing Availability:** | So long as the Termination Date has not occurred, advances will be made available under the DIP Facility but shall be limited in all respects by the Budget and the Draw Schedule. |
| | Within this term sheet, the "**Draw Schedule**" shall mean: |
| | from the Petition Date through September 12, 2025 a maximum principal amount not to exceed $2.3 million, with the remainder of the DIP Loan Commitment available after entry of the Final Order, subject to all of the terms and conditions herein. |
| | The Draw Schedule may be modified and amended from |

time to time only with the consent of the DIP Lender and the Debtors.

|  |  |
|---|---|
| **Budget and Variances:** | Subject to the Budget Variances (as defined below) (i) the Debtors' Budget line items for cash receipts and cash disbursements (excluding fees and expenses of third party professionals engaged by or for the benefit of Debtors and, if appointed, the Committee (collectively, "**Professional Fees**")) shall each be adhered to, by line item, on a weekly basis and a cumulative basis for the Budget (as defined below) period then ending as described below, provided, however, that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks and (ii) the Debtors' disbursements for Professional Fees (which shall be reported in a manner so that Professional Fees for each retained professional shall be reflected on its own line item) shall be adhered to on a cumulative basis for that portion of the Budget period then ending. |

Actual amounts for each cash receipt and cash disbursement from operations line items (which shall not include any Professional Fees) shall not vary from the applicable Budget (including any amounts deemed to roll over from a previous week due to not being spent) by (i) more than ten percent (10%) by line item on a trailing three-week basis; or (ii) ten percent (10%) on a cumulative basis (collectively, the "**Budget Variances**").

On or before the third Business Day (as defined below) of each week, commencing with the first week following the Petition Date, the Debtors shall deliver to the DIP Lender a Budget Variance Report.

|  |  |
|---|---|
| **Professional Fee Escrow:** | The Debtors shall, on the dates set forth in the Budget, establish and fund an escrow account with cash equal to the sum of the Debtors' Budget line items for Professional Fees (such account, the "**Professional Fee Escrow Account**"). For the avoidance of doubt, (i) the Professional Fees of each Chapter 11 Professional remain subject to approval by the Bankruptcy Court on appropriate notice and hearing to all parties-in-interest and (ii) the amount funded into the Professional Fee Escrow Account shall not limit the amount of fees and expenses that are the subject of a Chapter 11 Professional's request for payment with the Bankruptcy Court. |

2

**Termination Date:**    The earliest to occur of: (a) the Maturity Date (as defined below); (b) thirty (30) days after the Petition Date (as defined below) if the Final Order has not been entered; (c) the DIP Lender's written notice to Debtors' counsel of the acceleration of the obligations under the DIP Facility as a result of an Event of Default (as defined below); (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and is otherwise acceptable to the DIP Lender in its commercially reasonable discretion; (e) the date which is the closing date of any sale of all or substantially all of the Debtors' assets; (f) the entry of an order by the Bankruptcy Court (as defined below) (i) granting relief from the automatic stay permitting foreclosure of any assets of the Debtors with a value in excess of $100,000 in the aggregate, (ii) granting any motion by the DIP Lender to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) appointing a trustee or an examiner with special powers, or (iv) dismissing or converting the Chapter 11 Case; (g) the filing or support by the Debtors of a plan of reorganization or liquidation that (i) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and (ii) is not otherwise acceptable to the DIP Lender in its commercially reasonable discretion; (h) other than with respect to the Carve Out (as defined below), the entry of an order by the Bankruptcy Court granting liens or claims that are senior or *pari passu* to the liens securing the DIP Facility; (i) the date a Termination Event occurs, and (j) any of the Milestones do not occur on or prior to its Milestone Date. The date on which the earliest of clauses (a) through (j) above occurs and the DIP Lender provides notice thereof to the Debtors being referred to hereinafter as the "**Termination Date**." On the Termination Date, the DIP Facility shall be deemed terminated, and the DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility or the DIP Financing Documents, except for funding of the Carve Out.

**Non-Default Interest Rate:**    Interest on all outstanding advances under the DIP Facility shall accrue from and after the Petition Date at a fixed rate per annum equal to twelve percent (12%) and will be payable in kind.

| **Default Interest Rate:** | Effective immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Lender, interest on the outstanding loans under the DIP Facility shall accrue at a fixed rate per annum equal to fifteen percent (15%). |
|---|---|
| **Loan Payments:** | The Debtors promise and agree to pay to the DIP Lender all DIP Facility advances, together with interest thereon accruing pursuant to the DIP Financing Documents, in full, in cash, at the times set forth in the DIP Financing Documents, but no later than the Termination Date. |
| | All unpaid principal, interest, fees, costs and expenses on the DIP Facility shall be due and payable in full by the Debtors on the Termination Date, whether at maturity, upon acceleration or otherwise and if such amounts are not paid in full in cash, interest, fees, costs, and expenses in respect of the DIP Facility shall continue to accrue until paid in full. |
| **Use of Proceeds:** | Proceeds of the DIP Facility shall be used solely for the following purposes (solely to the extent identified and limited in the Budget, subject to the Budget Variances as permitted hereunder): (a) to fund, after application of all other available cash, ordinary course post-petition operating expenses and working capital needs of the Debtors; (b) to fund Bankruptcy Court approved fees and expenses incurred in connection with the 363 Sale (as defined below); (c) to pay Bankruptcy Court approved pre-petition claims as approved by the DIP Lender in its commercially reasonable discretion; (d) to pay Bankruptcy Court approved Professional Fees provided for in the Budget, including the funding of the Carve Out; and (e) to pay other ordinary course costs and expenses of administration of the Chapter 11 Case which do not require Bankruptcy Court approval. |
| **Cash Management Collections and Remittances:** | The Debtors shall use a cash management system that is the same as or substantially similar to their pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to the DIP Lender in its commercially reasonable discretion. The Interim Order and Final Order shall provide the DIP Lender with a valid and enforceable first priority senior secured |

priming lien and security interest (subject and subordinate to the Carve Out) on the cash held in the Debtors' bank accounts.

**Super-Priority Administrative Claim:**

In accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), amounts owed by the Debtors to the DIP Lender pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, subject and subordinate to the Carve Out, a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113, or 1114 of the Bankruptcy Code (the "**DIP Superpriority Administrative Claim**").

**Collateral Security:**

Subject and subordinate to the Carve Out, the DIP Facility (including accrued interest, fees, costs and expenses) shall be secured by valid and perfected first priority senior secured and priming liens and security interests in favor of the DIP Lender superior to all other liens, claims or security interests that any party in interest or any creditor of the Debtors' may have (the "**DIP Liens**") in all of the Debtors' pre-petition and post-petition property and assets and all proceeds thereof, including, without limitation, all of the Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtors, excluding only Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds (collectively, the "**DIP Collateral**").

**Lien Validation and Perfection:**

The DIP Liens granted on the DIP Collateral pursuant to the Interim Order or the Final Order approving the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.

**DIP Lender Fees and Expenses:**

The DIP Lender shall be entitled to legal fees and expenses incurred by the DIP Lender in connection with the negotiation and preparation of this DIP Term Sheet, the

4926-1988-6411

pleadings in connection with the Interim Order and the Final Order, and any other legal fees incurred by the DIP Lender in connection with the Chapter 11 Case (excluding any legal fees and expenses incurred in connection with the Stalking Horse Asset Purchase Agreement).

**Conditions Precedent to Initial DIP Facility Advance:**

The funding of the initial DIP Facility advance (not to exceed an aggregate principal amount of $2.3 million absent entry of the Final Order) shall be subject to the following conditions precedent: (a) a Termination Date not having occurred, (b) no Event of Default having occurred (or event that would constitute an Event of Default with the giving of notice or lapse of time), (c) approval of the Budget by the DIP Lender in its commercially reasonable discretion, (d) entry of an Interim Order approving the DIP Facility, the DIP Superpriority Administrative Claim (subject and subordinate to the Carve Out), the DIP Liens granted on the DIP Collateral (subject and subordinate to the Carve Out), and containing such other orders and findings as the DIP Lender may require, including automatic modification of the automatic stay upon the occurrence of an Event of Default enabling the DIP Lender to exercise all rights and remedies against the DIP Collateral without further order of the Bankruptcy Court, which Interim Order shall not have been modified or amended without the DIP Lender's approval, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to the DIP Lender in its commercially reasonable discretion, (e) the DIP Lender's approval of all material motions and orders filed in the Chapter 11 Case requiring the expenditure of cash, and (f) continuation of the Debtors' present cash management system.

**Additional Conditions to Each Borrowing Under the DIP Facility:**

The funding of each additional DIP Facility advance shall be subject to the following conditions precedent: (a) a Termination Date not having occurred, (b) no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) having occurred under any of the DIP Financing Documents, and the representations and warranties therein shall be true and correct in all material respects when made; (c) no material adverse change in the Debtors' operations (financial, environmental, or otherwise), performance, or properties (other than as a result of the commencement of the Chapter 11 Case), since the date of this DIP Term Sheet,

6

that has or could be expected to have a Material Adverse Effect on the rights and remedies of the DIP Lender or on the ability of the Debtors to perform their obligations under the DIP Facility; (d) entry of the Interim Order and the Final Order (as applicable); and (e) the DIP Financing Documents and the Interim and Final Orders shall include such waivers, indemnities, and other provisions as are acceptable to the DIP Lender in its commercially reasonable discretion.

|  |  |
|---|---|
| **Affirmative and Negative Covenants:** | The Debtors shall comply with the following affirmative and negative covenants: (a) compliance with Budget covenants consistent with the section titled "Budget and Variances," (b) the Debtors shall, from and after the Petition Date, satisfy the Milestones; (c) the Debtors shall, contemporaneously with closing a sale of substantially all of their assets to a party other than the DIP Lender, remit the portion of the proceeds of such sale to the DIP Lender for immediate application to the obligations owed to the DIP Lender, subject to payment of the Carve Out and other amounts set forth in the Budget; and (d) the Debtors shall not take (or refrain from taking) any action that could reasonably be expected to have a Material Adverse Effect. |
| **Bankruptcy Court Filings:** | As soon as practicable in advance of filing with the Bankruptcy Court, the Debtors shall furnish to the DIP Lender (i) the motion seeking approval of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance satisfactory to the DIP Lender and the Debtors, (ii) the motions seeking approval of the bidding procedures and the 363 Sale, and the proposed forms of the orders related thereto, which shall be in form and substance satisfactory to the DIP Lender and the Debtors, (iii) all other proposed orders and pleadings related to the DIP Facility and the 363 Sale, which orders and pleadings shall be in form and substance satisfactory to the DIP Lender and the Debtors, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which shall be in form and substance satisfactory to the DIP Lender and the Debtors, (v) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods in Section 1121 of the Bankruptcy Code, (vi) any motion seeking approval of any sale of the Debtors' assets and any proposed form of a |

7

related bidding procedures order and sale order (other than those with respect to the bidding procedures and the 363 Sale), and (vii) any other motion filed seeking approval of any matter requiring material expenditures of the DIP Collateral must comply with the Budget (each of which must be in form and substance satisfactory to the DIP Lender and the Debtors).

**Sale Process:**
The Debtors shall conduct a sale process for the sale of substantially all of their assets in accordance with the Milestones defined below.

<u>Milestones</u>. The Debtors shall be required to comply with the following (the "**Milestones**") on or prior to the respective date set forth below for each of the Milestones (each such date, the "**Milestone Date**"):

(a) On or within two (2) days of the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Debtors shall file a motion, in form and substance acceptable to the DIP Lender, requesting entry of the Sale Procedure Order (as defined below) and seeking approval of the sale in accordance with the Stalking Horse Asset Purchase Agreement to the Stalking Horse Bidder, or such higher bidder as may be identified through the procedures approved in the Sale Procedure Order as the Winning Bidder;

(b) On or before the date that is thirty (30) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have entered the Sale Procedure Order;

(c) On or before the date that is sixty (60) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, all competing binding bids under the Sale Procedure Order shall have been submitted;

(d) On or before the date that is seventy (70) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, an auction under the Sale Procedure Order shall have occurred (if necessary);

8

    (e)     On or before the date that is eighty (80) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have conducted a hearing to approve the 363 Sale to the Winning Bidder (as defined below);

    (f)     On or before the date that is eighty (80) days after the Petition Date, or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale; and

    (g)     On or before the date that is ten (10) days after entry of the Sale Order, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which the DIP Lender consents in writing in its commercially reasonable discretion, the 363 Sale shall close.

Notwithstanding anything to the contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension.

The DIP Lender shall have the right to "credit bid" in any sale of the Debtors' assets up to the aggregate amount due to the DIP Lender under the DIP Facility.

**Remedies:**

Following the Termination Date and provided that the Bankruptcy Court does not enter any order to the contrary, within five (5) Business Days following the Debtors' receipt of a notice of the occurrence of a Termination Event, the DIP Lender shall have all customary remedies, including the right to foreclose or otherwise realize on all of the DIP Collateral, the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court. Consistent with the foregoing sentence, relief from the Bankruptcy Code's automatic stay in favor of the DIP Lender shall be embodied in any order approving the DIP Facility.

**Events of Default:**

The term "**Default**" and "**Event of Default**" shall mean the

occurrence of any of the following:

- Any of the Milestones does not occur on or prior to its Milestone Date.

- The Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed which the Debtors fail to timely oppose.

- Filing or support of a proposed plan of reorganization by the Debtors that does not provide for the indefeasible payment in full and in cash of the Debtors' obligations outstanding under the DIP Facility, unless otherwise agreed in writing by the DIP Lender in its commercially reasonable discretion.

- Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible repayment in full, in cash of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by the DIP Lender in its commercially reasonable discretion.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the DIP Lender, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of the DIP Lender, or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order, or Final Order, without the prior written consent of the DIP Lender or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Any attempt by the Debtors to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or

10

judgment is to, invalidate, reduce or otherwise impair the DIP Facility obligations or the DIP Liens granted on the DIP Collateral.

- The Debtors shall request approval of any post-petition financing, other than the DIP Facility, that would not immediately repay all DIP Facility obligations, in full, in cash, on the date of the closing of such post-petition financing.

- The Debtors shall apply for an order substituting any assets (other than cash) for all or any portion of the DIP Collateral.

- Other than with respect to the Carve Out, entry of an order granting liens or claims that are senior or *pari passu* to the DIP Liens granted on the DIP Collateral.

- The Debtors shall assert that any of the DIP Liens are invalid, or any DIP Liens granted to the DIP Lender shall be determined to be invalid.

- A final order is entered granting any secured creditor (other than the DIP Lender) with a claim in excess of $100,000 relief from the automatic stay.

- Failure to make any payments under the DIP Facility when due.

- Failure to pay any post-petition material indebtedness when due (and after giving effect to any applicable grace period).

- Debtors' failure to comply with the terms of the DIP Financing Documents (including their failure to comply with the Budget, subject to the Budget Variances and any other approved variances).

- Breach of any covenant set forth in any DIP Financing Document.

- Exclusivity shall have been terminated by the Debtors or the Debtors shall have agreed to any such termination.

- After entry thereof, either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal, shall have been modified or amended without the prior written consent of the DIP Lender.

- The commencement of an action or filing of a motion

11

by the Debtors challenging the rights and remedies of the DIP Lender under the DIP Financing Documents or that is otherwise inconsistent with the DIP Financing Documents.

**Indemnification:** The Debtors shall indemnify and hold the DIP Lender and its officers, directors, employees and formally engaged agents (including all of their professionals) (each an "**Indemnified Party**") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, fraud or willful misconduct.

**Governing Law:** The DIP Financing Documents shall be governed by the laws of the State of New York, subject to applicable federal bankruptcy laws.

**Other Definitions:** "**363 Sale**" means the sale of all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code.

"**Auction**" means an auction held in connection with the 363 Sale and in accordance with the terms of the Sale Procedure Order.

"**Avoidance Actions**" means any claims or causes of action that could be brought under Section 5 or Section 724(a) of the Bankruptcy Code or any applicable state fraudulent transfer or similar statute.

"**Avoidance Proceeds**" means the proceeds received from, or property recovered in respect of, Avoidance Actions.

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. §§ 101–1532), as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas presiding over the Chapter 11 Case.

"**Budget**" means a budget for the Debtors' operations during the Chapter 11 Case for any fiscal period, as delivered to the DIP Lender in form and substance satisfactory to the DIP Lender. A Budget for the first 13 weeks of the Chapter 11 Case must be approved by the DIP Lender and must be attached to the Interim Order. A Budget covering the period from the date of entry of the Final Order through the Maturity Date must be delivered by the Debtors to the DIP Lender (and approved by the DIP Lender in its commercially reasonable discretion) at least two (2) Business Days before any hearing related to final approval of the DIP Facility and must be attached to the Final Order.

"**Budget Variance Report**" means a current report that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Budget (on a weekly and cumulative basis), (ii) compares such actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Budget for such period, and (iii) provides an explanation for all variances between budgeted and actual amounts.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York, or is a day on which banking institutions located in the State of New York are required or authorized by law or other governmental action to close.

"**Carve Out**" means the sum of:

(a)     all fees required to be paid to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate;

(b)     all reasonable fees and expenses up to $10,000 incurred by a trustee under Section 726(b) of the

Bankruptcy Code;

(c)      all unpaid post-petition fees and expenses of the professionals retained by the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and by the Committee (if any) pursuant to Sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Chapter 11 Professionals**"), but only to the extent that such fees and expenses are (i) incurred before or on the first Business Day after delivery by the DIP Lender of a notice of the occurrence of a Termination Event, (ii) within the cumulative amounts set forth in the Budget approved by the DIP Lender for such Chapter 11 Professional as of the date of the Termination Event, and (iii) allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code; and

(d)      post-petition fees and expenses of (i) the Debtor Professionals incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $250,000 to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code and (ii) the Committee Professionals (if any) incurred after the first Business Day following delivery by the DIP Lender of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $15,000, to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code.

The Carve Out shall not include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:

(i) the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to the DIP Lender or the validity of any liens granted to the DIP Lender;

(ii) preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by the DIP Lender of any of its

rights and remedies under the DIP Financing Documents;

(iii) the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Lender or any of its officers, directors, employees, agents, attorneys, affiliates, successors or assigns;

(iv) any request to borrow money other than pursuant to the terms of the DIP Financing Documents;

(v) with respect to the Debtors, any of the Debtor Professionals, or any of their successors or assigns (including any trustee, responsible officer, examiner, estate administrator or representative or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter released or to be released, waived, or to be waived, or specified as not subject to challenge by the Debtors pursuant to the Interim Order or Final Order; or

(vi) for any other purpose for which proceeds of the DIP Facility may not be used pursuant to this DIP Term Sheet.

"**Chapter 11 Case**" means collectively, the jointly administered voluntary Chapter 11 cases commenced simultaneously by the Debtors in the Bankruptcy Court.

"**Committee**" means any statutory committee appointed in the Chapter 11 Case.

"**Final Order**" means a final, non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, on terms satisfactory to the DIP Lender in its commercially reasonable discretion.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing the Debtors, among other things, to obtain interim financing and incur post-petition indebtedness on terms satisfactory to the DIP Lender in its commercially reasonable discretion.

"**Material Adverse Effect**" means (a) a material adverse

change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or financial condition of the Debtors, (b) a material impairment of the rights and remedies of the DIP Lender under the DIP Financing Documents, (c) a material impairment of the DIP Collateral, (d) a material adverse effect on the Debtors' ability to perform any of its obligations under the DIP Financing Documents, or (e) a material adverse effect upon the legality, validity, binding effect, or enforceability against the Debtors of any of the DIP Financing Documents.

"**Maturity Date**" means the date that is one hundred thirty (130) days after the Petition Date, or such later date to which the DIP Lender consents in writing.

"**Petition Date**" means the date on which the Chapter 11 Case is filed with the Bankruptcy Court.

"**Sale Order**" means the order entered by the Bankruptcy Court that is either (i) in form and substance satisfactory to the DIP Lender and the Debtors or (ii) that pays in full the DIP Facility obligations, and that, among other things, approves the 363 Sale, the results of the Auction (if applicable) and the Winning Bidder's bid.

"**Sale Procedure Order**" means an order in form and substance satisfactory to the DIP Lender approving the bidding procedures for the 363 Sale.

"**Stalking Horse Asset Purchase Agreement**" means an asset purchase agreement by and among the Debtors and the Stalking Horse Bidder that provides for the purchase and sale of substantially all of the assets of the Debtors.

"**Stalking Horse Bidder**" shall mean CS One, LLC or its designee.

"**Termination Event**" means the occurrence of the earlier of:

(i) an Event of Default under the DIP Facility; or

(ii) the Debtors' failure to comply with the terms of the DIP Financing Documents (including their failure to comply with the Budget, subject to the Budget Variances and any

4926-1988-6411

other approved variances).

"**Winning Bidder**" means the bidder that agrees (at the Auction if applicable) to purchase all or substantially all of the Debtors' assets.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**BORROWERS:**

**PARTNERS OF CONNECTICUT, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title: Chief Restructuring Officer

**PARTNERS OF MASSACHUSETTS, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title: Chief Restructuring Officer

**PARTNERS OF NEW YORK, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title: Chief Restructuring Officer

**PARTNERS OF PENNSYLVANIA, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title: Chief Restructuring Officer

**PARTNERS PHARMACY OF FLORIDA, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title: Chief Restructuring Officer

**PARTNERS PHARMACY OF MARYLAND, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title: Chief Restructuring Officer

4926-1988-6411

**PARTNERS PHARMACY OF TEXAS, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY OF VIRGINIA, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY SERVICES, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY SHELL POINT, LLC**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**PARTNERS PHARMACY, L.L.C.**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

**SOLUTIONS HOMECARE, L.L.C.**

By: *Ronald M. Winters*
Name: Ronald M. Winters
Title:   Chief Restructuring Officer

4926-1988-6411

**LENDER:**

**CS One, LLC**

By: _____

Name: Daniel E. Straus

Title:   Chief Officer