# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Partners Pharmacy Services, LLC, *et al.*,[1] | Case No. 25-34698 (CML) |
| Debtors. | (Jointly Administered) |

## DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BID PROCEDURES, (B) DESIGNATING STALKING HORSE BIDDER, (C) SCHEDULING AN AUCTION, RELATED DEADLINES, AND A SALE HEARING, AND (D) GRANTING RELATED RELIEF; AND (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, AND (C) GRANTING RELATED RELIEF

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on September 10, 2025 at 1:00 p.m. (prevailing Central Time) at the United States Court for the Southern District of Texas, 515 Rusk Street, Courtroom 401, Houston, Texas 77002. You may participate in the hearing either in person or by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C. (4578); and Solutions Homecare, L.L.C. (1583). The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (the "Motion").[2]

**RELIEF REQUESTED**

The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**

(the "Bid Procedures Order"):

(i)    approving the bid procedures attached as **Exhibit 1** to the Bid Procedures Order
       (the "Bid Procedures") to be used in connection with the sale of substantially all of
       the Debtors' assets (the "Assets" and, the sale thereof, the "Sale");

(ii)   designating CS One, LLC ("CS One") or its designee as the stalking horse bidder
       (the "Stalking Horse Bidder");

(iii)  scheduling an auction (if necessary) of the Assets (the "Auction") and a hearing to
       consider approval of the Sale (the "Sale Hearing");

(iv)   approving the form and manner of notice of the Auction and the Sale Hearing
       attached as **Exhibit 2** to the Bid Procedures Order (the "Sale and Auction Notice");

(v)    approving the form and manner of notice of the successful bidder at the Auction
       (the "Successful Bidder") attached as **Exhibit 3** to the Bid Procedures Order (the
       "Successful Bidder Notice");

(vi)   approving procedures for the assumption and assignment of executory contracts
       and unexpired leases (the "Contracts") in connection with the Sale (the
       "Assumption and Assignment Procedures");

(vii)  approving the form and manner of notice to each non-debtor counterparty to a
       Contract proposed to be assumed attached as **Exhibit 4** to the Bid Procedures Order
       (the "Cure Notice"); and

(viii) granting related relief.

The Debtors also seek entry of a sale order, substantially in the form of order to be filed in

advance of the Sale Hearing (the "Sale Order"):

(i)    authorizing the Sale to the Stalking Horse Bidder or the Successful Bidder free and
       clear of all liens, claims, interests and encumbrances pursuant to an asset purchase

---

[2]  Capitalized terms used but not otherwise defined in this Motion have the meaning given such terms in the Stalking
     Horse APA.

agreement,[3] which may be substantially in the form attached hereto as **Exhibit B** (the "Stalking Horse APA");

(ii)    authorizing the assumption and assignment of the Contracts to the Stalking Horse Bidder or the Successful Bidder; and

(iii)    granting related relief.

## PRELIMINARY STATEMENT

1.    The Debtors commenced these chapter 11 cases with the goal of running a robust marketing and sale process to sell substantially all of their assets.  The Debtors have secured a stalking horse bid from their pre-petition lender who is also providing post-petition financing[4] (the "DIP Facility") to fund operations and administrative costs during the sale process.  The stalking horse bid consists of (a) approximately $51 million credit bid comprised of $44,524,814 of the Debtors' obligations under the Credit Agreement with CS One (the "Pre-Petition Credit Agreement") and $6.5 million of the Debtors' obligations under the DIP Facility; ***plus*** (b) assumption of certain Assumed Liabilities; ***plus*** (c) assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder and payment of cure costs (collectively, the "Stalking Horse Bid").  The Stalking Horse Bid is ***not*** subject to a breakup fee, expense reimbursement, or other bid protections.  This is in part because the Debtors and the Stalking Horse Bidder (CS One) ultimately share common ownership.

2.    To ensure they maximize the value of the Assets, the Debtors have retained SSG Advisors, LLC ("SSG") as their investment banker to market the Assets and solicit higher or better

---

[3]  The Debtors and the Stalking Horse Bidder continue to negotiate certain provisions of the Stalking Horse APA.  If the Stalking Horse Bidder is the Successful Bidder at the Auction, then before the Sale Hearing the Debtors will file an updated version of the Stalking Horse APA, together with a comparison marked against the version attached hereto as **Exhibit B**.

[4]  *See Debtors' Emergency Motion for Entry of Interim and Final Orders(I) Authorizing the Debtors to Obtain Post-Petition Financing and Use Cash Collateral;(II) Granting Adequate Protection; and (III) Granting Related Relief* [Docket No. 6].

4913-0324-3088

offers.  To facilitate and ensure a fair and transparent process, the Debtors seek approval of procedures that will govern the submission and evaluation of bids.  The Bid Procedures establish clear protocols regarding, among other things, (i) the qualification of bidders, (ii) the criteria for submitting bids for all or a subset of the Assets, and (iii) the terms and conditions for access to due diligence materials.

3.      Given the milestones under the DIP Facility and the Debtors' anticipated negative cash flow during these cases (addressed via the DIP Facility), a prompt sale process is essential to (among other things) maximizing value and ensuring the Debtors' continued ability to meet administrative and operational obligations during these chapter 11 cases.  To that end, the timeline proposed below is designed to enable a competitive sale process, while minimizing operational and financial disruption that could result from a prolonged stay in chapter 11.

### TIMELINE FOR SALE

| Date and Time (All Central Times) | Event or Deadline |
|---|---|
| Three business days after entry of the Bid Procedures Order | Deadline to file and serve Sale and Auction Notice |
| As soon as reasonably practicable after entry of the Bid Procedures Order | Deadline to file and serve the Cure Notice and publish the Sale and Auction Notice |
| September 29, 2025 at 4:00 p.m. | Sale Objection Deadline[5] and Cure Objection Deadline |
| October 7, 2025 at 4:00 p.m. | Bid Deadline |
| October 9, 2025 at 10:00 a.m. | Auction (if necessary) |
| October 10, 2025 at 4:00 p.m. | Deadline to file Successful Bidder Notice |

---

[5]  Except for objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder (if the Stalking Horse Bidder is not the Successful Bidder or the Backup Bidder), all objections to the Sale, including (i) any objection to the sale of the Assets free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) entry of the Sale Order (each such objection, a "Sale Objection") shall be filed and served no later than **September 29, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Sale Objection Deadline").

| Date and Time (All Central Times) | Event or Deadline |
|---|---|
| October 13, 2025 at 4:00 p.m. | Supplemental Sale Objection Deadline[6] and Adequate Assurance Objection Deadline |
| October 17, 2025 at 11:59 p.m. | Deadline to Reply to Sale Objections, Cure Objections, and Adequate Assurance Objections |
| October 21, 2025 | *Proposed* Sale Hearing |
| October 31, 2025 | Closing Deadline |

### JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors consent to entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested are sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas.

---

[6]  After the Sale Objection Deadline, parties may object solely with respect to the conduct of the Auction and/or the Successful Bidder or Backup Bidder (in each case, if such bidder is not the Stalking Horse Bidder) by **October 13, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Supplemental Sale Objection Deadline").

4913-0324-3088

<u>**BACKGROUND**</u>

7.     On August 13, 2025 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these cases.

8.     The Debtors serve the medication management needs of residents at skilled nursing facilities, assisted living communities, long-term care residences, long-term acute care hospitals, and institutional care facilities across the United States.  These services are delivered through a network of in-house pharmacies and supported by a range of advanced technologies and capabilities, including automation systems, infusion therapy technologies, compounding services, clinical decision-support tools, and a dedicated team offering clinical support services.

9.     Additional information about the Debtors, including their business operations, corporate and capital structure, and the events leading to the filing of these cases is detailed in the *Declaration of Ronald M. Winters in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 13] (the "<u>First Day Declaration</u>").

**A.     Liquidity Challenges Leading to Pre-Petition Sale Efforts**

10.     In recent years, the Debtors have faced mounting challenges stemming from industry headwinds, including the Covid-19 pandemic, inflation, changes to Medicare, declining reimbursement rates, and unfavorable industry consolidation.  First Day Decl. ¶ 2.  In response to these mounting pressures, the Debtors initiated a series of restructuring efforts in late 2022, including closing underperforming pharmacies.  *See id.* ¶¶ 3, 38–39.

11.     Despite these efforts, the Debtors remained cash flow negative, which led to multiple amendments to their Pre-Petition Credit Agreement, including temporary waivers of

defaults and extensions of the maturity date.[7]  *See id.* ¶ 3.  The Debtors' financial difficulties were further exacerbated by the filing of multiple lawsuits against them and mounting payment demands from vendors, all of which added pressure to an already strained liquidity position.  *Id.*  In response, the Debtors began actively pursuing a potential sale of their business.  *Id.*

### B.     Unsuccessful Sale to PharMerica

12.     In June 2024, the Debtors and PharMerica, one of the largest institutional pharmacy companies in the United States, began negotiating an asset purchase agreement under which PharMerica would acquire substantially all of the Debtors' assets.  *Id.* ¶ 4.  Although the parties set an aggressive closing target, the closing date slipped multiple times, ultimately to April 15, 2025, all as the Debtors' financial condition continued to deteriorate.  *Id.*  In April 2025, PharMerica withdrew from negotiations.  *Id.*

### C.     Specialty RX Emerges as a Potential Buyer

13.     Shortly thereafter, Specialty RX, another pharmacy company focused on serving long-term care facilities, emerged as a potential purchaser.  *Id.* ¶ 43.  On May 9, 2025, Partners Acquisition SRX LLC ("SRX"), a Specialty RX affiliate, and the Debtors executed a term sheet outlining the principal terms under which the parties would negotiate an asset purchase agreement for the sale of the Assets (as amended, the "SRX Term Sheet").  *Id.*

14.     In May and June of 2025, SRX paid deposits to the Debtors totaling $5 million (collectively, the "SRX Deposit").  *Id.* ¶ 44.  The Debtors were permitted to use the SRX Deposit for operational and other expenses and did so.  *Id.*  CS One guaranteed the SRX Deposit, and the Pre-Petition Credit Agreement was amended to ensure that CS One's liability on the guaranty constitutes obligations under the Pre-Petition Credit Agreement.  *See id.*

---

[7]  The Debtors' obligations to CS One are described in greater detail in the First Day Declaration.  *See* First Day Decl. ¶¶ 20–23.

15. In the weeks leading up to the Petition Date, the Debtors and their advisors engaged in negotiations with SRX, although an asset purchase agreement was never signed. *Id.* ¶ 45. The purchase agreement that was being negotiated between the Debtors and SRX was conditioned on bid protections, including a breakup fee and a sixty-day sale process. *Id.*

16. On August 5, 2025, SRX issued a letter terminating the SRX Term Sheet and demanding immediate return of the SRX Deposit. *Id.* at ¶ 46.

### D.     CS One Emerges as a Stalking Horse Bidder

17. When an asset purchase agreement between the Debtors and SRX was not executed, the Debtors engaged in discussions with CS One. *Id.* ¶ 47. Those discussions led to the negotiation of the Stalking Horse APA[8] pursuant to which CS One is agreeing to: (a) acquire substantially all of the Debtors' assets as a going concern by credit bidding approximately $51 million of the obligations under the Pre-Petition Credit Agreement and the DIP Facility; (b) assume certain liabilities and pay the cure costs of any Contracts assumed and assigned to CS One; and (c) subject its bid to higher and better offers through a competitive auction process. *Id.* CS One has also agreed to provide $6.5 million in post-petition financing to fund the Debtors' operations and administrative expenses during the sale process, which the Court has approved on an interim basis. *See id.* ¶ 51; Docket No. 29.

18. With the benefit of the Stalking Horse Bid, the Debtors intend to run a reasonably expedited, but robust sale process. *See id.* ¶ 49. To that end, the Debtors have engaged SSG as investment banker to lead the marketing process and continue discussions with any parties

---

[8]  Notably, the Stalking Horse APA is based on the form of the purchase agreements negotiated (separately) with PharMerica and SRX but has more debtor-favorable terms than the purchase agreement that was being negotiated with SRX because it has no bid protections for the Stalking Horse Bidder.

4913-0324-3088

expressing an interest in the Assets, with the goal of having as many bidders as possible participate in the Auction. *See id.* ¶ 50.

## OVERVIEW OF BIDDING PROCEDURES, NOTICE PROCEDURES AND ASSIGNMENT PROCEDURES

### A.    The Bid Procedures

19.    To solicit, receive, and evaluate offers for the Assets in a fair and accessible manner, the Debtors are proposing the Bid Procedures, attached to the Bid Procedures Order as **Exhibit 1**. The Bid Procedures include information regarding:

a.  the requirements that potential bidders must satisfy to participate in the sale process and become qualified bidders, including by providing good faith deposits;

b.  the availability of and access to due diligence by potential bidders after executing a confidentiality agreement;

c.  the deadlines and requirements for submitting bids and the criteria for evaluating whether they are qualified bids sufficient to trigger the Auction;

d.  the manner in which qualified bids will be evaluated to determine the starting bid at the Auction;

e.  the conditions for having an Auction and procedures for conducting the Auction, if any;

f.  the criteria by which the Successful Bidder will be selected by the Debtors; and

g.  various other matters relating to the sale process generally, including the designation of a backup bid, return of any good faith deposits, and certain reservations of rights.[9]

20.    Importantly, the Bid Procedures recognize and comply with the Debtors' fiduciary obligations to maximize value, and, as such, do not impair the Debtors' ability to consider all bids. The Bid Procedures also preserve the Debtors' rights to modify the Bid Procedures as necessary or appropriate to maximize value.

---

[9]  This summary is provided for convenience and does not purport to be complete.  In the event of any discrepancy between this summary and the Bid Procedures, the terms of the Bid Procedures shall control.

4913-0324-3088

**B.     The Stalking Horse APA**

21.     The Debtors will request approval of the terms of the Stalking Horse APA at the Sale Hearing.  Although the Debtors and the Stalking Horse Bidder continue to negotiate certain provisions of the Stalking Horse APA, the table below summarizes the current material terms of the Stalking Horse APA.  Before the Sale Hearing, the Debtors will file either (i) an updated version of the Stalking Horse APA, together with a comparison marked against the version attached hereto as **Exhibit B**, or (ii) the asset purchase agreement negotiated with the Successful Bidder (if the Stalking Horse Bidder is not the Successful Bidder).[10]

| Stalking Horse APA Provision | Summary Description[11] |
|---|---|
| **Parties** <br> *See* **Preamble** | Sellers: Arrow Envoy Holdings, LLC; Arrow Pharmacy Holdings, LLC; Partners of Connecticut, LLC; Partners of Massachusetts, LLC; Partners of New York, LLC; Partners of Pennsylvania, LLC; Partners Pharmacy of Florida, LLC; Partners Pharmacy of Maryland, LLC; Partners Pharmacy of Texas, LLC; Partners Pharmacy of Virginia, LLC; Partners Pharmacy Services, LLC; Partners Pharmacy, L.L.C.; and Solutions Homecare, L.L.C. <br><br> Buyer: CS One, LLC or an affiliate thereof. |
| **Purchase Price** <br> *See* § 2.5 | Purchase Price: The aggregate consideration shall be a credit bid by the Buyer of the indebtedness it holds pursuant to the Pre-Petition Credit Agreement (as amended from time to time) and the DIP Facility, in the amount of approximately $51 million, pursuant to section 363(k) of the Bankruptcy Code. |
| **Assumption / Rejection** <br> *See* § 2.5; § 2.9 | Assumption/Rejection of Contracts: Unless otherwise agreed by the applicable counterparty, the Buyer shall pay any Cure Amounts due in connection with the assumption and assignment of the Assumed Contracts and Assumed Leases. |
| **Purchased Assets** <br> *See* § 2.1 | Purchased Assets: Except for any Excluded Assets, all of the assets, rights and properties of the Hospice Sellers, the LTC Sellers, and the Texas Seller that are used, held for use or related to the conduct of the Hospice Business, the LTC Business, and the Business of the Texas Seller, respectively, including the following: (i) patient files; (ii) pharmaceutical inventory and goods; (iii) records with respect to the Hospice Assets, LTC Assets, and Texas |

---

[10] If the asset purchase agreement negotiated with the Successful Bidder (that is not the Stalking Horse Bidder) is based on the form to the Stalking Horse APA, then the Debtors will also file a comparison of the Successful Bidder's asset purchase agreement marked against the version of the Stalking Horse APA attached hereto as **Exhibit B**.

[11] This summary is provided for convenience.  In the event of any discrepancy between this summary and the Stalking Horse APA, the terms of the Stalking Horse APA shall control.

4913-0324-3088

| Stalking Horse APA Provision | Summary Description[11] |
|---|---|
| | Assets; (iv) the Assumed Hospice Leases and Assumed LTC Leases; (v) Permits; (vi) equipment; (vii) causes of action, lawsuits, judgments, and claims relating to the Purchased Assets; (viii) guarantees, warranties, representations, covenants, indemnities, and similar rights relating to the Purchased Assets; (ix) deposits, advances, pre-paid expenses, credits relating to the Purchased Assets, and all accounts receivable and notes receivable of any Seller (the proceeds thereof and any security therefor); (x) Intellectual Property owned by the Sellers; (xi) vehicles used in connection with the Hospice Business and LTC Business; and (xii) the Hospice Assets, LTC Assets, and Texas Assets, as a going concern and all associated goodwill, including the Hospice Contracts, LTC Contracts, and Texas Contracts; and (xiii) employee personnel records of the Sellers. |
| **Assumed Liabilities** *See § 2.3* | "Assumed Liabilities": (1) all liabilities and obligations of each Seller arising under or related to the Purchased Assets required to be performed solely on and after the Closing Date; provided, however, that the Buyer will not assume or be responsible for any such liabilities or obligations (i) to be performed prior to the Closing Date or (ii) that arise from breaches of such contracts or defaults under such contracts, all of which non-assumed liabilities and obligations constitute Excluded Liabilities, and (2) all Liabilities for the paid time off hours of the employees of the Hospice Sellers and LTC Sellers hired by the Buyer. |
| **Excluded Assets** *See § 2.2* | Excluded Assets: (a) cash, marketable securities, intercompany receivables, and all rights to any bank or deposit accounts; (b) all assets of each Seller Benefit Plan, and any trust, fund or account that is related to such Seller Benefit Plan; (c) governance documents and certain books and records (including corporate and tax records with respect to the Sellers); (d) all Avoidance Actions and all other causes of action, lawsuits, judgments, claims, and demands relating to any of the Excluded Liabilities or Excluded Assets; (e) guarantees, warranties, representations, covenants, indemnities, and similar rights relating to Excluded Liabilities or Excluded Assets; (f) rights that accrue to any Seller under the Stalking Horse APA and under any agreement ancillary thereto; (g) records prepared in connection with the sale of the Purchased Assets; (h) all Contracts and Leases other than Assumed Contracts and Assumed Leases; and (i) all non-transferable Permits. |
| **Excluded Liabilities** *See § 2.4* | Excluded Liabilities: (a) any Liabilities of any Seller for or related to its employees (b) any product Liability claims with respect to the conduct of the Business; (c) any Liability under or with respect to any Seller Benefit Plan; (d) any Liability arising under, or related to any actual or alleged violation of, any Environmental Law or Healthcare Law by any Seller or any release of any Hazardous Substance occurring on or prior to the Closing Date; (e) any Liability of any Seller to the extent related to or arising in connection with the Excluded Assets; (f) any Liability of any Seller to any Seller's Affiliates; (g) any Liability of any Seller under this Agreement and any costs and expenses incurred by any Seller incident to the negotiation and preparation of this Agreement and any Seller's performance and compliance with the agreement and conditions contained herein; (h) only to the extent that such |

4913-0324-3088

| Stalking Horse APA Provision | Summary Description[11] |
|---|---|
|  | Liabilities are imposed upon the Buyer pursuant to the applicable provisions of the Code and/or ERISA, any Liability for offering and providing "continuation coverage" to any "qualified beneficiary" relating to the Business who is covered by a "group health plan" sponsored or contributed to by any Seller and has experienced a "qualifying event" or is receiving "continuation coverage" on, prior to, or following the Closing Date; (i) any accounts payable of any Seller; and (j) any Liability for Taxes of any Seller, any Affiliate of any Seller or of any other Person, except as expressly provided in this Agreement. |
| **Representations and Warranties of the Debtors** *See* § 3 | Customary representations and warranties, including representations of Seller regarding: (a) organization, good standing, and capitalization; (b) authorization and binding effect; (c) non-contravention; (d) financial statements; (e) real property; (f) intellectual property; (g) title to Purchased Assets and sufficiency and condition of Purchased Assets; (h) compliance with laws and licenses and permits; (i) litigation; (j) employees; (k) employee benefits; (l) insurance policies; (m) Taxes; (n) Material Contracts; (o) Healthcare Law compliance; (p) Environmental Law compliance; (q) operations since Balance Sheet Date; (r) product liability; (s) Affiliate transaction; (t) brokers; and (u) exclusivity of representations. |
| **Representations and Warranties of the Stalking Horse Bidder** *See* § 4 | Customary representations and warranties, including representations of Buyer regarding: (a) organization and good standing; (b) authorization and binding effect; (c) non-contravention; (d) litigation; (e) healthcare regulatory compliance status; (f) financial ability, character, and competence; (g) certain arrangements; (h) brokers; and (i) exclusivity of representations. |

### C.   Sale and Auction Notice and Successful Bidder Notice

22.    The Sale and Auction Notice, substantially in the form attached as **Exhibit 2** to the Bid Procedures Order, is reasonably calculated to provide all interested parties with timely and proper notice of the Sale, the Auction (if held), the Bid Procedures, and the dates and deadlines related thereto.  Within three business days after entry of the Bid Procedures Order, the Debtors will cause the Sale and Auction Notice to be served on: (a) the Office of the United States Trustee for the Southern District of Texas; (b) all parties on the Debtors' creditor matrix; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the Southern District of Texas; (e) the state attorneys general for all states in which the Debtors conduct business; (f) Glenn Agre Bergman & Fuentes LLP, as counsel to CS One, LLC; (g) Cardinal Health, Inc. and Cardinal

Health 110, LLC; (h) any statutory committee appointed in these chapter 11 cases; and (i) any other party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(d).

23.     In addition, as soon as reasonably possible after entry of the Bid Procedures Order, the Debtors will publish the Sale and Auction Notice, with any modifications necessary for ease of publication, on one occasion in the *New York Times* (national edition), *Financial Times* (global edition), or *Wall Street Journal* (national edition).  The Debtors will also publish the Sale and Auction Notice on the case website: https://restructuring.ra.kroll.com/PartnersPharmacy (the "Case Website").[12]

24.     Promptly after the conclusion of the Auction (if any), the Debtors will file with the Court and serve on the parties that received notice of this Motion, the Successful Bidder Notice, substantially in the form attached to the Bid Procedures Order as **Exhibit 3**.  The Debtors will also post the Successful Bidder Notice on the Case Website.  As so published, the Successful Bidder Notice is reasonably calculated to provide parties with timely and proper notice of the proposed sale, including: (a) the Successful Bidder; (b) any backup bidder; and (c) the date, time, and place of the Sale Hearing.

### D.     The Assumption and Assignment Procedures and Cure Notice

25.     The Debtors are also seeking approval of the Assumption and Assignment Procedures set forth below to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain Contracts in connection with the Sale.  The proposed Assumption and Assignment Procedures are as follows:

> a.   *Cure Notice*.  As soon as reasonably practicable after entry of the Bid Procedures Order, the Debtors will file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice, attached as **Exhibit 4** to the proposed Bid Procedures Order, on counterparties to

---

[12] As part of its marketing and solicitation efforts, SSG plans to distribute marketing materials, which may include the Sale and Auction Notice, to parties on its prospective buyer list, including by email or other customary means.

Contracts that may be assumed and assigned in connection with the Sale (collectively, the "Contract Counterparties," and each, a "Contract Counterparty"), and post the Cure Notice to the Case Website.

b.  *Content of Cure Notice*.  The Cure Notice will notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale and will contain: (i) a list of the applicable Contracts that may be assumed and assigned in connection with the Sale (the "Assigned Contracts," and each individually, an "Assigned Contract"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary, if any, to cure any monetary defaults under each Assigned Contract (the "Cure Costs"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "Cure Objection"); *provided* that service of a Cure Notice does not constitute an admission that a Contract is an executory contract or unexpired lease or guarantee that such Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

c.  *Cure Objections*.  Cure Objections, if any, must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed and served no later than **September 29, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Cure Objection Deadline"); *provided* that the Debtors may modify the Cure Objection Deadline by filing a notice of such modification with the Court.

d.  *Effects of Filing a Cure Objection*.  A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Contract at issue and/or objection to the accompanying Cure Costs, as and to the extent set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in this Motion.

e.  *Dispute Resolution*.  Any Cure Objection to the proposed assumption and assignment of a Contract or Cure Costs that remains unresolved after the Sale Hearing, shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the applicable Successful Bidder's reasonable discretion.  To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed

14

and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing. If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should not be assigned, in which case the Successful Bidder will not be responsible for any Cure Costs in respect of such Contract. Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "Cure Dispute"), the applicable Contract may be assumed by the Debtors and assigned to the Successful Bidder *provided* that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

f.   *Supplemental Cure Notice*. If the Debtors discover Contracts inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Contracts that it desires to assume or assume and assign in connection with the Sale, the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the Sale supplement the Cure Notice with previously omitted Contracts or modify a previously filed Cure Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "Supplemental Cure Notice"). The Debtors shall serve such Supplemental Cure Notice on the Contract Counterparties to Contracts that were added or removed or to the Contract Counterparties to Contracts for which the Cure Costs were changed.

g.   *Objection to the Supplemental Cure Notice*. Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "Supplemental Cure Objection") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs included in the Supplemental Cure Notice, if any. All Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

h.   *Dispute Resolution of Supplemental Cure Objection*. If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts. If there is no such objection, then the Debtors shall obtain an order of the Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Cure

15

Notice.  Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to the Cure Costs, the applicable Contract may be assumed by the Debtors and assigned to the Successful Bidder *provided* that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

i.    *No Cure Objections*.  If no Cure Objections or Supplemental Cure Objections are timely filed, or if a Contract Counterparty does not file and serve a Cure Objection or a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) will control, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

j.    *Adequate Assurance Objection Deadline*.  Any Contract Counterparty that wishes to object to the proposed assumption and assignment of a Contract, the subject of which objection is a Successful Bidder's (other than the Stalking Horse Bidder's) proposed form of adequate assurance of future performance (each such objection, an "Adequate Assurance Objection"), shall file and serve such objection no later than **October 13, 2025, at 4:00 p.m. (prevailing Central Time)** (the "Adequate Assurance Objection Deadline").  If no Adequate Assurance Objections are timely filed, or if an objecting party does not file and serve an Adequate Assurance Objection in a manner that is consistent with the requirements set forth above for Cure Objections, and absent a subsequent order of the Court, (i) the assumption shall be effective, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract, and will be forever barred from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

4913-0324-3088

## BASIS FOR RELIEF

**A.      The Bid Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Consistent with the Debtors' Reasonable Business Judgment**

26.      The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty[13] to maximize and protect the value of the estate's assets); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value).

27.      Courts in this and other districts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) ("[T]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction . . . .").[14]

28.      Courts use the business judgment standard to evaluate proposed bid procedures, and a debtor's business judgment is entitled to substantial deference with respect to procedures

---

[13] Bid procedures providing for a court-approved auction process also allow a debtor to satisfy its fiduciary duty of maximizing value by selling assets through exposure to the market. *See Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010).

[14] *See generally In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023) (approving bid procedures); *In re Center for Autism and Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. June 16, 2023) (same); *In re Pipeline Health System, LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Oct. 12, 2022) (same).

4913-0324-3088

proposed to sell estate assets. *See, e.g.*, *In re Redwine Res.*, 2010 WL 5209287 at *2 (Bankr. N.D. Tex., June 24, 2010) (approving the debtor's proposed bid procedures after finding the debtors "have exercised sound business judgment and presented sound business reasons"); *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty . . . there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.").

29.     Here, the Bid Procedures are designed to facilitate orderly yet competitive bidding to maximize the value of the Assets. The Bid Procedures contemplate an open auction process with minimum barriers to entry. The proposed sale timeline provides potential bidding parties with sufficient time—more than seven weeks from the filing of this Motion—to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

30.     The Stalking Horse Bid, which represents the current highest offer for the Assets, will ensure that the Debtors obtain fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace. *See id.* ¶ 48. The Stalking Horse Bid enhances the bidding process by providing a floor that prospective bidders must clear and ensuring that only serious, financially capable bidders participate in the Auction. *Id.* The consideration obtained for the Assets will be fair and reasonable and at or above market.[15]

31.     SSG will also market the Assets and solicit offers consistent with the Bid Procedures by contacting previously solicited parties, continuing to provide prospective bidders with data room access and requested information (upon signing a confidentiality agreement), and

---

[15] Where there is a court-approved auction process, a full and fair price for the assets is presumed because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999).

otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that will be eligible to participate in process will be maximized, or, if no Auction is held because no qualified bids are received, then the Stalking Horse Bid will, conclusively, be fair value.

    **B.**    **The Court Should Approve CS One as the Stalking Horse Bidder and the Free and Clear Sale of the Assets as a Sound Exercise of the Debtors' Business Judgment**

       **i.**    **Standard for Sale under Section 363**

32.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy courts routinely authorize the sale of a debtor's assets if the sale is based on "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." *In re Continental Air Lines, Inc.*, 780 F.2d at 1226; *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

33.    Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor has the discretionary authority to exercise business judgment given to an officer or director of a corporation).  The business judgment rule protects certain debtor decisions—such as the Debtors' entry into one or more definitive purchase agreements—from judicial second-guessing. *See Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the

19

Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").[16]  Consequently, if a debtor's actions satisfy the business judgement rule, then the transaction should be approved under section 363(b)(1) of the Bankruptcy Code.

### ii.    A Sound Business Justification Exists for Designating CS One as the Stalking Horse Bidder

34.    The Debtors have a sound business justification for designating CS One as the Stalking Horse Bidder.  After two failed transactions in the past year, CS One's offer represents the highest and only viable offer for the Assets.  *See* First Day Decl. ¶ 48.  The Stalking Horse APA is the result of extensive negotiations as it is based on the form of the asset purchase agreements negotiated with two prior buyers, PharMerica and SRX.  The Stalking Horse APA has even more debtor-favorable terms as SRX had requested a full array of bid protections.  *See id.* ¶ 46.

35.    The Stalking Horse APA also provides a "floor" price for the Assets and a framework purchase agreement from which other bidders can submit competing bids.  *See id.* ¶ 48. The Stalking Horse APA does not contain ***any*** bid protections (*i.e.*, breakup fees or expense reimbursements) for the Stalking Horse Bidder, allowing the Debtors to pivot to a more value-maximizing transaction without having to pay the Stalking Horse Bidder any fees or expenses. *See id.* ¶ 47.

36.    Finally, through the Stalking Horse APA, the Stalking Horse Bidder is giving the Debtors and their stakeholders significant operational comfort by standing ready, willing, and able to purchase the Assets on a going-concern basis.  *See id*. ¶ 48.  The ultimate result is significant

---

[16] *Accord Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth).

4913-0324-3088

value to the Debtors' estates through the Stalking Horse APA or an alternative value-maximizing transaction.

> ### iii.   The Sale Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code

37.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

38.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.   Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of any and all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "Interests").  *See In re Kellstrom Indus., Inc*., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

39.     Any Interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Interest will be adequately protected by either being paid in full at the time of closing or by attaching to the net sale proceeds in the same order of priority as existed on the Petition Date and subject to any claims and defenses the Debtors may have with respect thereto.  The holders of the Pre-Petition Liens on the Assets also consent to the Sale.  The Debtors accordingly request authority to convey the Assets to the Successful Bidder(s) free and clear of all Interests with any such Interests attaching to the net sale proceeds.

### iv. The Bid Procedures Ensure that the Sale Transaction Will Be Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder Are "Good Faith Purchasers"

40.     The Debtors request that the Court find the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction (i) are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets and (ii) are good faith purchasers within the meaning of section 363(m) of the Bankruptcy Code.[17]

41.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

42.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc*., 788 F.2d 143 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee,

---

[17] A finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction.  Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures.  In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence at the Sale Hearing for the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

or an attempt to take grossly unfair advantage of other bidders."); *In re Andy Frain Servs., Inc*.,
798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc*., 90 B.R. 608, 610 (S.D.N.Y. 1988)
(same).

43.     As explained above, the Stalking Horse APA is the result of extensive negotiations
as it is based on the form of the purchase agreements negotiated (separately) with PharMerica and
SRX.  The Stalking Horse APA has even more debtor-favorable terms than the purchase agreement
that was being negotiated with SRX because it has no bid protections for the Stalking Horse Bidder.
*Id.* ¶ 47.  Moreover, there is no evidence of fraud or wrongdoing by the Stalking Horse Bidder,
who in addition to agreeing to acquire the Assets as a going concern and assume certain liabilities,
is providing the DIP Facility for the Debtors to run a competitive auction process.  *See id.* ¶ 51.
To the extent necessary, the Debtors will demonstrate at the Sale Hearing that the Stalking Horse
Bidder has not colluded with any other party.  For these reasons, the Stalking Horse Bidder is a
"good faith" purchaser as contemplated under section 363(m) of the Bankruptcy Code and should
be granted the protections provided for therein.

44.     In the event of a sale of the Assets to a Successful Bidder other than a Stalking
Horse Bidder, the Debtors submit that the Successful Bidder would be a "good faith purchaser"
within the meaning of section 363(m) of the Bankruptcy Code.  The Bid Procedures require each
qualified bidder participating in the Auction to confirm that it has not engaged in any collusion
with respect to any bid or the proposed sale transaction.  Any asset purchase agreement with the
Successful Bidder will be negotiated at arms' length and in good faith. Further, to the extent
necessary, the Debtors will demonstrate at the Sale Hearing that such Successful Bidder conducted
itself in good faith and did not engage in collusion.  Accordingly, the Successful Bidder should
likewise be subject to the protections provided by section 363(m) of the Bankruptcy Code. The

Debtors believe that providing the Stalking Horse Bidder or the Successful Bidder, as applicable, with such protection will ensure that the maximum price will be received by the Debtors for the Assets and that closing of the Sale will occur promptly after the Sale Hearing.

### C.     The Form and Manner of the Sale and Auction Notice and Successful Bidder Notice Should Be Approved

45.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rules 2002(c) and 6004(a), (b), such notice must include the time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested herein.  The Sale and Auction Notice contains the information required by Bankruptcy Rule 2002(c).  Additionally, the Successful Bidder Notice will provide notice of the Sale to the Stalking Horse Bidder or the Successful Bidder, and the deadlines to file any objections thereto.

46.     Notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale and Auction Notice and the Successful Bidder Notice, constitutes good and adequate notice of the proposed sale and the proceedings with respect thereto in compliance with the applicable requirements of Bankruptcy Rules 2002 and 6004. Accordingly, the Debtors request that the Court approve the form and manner of the Sale and Auction Notice and the Successful Bidder Notice.

### D.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved

#### i.     The Assumption and Assignment of the Assigned Contracts Reflects the Debtors' Reasonable Business Judgment

47.     To facilitate and effectuate the sale of the Debtors' business as a going concern, the Debtors seek authority to assign or transfer the Assigned Contracts to a Successful Bidder (which may be the Stalking Horse Bidder) to the extent required by such bidder.  Section 365 of the

24

Bankruptcy Code authorizes a debtor to assume and assign its executory contracts and unexpired leases, subject to court approval; *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

48.     The Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Cure Notice. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor was deemed to consent).

49.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. *First*, the Assigned Contracts are essential to the value of the Assets and the Debtors' business as a going concern and, as such, they are critical to inducing the highest or otherwise best offer for the Assets. *Second*, it is unlikely that any purchaser would want to acquire certain of the Assets unless the Assigned Contracts needed to conduct business and manage day-to-day operations of those Assets were included in the transaction.  *Third*, the Assigned Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bid Procedures Order and, thus, Contract Counterparties and other stakeholders will have an opportunity to object.

4913-0324-3088

50.     Accordingly, the assumption and assignment of the Assigned Contracts pursuant to the Assumption and Assignment Procedures should be approved as a sound exercise of the Debtors' business judgment.

       **ii.     Defaults Under the Assumed Contracts Will Be Cured in Connection with Any Sale Transaction**

51.     Upon finding that a debtor has exercised its business judgment in deciding to assume an executory contract, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, pre-petition defaults under the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

52.     The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults.  The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

       **iii.     Non-Debtor Parties Will Be Adequately Assured of Future Performance**

53.     Similarly, the third requirement of section 365(b) of the Bankruptcy Code— adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based

upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

54.     The Debtors will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied. The Debtors will evaluate the financial wherewithal of potential bidders before designating them as qualified bidders or a Successful Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Contracts), including as it relates to each qualified bidder's willingness and ability to perform under the Assigned Contracts. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed cure amounts. The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Contracts as set forth in the definitive purchase agreement of the Successful Bidder.

### REQUEST FOR WAIVER OF STAY IMPOSED BY BANKRUPTCY RULES 6004 AND 6006

55.     The Debtors request that the Court waive the stays imposed by Bankruptcy Rules 6004(h) and 6006(d), which provide that, unless the court orders otherwise, "an order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days

27

after entry of the order" and "an order authorizing the trustee to assign an executory contract or unexpired lease under §365(f) is stayed for 14 days after the order is entered." FED. R. BANKR. P. 6004(h) and 6006(d).  As explained above, because of the Debtors' liquidity position, it is imperative that they move forward with the sale process promptly.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the nature of the relief requested justifies immediate relief.

### RESERVATION OF RIGHTS

56.     Nothing contained in this Motion is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vii) an admission as to the validity of any liens satisfied pursuant to this Motion, or (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief requested, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

### NOTICE

57.     Notice of this Motion will be served on the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Debtors' thirty largest unsecured creditors (on a consolidated basis); (c) the Internal Revenue

4913-0324-3088

Service; (d) the United States Attorney's Office for the Southern District of Texas; (e) the state attorneys general for all states in which the Debtors conduct business; (f) Glenn Agre Bergman & Fuentes LLP, as counsel to CS One, LLC; (g) Allen Stovall Neuman & Ashton LLP, as counsel to Cardinal Health 110, LLC and Cardinal Health 112, LLC; and (h) any party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(d).  Given the nature of the relief requested, no other or further notice need be given.

<u>**CONCLUSION**</u>

58.     WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in this Motion by (a) entering the Bid Procedures Order attached as **<u>Exhibit A</u>**, (b) ultimately entering the Sale Order (to be submitted prior to the Sale Hearing), and (c) granting such other and further relief as the Court deems just and proper.

4913-0324-3088

Dated: August 15, 2025
       Washington, DC

Respectfully submitted,

*/s/ Patrick J. Potter*

Patrick J. Potter (S.D. Tex. Fed. No. 3089812)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 Seventeenth Street, NW
Washington, DC 20036
Telephone:(202) 663-8928
Facsimile: (202) 663-8007
Email: patrick.potter@pillsburylaw.com

-and-

Dania Slim (S.D. Tex. Fed. No. 3049178)
Amy West (admitted *pro hac vice*)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
Email: dania.slim@pillsburylaw.com
       amy.west@pillsburylaw.com

-and-

L. James Dickinson (Tex. Bar. No. 24105805)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
609 Main Street, Suite 2000
Houston, TX 77002
Telephone: (713) 276-7654
Facsimile: (713) 276-7373
Email: james.dickinson@pillsburylaw.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

4913-0324-3088

**C**ERTIFICATE OF **S**ERVICE

I certify that on August 15, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' proposed claims agent.

*/s/ Patrick J. Potter*
Patrick J. Potter

4913-0324-3088

## EXHIBIT A

*Proposed Bid Procedures Order*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Partners Pharmacy Services, LLC, *et al.*,[1] | Case No. 25-34698 (CML) |
| Debtors. | (Jointly Administered) |

**ORDER (I) APPROVING BID PROCEDURES, (B) DESIGNATING STALKING HORSE
BIDDER, (C) SCHEDULING AN AUCTION, RELATED DEADLINES, AND A
SALE HEARING, AND (D) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (i) approving the Bid Procedures attached hereto as **Exhibit 1** (the "Bid Procedures"); (ii) designating CS One, LLC ("CS One") or its designee as the stalking horse bidder (the "Stalking Horse Bidder"); (iii) scheduling an auction of the Assets (the "Auction") and a hearing to consider approval of the Sale (the "Sale Hearing"); (iv) approving the form and manner of notice of the Auction and the Sale Hearing attached as **Exhibit 2** to the Bid Procedures Order (the "Sale and Auction Notice"); (v) approving the form and manner of notice of the successful bidder at the Auction (the "Successful Bidder") attached as **Exhibit 3** to the Bid Procedures Order (the "Successful Bidder Notice"); (vi) approving procedures for the assumption and assignment of executory contracts and

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C. (4578); and Solutions Homecare, L.L.C. (1583).  The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Bid Procedures as applicable.

unexpired leases (the "Contracts") in connection with the Sale (the "Assumption and Assignment Procedures"); (vii) approving the form and manner of notice to each non-debtor counterparty to a Contract proposed to be assumed attached as **Exhibit 4** to the Bid Procedures Order (the "Cure Notice"); and (viii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having jurisdiction over this matter in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of these cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and the Court having considered the statements in support of the relief requested therein at a hearing before the Court (the "Bid Procedures Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors and all parties in interest; and upon all of the proceedings had before the Court after due deliberation and sufficient cause appearing therefor, it is **FOUND AND DETERMINED THAT**:

     A.     Jurisdiction and Venue.  The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334, and venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

     B.     Findings and Conclusions.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made

4924-0541-5258

applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      Notice of the Bid Procedures Motion.  As evidenced by the certificate of service filed on August __, 2025 [Docket No. __] (the "Certificate of Service"), notice of the Motion, the Bid Procedures Hearing, the dates and objection deadlines contained in this Order and the Bid Procedures (as defined below), and the proposed entry of this Order was sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, Bankruptcy Rules, and the Local Rules.  The notice of the Motion and of the Bid Procedures Hearing is reasonable and sufficient in light of the circumstances and nature of the relief requested in the Motion, and no other or further notice of the Motion is necessary.  A reasonable and fair opportunity to object to the Motion and the relief granted in this Order has been afforded under the circumstances.

D.      Bid Procedures.  The Debtors have articulated good and sufficient reasons for the Court to approve the Bid Procedures, attached hereto as **Exhibit 1**, which are fair, reasonable, and appropriate under the circumstances, are designed to maximize value for the benefit of the Debtors' estates, their creditors, and other parties in interest, and are consistent with the Debtors' exercise of their respective duties under applicable law.  The Bid Procedures are reasonably designed to promote active bidding at and participation in the Auction to ensure that the highest or otherwise best value is generated for the Assets.

E.      Sale and Auction Notice.   The Sale and Auction Notice, substantially in the form attached hereto as **Exhibit 2**, is reasonably calculated to provide interested parties with timely and proper notice of the Auction, the Sale Hearing, the Bid Procedures, the Assumption and

3

Assignment Procedures, the Debtors' proposed Cure Costs, and all relevant and important dates and deadlines with respect to the foregoing, and no other or further notice of the Auction, the sale of the Assets, or the assumption and assignment of Contracts in connection therewith shall be required.

F.    <u>Successful Bidder Notice</u>.  The Successful Bidder Notice, substantially in the form attached hereto as **<u>Exhibit 3</u>**, is reasonably calculated to provide interested parties with timely and proper notice of the proposed Successful Bid, including: (a) the Successful Bidder; (b) the Backup Bidder, if applicable; (c) the key terms of the proposed sale to the Successful Bidder; and (d) the date, time, and place of the Sale Hearing.

G.    <u>Assumption and Assignment Procedures</u>.  The Cure Notice, substantially in the form attached hereto as **<u>Exhibit 4</u>**, is reasonably calculated to provide all counterparties to Contracts that may be assumed and assigned in connection with the Sale (collectively, the "<u>Contract Counterparties</u>," and each, a "<u>Contract Counterparty</u>") with proper notice of the potential assumption and assignment of their Contract, the proposed cure amounts relating thereto, and the related Assumption and Assignment Procedures, and no other or further notice of such intention, the cure amounts, or the Assumption and Assignment Procedures shall be required; *provided* that the mere listing of a Contract on a Cure Notice does not require or guarantee that such Contract will be assumed and assigned, and the Debtors' rights with respect to such Contracts are reserved. The Assumption and Assignment Procedures are reasonable and appropriate and comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

H.    The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Order is in the best interests of the Debtors and their estates, creditors, interest holders, and all other parties in interest.

4924-0541-5258

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED to the extent set forth herein.

2.      All objections to the relief granted in this Order that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included therein, are hereby overruled, and denied on the merits with prejudice.

### A.      The Timeline for the Sale

3.      The Debtors are authorized to proceed with the proposed sale of their assets in accordance with the Bid Procedures and the timeline approved below and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bid Procedures.

4.      The following dates and deadlines are approved, subject to the Debtors' right to modify them without further order of the Court by filing notice of such modification with the Court:

| Date and Time (All Central Times) | Event or Deadline |
|---|---|
| Three business days after entry of the Bid Procedures Order | Deadline to file and serve Sale and Auction Notice |
| As soon as reasonably practicable after entry of the Bid Procedures Order | Deadline to file and serve the Cure Notice and publish the Sale and Auction Notice |
| September 29, 2025 at 4:00 p.m. | Sale Objection Deadline[3] and Cure Objection Deadline |
| October 7, 2025 at 4:00 p.m. | Bid Deadline |
| October 9, 2025 at 10:00 a.m. | Auction (if necessary) |
| October 10, 2025 at 4:00 p.m. | Deadline to file Successful Bidder Notice |

---

[3]  Except for objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder (if the Stalking Horse Bidder is not the Successful Bidder or the Backup Bidder), all objections to the Sale, including (i) any objection to the sale of the Assets free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) entry of the Sale Order (each such objection, a "Sale Objection") shall be filed and served no later than **September 29, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Sale Objection Deadline").

4924-0541-5258

| Date and Time (All Central Times) | Event or Deadline |
|---|---|
| October 13, 2025 at 4:00 p.m. | Supplemental Sale Objection Deadline[4] and Adequate Assurance Objection Deadline |
| October 17, 2025 at 11:59 p.m. | Deadline to Reply to Sale Objections, Cure Objections, and Adequate Assurance Objections |
| October 21, 2025 | *Proposed* Sale Hearing |
| October 31, 2025 | Closing Deadline |

**B.      The Bid Procedures**

5.      The Bid Procedures, attached hereto as **Exhibit 1**, are approved in their entirety and incorporated by reference as though fully set forth herein.  The Bid Procedures shall govern the bids and proceedings related to the Auction and the sale of the Assets. The failure to specifically include or reference any particular provision of the Bid Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures.  The Debtors are authorized to solicit bids and conduct an Auction, if necessary, on the terms set forth in the Bid Procedures and to take all actions as are necessary or appropriate to implement the Bid Procedures. The Bid Procedures shall govern the submission, receipt, and analysis of all bids, and any party desiring to submit a bid for the Assets must do so strictly in accordance with the terms of the Bid Procedures and this Order.

6.      Each bidder participating at the Auction, if held, shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale of the Assets, as set forth in the Bid Procedures.  The Auction, if held, shall be transcribed or recorded.

---

[4]  After the Sale Objection Deadline, parties may object solely with respect to the conduct of the Auction and/or the Successful Bidder or Backup Bidder (in each case, if such bidder is not the Stalking Horse Bidder) by **October 13, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Supplemental Sale Objection Deadline").

7.      Pursuant to the Bid Procedures the Debtors may: (a) determine which Qualified Bid is the highest or otherwise best offer for some or all of the Assets; (b) at any time prior to entry of an order of the Court approving the Successful Bid, reject any bid (other than the Stalking Horse Bid) that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors; (c) waive terms and conditions set forth herein with respect to all Qualified Bidders to the extent permissible under this Order or the Bid Procedures; (d) impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these chapter 11 cases; and (e) modify the Bid Procedures, including the dates and deadlines set forth therein.

8.      If the Debtors receive more than one Qualified Bid from Qualified Bidders, then the Debtors shall conduct the Auction in accordance with the Bid Procedures.  If one or more Qualified Bid(s) exist for acquiring specific sub-groups of the Assets, then the Debtors may, in the exercise of their reasonable business judgment, first conduct a sub-Auction for each of the Assets that has at least one Qualified Bid pursuant to the Bid Procedures.

9.      If no Qualified Bids (or bid that may be remedied into a Qualified Bid pursuant to the Bid Procedures and is actually remedied into a Qualified Bid prior to the Auction) other than the Stalking Horse Bid are received by the Bid Deadline, or the Debtors determine not to conduct an Auction, the Debtors shall file a notice of cancellation of the Auction with the Court.

10.     At the Auction, if held, any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "Secured Creditor"), whether or not such liens remain subject to any challenge period as set forth in any of the orders approving the DIP Facility (collectively, the "DIP Orders"), shall be permitted to submit a credit bid for all or a portion of the assets subject

7

to such lien, up to the amount of such Secured Creditor's claims (a "Credit Bid").  For purposes of valuing competing Qualified Bids and determining the Successful Bid, the full face amount of a Credit Bid satisfying the requirements set forth in the Bid Procedures and this Order shall be deemed to have the same value as the equivalent amount of cash.  Subject to each Bid and Qualified Bid satisfying the requirements of these Bid Procedures, the Debtors shall treat comparable Credit Bids and cash bids as equivalent, and no Credit Bid shall be considered inferior to a cash bid merely because it is a Credit Bid.  Notwithstanding anything to the contrary contained herein, but subject in all respects to the challenge period as set forth in the DIP Orders, the CS One shall have the right to Credit Bid all or any portion of the aggregate amount of its applicable outstanding secured obligations, including, without limitation, on account of its secured claims under the DIP Facility and Pre-Petition Credit Agreement.

11.     CS One shall be deemed a Qualified Bidder, and its $51 million bid shall be deemed a Qualified Bid and the Stalking Horse Bid, which status cannot be abrogated by subsequent amendment or modification to the Bid Procedures absent further order of the Court.  If no other Qualified Bids are submitted, the Stalking Horse Bidder shall be deemed the Successful Bidder.  Nothing in this Order or the Bid Procedures shall prevent the Debtors from, in the exercise of their fiduciary duties, pursuing or otherwise consummating an alternative transaction.

### C.     Sale and Auction Notice

12.     The Sale and Auction Notice, substantially in the form attached hereto as **Exhibit 2**, is approved.  Within three business days of the entry of this Order, the Debtors shall cause the Sale and Auction Notice to be served upon parties in interest and posted on the Case Website.

13.     As soon as reasonably possible after entry of this Order, the Debtors shall publish the Sale and Auction Notice, with any modifications necessary for ease of publication, for on one occasion in the *New York Times* (national edition), *Financial Times* (global edition), or *Wall Street*

*Journal* (National Edition). Such notice shall be deemed sufficient and proper notice of the sale of

the Debtors' assets with respect to any potential interested parties.

### D.    The Successful Bidder Notice

14.    The Successful Bidder Notice, substantially in the form attached hereto as

**Exhibit 3**, is approved.  Promptly after the conclusion of the Auction (if held), the Debtors shall

file the Successful Bidder Notice with the Court and cause it to be served on the parties that

received notice of the Motion.  The Debtors shall also publish the Successful Bidder Notice on the

Case Website.

### E.    Assumption and Assignment Procedures

15.    The Assumption and Assignment Procedures set forth below are approved:

a.  *Cure Notice*.  As soon as reasonably practicable after entry of the Bid Procedures Order, the Debtors will file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice, attached as **Exhibit 4** to the proposed Bid Procedures Order, on counterparties to Contracts that may be assumed and assigned in connection with the Sale (collectively, the "Contract Counterparties," and each, a "Contract Counterparty"), and post the Cure Notice to the Case Website.

b.  *Content of Cure Notice*.  The Cure Notice will notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale and will contain: (i) a list of the applicable Contracts that may be assumed and assigned in connection with the Sale (the "Assigned Contracts," and each individually, an "Assigned Contract"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary, if any, to cure monetary defaults under each Assigned Contract (*i.e.*, Cure Costs); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "Cure Objection"); *provided* that service of a Cure Notice does not constitute an admission that a Contract is an executory contract or unexpired lease or guarantee that such Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.  Only those Contracts that are included on a schedule of Assigned Contracts attached to the executed definitive asset purchase agreement with a Successful Bidder (including amendments or modifications to such

9

schedules in accordance with such asset purchase agreement) will be assumed and assigned to the applicable Successful Bidder

c. *Cure Objections*.  Cure Objections, if any, must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed and served no later than **September 29, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Cure Objection Deadline"); *provided* that the Debtors may modify the Cure Objection Deadline by filing a notice of such modification with the Court.

d. *Effects of Filing a Cure Objection*.  A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Contract at issue and/or objection to the accompanying Cure Costs, as and to the extent set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in this Motion.

e. *Dispute Resolution*.  Any Cure Objection to the proposed assumption and assignment of a Contract or Cure Costs that remains unresolved after the Sale Hearing, shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the applicable Successful Bidder's reasonable discretion.  To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing.  If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should not be assigned, in which case the Successful Bidder will not be responsible for any Cure Costs in respect of such Contract.  Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "Cure Dispute"), the applicable Contract may be assumed by the Debtors and assigned to the Successful Bidder *provided* that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

f. *Supplemental Cure Notice*.  If the Debtors discover Contracts inadvertently omitted from the Cure Notice or the Successful Bidder identifies other

4924-0541-5258

Contracts that it desires to assume or assume and assign in connection with the Sale, the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the Sale supplement the Cure Notice with previously omitted Contracts or modify a previously filed Cure Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "<u>Supplemental Cure Notice</u>"). The Debtors shall serve such Supplemental Cure Notice on the Contract Counterparties to Contracts that were added or removed or to the Contract Counterparties to Contracts for which the Cure Costs were changed.

g. <u>*Objection to the Supplemental Cure Notice*</u>. Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "<u>Supplemental Cure Objection</u>") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs included in the Supplemental Cure Notice, if any. All Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

h. <u>*Dispute Resolution of Supplemental Cure Objection*</u>. If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts. If there is no such objection, then the Debtors shall obtain an order of the Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Cure Notice. Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to the Cure Costs, the applicable Contract may be assumed by the Debtors and assigned to the Successful Bidder *provided* that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

i. <u>*No Cure Objections*</u>. If no Cure Objections or Supplemental Cure Objections are timely filed, or if a Contract Counterparty does not file and serve a Cure Objection or a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) will control, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have

consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

j.   *Adequate Assurance Objection Deadline*.  Any Contract Counterparty that wishes to object to the proposed assumption and assignment of a Contract, the subject of which objection is a Successful Bidder's (other than the Stalking Horse Bidder's) proposed form of adequate assurance of future performance (each such objection, an "Adequate Assurance Objection"), shall file and serve such objection no later than **October 13, 2025, at 4:00 p.m. (prevailing Central Time)** (the "Adequate Assurance Objection Deadline").  If no Adequate Assurance Objections are timely filed, or if an objecting party does not file and serve an Adequate Assurance Objection in a manner that is consistent with the requirements set forth above for Cure Objections, and absent a subsequent order of the Court, (i) the assumption shall be effective, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract, and will be forever barred from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

### F.   Sale Objection Procedures

16.   Except objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder, all objections to the sale of the Assets (each, a "Sale Objection"), including (a) any objection to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code to the Stalking Horse Bidder, a Successful Bidder, and/or a Backup Bidder (as applicable) and (b) any objection to the entry of any Sale Order shall (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court so as to be *actually received* no later than **September 29, 2025 at 4:00 p.m. (prevailing Central Time)**, including as established herein, by Clerk of the Court and the following parties (the "Objection Notice Parties"): (a) proposed counsel

12

for the Debtors, (i) Pillsbury Winthrop Shaw Pittman LLP, 1200 Seventeenth Street, NW, Washington, DC 20036, Attn: Patrick Potter (patrick.potter@pillsburylaw.com); Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, NY 10019, Attn: Dania Slim (dania.slim@pillsburylaw.com) and Amy West (amy.west@pillsburylaw.com); and Pillsbury Winthrop Shaw Pittman LLP, 609 Main Street, Suite 2000 Houston, TX 77002, Attn: James Dickinson (james.dickinson@pillsburylaw.com); (b) the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Andrew Jimenez (Andrew.Jimenez@usdoj.gov); and (c) counsel to the Pre-Petition Secured Lender, Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of the Americas, 22nd Floor, New York, NY 10036, Attn: Andrew Glenn (aglenn@glennagre.com).

17.     Following service of the Successful Bidder Notice, parties in interest may file an objection solely with respect to the conduct of the Auction, the Successful Bidder, the Backup Bidder, or the Sale to the Successful Bidder or the Backup Bidder (in each case, if such bidder is not the Stalking Horse Bidder) (each such objection, a "Supplemental Sale Objection").  Any Supplemental Sale Objection shall be (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) filed with the Court by no later than **October 13, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Supplemental Sale Objection Deadline"); and (c) served on the Objection Notice Parties.

18.     Any party who fails to file and serve a timely Sale Objection or Supplemental Sale Objection in accordance with the terms of this Order shall be forever barred from asserting, at the Sale Hearing or thereafter, any Sale Objection or Supplemental Sale Objection to the relief requested in the Motion, or to the consummation or performance of the sale of the Assets, including the transfer of Assets to the Successful Bidder free and clear of liens, claims, interests, and

encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" to such sale for purposes of section 363(f) of the Bankruptcy Code.

19.     The Debtors or any other party in interest may file a reply to any Sale Objection or Supplemental Sale Objection, if any, by no later than **October 17, 2025 at 11:59 p.m. (prevailing Central Time)**.

20.     Consummation of the sale of the Assets pursuant to a Successful Bid shall be subject to the Court's approval.  The Sale Hearing to (a) approve a sale of all, substantially all, or a portion of the Assets to the Stalking Horse Bidder or another Successful Bidder(s) and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held before the Court on **October 21, 2025 at [●] (prevailing Central Time)**; *provided, that*, the Debtors may seek an adjournment or rescheduling of the Sale Hearing, consistent with the Bid Procedures and this Order.  At the Sale Hearing, the Debtors will seek the Court's approval of the Stalking Horse Bid or another Successful Bid(s) and the Backup Bid(s) (if any).  Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the sale transaction and there will be no further bidding at the Sale Hearing.  If the Successful Bidder(s) cannot or refuses to consummate the Sale(s) because of the breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bid Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Court.

G.     **Miscellaneous**

21.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

14

22.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

23.     Notwithstanding anything to the contrary herein or in the Bid Procedures, the Debtors may determine in their reasonable business judgment to suspend or cancel the sale process with respect to all or any portion of the Assets.

24.     The requirements set forth in Local Rules and the Complex Rules are satisfied by the contents of the Motion.

25.     All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by the Court in connection with the Motion and (b) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

26.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice.

27.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

28.     Nothing in this Order or the Bid Procedures shall be deemed a waiver of any rights, remedies, or defenses that the Debtors have under applicable bankruptcy and non-bankruptcy law, under any indemnity agreements, or any rights, remedies or defenses of the Debtors with respect thereto, including seeking relief from the Court with regard to the Auction, the Bid Procedures, the Sale Transaction, and any related items.

29.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

4924-0541-5258

Dated:  September __, 2025
       Houston, Texas

_____

Christopher M. Lopez
United States Bankruptcy Judge

4924-0541-5258

## Exhibit 1

*Bid Procedures*

4924-0541-5258

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Partners Pharmacy Services, LLC, *et al.*,[1] | Case No. 25-34698 (CML) |
| Debtors. | (Jointly Administered) |

## BID PROCEDURES

On August 13, 2025, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

On September [●], 2025, the Court entered the *Order (I) Approving Bid Procedures, (II) Designating Stalking Horse Bidder, (III) Scheduling an Auction, Related Deadlines, and a Sale Hearing, and (IV) Granting Related Relief* [Docket No. ●] (the "Bid Procedures Order"),[2] approving procedures ("Bid Procedures") for conducting a marketing process and auction (the "Auction") for the sale of substantially all of the Debtors' assets (collectively, the "Assets") pursuant to one or more sale transactions.

The Debtors have negotiated an asset purchase agreement with CS One, LLC (the "Stalking Horse Bidder" and such asset purchase agreement, the "Stalking Horse APA") pursuant to which the Stalking Horse Bidder agreed to acquire substantially all of the Debtors' assets as a going concern and subject its bid to higher and better offers through a competitive auction process. The Stalking Horse Bidder's bid consists of (a) a $51 million credit bid; ***plus*** (b) assumption of certain liabilities; ***plus*** (c) assumption and assignment of certain contracts and payment of cure costs (collectively, the "Stalking Horse Bid"). Absent a successful competing bid, the Debtors will request that the Court approve the Stalking Horse APA (and consummation of the transactions set forth therein) at the Sale Hearing (defined below).

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C. (4578); and Solutions Homecare, L.L.C. (1583). The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

[2] Capitalized terms used but not defined herein shall have the meanings given such terms in the Bid Procedures Order or the *Declaration of Ronald M. Winters in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 13] (the "First Day Declaration"), as applicable.

Copies of the Bid Procedures Order, the Stalking Horse APA, and related documents are available at https://restructuring.ra.kroll.com/PartnersPharmacy or may be obtained by calling (877) 306-2072 in the U.S. and Canada or +1 (646) 979-4416 internationally.

## I.  Assets for Sale

The Debtors intend to sell all or substantially all of their Assets.  The ability to undertake and consummate a sale of the Assets shall be subject to competitive bidding, as set forth herein, and approval by the Court.  In addition to the Stalking Horse Bid, the Debtors will consider bids for the Assets from other parties.

Parties may submit bids for all or some of the Debtors' business and assets, including for parts of the Debtors' business or assets (each, a "Partial Bid"), which bids may be combined with other Partial Bids or be considered independently or together with the liquidation value (as reasonably determined by the Debtors in good faith) of the Debtors' business or assets that are not the subject of other Partial Bids.  While a bidder must timely submit an asset purchase agreement, it may, but need not be, in the form of the Stalking Horse APA.

Any party interested in submitting a bid for any of the Debtors' Assets should contact the following individuals at SSG Advisors, LLC ("SSG"):

**SSG Advisors, LLC**
Attn: Mark Chesen and Matthew Karlson
mchesen@ssgca.com
mkarlson@ssgca.com

## II.  Key Dates and Deadlines

| Date and Time<br>(All Central Times) | Event or Deadline |
|---|---|
| Three business days after entry of the Bid Procedures Order | Deadline to file and serve Sale and Auction Notice |
| As soon as reasonably practicable after entry of the Bid Procedures Order | Deadline to file and serve the Cure Notice and publish the Sale and Auction Notice |
| September 29, 2025 at 4:00 p.m. | Sale Objection Deadline and Cure Objection Deadline |
| October 7, 2025 at 4:00 p.m. | Bid Deadline |
| October 9, 2025 at 10:00 a.m. | Auction (if necessary) |
| October 10, 2025 at 4:00 p.m. | Deadline to file Successful Bidder Notice |
| October 13, 2025 at 4:00 p.m. | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline |

| Date and Time (All Central Times) | Event or Deadline |
|---|---|
| October 17, 2025 at 11:59 p.m. | Deadline to Reply to Sale Objections, Cure Objections, and Adequate Assurance Objections |
| October 21, 2025 | *Proposed* Sale Hearing |
| October 31, 2025 | Closing Deadline |

### III.    Public Announcement of Auction

The Debtors will publish the Sale and Auction Notice,[3] with any modifications necessary for ease of publication, on one occasion in the *New York Times* (national edition), *Financial Times* (global edition), or *Wall Street Journal* (national edition).  The Debtors will also publish the Sale and Auction Notice on the case website: https://restructuring.ra.kroll.com/PartnersPharmacy.

### IV.    Due Diligence

####    A.    Participation Requirements

Each person or entity that desires to participate in the Auction process (each, a "Prospective Bidder") must first deliver to SSG (contact information in Section I above) the following (the "Preliminary Bid Documents"):

- an executed confidentiality agreement, in form and substance satisfactory to the Debtors ("Confidentiality Agreement");

- a statement and other factual support demonstrating to the Debtors and their advisors, in their sole judgment, that the Prospective Bidder has a *bona fide* interest in purchasing some or all of the Assets; and

- preliminary proof of the Prospective Bidder's financial capability to close a proposed sale transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Prospective Bidder (or, if the Prospective Bidder is an entity formed for the purpose of acquiring the Assets, the party that will bear liability for a breach by the Prospective Bidder of an asset purchase agreement or other agreement entered into in respect of the sale transaction), the adequacy of which the Debtors and their advisors will determine in their sole judgment.

Upon execution of a Confidentiality Agreement and subject to the other limitations and guidelines set forth herein, the Debtors may grant a Prospective Bidder that the Debtors identify as reasonably likely to become a Qualified Bidder (defined below) with access to the information in the Debtors' confidential electronic data room (the "Data Room") allowing such Prospective Bidder to conduct due diligence with respect to the potential acquisition of some or all of the Assets. Access may be terminated by the Debtors in their reasonable discretion at any time for any reason

---

[3]   The Sale and Auction Notice is attached as **Exhibit 2** to the Bid Procedures Order.

whatsoever, including that a Prospective Bidder does not become a Qualified Bidder, these Bid Procedures are terminated, the Prospective Bidder breaches any obligations under its Confidentiality Agreement or the Debtors become aware that information submitted by the Prospective Bidder for requesting access to the Data Room is inaccurate or misleading. The Debtors may restrict or limit access of a Prospective Bidder to the Data Room if the Debtors determine, based on their reasonable business judgment, that certain information in the Data Room is sensitive, proprietary, or otherwise not appropriate for disclosure to such Prospective Bidder.

If the Debtors determine, after consulting with the Consultation Parties,[4] that a Prospective Bidder is unlikely to qualify as a Qualified Bidder or fails to become a Qualified Bidder, then such Prospective Bidder shall have no further right to access due diligence or any other non-public information. The Prospective Bidder shall return or destroy any non-public information the Debtors or their advisors provided to the Prospective Bidder in accordance with the terms of the Confidentiality Agreement executed by the Debtors and the Prospective Bidder.

The Debtors will try to accommodate all reasonable requests from Prospective Bidders for additional information and due diligence access. All due diligence requests shall be directed to Mark Chesen (mchesen@ssgca.com) and Matthew Karlson (mkarlson@ssgca.com).

The Debtors shall not be obligated to furnish information of any kind whatsoever relating to their businesses or assets to any person or entity who (i) is not a Prospective Bidder, (ii) does not comply with the participation requirements set forth herein, or (iii) in the case of competitively sensitive information, is a competitor of the Debtors (in the Debtors' reasonable business judgment after consulting with the Consultation Parties).

Each Qualified Bidder shall be deemed to acknowledge and represent (i) that it has had an opportunity to (x) conduct any and all due diligence regarding the Assets prior to making a bid and (y) investigate and inspect any documents and the Assets in making its bid; (ii) that it has relied solely on its own independent review in making its bid; and (iii) that it did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Assets or the completeness of any information provided in connection therewith. The Debtors and their respective estates are not responsible for, and will have no liability with respect to, any information obtained by, or provided to, any Prospective Bidders in connection with these Bid Procedures.

Each Prospective Bidder, including any Qualified Bidder, shall comply with all reasonable requests by the Debtors or their advisors regarding such Prospective Bidder and its contemplated sale transaction. Failure by a Prospective Bidder, including any Qualified Bidder, to comply with reasonable requests for information and due diligence may be a basis for the Debtors to determine, after consulting with the Consultation Parties, that such Prospective Bidder or Qualified Bidder

---

[4]  The "Consultation Parties" are (a) the Pre-Petition Lender (as defined in the First Day Declaration); (b) the DIP Lender (as defined in the First Day Declaration); and (c) any official committee appointed in these chapter 11 cases; *provided* that, to the extent that any party in clause (a), (b), or a member of any committee described in clause (c) submits a bid (including a credit bid that is either revocable or subject to amendment) for any Assets, such Pre-Petition Lender, DIP Lender, or committee member shall not be a Consultation Party with respect to the evaluation and qualification of competing bids for the Assets included in the Pre-Petition Lender's, DIP Lender's, or committee member's bid, or with respect to seeking or obtaining information about other bids, but shall remain a Consultation Party for other purposes set forth in these Bid Procedures and the Bid Procedures Order.

4920-8270-2682

may no longer participate in diligence (including access to the Data Room) or the Auction, or that a bid made by such Prospective Bidder is not a Qualified Bid.

### B. Restrictions on Communications

There shall be no communication between or among Prospective Bidders, or between Prospective Bidders and the Consultation Parties, unless SSG has previously authorized such communication in writing (email being sufficient).  Should any Prospective Bidder attempt to communicate directly with a Consultation Party, such Consultation Party shall immediately direct the Prospective Bidder to SSG.  Prospective Bidders shall not, directly or indirectly, contact, initiate or engage in discussions in respect of matters relating to the Debtors or a potential sale transaction with any customer, supplier, or other contract counterparty of the Debtors without the Debtors' prior written consent (email being sufficient).

The Debtors reserve the right, in their reasonable business judgment, and after consulting with the Consultation Parties, to disqualify any Prospective Bidders that have communications between or amongst themselves without the Debtors' prior authorization.  The Debtors further reserve the right, in their business judgment, to disqualify any Prospective Bidders that have communications with a Consultation Party, and to strip any Consultation Party that violates this provision of its consultation rights hereunder.

### V. Bid Deadline

Any Prospective Bidder that intends to participate in the Auction must submit a bid in writing on or before **October 7, 2025 at 4:00 p.m. (Central Time**) (the "Bid Deadline").  Bids must be submitted in writing to the parties set forth below (collectively, the "Notice Parties").  Unless specifically provided otherwise, e-mail notice shall be sufficient.  The Debtors may extend the Bid Deadline, in their business judgment after consulting with the Consultation Parties, for all or certain Prospective Bidders.

| Notice Parties and Contact Information |
| --- |
| **Proposed Counsel to the Debtors** |
| Pillsbury Winthrop Shaw Pittman LLP<br>Patrick Potter (patrick.potter@pillsburylaw.com)<br>Dania Slim (dania.slim@pillsburylaw.com)<br>James Dickinson (james.dickinson@pillsburylaw.com) |
| **Proposed Investment Banker to the Debtors** |
| SSG Advisors, LLC<br>Mark Chesen (mchesen@ssgca.com)<br>Matthew Karlson (mkarlson@ssgca.com) |
| **Proposed Financial Advisor to the Debtors** |
| Gibbins Advisors, LLC<br>Ronald M. Winters (rwinters@gibbinsadvisors.com)<br>Tyler Brasher (tbrasher@gibbinsadvisors.com) |

4920-8270-2682

VI.    **Process for Submitting and Reviewing Bids**

A.    **Qualified Bid Requirements**

To qualify as a "<u>Qualified Bid</u>," a bid must be in writing and satisfy the following requirements:

1.    <u>Identification of Bidder & Corporate Authority</u>: A Qualified Bid must fully disclose the following: (a) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such bid) the Auction in connection with such bid and the complete terms of any such participation; (b) evidence that the Prospective Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties, and has obtained all necessary corporate authorizations or approvals with respect to the submission of its bid and the consummation of the transactions contemplated in such bid; and (c) any past or present connections or agreements with the Debtors, the Stalking Horse Bidder, any other known Prospective Bidder or Qualified Bidder, the Debtors' lenders, or any officer or director of any of the foregoing (including of the Debtors' current or former officers or directors).

2.    <u>Purchased Assets</u>.  A Qualified Bid must identify the following:

a.    the Assets to be purchased, including any executory contracts and unexpired leases (collectively, the "<u>Contracts</u>") that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtors in connection with the proposed sale; and

b.    the liabilities, if any, to be assumed, including any debt to be assumed.

3.    <u>Form of Consideration</u>:

a.    <u>Consideration</u>.  Each Qualified Bid must include a statement confirming that the bid is based on an all-cash offer, or if a bid includes forms of consideration other than cash, the Prospective Bidder must include an analysis or description of the value of such non-cash components, including any supporting documentation, to assist the Debtors and the Consultation Parties in evaluating the bid.

b.    <u>Credit Bidding</u>.  Any Prospective Bidder holding a perfected security interest in any of the Assets (a "<u>Secured Creditor</u>") may seek to credit bid all or a portion of such Prospective Bidder's claims for the collateral in which such party holds a perfected security interest (each such bid, a "<u>Credit Bid</u>") in accordance with section 363(k) of the Bankruptcy Code. A Credit Bid may be applied only with respect to those Assets in which

6

the party submitting such Credit Bid holds a perfected security interest. If a Secured Creditor is a junior lienholder, then such Secured Creditor may submit a Credit Bid only if such bid is accompanied by cash consideration or other means acceptable to the Debtors and the senior lienholder sufficient to satisfy in full the senior lienholder's secured claim or otherwise provide for treatment satisfactory to the senior lienholder.

4. <u>Minimum Bid for Assets</u>.  Each bid that is not the Stalking Horse Bid must have a value to the Debtors, as determined by the Debtors in consultation with the Consultation Parties, that is greater than the Stalking Horse Bid.

If the value of a bid relative to the Stalking Horse Bid includes non-cash components (such as fewer contingencies than are in such Stalking Horse APA), the bidder should include an analysis or description of the value of any such additional non-cash components, including any supporting documentation, to assist the Debtors and the Consultation Parties in better evaluating the competing bid.  The Debtors, in consultation with their advisors and the Consultation Parties, reserve the right in their sole discretion to ascribe a value to any non-cash components of competing bids and the Stalking Horse Bid.[5]

5. <u>Proposed Asset Purchase Agreement</u>.  A Qualified Bid must constitute an irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the bid (each, a "<u>Proposed Asset Purchase Agreement</u>").  A Proposed Asset Purchase Agreement shall be (a) duly authorized and executed; (b) if based on the form of the Stalking Horse APA, then marked against the Stalking Horse APA to reflect the proposed sale transaction and show any other proposed modifications to the Stalking Horse APA; (c) specify the proposed purchase price for the Assets in U.S. dollars; (d) include all exhibits and schedules contemplated thereby (other than exhibits and schedules that, by their nature, must be prepared by the Debtors); and (e) identify any Contracts that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtors in connection with the proposed sale transaction.

6. <u>Proposed Sale Order</u>.  A Qualified Bid must include a proposed sale order and a comparison marked against the Debtors' proposed sale order approving the sale of the Assets to the Stalking Horse Bidder (which the Debtors will file before the Bid Deadline).

7. <u>Financial Information</u>.  A Qualified Bid must include the following:

---

[5]  The Debtors reserve the right to ask any Prospective Bidder to allocate the value ascribed to a bid for any particular Asset and to inquire about any significant assumptions on which such valuations are based.

a. a statement that the Prospective Bidder is financially capable of consummating the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement;

b. sufficient evidence, as determined by the Debtors in their sole discretion, to determine that the Prospective Bidder has, or will obtain, the financial wherewithal to consummate the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement; and

c. Adequate Assurance Information (as defined in Section VI.A.9 below) with respect to any Contracts included or that may be included in the Prospective Bidder's bid, including the identity of any known proposed assignee of the applicable Contracts (if different from the Prospective Bidder) and contact information for such proposed assignee.

8. <u>Good Faith Deposit</u>: Each Qualified Bid (other than the Stalking Horse Bid) must be accompanied by a good faith deposit (each, a "<u>Good Faith Deposit</u>") in the form of cash in an amount equal to ten percent (10%) of the proposed purchase price for the Assets. Good Faith Deposits shall be deposited **no later than October 7, 2025 at 4:00 pm (prevailing Central Time)** with an escrow agent selected by the Debtors (the "<u>Escrow Agent</u>") and held in escrow until ten (10) business days after the conclusion of the Auction (except for the Good Faith Deposit of any bidder who is selected at the Auction as a Successful Bidder or as a Backup Bidder) and thereafter returned to the respective Qualified Bidders in accordance with Section IX of these Bid Procedures.

To the extent that a Qualified Bid is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such bid, the Qualified Bidder shall, promptly and no later than one business day following the increased purchase price, increase its Good Faith Deposit so that it equals 10% of the increased cash purchase price.

9. <u>Adequate Assurance</u>. A Qualified Bid must include evidence of the Prospective Bidder's (or any other relevant assignee's) ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Contracts included in its bid. The Debtors may require the following information in connection with demonstrating adequate assurance of future performance: (a) information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Contracts included in the bid, which information may include (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (ii) financial statements, (iii) tax returns, and (iv) annual reports; and (b) the Prospective Bidder's (or any other relevant assignee's) proposed use of any leased

8

premises or other property included in the bid (the information described in the foregoing clauses (a) and (b), the "Adequate Assurance Information").

All Adequate Assurance Information must be in a form that will permit its immediate dissemination to Contract counterparties.

10. Representations and Warranties (As-Is, Where-Is). Each Qualified Bid must include a written acknowledgement and representation that (a) the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its Qualified Bid, (b) the Prospective Bidder has relied solely on its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets in making its Qualified Bid, (c) the Prospective Bidder did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Prospective Bidder's Proposed Asset Purchase Agreement, and (d) the Assets will be conveyed "as is, where is, with all faults," with limited representations and warranties, and no indemnification or guarantees.

11. Authorization. A Qualified Bid must (a) include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of any bid for the Assets, participation in the Auction, and closing of the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement; or (b) if the Prospective Bidder is an entity formed for the purpose of effecting the proposed sale transaction, a Qualified Bid must provide written evidence acceptable to the Debtors of authorization and the approval by the equity holder(s) of such Prospective Bidder.

12. Regulatory and Third-Party Approvals: Each bid must include: (a) a description of all governmental, licensing, regulatory, or other approvals or consents that are required for the Prospective Bidder to consummate the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement; (b) evidence satisfactory to the Debtors, in consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed on, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals; and (c) all forms necessary for submission of such regulatory consents or approvals (other than Hart-Scott-Rodino and non-U.S. antitrust filings), if any. Each bid must further include: (x) an estimated timeframe for obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating the sale transaction contemplated by the Prospective Bidder's Proposed Asset

Purchase Agreement; (y) the basis for such estimate; and (z) in the case that receipt of any such governmental, licensing, regulatory, or other approvals or consents is estimated to take more than 30 days following execution of the Prospective Bidder's Proposed Asset Purchase Agreement, the actions the Prospective Bidder will take to ensure such approvals or consents are received as promptly as possible; and

13. <u>Other Requirements</u>.  A Qualified Bid must:

a. state that the Prospective Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") for the Assets (each such bid, a "<u>Backup Bid</u>") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined in Section VII.D.1 below);

b. state that the bid represents a binding, good-faith, and *bona fide* offer to purchase the Assets and is not subject to or conditioned on any further due diligence, and is irrevocable (i) until the selection of the Successful Bid in accordance with these Bid Procedures; or (ii) if the bid is selected as a Successful Bid or as a Backup Bid, until the Backup Bid Expiration Date (as defined in Section VII.D.1 below);

c. state and acknowledge that the Prospective Bidder shall not be entitled to any bid protections or payment in connection with the submission of a bid for the Assets or for participating in the sale process;

d. state that the Prospective Bidder is committed to closing the sale transaction contemplated in its bid as soon as practicable;

e. expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for any of the Assets or for participating in the Auction or the sale process;

f. not contain any financing contingencies of any kind;

g. not contain any conditions or contingencies relating to the validity, effectiveness, or binding nature of the bid, including contingencies for due diligence and inspection;

h. state whether the Prospective Bidder intends to offer future employment to any of the Debtors' employees and, if so, to whom;

i. certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture, or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Debtors;

4920-8270-2682

j.   include a covenant to comply with the terms of these Bid Procedures and the Bid Procedures Order;

k.   consent to the jurisdiction of the Court to adjudicate any disputes and enter final orders related to the Debtors' qualification of bids, the Auction, these Bid Procedures, any written indications of interest, Preliminary Bid Documents, Qualified Bids, Proposed Asset Purchase Agreements, and any and all other agreements entered into in connection with any proposed sale transaction;

l.   waive any right to a jury trial in connection with any disputes related to the Debtors' qualification of bids, the Auction, these Bid Procedures, any written indications of interest, Preliminary Bid Documents, Qualified Bids, Proposed Asset Purchase Agreements, and any and all other agreements entered into in connection with any proposed sale transaction; and

m.   contain such other information as may be reasonably requested by the Debtors.

### B.   Bid Review Process

The Debtors will evaluate bids and, based on their evaluation of each bid, the Debtors may, as they deem appropriate in their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, engage in negotiations with any Prospective Bidder for the purposes of (i) curing any deficiencies in a bid that prevents them from constituting a Qualified Bid, (ii) improving the terms of the Prospective Bidder's bid, or (iii) otherwise promoting a more competitive bidding and Auction process with the goal of maximizing the value of the Assets.

In evaluating a bid, the Debtors may take into consideration any and all factors that the Debtors deem reasonably pertinent, including (i) the amount of the proposed purchase price and proposed form of consideration; (ii) any Assets included in, or excluded from, the bid, including any Contracts to be assumed and assigned; (iii) the value to be provided to the Debtors under the bid, including the net economic effect on the Debtors' estates; (iv) any benefits to the Debtors' estates from any assumption or waiver of liabilities contemplated by the bid; (v) the structure of the proposed sale transaction and any attendant execution risk, including conditions to, timing of, and certainty of closing; termination provisions; availability of financing and general financial wherewithal to meet all commitments; and any required governmental approvals; and (vi) the impact of the proposed sale transaction on the Debtors' employees, trade creditors, landlords, and any other parties-in-interest (collectively, the "Bid Assessment Criteria").

The Debtors will evaluate timely bids and will (i) after consultation with the Consultation Parties (subject to Section XI hereof), determine which bids qualify as Qualified Bids and which Qualified Bid has been selected as the Baseline Bid (defined below) and (ii) notify bidders whether they are Qualified Bidders and of the Baseline Bid as soon as commercially reasonable following the Bid Deadline. The Debtors shall have the right to deem a bid a Qualified Bid even if such bid does not conform to one or more of the requirements above.

A Qualified Bidder shall not (without the Debtors' consent), modify, amend, or withdraw its Qualified Bid, unless to increase the purchase price or otherwise improve the terms of the Qualified Bid, as determined by the Debtors in their reasonable business judgment. Any Consultation Party that submits a bid or a Credit Bid shall immediately upon submission of such bid or Credit Bid cease to be a Consultation Party, *provided, however*, that upon written notice (which may be via email) by the DIP Lender or a Committee member to the Debtors, or express confirmation on the record during the Auction, of its withdrawal as a bidder for the Assets, the DIP Lender's or the Committee member's rights as a Consultation Party shall be restored.

## C. Qualified Bidders

Any bidder that submits a Qualified Bid as set forth in Sections V and VI.A above will qualify as a "Qualified Bidder." The Debtors may in their reasonable business judgment and in a manner consistent with their fiduciary duties amend or waive the conditions precedent to qualifying as a Qualified Bidder.

## D. Break-Up Fee and Expense Reimbursement

No bidder or any other party shall be entitled to any termination or "break-up" fee, expense reimbursement, or any other bidding protection in connection with the submission of a bid for the Assets or otherwise participating in the Auction or the sale process.

## VII. Auction

### A. Location and Date of Auction

If the Debtors receive one Qualified Bid (including a combination of bids that, when considered together, constitute a Qualified Bid) for the Assets in addition to the Stalking Horse Bid, then the Debtors will conduct an Auction for the Assets. If the Stalking Horse Bid is the only Qualified Bid received in respect of the Assets, the Debtors will not conduct an Auction and will seek approval of the Stalking Horse Bid at the Sale Hearing. If the Debtors determine not to hold an Auction, the Debtors will file with the Court and cause to be published on the Debtors' chapter 11 case website, a notice containing: (a) a statement that the Auction for the Assets has been canceled; (b) the identity of the Successful Bidder; and (c) the date, time, and location of the Sale Hearing.

The Auction, if required, will be conducted on **October 9, 2025, at 10:00 a.m. (prevailing Central Time)**, either (a) at the offices of Pillsbury Winthrop Shaw Pittman LLP, 609 Main Street, Suite 2000, Houston, Texas 77002, (b) some other physical location to be determined by the Debtors, or (c) virtually or at such other date, time or location as designated by the Debtors, after consulting with the Consultation Parties (subject to Section XI hereof). If the Debtors conduct the Auction virtually, the Debtors will provide instructions to participants and other attendees on how to attend the Auction via electronic mail. The Debtors will provide notice (via electronic mail or otherwise) of any change in the date, time or location of the Auction to Qualified Bidders and the Consultation Parties, and will cause publication of such change to occur on the Debtors' chapter 11 case website as soon as reasonably practicable and no later than 24 hours before the Auction. If held, the Auction will be transcribed and/or video recorded.

B.    **Attendees and Participants**

Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bid Procedures. Qualified Bidders participating in the Auction must attend the Auction personally or through a duly authorized representative. Subject to the Auction procedures set forth in Section VII.C, all Qualified Bidders and the Consultation Parties (including the members of the Committee and its counsel) are permitted to attend the Auction; *provided* that the Debtors may, in their sole discretion, establish a reasonable limit on the number of representatives or professional advisors that may appear on behalf of a Qualified Bidder or otherwise attend the Auction.

Each Qualified Bidder participating in the Auction will be required to confirm in writing and/or on the record at the Auction that (i) it has not engaged in any collusion with respect to the Auction or the submission of any bid for any of the Assets; (ii) its Qualified Bid that gained the Qualified Bidder admission to participate in the Auction and each Qualified Bid submitted by the Qualified Bidder at the Auction is a binding, good-faith, and *bona fide* offer to purchase the Assets identified in such bids; and (iii) it agrees to serve as a Backup Bidder if its Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid.

C.    **Auction Procedures**

The Auction will be conducted in accordance with the following procedures (the "<u>Auction Procedures</u>"), in consultation with the Consultation Parties:

1.    <u>The Debtors Shall Conduct the Auction</u>: The Debtors, with the assistance of their advisors, shall direct and preside over the Auction. If the Debtors receive bids for one or more Asset in lieu of all of the Debtors' Assets, the Debtors may run one or more separate Auctions for one or more of the Assets. For the avoidance of doubt, if the Debtors only receive bids for all or substantially all of the Debtors' Assets, only one Auction will be conducted. Other than as expressly set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the highest or otherwise best offer for the Assets so long as such conduct is not inconsistent in any material respect with the other terms and provisions of these Bid Procedures.

2.    <u>Additional Procedures</u>: At the commencement of or during the Auction, the Debtors may announce additional or modified procedures for conducting the Auction and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s).

3.    <u>Baseline Bids</u>. Before the commencement of the Auction, the Debtors will determine, in their reasonable business judgment (and in consultation with the Consultation Parties (subject to Section XI hereof)) the highest or otherwise best Qualified Bid submitted for the Assets (such Qualified Bid, a "<u>Baseline Bid</u>"). **No later than October 8, 2025 at 5:00 p.m. (prevailing Central Time)**, the Debtors will provide all Qualified Bidders with (a) a

notice identifying which Qualified Bid is the Baseline Bid; and (b) a copy of each Qualified Bid.

4. <u>Minimum Overbid</u>: Bidding at the Auction shall commence at the amount of the Baseline Bid.  Subsequent bids at the Auction (each, an "<u>Overbid</u>"), including any bids by the Staking Horse Bidder, must be made in minimum increments of $150,000 (the "<u>Minimum Overbid</u>") of additional value over the prevailing highest or otherwise best bid (the "<u>Prevailing Highest Bid</u>"), and each successive Overbid shall exceed the then-Prevailing Highest Bid by an amount not less than the Minimum Overbid; *provided, however*, that during the Auction, the Debtors may, in their reasonable discretion after consultation with the Consultation Parties, announce increases or reductions to the Minimum Overbid at any time.

After the first round of bidding and between each subsequent round of bidding, the Debtors will announce, after consultation with the Consultation Parties, the Prevailing Highest Bid (*i.e.*, the bid that they believe to be the highest or otherwise best offer for the Assets) and describe the material terms thereof.  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the material terms of the Prevailing Highest Bid.

5. <u>Announcement and Consideration of Overbids</u>: The Auction will include open bidding in the presence of all other Qualified Bidders.  Each Qualified Bidder shall have the right to be present for all rounds of bidding and to submit additional bids and make modifications to its Proposed Asset Purchase Agreement at the Auction to improve its bid.  Each Qualified Bidder will be permitted a reasonable time to respond to the Overbids at the Auction, as determined by the Debtors.  The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.

6. <u>No Overbid-Skipping</u>: To remain eligible to participate in the Auction, each Qualified Bidder must submit an Overbid to the then-Prevailing Highest Bid.  To the extent a Qualified Bidder fails to submit an Overbid during a round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction; *provided* that the Debtors may waive such requirement in their reasonable business judgment, in consultation with the Consultation Parties.

7. <u>Reservation of Rights</u>: The Debtors reserve the right, in their reasonable business judgment, in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things: (a) facilitate discussions between the Debtors and individual Qualified Bidders; (b) allow Qualified Bidders to consider how they wish to proceed; and (c) give Qualified Bidders the opportunity to provide the Debtors with additional evidence that the Qualified Bidder has sufficient internal

14

resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed sale transaction at the Prevaling Highest Bid amount.

For the avoidance of doubt, nothing in the Auction Procedures (if an Auction is held) will prevent the Debtors from exercising their respective fiduciary duties under applicable law.

### D.   Auction Results

1.   <u>Successful Bids</u>.  The Auction shall continue until (a) there is only one Qualified Bid for the Assets (or one or more Qualified Bids for any particular Asset or Assets) that the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, is (or are) the highest or otherwise best Qualified Bid (or Qualified Bids) (each such Qualified Bid, a "<u>Successful Bid</u>" and the Qualified Bidder submitting any such Successful Bid, the "<u>Successful Bidder</u>"), taking into account any factors the Debtors reasonably deem relevant to the value and certainty of the Qualified Bid(s) to the Debtors' estates, including the Bid Assessment Criteria, and (b) the Debtors determine, in their reasonable business judgment and in consultation with the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the Debtors, at which point, the Auction will be closed.

Following conclusion of the Auction and selection of a Successful Bidder, the Debtors shall present the results of the Auction at the Sale Hearing and shall seek the Court's approval to enter into a binding purchase agreement with the Successful Bidder on the terms of the Successful Bid (the order approving such entry, the "<u>Sale Order</u>").  Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

2.   <u>Backup Bids</u>.  If an Auction is conducted, then the Qualified Bidder(s) with the next highest or otherwise best bid to the Successful Bid(s) at the Auction for the applicable Assets, as determined by the Debtors, in the exercise of their reasonable business judgment and in consultation with the Consultation Parties, will be designated as a Backup Bidder and their bid as the Backup Bid. The identity of the Backup Bidder(s) and the amount and material terms of the Backup Bid(s) shall be announced by the Debtors at the same time the Debtors announce the identity of the Successful Bidder(s).

A Backup Bid will remain binding on the applicable Backup Bidder until the earlier of (a) the first business day after the closing of the sale transaction with the Successful Bidder for the Assets and (b) 30 days after the Sale Hearing (such date, the "<u>Backup Bid Expiration Date</u>").  If the sale

transaction with the Successful Bidder is terminated before the Backup Bid Expiration Date, then the Backup Bidder shall be deemed the new Successful Bidder for the Assets and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction; *provided* that the Debtors may, in their reasonable business judgment after consultation with the Consultation Parties, elect not to pursue the sale transaction contemplated by the Backup Bid.

3.  <u>Notice of Auction Results</u>.  Within one business day after the conclusion of the Auction, the Debtors will file with the Court and cause to be published on the Debtors' case website, a notice setting forth the results of the Auction, which will (a) identify each Successful Bidder and Backup Bidder; (b) include a copy of each Successful Bid and Backup Bid or a summary of the material terms of such bids, or provide instructions for accessing each Successful Bid and Backup Bid free of charge from the Debtors' case website; and (c) set forth the Supplemental Sale Objection Deadline (as defined in Section VIII.B below), the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise parties in interest of the outcome of the Auction.

**VIII.  Sale Hearing and Objection Deadlines**

   **A.  Sale Hearing**

A hearing to consider the approval of the Successful Bid and the Backup Bid is currently scheduled to take place on **October 21, 2025** (the "<u>Sale Hearing</u>"), or as soon as reasonably practicable thereafter, before Honorable Christopher M. Lopez, at the United States Court for the Southern District of Texas, 515 Rusk Street, Courtroom 401, Houston, Texas 77002.

At the Sale Hearing, the Debtors will request certain findings from the Court, including that: (a) the Auction was conducted (if held) and each Successful Bidder was selected, in each case in accordance with the Bid Procedures; (b) the Auction (if held) was fair in substance and procedure; (c) the Successful Bid(s) and Backup Bid(s) were Qualified Bids as defined in the Bid Procedures; and (d) consummation of any sale transaction as contemplated by the Successful Bid(s) will provide the highest or otherwise best offer for the Assets and is in the best interests of the Debtors and their estates. **The Sale Hearing may be continued to a later date by the Debtors by sending notice to creditors or other parties in interest prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder)**.

   **B.  Sale Objection Deadlines**

Except objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder, all objections to a sale of the Assets, including (i) any objection to a sale of the Assets free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) entry of the Sale Order (each such objection, a "<u>Sale Objection</u>") shall, by no later than **September 29, 2025 at 4:00 p.m. (prevailing Central Time)** (the "<u>Sale Objection</u>

Deadline"), be filed with Court and served on: (i) the Notice Parties; (ii) counsel for any committee appointed in these cases; and (iii) the U.S. Trustee.

After the Sale Objection Deadline, parties may object solely with respect to the conduct of the Auction and/or the Successful Bidder or Backup Bidder (in each case, if such bidder is not the Stalking Horse Bidder) (each such objection, a "Supplemental Sale Objection") by **October 13, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Supplemental Sale Objection Deadline").

Any Sale Objection or Supplemental Sale Objection must: (a) be in writing; (b) state with particularity the legal and factual basis for the objection; and (c) comply with the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and all orders of the Court.

### IX.    Return of Good Faith Deposits

#### A.    Prospective Bidders

Within five business days after the Debtors make final determinations as to which Prospective Bidders qualify as Qualified Bidders, the Escrow Agent shall return to each Prospective Bidder that did not qualify as a Qualified Bidder, as confirmed by the Debtors, such Prospective Bidder's Good Faith Deposit.  Upon the authorized return of a Prospective Bidder's Good Faith Deposit in accordance with this Section IX, the bid of such Prospective Bidder shall be deemed terminated and no longer binding against the Prospective Bidder.

#### B.    Qualified Bidders

1.  Forfeiture of Good Faith Deposit.  The Good Faith Deposit of a Qualified Bidder shall be forfeited if the Qualified Bidder attempts to withdraw its Qualified Bid, except as may be permitted by these Bid Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bid Procedures.  The Debtors and their estates shall be entitled to retain the Qualified Bidder's Good Faith Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of the Qualified Bidder's failure to adhere to the terms of these Bid Procedures and/or the relevant Qualified Bid.  If a Qualified Bidder's Good Faith Deposit is deemed forfeited, the Escrow Agent shall release such Good Faith Deposit by wire transfer of immediately available funds to an account designated by the Debtors within two business days after the Escrow Agent receives written notice by an authorized officer of the Debtors stating that the applicable Qualified Bidder has breached or otherwise failed to satisfy its obligations in accordance with these Bid Procedures and the applicable Qualified Bid.

2.  Return of Good Faith Deposit.  With the exception of the Good Faith Deposits of the Successful Bidder and the Backup Bidder, the Escrow Agent shall return to any other Qualified Bidder the Qualified Bidder's Good Faith Deposit, within 10 business days after the conclusion of the Auction.

3.    <u>Backup Bidder</u>.  Unless the Backup Bidder becomes the Successful Bidder, the Escrow Agent shall return the Backup Bidder's Good Faith Deposit, within 10 business days after the occurrence of the applicable Backup Bid Expiration Date; *provided*, *however*, that if the Backup Bidder becomes the Successful Bidder, its Good Faith Deposit shall be forfeited if it fails to consummate the sale transaction because of a breach that entitles the Debtors to terminate the applicable asset purchase agreement with such Backup Bidder, and the Debtors and their estates shall be entitled to retain the Backup Bidder's Good Faith Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of such breach. If a Backup Bidder's Good Faith Deposit is deemed forfeited, the Escrow Agent shall release such Good Faith Deposit by wire transfer of immediately available funds to an account designated by the Debtors within two business days after the Escrow Agent receives written notice by an authorized officer of the Debtors stating that the applicable Backup Bidder has breached or otherwise failed to satisfy its obligations in accordance with these Bid Procedures and the applicable Backup Bid.

4.    <u>Successful Bidder</u>.  At the closing of the sale transaction, the Successful Bidder shall be entitled to a credit against the purchase price in the amount of the Successful Bidder's Good Faith Deposit.  The Good Faith Deposit of a Successful Bidder shall be forfeited if the Successful Bidder fails to consummate the sale transaction because of a breach that entitles the Debtors to terminate the applicable asset purchase agreement with such Successful Bidder, and the Debtors and their estates shall be entitled to retain the Successful Bidder's Good Faith Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of such breach.  If a Successful Bidder's Good Faith Deposit is deemed forfeited, the Escrow Agent shall release such Good Faith Deposit by wire transfer of immediately available funds to an account designated by the Debtors within two business days after the Escrow Agent receives written notice by an authorized officer of the Debtors stating that the Successful Bidder has breached or otherwise failed to satisfy its obligations in accordance with these Bid Procedures and the Successful Bid.

## X.    Reservation of Rights of the Debtors and Modifications

The Debtors reserve the right to modify these Bid Procedures in their reasonable business judgment and consistent with their fiduciary duties, in consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction, additional terms and conditions on the sale of the Assets, including: (a) extending the deadlines in the Bid Procedures; (b) adjourning the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) rejecting any or all bids or Qualified Bids; and (f) adjusting the applicable Minimum Overbid.

18

## XI.        Fiduciary Out and Consultation by the Debtors

Nothing in these Bid Procedures or the Bid Procedures Order shall require the Debtors or the board of directors, board of managers, or similar governing bodies, or the special committee of any board of any Debtor, to take any action or to refrain from taking any action related to any sale transaction or with respect to these Bid Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.

For the avoidance of doubt, any consultation rights afforded to the Consultation Parties by these Bid Procedures or the Bid Procedures Order shall not in any way limit the Debtors' discretion and shall not include the right to veto any decision made by the Debtors in the exercise of their reasonable business judgment.

4920-8270-2682

**EXHIBIT 2**

*Form of Sale and Auction Notice*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Partners Pharmacy Services, LLC, *et al.*,[1] | Case No. 25-34698 (CML) |
| Debtors. | (Jointly Administered) |

**NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS FREE**
**AND CLEAR OF ANY AND ALL CLAIMS, INTERESTS AND ENCUMBRANCES**

**PLEASE TAKE NOTICE** that on September [●], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order (I) Approving Bid Procedures, (B) Designating Stalking Horse Bidder, (C) Scheduling an Auction, Related Deadlines, and a Sale Hearing, and (D) Granting Related Relief* [Docket No. [●]] (the "Bid Procedures Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to conduct a marketing and sale process, potentially including an auction (the "Auction"), to sell the Assets. The sale process and Auction, if any, will be governed by the bid procedures approved pursuant to the Bid Procedures Order and attached to the Bid Procedures Order as **Exhibit 1** (the "Bid Procedures"). *All interested bidders should carefully read the Bid Procedures and the Bid Procedures Order.* To the extent that there are any inconsistencies between this notice and the Bid Procedures or the Bid Procedures Order, the Bid Procedures or the Bid Procedures Order, as applicable, shall govern in all respects.

> **Copies of the Bid Procedures Order and other related documents are available by visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/PartnersPharmacy or by telephone at (877) 306-2072 in the U.S. and Canada or +1 (646) 979-4416 internationally.**

**PLEASE TAKE FURTHER NOTICE** that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bid Procedures. The Bid Deadline is **October 7, 2025 at 4:00 p.m. (prevailing Central Time)**. The Auction will be held on **October 9, 2025 at 10:00 a.m. (prevailing Central Time)**, or such other time and place as the Debtors determine. If the Auction

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C. (4578); and Solutions Homecare, L.L.C. (1583). The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order or the Bid Procedures as applicable.

is cancelled pursuant to the Bid Procedures, the Debtors will file a notice of cancellation of the Auction with the Court.

**PLEASE TAKE FURTHER NOTICE** that the Debtors expect to seek approval of the sale of the Assets at the Sale Hearing, which is presently scheduled to commence on **October 21, 2025 at [●] a.m./p.m. (prevailing Central Time)**, before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, in Courtroom 401 of the United States Bankruptcy Court, 515 Rusk Street, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right in their reasonable business judgment to modify the Bid Procedures in accordance with the Bid Procedures and/or terminate discussions with any potential bidders.

**PLEASE TAKE FURTHER NOTICE** that except objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder (in each case other than the Stalking Horse Bidder), any objections to the proposed sale of the Debtors' assets, including (a) any objection to a sale of the Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (b) entry of any Sale Order, _must_: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served on the Objection Notice Parties so as to be _actually received_ no later than **September 29, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Sale Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that, following service of the Successful Bidder, parties may object solely with respect to the particular terms of the proposed sale to the Successful Bidder or Backup Bidder (in each case, if such bidder is not the Stalking Horse Bidder). Any such Supplemental Sale Objection _must_: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served on the Objection Notice Parties so as to be _actually received_ no later than **October 13, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Supplemental Sale Objection Deadline").

---

### Consequences of Failing to Timely Make an Objection

**Any party or entity who fails to timely object by the Sale Objection Deadline or the Supplemental Sale Objection Deadline, as applicable, _shall be forever barred_ from asserting any objection to the sale of the Debtors' assets free and clear of all liens, claims, encumbrances, and other interests.**

---

4924-0541-5258

**No Successor Liability**

The Sale Order is expected to provide, among other things, that the Successful Bidder from the Sale Transaction will have no responsibility for, and the assets will be sold free and clear of, any successor liability, including the following:

To the greatest extent allowable by applicable law, by virtue of the consummation of the transactions contemplated under the Stalking Horse APA: (i) the Successful Bidder is not a continuation of any Debtor and its respective estate, there is not substantial continuity between the Successful Bidder and the Debtors, and there is no continuity of enterprise between the Debtors and the Successful Bidder; (ii) the Successful Bidder is not holding itself out to the public as a continuation of the Debtors or their respective estates; (iii) the transactions do not amount to a consolidation, merger, or *de facto* merger of the Successful Bidder and the Debtors and/or the Debtors' estates; and (iv) the Successful Bidder is not a successor or assignee of the Debtors or their estates for any purpose including, but not limited to, under any federal, state or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), and the Successful Bidder shall have no liability or obligation under the Workers Adjustment and Retraining Act (the "WARN Act"), 929 U.S.C. §§ 210 et seq. or the Comprehensive Environmental Response Compensation and Liability Act and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act.

Except for the Assumed Liabilities, (i) the transfer of the Acquired Assets to the Successful Bidder and (ii) the assumption and assignment to Successful Bidder of the Assigned Contracts do not and will not subject the Successful Bidder to any liability whatsoever with respect to the operation of the Debtors' business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based on, in whole or in part, directly or indirectly, any theory of law or equity including, without limitation, any theory of antitrust or successor or transferee liability.

Dated: September [●], 2025
        Washington, DC

Respectfully submitted,

*/s/ DRAFT*
Patrick J. Potter (S.D. Tex. Fed. No. 3089812)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 Seventeenth Street, NW
Washington, DC 20036
Telephone:(202) 663-8928
Facsimile: (202) 663-8007
Email: patrick.potter@pillsburylaw.com

-and-

Dania Slim (S.D. Tex. Fed. No. 3049178)
Amy West (admitted *pro hac vice*)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
Email: dania.slim@pillsburylaw.com
       amy.west@pillsburylaw.com

-and-

L. James Dickinson (Tex. Bar. No. 24105805)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
609 Main Street, Suite 2000
Houston, TX 77002
Telephone: (713) 276-7654
Facsimile: (713) 276-7373
Email: james.dickinson@pillsburylaw.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

4

## Exhibit 3

*Form of Cure Notice*

4924-0541-5258

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Partners Pharmacy Services, LLC, *et al.*,[1] | Case No. 25-34698 (CML) |
| Debtors. | (Jointly Administered) |

## NOTICE TO CONTRACT PARTIES TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

You are receiving this notice because you or one of your affiliates is a counterparty to an executory contract or unexpired lease with one or more of the Debtors as set forth on **Exhibit A** attached hereto.

### PLEASE TAKE NOTICE OF THE FOLLOWING:

On September [●], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order (I) Approving Bid Procedures, (B) Designating Stalking Horse Bidder, (C) Scheduling an Auction, Related Deadlines, and a Sale Hearing, and (D) Granting Related Relief* [Docket No. [●]] (the "Bid Procedures Order"),[2] by which the Court approved procedures for the assumption and assignment of executory contracts and unexpired leases in connection with the sale of substantially all of the Debtors' asset (the "Sale").

### POTENTIAL ASSUMPTION AND ASSIGNMENT AND CURE COSTS

In accordance with the Bid Procedures Order and the Assumption and Assignment Procedures approved therein, the Debtors may, in connection with the sale of their assets, seek to assume and assign to the Successful Bidder certain of their Contracts. Each of the Contracts that potentially could be assumed and assigned in connection with the Sale, together with the Debtors' calculation of Cure Costs with respect to such Contracts, is set forth on Schedule 1 hereto. The inclusion of any Contract on Schedule 1 does not constitute an admission by the Debtors, the Stalking Horse Bidder, any Successful Bidder, or any other party that such Contract is an executory

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C. (4578); and Solutions Homecare, L.L.C. (1583). The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order or the Bid Procedures as applicable.

contract or an unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Contract ultimately will be assumed or assigned.  All rights of the Debtors with respect thereto are reserved.

In addition, to the extent that any of the Cure Costs set forth on Schedule 1 do not reflect (i) postpetition payments that have been made by the Debtors in respect of applicable Cure Costs or (ii) any payments that are made by the Debtors in respect of such Cure Costs after the filing of this Notice, the respective amounts required to be paid to cure any existing defaults under the applicable Contracts shall be reduced by any such corresponding postpetition payments, and the Debtors reserve their rights to update the Cure Costs set forth on Schedule 1 accordingly, either by filing a supplemental notice with the Court or by written notice to the applicable Counterparty.

## CONTRACT AND CURE OBJECTIONS

Any Counterparty that wishes to object to the Debtors' proposed Cure Costs or the assumption and assignment on any basis (each such objection, a "Contract Objection") must file with the Court by no later than **September 29, 2025, at 4:00 p.m. (prevailing Central Time)** and serve on the Objection Notice Parties (set forth below) its Contract Objection, which must be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof.

**IF A COUNTERPARTY FAILS TO FILE WITH THE COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY CONTRACT OBJECTION, THE COUNTERPARTY SHALL BE (i) DEEMED TO HAVE CONSENTED TO THE ASSUMPTION BY THE DEBTORS AND ASSIGNMENT TO THE SUCCESSFUL BIDDER, (ii) PROHIBITED FROM ASSERTING THAT THE SUCCESSFUL BIDDER FAILED TO PROVIDE ADEQUATE ASSURANCE, AND (iii) FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE ASSUMPTION AND ASSIGNMENT OF THE APPLICABLE CONTRACT, THE COST TO CURE ANY DEFAULTS UNDER THE APPLICABLE CONTRACT, OR ADEQUATE ASSURANCE OF FUTURE PERFORMANCE, AND THE CURE COSTS SET FORTH ON SCHEDULE 1 HERETO SHALL BE CONTROLLING AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE CONTRACT AND SATISFY THE REQUIREMENTS OF SECTION 365(b) OF THE BANKRUPTCY CODE, AND THE COUNTERPARTY TO THE CONTRACT SHALL BE DEEMED BOUND BY AND TO HAVE CONSENTED TO THE CURE COSTS.  THE APPLICABLE SUCCESSFUL BIDDER SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE CONTRACT IN ACCORDANCE WITH BANKRUPTCY CODE SECTIONS 365(b)(1)(C), 365(f)(2)(B) AND, IF APPLICABLE, 365(b)(3), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR ANY OTHER DOCUMENT.**

## NOTICE OF AUCTION RESULTS

The Auction, if required, will be conducted on **October 9, 2025, at 10:00 a.m. (prevailing Central Time)**.  One day after the conclusion of the Auction, the Debtors will file with the Court and cause to be published on their chapter 11 case website, located at

2

https://restructuring.ra.kroll.com/PartnersPharmacy (the "Case Website") a notice of the results of the Auction, which will, among other things, (i) identify the Successful Bidder(s) and Backup Bidder(s); (ii) either include a copy of each Successful Bid and each Backup Bid or a summary of the material terms of such bids, or provide instructions for accessing each Successful Bid and each Backup Bid free of charge from the Case Website; and (iii) set forth the date, time, and location of the hearing to approve the sale (the "Sale Hearing") and any other relevant dates or other information necessary to reasonably apprise all parties in interest of the outcome of the Auction.

### ADEQUATE ASSURANCE OBJECTIONS

#### A.    Adequate Assurance Objection Deadline

Any Counterparty to a Contract that wishes to object to the proposed assumption and assignment of a Contract, the subject of which objection is the Successful Bidder's (or any other relevant assignee's but not the Stalking Horse Bidder's) proposed form of adequate assurance of future performance with respect to the Contract (each such objection, an "Adequate Assurance Objection"), must file with the Court and serve on the Objection Notice Parties an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by **October 13, 2025 at 4:00 p.m. (prevailing Central Time)**.

**IF A COUNTERPARTY FAILS TO FILE WITH THE COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY ADEQUATE ASSURANCE OBJECTION, THE COUNTERPARTY SHALL FOREVER BE BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND/OR ASSIGNMENT OF THE APPLICABLE CONTRACT WITH REGARD TO ADEQUATE ASSURANCE OF FUTURE PERFORMANCE.  THE APPLICABLE SUCCESSFUL BIDDER SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE CONTRACT IN ACCORDANCE WITH BANKRUPTCY CODE SECTIONS 365(b)(1)(C), 365(f)(2)(B) AND, IF APPLICABLE, 365(b)(3), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR ANY OTHER DOCUMENT.**

### OBJECTION NOTICE PARTIES

Any Contract Objection or Adequate Assurance Objection must be served on the following parties (the "Objection Notice Parties"): (a) proposed counsel for the Debtors, (i) Pillsbury Winthrop Shaw Pittman LLP, 1200 Seventeenth Street, NW, Washington, DC 20036, Attn: Patrick Potter (patrick.potter@pillsburylaw.com); Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, NY 10019, Attn: Dania Slim (dania.slim@pillsburylaw.com) and Amy West (amy.west@pillsburylaw.com); and Pillsbury Winthrop Shaw Pittman LLP, 609 Main Street, Suite 2000 Houston, TX 77002, Attn: James Dickinson (james.dickinson@pillsburylaw.com); (b) the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Andrew Jimenez (Andrew.Jimenez@usdoj.gov); and (c) counsel to the Pre-Petition Secured Lender, Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of the Americas, 22nd Floor, New York, NY 10036, Attn: Andrew Glenn (aglenn@glennagre.com).

## SALE HEARING

The Sale Hearing shall take place on **October 21, 2025 at [●] a.m./p.m. (prevailing Central Time)**, before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, in Courtroom 401 of the United States Bankruptcy Court, 515 Rusk Street, Houston, Texas 77002. Any Cure Objection in connection with the Successful Bid that otherwise complies with these procedures but remains unresolved as of the commencement of the Sale Hearing, may be heard at a later date to be fixed by the Court.

## ADDITIONAL INFORMATION

Copies of the Motion, the Bid Procedures Order and the Bid Procedures may be obtained free of charge by visiting the Case Website.

4

4924-0541-5258

Dated: September [●], 2025
      Washington, DC

Respectfully submitted,

*/s/ DRAFT*                       
Patrick J. Potter (S.D. Tex. Fed. No. 3089812)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 Seventeenth Street, NW
Washington, DC 20036
Telephone:(202) 663-8928
Facsimile: (202) 663-8007
Email: patrick.potter@pillsburylaw.com

-and-

Dania Slim (S.D. Tex. Fed. No. 3049178)
Amy West (admitted *pro hac vice*)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
Email: dania.slim@pillsburylaw.com
         amy.west@pillsburylaw.com

-and-

L. James Dickinson (Tex. Bar. No. 24105805)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
609 Main Street, Suite 2000
Houston, TX 77002
Telephone: (713) 276-7654
Facsimile: (713) 276-7373
Email: james.dickinson@pillsburylaw.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

5

4924-0541-5258

## EXHIBIT 4

*Form of Successful Bidder Notice*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Partners Pharmacy Services, LLC, *et al.*,[1] | Case No. 25-34698 (CML) |
| Debtors. | (Jointly Administered) |

## <u>NOTICE OF SUCCESSFUL BIDDER</u>

**PLEASE TAKE NOTICE** that, on August 13, 2025, each of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") commenced filing petitions with this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>").

**PLEASE TAKE FURTHER NOTICE** that, on September [●], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") entered the *Order (I) Approving Bid Procedures, (B) Designating Stalking Horse Bidder, (C) Scheduling an Auction, Related Deadlines, and a Sale Hearing, and (D) Granting Related Relief* [Docket No. [●]] (the "<u>Bid Procedures Order</u>") (the "<u>Bid Procedures Order</u>"), authorizing the Debtors to solicit and select the highest or otherwise best offer(s) for a Sale Transaction of (a) all or substantially all of the assets or (b) one or more, or any combination of, assets of one or more Debtors (collectively, the "<u>Assets</u>").[2]

**PLEASE TAKE FURTHER NOTICE** that, on October 9, 2025, at 10:00 a.m. (prevailing Central Time), pursuant to the Bid Procedures Order, the Debtors conducted the Auction with respect to the Assets by videoconference or such other form of remote communication established by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that, upon the conclusion of the Auction, the Debtors, in the exercise of their reasonable, good-faith business judgement have selected (a) [●] as a Successful Bidder (the "<u>Purchaser</u>"), and (b) [●] as a Backup Bidder.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C. (4578); and Solutions Homecare, L.L.C. (1583). The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Bid Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that, the Debtors (collectively, the "Sellers") and [●] (as Purchaser) entered into that certain purchase and sale agreement (the "Purchase Agreement") to effectuate the Sale Transaction on the terms set forth in the Purchase Agreement, filed contemporaneously herewith.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have determined to effectuate the Sale Transaction.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale Transaction of these Assets to the Purchaser at the Sale Hearing scheduled to commence on **October 21, 2025 at [●] a.m./p.m. (prevailing Central Time)** before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, in Courtroom 401 of the United States Bankruptcy Court, 515 Rusk Street, Houston, Texas 77002. The Sale Hearing may be adjourned by announcement in open Court or on the Court's calendar without any further notice required.

**PLEASE TAKE FURTHER NOTICE** that objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder (if neither the Successful Bidder or Backup Bidder is the Stalking Horse Bidder) must be made on or before **October 13, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Supplemental Sale Objection Deadline"). Objections must be made in writing, state the basis of such objection with specificity, and shall be filed with the Court and served on the following parties no later than the Supplemental Sale Objection Deadline (the "Notice Parties"): (a) proposed counsel for the Debtors, (i) Pillsbury Winthrop Shaw Pittman LLP, 1200 Seventeenth Street, NW, Washington, DC 20036, Attn: Patrick Potter (patrick.potter@pillsburylaw.com); Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, NY 10019, Attn: Dania Slim (dania.slim@pillsburylaw.com) and Amy West (amy.west@pillsburylaw.com); and Pillsbury Winthrop Shaw Pittman LLP, 609 Main Street, Suite 2000 Houston, TX 77002, Attn: James Dickinson (james.dickinson@pillsburylaw.com); (b) the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Andrew Jimenez (Andrew.Jimenez@usdoj.gov); and (c) counsel to the Pre-Petition Secured Lender, Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of the Americas, 22nd Floor, New York, NY 10036, Attn: Andrew Glenn (aglenn@glennagre.com).

**PLEASE TAKE FURTHER NOTICE**, that at the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid by the Purchaser. Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction, and there will be no further bidding at the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that this Successful Bidder Notice is subject to the terms and conditions of the Motion and the Bid Procedures Order, with such Bid Procedures Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bid Procedures, the Bid Procedures Order, this notice, and any other related documents are available: (a) upon request to Omni by telephone at (877) 306-2072 in the U.S. and Canada or +1 (646) 979-4416 internationally; (b) for a fee via PACER by visiting https://ecf.txsb.uscourts.gov; or (c) by visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/PartnersPharmacy.

Dated:  October [●], 2025
       Washington, DC

Respectfully submitted,

*/s/ DRAFT*
Patrick J. Potter (S.D. Tex. Fed. No. 3089812)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 Seventeenth Street, NW
Washington, DC 20036
Telephone:(202) 663-8928
Facsimile: (202) 663-8007
Email:  patrick.potter@pillsburylaw.com

-and-

Dania Slim (S.D. Tex. Fed. No. 3049178)
Amy West (admitted *pro hac vice*)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
Email:  dania.slim@pillsburylaw.com
       amy.west@pillsburylaw.com

-and-

L. James Dickinson (Tex. Bar. No. 24105805)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
609 Main Street, Suite 2000
Houston, TX 77002
Telephone: (713) 276-7654
Facsimile: (713) 276-7373
Email: james.dickinson@pillsburylaw.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

3

## Exhibit B

*Stalking Horse APA*

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**[●], AS THE BUYER,**

**AND**

**THE PERSONS LISTED ON THE SIGNATURE PAGES HERETO, AS THE SELLERS,**

**DATED AS OF [●], 2025**

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ................................................................................................2

Article II PURCHASE AND SALE OF ASSETS .......................................................11

2.1    Agreement to Purchase and Sell .................................................................11
2.2    Excluded Assets ...........................................................................................15
2.3    Assumed Liabilities ......................................................................................16
2.4    Excluded Liabilities ......................................................................................16
2.5    Purchase Price/Inventory Calculation .........................................................17
2.6    Tax Treatment; Allocation of Purchase Price ..............................................18
2.7    Withholding Tax ............................................................................................18
2.8    Allocation of Certain Items ..........................................................................18
2.9    Assumption/Rejection of Contracts .............................................................19

Article III REPRESENTATIONS AND WARRANTIES OF THE SELLERS ......................20

3.1    Organization; Good Standing; Capitalization ...............................................20
3.2    Authorization; Binding Effect ........................................................................20
3.3    Non-Contravention .......................................................................................20
3.4    Financial Statements ...................................................................................21
3.5    Real Property ...............................................................................................21
3.6    Intellectual Property .....................................................................................22
3.7    Title to Purchased Assets; Sufficiency and Condition of Purchased Assets .....................23
3.8    Compliance with Laws; Licenses and Permits .............................................23
3.9    Litigation ......................................................................................................23
3.10   Employees ...................................................................................................24
3.11   Employee Benefits .......................................................................................24
3.12   Insurance .....................................................................................................26
3.13   Taxes ...........................................................................................................26
3.14   Material Contracts ........................................................................................27
3.15   Healthcare Law Compliance ........................................................................29
3.16   Environmental Law Compliance ...................................................................31
3.17   Operations Since Balance Sheet Date .........................................................32
3.18   Product Liability ...........................................................................................32
3.19   Affiliate Transactions ...................................................................................32
3.20   Brokers ........................................................................................................32
3.21   Exclusivity of Representations .....................................................................32

Article IV REPRESENTATIONS AND WARRANTIES OF THE BUYER .......................33

4.1    Organization; Good Standing .......................................................................33
4.2    Authorization; Binding Effect ........................................................................33
4.3    Non-Contravention .......................................................................................33
4.4    Litigation ......................................................................................................33
4.5    Healthcare Regulatory Compliance Status ..................................................33
4.6    Financial Ability; Character; Competence ....................................................33
4.7    Certain Arrangements ..................................................................................34
4.8    Brokers ........................................................................................................34
4.9    Exclusivity of Representations .....................................................................34

Article V COVENANTS .............................................................................................34

5.1    Employees ...................................................................................................34

4911-6683-3741
4911-6683-3741
4911-6683-3741

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 5.2 | Performance of Agreement | 35 |
| 5.3 | Interim Operations | 35 |
| 5.4 | Access | 36 |
| 5.5 | Governmental Approvals | 37 |
| 5.6 | Confidentiality | 37 |
| 5.7 | Tax Matters | 37 |
| 5.8 | Consents | 39 |
| 5.9 | Use of Business Name | 40 |
| 5.10 | Wrong Pockets | 40 |
| 5.11 | No Transition Services | 40 |

**Article VI CONDITIONS TO CLOSING** .......................................................... 40

| | | |
|---|---|---|
| 6.1 | Conditions to the Buyer' Obligations | 40 |
| 6.2 | Conditions to the Sellers' Obligations | 41 |

**Article VII NON-SURVIVAL** ......................................................................... 41

| | | |
|---|---|---|
| 7.1 | Non-Survival | 41 |

**Article VIII TERMINATION AND CLOSING** ................................................ 42

| | | |
|---|---|---|
| 8.1 | Termination | 42 |
| 8.2 | Effect of Termination | 43 |
| 8.3 | Closing; Effective Time | 43 |
| 8.4 | Closing Deliveries | 43 |

**Article IX BANKRUPTCY MATTERS** ........................................................... 44

| | | |
|---|---|---|
| 9.1 | Sale Order | 44 |
| 9.2 | Bankruptcy Process | 44 |
| 9.3 | Approval | 44 |
| 9.4 | Stalking Horse Bidder | 44 |
| 9.5 | Auction | 44 |

**Article X MISCELLANEOUS** ....................................................................... 45

| | | |
|---|---|---|
| 10.1 | Entire Agreement | 45 |
| 10.2 | Invalidity | 45 |
| 10.3 | Specific Performance | 45 |
| 10.4 | Amendment; Extension; Waiver | 46 |
| 10.5 | Expenses | 46 |
| 10.6 | Public Announcements | 46 |
| 10.7 | Notices | 46 |
| 10.8 | Successors and Assigns; No Third-Party Beneficiaries | 47 |
| 10.9 | Disclosure Schedules | 47 |
| 10.10 | Interpretation | 47 |
| 10.11 | Governing Law | 47 |
| 10.12 | Jurisdiction; Waiver of Jury Trial | 48 |
| 10.13 | Further Assurances | 48 |
| 10.14 | Execution in Counterparts | 48 |
| 10.15 | Non-Recourse | 48 |
| 10.16 | No Right of Set-Off | 48 |

4911-6683-3741

## SCHEDULES TO THE ASSET PURCHASE AGREEMENT

Schedule 1.1              Permitted Liens
Schedule 2.1(a)(v)        Hospice Business Permits
Schedule 2.1(a)(xi)       Hospice Vehicles
Schedule 2.1(a)(xii)      Hospice Contracts
Schedule 2.1(b)(iv)       LTC Leases
Schedule 2.1(b)(v)        Business Permits
Schedule 2.1(b)(xi)       LTC Vehicles
Schedule 2.1(b)(xii)      LTC Contracts
Schedule 2.1(c)(viii)     Texas Contracts
Schedule 2.6              Allocation Schedule
Schedule 2.9(a)           Security Deposits
Schedule 3.1              Organization
Schedule 3.3(a)           Non-Contravention – Sellers
Schedule 3.3(b)           Non-Contravention – Third-Party Consents
Schedule 3.4(a)           Financial Statements
Schedule 3.4(b)           Undisclosed Liabilities
Schedule 3.5(a)           Leases; Leased Real Property
Schedule 3.5(b)           Default under Leased Real Property
Schedule 3.6(a)           Intellectual Property
Schedule 3.6(d)           IP Licenses
Schedule 3.6(e)           Sellers' Software
Schedule 3.7(a)           Exceptions to Title
Schedule 3.8              Compliance with Laws; License and Permits
Schedule 3.9              Litigation
Schedule 3.10(b)          Employees – Compliance with Laws
Schedule 3.10(c)          List of Employees, Etc.
Schedule 3.10(d)          Complaints
Schedule 3.11             Seller Benefit Plans
Schedule 3.11(g)          Employee Arrangements
Schedule 3.12(a)          Policies
Schedule 3.12(b)          Expiring Policies
Schedule 3.13(a)          Unfiled Tax Returns
Schedule 3.13(b)          Unpaid Taxes
Schedule 3.13(c)          Tax Liens
Schedule 3.13(e)          Tax Adjustments
Schedule 3.14(a)          Material Contracts
Schedule 3.14(b)          Exceptions to Material Contracts
Schedule 3.15(a)          Compliance with Healthcare Laws
Schedule 3.15(b)          Healthcare Law Permits
Schedule 3.15(c)          Healthcare Law Actions
Schedule 3.15(h)(A)       Payment Programs
Schedule 3.15(h)(B)       Exceptions to Payment Program
Schedule 3.19             Affiliate Transactions
Schedule 3.20             Brokers
Schedule 5.3(k)           Settlements

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***"), dated as of **[●]**, 2025 (the "***Signing Date***"), is entered into by and among (a) [●] (the "***Buyer***") and (b) the Persons listed on the signature pages hereto as "Sellers" (each, individually, a "***Seller***", and, collectively, the "***Sellers***").

## RECITALS

A.      The Hospice Sellers are engaged in the business of (a) selling, marketing or providing pharmacy and pharmacy-related products and services to hospice providers, hospice pharmacy benefit managers and hospice patients, in any setting of care, including, but not limited to, patient homes, hospice IPU facilities, and long-term care and senior living facilities, (b) pharmacy benefit manager services to hospice providers and (c) providing professional support services related to the foregoing (collectively, the "***Hospice Business***");

B.      The LTC Sellers and Texas Seller are engaged in the business of (a) selling, marketing or providing pharmacy and pharmacy-related products and services to long-term care and multi-patient facilities (including skilled nursing facilities, assisted living facilities, independent living facilities, mental health facilities, correctional facilities, group homes, hospices, and alternative clinical sites) and patients therein and (b) providing consulting, consulting pharmacist, compliance packaging to patients receiving services in-home, cost containment, medical records and other professional support services, in each case, related to the foregoing (collectively, the "***LTC Business***", and together with the Hospice Business, the "***Business***");

C.      On August 13, 2025, the Sellers and certain of their Affiliates (collectively, the "***Debtors***") filed (the date of such filing, the "***Petition Date***") voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") (such case, the "***Bankruptcy Case***"), and are operating their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

D.      The Buyer, as lender, has agreed to provide post-petition debtor-in-possession financing to the Sellers in connection with the Bankruptcy Case, subject to approval by the Bankruptcy Court, consisting of a senior secured, superpriority priming credit facility in the principal amount of $6.5 million, with all sums owing thereon to be credit bid by the Buyer at Closing pursuant to Section 363(k) of the Bankruptcy Code (the "***DIP Facility***");

E.      The Sellers have determined, in the exercise of their business judgment, that a sale of Purchased Assets is in the best interests of the Sellers and their stakeholders, including their creditors and other parties in interest;

F.      The Sellers desire to sell, transfer and assign to the Buyer, and the Buyer desires to acquire and assume from the Sellers, all of the Purchased Assets and all of the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of an order of the Bankruptcy Court approving the transactions contemplated herein (the "***Sale Order***"); and

G.      The Purchased Assets and Assumed Liabilities shall be purchased and assumed by the Buyer pursuant to the Sale Order, free and clear of all Liens (other than Permitted Liens), all in the manner and subject to the terms and conditions set forth in this Agreement and subject to entry of the Sale Order, and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court (together, the "***Bankruptcy Rules***").

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

As used herein, the terms below shall have the following meanings:

"*Action*" means any action, administrative enforcement, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, investigation, audit, review or other proceeding commenced, brought or heard by or before any Governmental Authority, Taxing Authority, or any intermediary or carrier.

"*Affiliate*" means any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the Person specified; it being understood that, for purposes of this definition, "control" of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Agreement Dispute*" has the meaning set forth in Section 10.15.

"*Alternative Transaction*" means any transaction or series of related transactions pursuant to which a material portion of the Purchased Assets will be acquired by, or transferred to, a third party other than the Buyer, whether pursuant to an asset sale, merger, stock purchase, or otherwise.

"*Ancillary Agreements*" means the Bill of Sale, Assignment and Assumption Agreement, and the IP Assignments.

"*Appraiser*" has the meaning set forth in Section 2.5(b).

"*Assignment and Assumption Agreement*" has the meaning set forth in Section 8.4(a)(iii).

"*Assumed Contracts*" means the Hospice Contracts, the LTC Contracts and the Texas Contracts.

"*Assumed Hospice Liabilities*" has the meaning set forth in Section 2.3(a).

"*Assumed Hospice Leases*" has the meaning set forth in Section 2.1(a)(iv).

"*Assumed Leases*" has the meaning set forth in Section 2.1(b)(iv).

"*Assumed Liabilities*" means, collectively, the Assumed Hospice Liabilities, the Assumed LTC Liabilities and the Assumed Texas Liabilities.

"*Assumed LTC Leases*" has the meaning set forth in Section 2.1(b)(iv).

"*Assumed LTC Liabilities*" has the meaning set forth in Section 2.3(b).

"*Assumed Texas Liabilities*" has the meaning set forth in Section 2.3(c).

"*Auction*" means an auction conducted by the Sellers in accordance with the Bidding Procedures Order.

"*Avoidance Actions*" means those actual and potential claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

"*Back-Up Bidder*" has the meaning set forth in Section 9.5(b).

"*Balance Sheet Date*" means [June 30, 2025].

"*Balance Sheets*" has the meaning set forth in Section 3.4(a).

"*Bankruptcy Case*" has the meaning set forth in the recitals.

"*Bankruptcy Code*" has the meaning set forth in the recitals.

"*Bankruptcy Court*" has the meaning set forth in the recitals.

"*Bankruptcy Rules*" has the meaning set forth in the recitals.

"*Benefit Plan*" means each compensation or benefits plan, program or arrangement including, without limitation, plans within the meaning of Section 3(3) of ERISA, employment agreements, profit-sharing, defined contribution, deferred compensation, insurance, pension, retirement, medical, hospital, disability, change of control, termination, welfare or fringe benefit plans, programs, agreements or arrangements, cash or equity-based bonus or incentive arrangements, severance arrangements and vacation policies sponsored or maintained by any Seller or any of any Seller's Affiliates or ERISA Affiliates for the benefit of any Seller's employees, managers, partners, individual or single-member independent contractors or individual or single-member consultants.

"*Bidding Procedures Order*" means that certain *Order (I)(A) Approving Bid Procedures, (B) Designating Stalking Horse Bidder, (C) Scheduling an Auction, Related Deadlines, and a Sale Hearing, and (D) Granting Related Relief* [Docket No. ●], as subsequently amended, modified or supplemented.

"*Bill of Sale*" has the meaning set forth in Section 8.4(a)(ii).

"*Business*" has the meaning set forth in the recitals.

"*Business Day*" means a day other than Saturday, Sunday or any day on which banks located in the State of New York are authorized or obligated to close.

"*Buyer*" has the meaning set forth in the preamble.

"*Buyer 401(k) Plan*" has the meaning set forth in Section 5.1(b).

"*Closing*" has the meaning set forth in Section 8.3(a).

"*Closing Date*" has the meaning set forth in Section 8.3(a).

"*Code*" means the Internal Revenue Code of 1986, as amended, and all rules and regulations promulgated thereunder.

"**Contract**" means any contract, agreement, lease, sublease, mortgage, obligation, understanding, promise, arrangement, undertaking, restriction, license, sublicense or other instrument, in each case, whether written or oral, and whether express or implied.

"**Credit Agreement**" means that certain Credit Agreement, dated as of July 2, 2019, by and among (i)  Partners Pharmacy Services, LLC, Partners Pharmacy, L.L.C., Partners of Connecticut, LLC, Partners of Massachusetts, LLC, Solutions Homecare, L.L.C., Partners Pharmacy of Virginia, LLC, Partners of Pennsylvania, LLC, Partners of New York, LLC, Partners of Florida, LLC, Partners Pharmacy of Maryland, LLC, Partners Pharmacy of Texas, LLC, Arrow Pharmacy Holdings LLC, and Arrow Envoy Holdings, LLC as borrowers thereunder, (ii) Care Solutions, LLC as guarantor thereunder, (iii) CIT Bank, N.A. as administrative agent, and (iv) the lenders party thereto, as amended, supplemented, and modified from time to time.

"**Credit Bid**" has the meaning set forth in Section 2.5(a).

"**Cure Amounts**" means all amounts that must be paid and all obligations that otherwise must be satisfied by the Buyer, pursuant to Section 365 of the Bankruptcy Code, to cure all defaults, if any, in connection with the assumption and assignment of the Assumed Contracts and Assumed Leases to the Buyer as provided herein, unless such other amounts are otherwise agreed upon by the Buyer and the counterparty to such Assumed Contract or Assumed Lease, or determined by the Bankruptcy Court.

"**Debtors**" has the meaning set forth in the recitals.

"**DIP Facility**" has the meaning set forth in the recitals.

"**Disclosure Schedules**" has the meaning set forth in Article III.

"**Disputed Amount Contract**" has the meaning set forth in Section 2.9(d).

"**End Date**" has the meaning set forth in Section 8.1(d).

"**Enforceability Exceptions**" has the meaning set forth in Section 3.2.

"**Environmental Laws**" means any and all Laws with respect to (a) the protection of the environment (including ambient air, soil, surface water or groundwater, or subsurface strata), pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, safety of employees or the public, or (b) the presence of, exposure to, or the management, manufacture, use, distribution, treatment, storage, recycling, processing, production, generation, reclamation, reuse, discharge, disposal, release, remediation or transportation of Hazardous Substances.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means each trade or business (whether or not incorporated) that together with any Seller is treated as a single employer pursuant to Code Sections 414(b), (c), (m) or (o).

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**Facilities**" has the meaning set forth in Section 3.5(b).

"**Financial Statements**" has the meaning set forth in Section 3.4(a).

"**GAAP**" means United States generally accepted accounting principles, as in effect from time to time, consistently applied.

"**Governmental Approvals**" means all consents, authorizations or approvals of or by, and all filings with or notices to, all Governmental Authorities that are necessary to consummate the transactions contemplated hereby.

"**Governmental Authority**" means any legislature, agency (including the IRS), bureau, branch, board, department, division, commission, court, tribunal, magistrate, justice, multi-national organization, quasi-governmental body or other similarly recognized organization (including the Centers for Medicare and Medicaid Services) or body of any federal, state, county, municipal, local or foreign government or other similarly statutorily recognized organization or body exercising similar powers or authority.

"**Hazardous Substances**" means (a) any and all substances, wastes, pollutants, contaminants and materials regulated, defined or designated as hazardous, dangerous or toxic under any Environmental Law or Healthcare Law, (b) gasoline, diesel fuel or other petroleum hydrocarbons, (c) PCBs, asbestos, mold or urea formaldehyde foam insulation, (d) emerging contaminants, per and polyfluoroalkyl substances, (e) natural gas, synthetic gas and any mixtures thereof, and (f) any other chemical, pollutant, waste, material or substance that is prohibited, controlled or regulated by, or to which Liability or standards of conduct may be imposed under any Environmental Law.

"**Healthcare Laws**" means all applicable Laws of any Governmental Authority regulating health services or payment, including, but not limited to, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the exclusion laws (42 U.S.C. § 1320a-7), the civil monetary penalty laws (42 U.S.C. § 1320a-7a), the administrative simplification provisions of HIPAA, the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), the Food, Drug and Cosmetic Act (21 C.F.R. §§ 301 et seq.), the Prescription Drug Marketing Act of 1987, the Deficit Reduction Act of 2005, the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191), HITECH, the Patient Protection and Affordable Care Act of 2010, any amendments thereto, the regulations promulgated pursuant to such Laws, any state analogs to any of the foregoing Laws, and any other federal, state, or local Law, regulation, guidance document, manual provision, program memorandum, opinion letter, or other issuance of any Governmental Authority which regulates kickbacks, patient or program charges, recordkeeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government healthcare programs, quality, safety, privacy, security, pharmacy practice, licensure, infusion therapy, home health, DMEPOS, accreditation, billing/coding, or any other aspect of providing healthcare.

"**Healthcare Regulatory Consents**" means in respect of the Sellers or the Buyer, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained and such notifications to any Governmental Authority as shall be required to be given by such party in order for it to consummate the contemplated transaction in compliance with all Healthcare Laws and shall include obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority needed for the Parties to consummate the contemplated transactions and for the Buyer to operate the Business as currently conducted.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended (42 U.S.C. §§ 1320d-1320d-8), and all rules and regulations promulgated thereunder.

"**HITECH**" means the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009 (Public Law 111-005), as amended.

"**Hospice Assets**" has the meaning set forth in Section 2.1(a).

"**Hospice Business**" has the meaning set forth in the recitals.

"**Hospice Contracts**" has the meaning set forth in Section 2.1(a)(xii).

"**Hospice Inventory**" has the meaning set forth in Section 2.1(a)(ii).

"**Hospice Seller**" means each of Arrow Pharmacy Holdings, LLC, a Connecticut limited liability company, and Arrow Envoy Holdings, LLC, a Delaware limited liability company; "**Hospice Sellers**" means the Hospice Sellers, collectively.

"**Improvements**" has the meaning set forth in Section 3.5(b).

"**Intellectual Property**" means, collectively, all United States, foreign and international industrial and intellectual property and other proprietary rights, including patents, patent applications, rights to file for patent applications (including continuations, continuations-in-part, divisionals, reissues and reexaminations), trademarks, logos, service marks, trade names and service names (in each case whether or not registered) and applications for and the right to file applications for registration thereof, Internet domain names or applications for Internet domain names, Internet and World Wide Web URLs or addresses and web site content, copyrights (whether or not registered), applications for and the right to file applications for registration thereof, works of authorship, moral rights, mask work rights, mask work registrations, applications and rights to file applications therefor, franchises, licenses, inventions, trade secrets, trade dress, know-how, confidential information, customer lists, supplier lists, proprietary processes and formulae, software source code and object code, database, algorithms, net lists, architectures, structures, screen displays, layouts, development tools, designs, blueprints, specifications, technical drawings (or similar information in electronic format), publicity and privacy rights and any other intellectual property rights arising under the laws of the United States of America, any state thereof, or any country or province, and all documentation and media (in whatever form) constituting, describing or relating to the foregoing, including programmers' notes, memoranda and records.

"**Interim Financial Statements**" has the meaning set forth in Section 3.4(a).

"**Interim Period**" means the period between the Signing Date and the Closing Date.

"**Inventory**" has the meaning set forth in Section 2.1(c)(ii).

"**Inventory Amount**" has the meaning set forth in Section 2.5(b).

"**IP Licenses**" has the meaning set forth in Section 3.6(d).

"**IRS**" means the United States Internal Revenue Service or any successor organization thereto.

"**Knowledge**" or phrases of similar import, means when applied to the Sellers, the actual knowledge of David Baruch, James Matthews or Edwin Clark, and the knowledge that any such Person could have possessed after due inquiry and a reasonable investigation of each such person's direct reports, in each case, for the subject matter in question.

"***Law***" means any law, statute, code, order, common law, rule, regulation, policy, guidance or ordinance enacted or promulgated by any Governmental Authority, including any Environmental Law or Healthcare Laws.

"***Leased Real Property***" has the meaning set forth in Section 3.5(a).

"***Leases***" has the meaning set forth in Section 3.5(a).

"***Liability***" means, with respect to any Person, any liability or obligation of such Person of any kind, whether known or unknown, absolute or contingent, matured or unmatured, conditional or unconditional, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, or due or to become due.

"***Lien***" means, with respect to any assets, any lien, encumbrance, claim, charge, security interest, mortgage, deed of trust, pledge, easement, conditional sale or other title retention agreement or other restriction of a similar kind, other than Permitted Liens.

"***Loss***" means any Action, investigation, Order, ruling, damage, due penalty, fine, cost, reasonable amount paid in settlement, Liability, Tax, Lien, loss, expense or fee, including court costs and reasonable attorneys' fees, expenses and disbursements, excluding punitive damages unless included in a Third Party Claim.

"***LTC Assets***" has the meaning set forth in Section 2.1(b).

"***LTC Business***" has the meaning set forth in the recitals.

"***LTC Contracts***" has the meaning set forth in Section 2.1(b)(xii).

"***LTC Inventory***" has the meaning set forth in Section 2.1(b)(ii).

"***LTC Seller***" means each of Partners Pharmacy Services, LLC, a Delaware limited liability company, Partners Pharmacy, LLC, a New Jersey limited liability company, Partners of Connecticut, LLC a Delaware limited liability company, Partners of Massachusetts, LLC, a Delaware limited liability company, Partners of Pennsylvania, LLC, a Delaware limited liability company;  "***LTC Sellers***" means the LTC Sellers, collectively.

"***Material Adverse Effect***" means, with respect to any Person, any event, occurrence, state of facts or development, condition or change (collectively, "***Effects***") that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, assets, or results of operations of such Person, taken as a whole; provided, however, that the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been or would reasonably be expected to be, a Material Adverse Effect: (i) Effects that generally affect the industry or industries in which such Person operates, (ii) any Effects arising from general business, political or economic conditions or the financial, credit or securities markets, including any disruptions thereof or changes in monetary policy, inflation, interest rates, exchange rates or stock or bond prices, (iii) Effects arising out of, or attributable to, acts of God, calamities, natural disasters, global or national health concern, epidemic, pandemic, acts of terrorism, the commencement or escalation of any hostilities or war (whether declared or undeclared), or any social conditions or any other *force majeure*; (iv) changes in GAAP or in accounting rules applicable to such Person, (v) any changes in Law of any Governmental Authority or interpretations thereof, (vi) any action taken by such Person on or after the date of this Agreement at the written request or with the written consent of the Buyer, whether pursuant to this Agreement or otherwise, the taking of any action contemplated by this Agreement, failure to take any action if such action is prohibited by this

Agreement or the Buyer's failure to consent to any of the actions restricted in <u>Section 5.3</u>, (vii)(A) the commencement or pendency of the Bankruptcy Case, the financial condition of the Sellers as a result of the commencement of the Bankruptcy Case or from any action approved by the Bankruptcy Court, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated by this Agreement, (2) the Sale Order or the reorganization or liquidation of Seller or its Affiliates, or (3) the assumption or rejection of any Assumed Contract, or (C) any Order of the Bankruptcy Court or any actions or omissions of the Sellers or their respective Affiliates in compliance with such Orders, (viii) the negotiation, announcement, pendency or performance of the transactions contemplated by this Agreement or any other Ancillary Agreement or the identity, nature or ownership of the Buyer or the Buyer's plans with respect to the Business, Purchased Assets, Assumed Liabilities and Sellers' employees, including the impact on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the transactions contemplated by this Agreement, (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with the Buyer or its Affiliates or Representatives), (x) any action taken by the Buyer or its Affiliates with respect to the transactions contemplated by this Agreement or the financing of such transactions or any breach by the Buyer of this Agreement, (xi) the matters set forth on the Disclosure Schedules and any changes or developments in, or Effects or results arising from or relating to, the matters set forth on the Disclosure Schedules, <u>provided</u> <u>further</u> that the Effects described in clauses (i) through (v) shall be taken into account in determining whether a Material Adverse Effect exists, has occurred or would reasonably be expected to occur only to the extent such Effects have had or would reasonably be expected to have a disproportionate and adverse effect on the Business relative to other similarly situated participants in the industries and geographic areas in which the Business operates generally.

"***Material Contract***" has the meaning set forth in <u>Section 3.14(b)</u>.

"***Non-Assignable Contract***" has the meaning set forth in <u>Section 5.8</u>.

"***Non-Recourse Person***" has the meaning set forth in <u>Section 10.15</u>.

"***Order***" means any binding and enforceable judgment, order, writ, decision, injunction, verdict, ruling, award (including arbitration awards), decree or other similar determination or finding by, before or under the supervision of any Governmental Authority, arbitrator or mediator of competent jurisdiction, including any Order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"***Ordinary Course of Business***" means the ordinary course of business consistent with the past custom and practice (including with respect to quantity and frequency to the extent applicable under the circumstances) of the Sellers in the operation of the Business.

"***Parties***" means the Buyer and the Sellers, collectively; "***Party***" means each Party, individually.

"***Payment Programs***" means Medicare, TRICARE, Medicaid, worker's compensation programs, commercial insurance programs, and all other third-party reimbursement and payment programs, including those offered or administered by health maintenance organizations, preferred provider organizations, health benefit plans, or health insurance plans.

"***Permits***" means any and all licenses, permits, authorizations, bonds, approvals, franchises, registrations, accreditations, certificates of need, consents, supplier or provider numbers, qualifications, operating authority, or any other permits or permissions which are material to or legally required for the operation of the Business as currently conducted or in connection with any Seller's ability to own, lease,

operate or manage any of its property, or bill any governmental payer, in each case that are issued or enforced by any Governmental Authority.

"***Permitted Liens***" means (a) Liens for Taxes and other governmental charges and assessments that are not yet due and payable, (b) Liens of landlords and liens of carriers, warehousemen, mechanics and materialmen and other like liens arising in the Ordinary Course of Business for sums not yet due and payable, (c) Liens relating to deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security or to secure the performance of leases, trade contracts or other similar agreements, (d) purchase money Liens on Personal Property acquired in the Ordinary Course of Business, (e) Liens securing executory obligations under any lease that constitute a "capital lease" under GAAP, (f) any utility company rights, easements and franchises, (g) rights of licensors under (x) the IP Licenses and (y) off-the-shelf Intellectual Property or Intellectual Property subject to shrink-wrap, click-through or similar commercial licenses, and (h) Liens disclosed on Schedule 1.1.

"***Person***" means an individual, partnership, limited liability company, corporation, association, business trust, joint stock company, trust, unincorporated organization, joint venture, Governmental Authority or other entity of whatever nature.

"***Personal Property***" means all machinery, equipment, furniture, computer hardware, fixtures, motor vehicles, other miscellaneous supplies, tools, fixed assets and other tangible personal property owned or leased by any Seller or used in connection with the Business.

"***Petition Date***" has the meaning set forth in the recitals.

"***Pharmacy Services Agreement***" means that certain Master Pharmacy Services Agreement, dated January 1, 2023, by and between Partners Pharmacy, LLC d/b/a Partners Pharmacy and Care One Management, LLC.

"***Policies***" has the meaning set forth in Section 3.12.

"***Post-Closing Tax Period***" means any taxable period beginning after the Closing Date and, with respect to any Straddle Period, the portion of such taxable period beginning after the Closing Date.

"***PPACA***" means the Patient Protection and Affordable Care Act of 2010, as amended, including all rules and regulations promulgated thereunder.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such taxable period ending on and including the Closing Date.

"***Projections***" has the meaning set forth in Section 2.1(e).

"***Provider***" has the meaning set forth in Section 3.15(k).

"***Purchase Price***" has the meaning set forth in Section 2.5(a).

"***Purchased Assets***" means, collectively, the Hospice Assets, the LTC Assets and the Texas Assets.

"***Recourse Party***" has the meaning set forth in Section 10.15.

"***Rent Charges***" has the meaning set forth in Section 2.8(a).

"***Representatives***" has the meaning set forth in Section 5.6.

"**Sale Order**" has the meaning set forth in the recitals.

"**Seller**" and "**Sellers**" each has the meaning set forth in the preamble.

"**Seller 401(k) Plan**" has the meaning set forth in Section 5.1(b).

"**Seller Benefit Plan**" has the meaning set forth in Section 3.11.

"**Seller Intellectual Property**" has the meaning set forth in Section 3.6(a).

"**Sellers' Software**" has the meaning set forth in Section 3.6(e).

"**Signing Date**" has the meaning set forth in the preamble.

"**Stalking Horse Bidder**" has the meaning set forth in the Bidding Procedures Order.

"**Straddle Period**" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"**Successful Bidder**" has the meaning set forth in Section 9.5(b).

"**Tax**" or "**Taxes**" means any federal, state, county, local or foreign income, gross receipts, commercial activity, *ad valorem*, franchise, net worth, profits, sales or use, value added, transfer, production, documentary, profits, windfall profits, registration, excise, utility, environmental, premium, communications, real or personal property, real property transfer, intangibles, capital stock, escheatment or unclaimed property, license, lease, service, service use, payroll, wage or other withholding, employment, unemployment, social security, severance, stamp, occupation, alternative or add-on minimum, estimated, customs, duties and other taxes of any kind whatsoever (including tax for which a taxpayer is responsible by reason of Treasury Regulations Section 1.1502-6 and any comparable provision of state, local or foreign Tax Law) or as a successor or by reason of contract, indemnity or otherwise, together with any interest, deficiencies, penalties, additions to tax and any interest attributable in respect of such deficiencies, penalties or additions whether disputed or not.

"**Tax Claim**" means any written claim with respect to Taxes made by any Taxing Authority or other Person.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule, attachment thereto or amendment thereof.

"**Taxing Authority**" means any federal, state, local, foreign governmental entity or other authority (including any Governmental Authority) having jurisdiction over the assessment, determination, collection or other imposition of any Tax.

"**Texas Assets**" has the meaning set forth in Section 2.1(c).

"**Texas Contracts**" has the meaning set forth in Section 2.1(c)(viii).

"**Texas Inventory**" has the meaning set forth in Section 2.1(c)(ii).

"**Texas Seller**" means Partners Pharmacy of Texas, LLC, a Delaware limited liability company.

"**Third-Party Approvals**" means all approvals, consents, licenses and waivers from third parties that are required to effect the transactions contemplated by this Agreement, that are required for the transfer

of the Purchased Assets (including each Assumed Contract and Assumed Lease) to the Buyer or that are required in order to prevent a breach of or a default under or a termination or modification of or any right of acceleration of any obligations under any Assumed Contract or Assumed Lease or otherwise in connection with the Business or other operations conducted by each Seller.

"***Transfer Taxes***" has the meaning set forth in Section 5.7(e)(i).

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1     <u>**Agreement to Purchase and Sell**</u>.  Subject to the terms and conditions hereof:

(a)     <u>Hospice Assets</u>.  At the Closing, each Hospice Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from each Hospice Seller, all right, title and interest of each Hospice Seller in and to all of the assets, rights and properties of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired, to the extent used, held for use or related to the conduct of the Hospice Business (collectively, the "***Hospice Assets***"), in each case free and clear of all Liens, including the following:

(i)     all of each Hospice Seller's patient files; <u>provided</u>, <u>however</u>, that each Hospice Seller will be entitled to retain copies of any patient files it deems reasonably necessary for its audit, legal, administrative, or other business purposes;

(ii)     all pharmaceutical inventory, finished goods, supplies, raw materials, work in progress, spare, replacement and components, or goods or products used, held for use or related to the conduct of the Hospice Business, whether located on any Hospice Seller's owned or leased property or located at any third-party locations, including inventories of pharmaceutical products and medical products and supplies of a Hospice Seller relating to the Hospice Assets held for use or related to the conduct of the Hospice Business, whether located on any Hospice Seller's owned or leased property or located at any third-party locations, all as determined in connection with the Inventory calculations set forth in Section 2.5(b) ("***Hospice Inventory***");

(iii)     all records of each Hospice Seller with respect to the Hospice Assets, including all books, records, ledgers, files, documents, correspondence, lists (including customer lists, customer contact information and historical customer buying data and vendor lists, vendor contact information and historical vendor sales data, in whatever form or medium), drawings, photographs, creative materials, advertising and promotional materials, studies, reports and other materials (in whatever form or medium), owned or maintained by each Hospice Seller;

(iv)     (i) all rights of the Hospice Sellers under each Lease governing the Leased Real Property as set forth on Schedule 2.1(a)(iv) (the "***Assumed Hospice Leases***") and (ii) to the extent their transfer is permitted or required under applicable Laws, all Permits related primarily to such Leased Real Property, easements, improvements and other rights relating thereto;

(v)     to the extent their transfer is permitted under applicable Laws, all Permits related to the operation of the Hospice Business and held in the name of each Hospice Seller listed on Schedule 2.1(a)(v);

(vi)     all machinery, equipment, furniture, computer hardware, fixtures, motor vehicles, other miscellaneous supplies, tools, fixed assets and other tangible personal property owned or leased by each Hospice Seller or used in connection with the Hospice Business;

(vii)     all causes of action, lawsuits, judgments, claims and demands relating to any of the Assumed Hospice Liabilities or the Hospice Assets, whether arising by way of counterclaim or otherwise;

(viii)    all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights relating to the Assumed Hospice Liabilities or the Hospice Assets, including third-party warranties and guarantees and all related claims, rights of recovery and set-off as to third parties which are held by or in favor of any Hospice Seller and relate to the Assumed Hospice Liabilities or the Hospice Assets;

(ix)     (i) all deposits, advances, pre-paid expenses and credits relating exclusively to the operation of the Hospice Business and (ii) all accounts receivable and notes receivable of any Hospice Seller, the proceeds thereof, and any security therefor;

(x)      all (i) Seller Intellectual Property of any Hospice Seller and (ii) all other Intellectual Property owned by each Hospice Seller in relation to the Hospice Business, including all goodwill associated therewith, and all claims, causes of action, and rights to sue at law or in equity for any past, present or future infringement of such Intellectual Property;

(xi)     the vehicles used in connection with the Hospice Business set forth on Schedule 2.1(a)(xi); and

(xii)    the Hospice Assets as a going concern and all of the goodwill associated with the Hospice Assets, including all customer relationships (including all fulfillment obligations and all related agreements or Contracts) listed on Schedule 2.1(a)(xii) (the "**Hospice Contracts**") and all intellectual property relating thereto.

(b)     LTC Assets. At the Closing, each LTC Seller shall sell, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase from each LTC Seller, all right, title and interest of each LTC Seller in and to all of the assets, rights and properties of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired, to the extent used, held for use or related to the conduct of the LTC Business (collectively, the "**LTC Assets**"), free and clear of all Liens, including the following:

(i)      all of each LTC Seller's patient files; provided, however, that each LTC Seller will be entitled to retain copies of any patient files it deems reasonably necessary for its audit, legal, administrative, or other business purposes;

(ii)     all pharmaceutical inventory, finished goods, supplies, raw materials, work in progress, spare, replacement and components, or goods or products used, held for use or related to the conduct of the LTC Business, whether located on any LTC Seller's owned or leased property or located at any third-party locations, including inventories of pharmaceutical products and medical products and supplies of each LTC Seller relating to the LTC Assets held for use or related to the conduct of the LTC Business, whether located on any LTC Seller's owned or leased property or located at any third-party locations, all as determined in connection with the Inventory calculations set forth in Section 2.5(b) ("**LTC Inventory**" and together with the Hospice Inventory, the "**LTC and Hospice Inventory**");

(iii)    all records of each LTC Seller with respect to the LTC Assets, including all books, records, ledgers, files, documents, correspondence, lists (including customer lists, customer contact information and historical customer buying data and vendor lists, vendor contact information and historical vendor sales data, in whatever form or medium), drawings, photographs, creative materials,

advertising and promotional materials, studies, reports and other materials (in whatever form or medium), owned or maintained by each LTC Seller;

(iv)     (i) all rights of the LTC Sellers under each Lease governing the Leased Real Property as set forth on Schedule 2.1(b)(iv) (the "***Assumed LTC Leases***" and, together with the Assumed Hospice Leases, the "***Assumed Leases***") and (ii) to the extent their transfer is permitted or required under applicable Laws, all Permits related primarily to such Leased Real Property, easements, improvements and other rights relating thereto;

(v)     to the extent their transfer is permitted under applicable Laws, all Permits related to the operation of the LTC Business and held in the name of each LTC Seller listed on Schedule 2.1(b)(v);

(vi)     all machinery, equipment, furniture, computer hardware, fixtures, motor vehicles, other miscellaneous supplies, tools, fixed assets and other tangible personal property owned or leased by each LTC Seller or used in connection with the LTC Business, including all owned and leased APS/passport machines;

(vii)     all causes of action, lawsuits, judgments, claims and demands relating to any of the Assumed LTC Liabilities or the LTC Assets, whether arising by way of counterclaim or otherwise;

(viii)     all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights relating to the Assumed LTC Liabilities or the LTC Assets, including third-party warranties and guarantees and all related claims, rights of recovery and set-off as to third parties which are held by or in favor of any LTC Seller and relate to the Assumed LTC Liabilities or the LTC Assets;

(ix)     (i) all deposits, advances, pre-paid expenses and credits relating exclusively to the operation of the LTC Business and (ii) all accounts receivable and notes receivable of any LTC Seller, the proceeds thereof, and any security therefor;

(x)     all (i) Seller Intellectual Property of any LTC Seller and (ii) all other Intellectual Property owned by each LTC Seller in relation to the LTC Business, including all goodwill associated therewith, and all claims, causes of action, and rights to sue at law or in equity for any past, present or future infringement of such Intellectual Property;

(xi)     the vehicles used in connection with the LTC Business set forth on Schedule 2.1(b)(xi);

(xii)     the LTC Assets as a going concern and all of the goodwill associated with the LTC Assets, including all customer relationships (including all fulfillment obligations and all related agreements or Contracts) listed on Schedule 2.1(b)(xii) (the "***LTC Contracts***") and all intellectual property relating thereto; and

(xiii)     employee personnel records (other than confidential medical records).

(c)     Texas Assets. At the Closing, the Texas Seller shall sell, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase from the Texas Seller, all right, title and interest of the Texas Seller in and to the following assets, rights and properties held for use or related to the conduct of the Business by the Texas Seller (collectively, the "***Texas Assets***"), free and clear of all Liens:

(i) all of the Texas Seller's patient files;

(ii) all pharmaceutical inventory, finished goods, supplies, raw materials, work in progress, spare, replacement and components, or goods or products used, held for use or related to the conduct of the Business of the Texas Seller, whether located on the Texas Seller's owned or leased property or located at any third-party locations, including inventories of pharmaceutical products and medical products and supplies of the Texas Seller relating to the Texas Assets held for use or related to the conduct of the Business of the Texas Seller, whether located on the Texas Seller's owned or leased property (including 12503 Exchange Drive, Suites 536-538, Stafford, Texas) or located at any third-party locations, all as determined in connection with the Inventory calculation set forth in <u>Section 2.5(b)</u> ("**Texas Inventory**", and together with the LTC and Hospice Inventory, the "**Inventory**"));

(iii) all records of the Texas Seller with respect to the Texas Assets, including all books, records, ledgers, files, documents, correspondence, lists (including customer lists, customer contact information and historical customer buying data and vendor lists, vendor contact information and historical vendor sales data, in whatever form or medium), drawings, photographs, creative materials, advertising and promotional materials, studies, reports and other materials (in whatever form or medium), owned or maintained by the Texas Seller;

(iv) all machinery, equipment, furniture, computer hardware, fixtures, motor vehicles, other miscellaneous supplies, tools, fixed assets and other tangible personal property owned or leased by the Texas Seller or used in connection with the Business of the Texas Seller;

(v) all causes of action, lawsuits, judgments, claims and demands relating to any of the Assumed Texas Liabilities or the Texas Assets, whether arising by way of counterclaim or otherwise;

(vi) all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights relating to the Assumed Texas Liabilities or the Texas Assets, including third-party warranties and guarantees and all related claims, rights of recovery and set-off as to third parties which are held by or in favor of any Texas Seller and relate to the Assumed Texas Liabilities or the Texas Assets; and

(vii) (i) all deposits, advances, pre-paid expenses and credits relating exclusively to the operation of the Business of the Texas Seller and (ii) all accounts receivable and notes receivable of any Texas Seller, the proceeds thereof, and any security therefor;

(viii) the Texas Assets as a going concern and all of the goodwill associated with the Texas Assets, including all customer relationships (including all fulfillment obligations and all related agreements or Contracts) listed on <u>Schedule 2.1(c)(viii)</u> (the "**Texas Contracts**") and all intellectual property relating thereto; and

(ix) employee personnel records (other than confidential medical records).

(d) EXCEPT AS SET FORTH IN THIS AGREEMENT, (I) THE PURCHASED ASSETS ARE BEING SOLD BY THE SELLERS AND PURCHASED AND ACCEPTED BY THE BUYER ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS, SUBJECT TO ANY CONDITION WHICH MAY EXIST, AND WITHOUT THE EXISTENCE OF AND WITHOUT RELIANCE UPON ANY REPRESENTATION, WARRANTY, AGREEMENT, OR STATEMENT BY THE SELLERS, OR ANYONE ACTING ON BEHALF OF THE SELLERS; (II) THE BUYER HAS BEEN GIVEN THE OPPORTUNITY TO THOROUGHLY INSPECT AND EXAMINE THE PURCHASED ASSETS TO THE EXTENT DEEMED NECESSARY BY THE BUYER IN ORDER TO

ENABLE THE BUYER TO EVALUATE THE PURCHASE OF THE PURCHASED ASSETS ON THE FOREGOING BASIS; AND (III) THE BUYER IS RELYING SOLELY UPON SUCH INSPECTIONS, EXAMINATION, AND EVALUATION OF THE PURCHASED ASSETS BY THE BUYER IN PURCHASING THE PURCHASED ASSETS ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATION, WARRANTY, AGREEMENT OR STATEMENT BY THE SELLERS OR ANYONE ACTING ON BEHALF OF THE SELLERS, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE.

(e)     Without limiting the generality of the foregoing, in connection with the investigation by the Buyer, the Buyer and its Affiliates, and the advisors and Representatives of the Buyer or any of its Affiliates, have received or may receive, from or on behalf of the Sellers or their respective Affiliates or Representatives, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the virtual data room set up for this transaction) (collectively, "***Projections***"). The Buyer acknowledges and agrees, on its own behalf and on behalf of its Affiliates, that (i) such Projections are being provided solely for the convenience of the Buyer to facilitate its own independent investigation of the Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) the Buyer is familiar with such uncertainties, and (iv) the Buyer understands and acknowledges that no representation or warranty of any kind or nature whatsoever, oral or written, express or implied, is being made with respect to the Projections and takes full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

2.2     **Excluded Assets**. Notwithstanding anything to the contrary set forth herein, the Purchased Assets shall not include any of the following assets, properties and rights of any Seller (collectively, the "***Excluded Assets***"):

(a)     cash, marketable securities and intercompany receivables and all rights to any bank or deposit accounts (and any amounts (including the Purchase Price) paid or payable to the Sellers pursuant to this Agreement or any other Ancillary Agreement);

(b)     all assets of, or held by or with respect to, each Seller Benefit Plan, and any trust, fund or account that is related to such Seller Benefit Plan;

(c)     the articles of organization and operating agreement (or their respective equivalent) of the Sellers, minute books, equity interest ledgers and other records of capitalization, qualifications to conduct business, taxpayer and other identification numbers, subject to Section 5.7(h), Tax Returns, Tax information, Tax records related to any Seller or any Seller's Affiliates, corporate seals and any other document relating to the organization, maintenance and existence of any Seller;

(d)     all Avoidance Actions and all other causes of action, lawsuits, judgments, claims and demands relating to any of the Excluded Liabilities or Excluded Assets, whether arising by way of counterclaim or otherwise;

(e)     all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights relating to the Excluded Liabilities or Excluded Assets, including third-party warranties and guarantees and all related claims, credits, rights of recovery and set-off as to third parties which are held by or in favor of any Seller and relate to the Excluded Liabilities or Excluded Assets;

(f)     the rights that accrue to any Seller hereunder and under any Ancillary Agreement to which any Seller is a party;

(g)     all records prepared in connection with the sale of the Purchased Assets, including bids received from third Persons and analyses relating to the Purchased Assets;

(h)     all Contracts and Leases other than Assumed Contracts and Assumed Leases; and

(i)     all non-transferable Permits.

2.3     **Assumed Liabilities**.

(a)     <u>Assumed Hospice Liabilities</u>.  On the Closing Date, the Buyer shall assume and become responsible for, and will thereafter pay, perform and discharge as and when due only, (1) all liabilities and obligations of each Hospice Seller arising under or related to the Hospice Assets required to be performed solely on and after the Closing Date; <u>provided</u>, <u>however</u>, that the Buyer will not assume or be responsible for any such liabilities or obligations (i) to be performed prior to the Closing Date or (ii) that arise from breaches of such contracts or defaults under such contracts, all of which non-assumed liabilities and obligations constitute Excluded Liabilities, and (2) all Liabilities for the paid time off hours of the employees of the Hospice Sellers hired by the Buyer (collectively, the "***Assumed Hospice Liabilities***").

(b)     <u>Assumed LTC Liabilities</u>. On the Closing Date, the Buyer shall assume and become responsible for, and will thereafter pay, perform and discharge as and when due only, (1) all liabilities and obligations of each LTC Seller arising under or related to the LTC Assets required to be performed solely on and after the Closing Date; <u>provided</u>, <u>however</u>, that the Buyer will not assume or be responsible for any such liabilities or obligations (i) to be performed prior to the Closing Date or (ii) that arise from breaches of such contracts or defaults under such contracts, all of which non-assumed liabilities and obligations constitute Excluded Liabilities, and (2) all Liabilities for the paid time off hours of the employees of the LTC Sellers hired by the Buyer (collectively, the "***Assumed LTC Liabilities***").

(c)     <u>Assumed Texas Liabilities</u>. On the Closing Date, the Buyer shall assume and become responsible for, and will thereafter pay, perform and discharge as and when due only, all liabilities and obligations of the Texas Seller arising under or related to the Texas Assets required to be performed solely on and after the Closing Date; <u>provided</u>, <u>however</u>, that the Buyer will not assume or be responsible for any such liabilities or obligations (i) to be performed prior to the Closing Date or (ii) that arise from breaches of such contracts or defaults under such contracts, all of which non-assumed liabilities and obligations constitute Excluded Liabilities (collectively, the "***Assumed Texas Liabilities***").

2.4     **Excluded Liabilities**. Except for the Assumed Liabilities, the Buyer does not and will not assume, or become responsible for, any Liability of any Seller or any of its Affiliates or predecessors, whether or not incurred in connection with the operation of the Purchased Assets (all such Liabilities other than the Assumed Liabilities, collectively the "***Excluded Liabilities***"), including the following:

(a)     (i) any Liabilities of any Seller for or related to its employees that were hired by the Buyer for periods prior to the Closing Date and (ii) any Liability for any other employees of any Seller for any period, whether as of, prior to or following the Closing Date;

(b)     any product Liability claims with respect to the conduct of the Business that occurred on or prior to the Closing Date;

(c)     any Liability under or with respect to any Seller Benefit Plan;

(d)     any Liability arising under, or related to any actual or alleged violation of, any Environmental Law or Healthcare Law by any Seller or any release of any Hazardous Substance occurring

on or prior to the Closing Date, regardless of whether such Liability related to any act or omission of any Seller;

(e)     any Liability of any Seller to the extent related to or arising in connection with the Excluded Assets;

(f)     any Liability of any Seller to any Seller's Affiliates;

(g)     any Liability of any Seller under this Agreement  and any costs and expenses incurred by any Seller incident to the negotiation and preparation of this Agreement and any Seller's performance and compliance with the agreement and conditions contained herein, including any sale or transaction bonuses payable to any employee, independent contractor, advisor or other representative of any Seller;

(h)     only to the extent that such Liabilities are imposed upon the Buyer pursuant to the applicable provisions of the Code and/or ERISA, any Liability for offering and providing "continuation coverage" to any "qualified beneficiary" relating to the Business who is covered by a "group health plan" sponsored or contributed to by any Seller and has experienced a "qualifying event" or is receiving "continuation coverage" on, prior to, or following the Closing Date, wherein the terms "continuation coverage," "qualified beneficiary," "qualifying event" and "group health plan" have the respective meanings given such terms under Section 4980B of the Code and Section 601 et seq. of ERISA;

(i)     any accounts payable of any Seller; and

(j)     any Liability for Taxes of any Seller, any Affiliate of any Seller or of any other Person (whether direct or as a result of successor Liability, transferee Liability, joint and several Liability or contractual Liability), except as expressly provided in this Agreement.

2.5     **Purchase Price/Inventory Calculation**.

(a)     Purchase Price.[1] Upon the terms and subject to the conditions of this Agreement, the aggregate consideration for the transfer from the Sellers to the Buyer of the Purchased Assets will consist of (a) a credit bid pursuant to Section 363(k) of the Bankruptcy Code (the "***Credit Bid***") comprised of (i) the indebtedness held by Buyer pursuant to the Credit Agreement in an amount of $44,524,814 *plus* (ii) the full amount of the obligations of the Sellers under the DIP Facility in an amount of $6.5 million and (b) the assumption of the Assumed Liabilities by the Buyer in accordance with the terms of this Agreement (the sum of clauses (a) and (b), collectively, the "***Purchase Price***"), which shall be paid on the Closing Date. No bidder may bid less than the Purchase Price, plus any minimum bid increment established pursuant to the Bidding Procedures Order.

(b)     Inventory Calculation. The "***Inventory Amount***" shall equal the sum of (a) the LTC and Hospice Inventory *plus* (b) the Texas Inventory to be calculated as follows: (i) the Buyer and the Sellers will cause  a count of the LTC and Hospice Inventory to be conducted by RGIS (the "***Appraiser***") one week prior to Closing Date (whose costs and fees will be split equally between the Buyer and the Sellers) and the Appraiser shall prepare a statement setting forth its calculation of the dollar value of all saleable and useable Inventory (excluding the Texas Inventory) as of such date (as determined in accordance with the methodology established by such Appraiser) and (ii) the Buyer and the Sellers will cause a count of the Texas Inventory to be conducted by the Appraiser one week prior to the Closing Date (whose costs and fees will be split equally between the Buyer and the Sellers) and the Appraiser shall

---

[1]    **Note to Draft**: Subject to ongoing review and discussion.

prepare a statement setting forth its calculation of the dollar value of all saleable and useable Texas Inventory as of such date (as determined in accordance with the methodology established by such Appraiser). The Appraiser shall deliver to Buyer and Seller its calculations provided herein, together with all worksheets, working papers, line item details for accounts, schedules and other data that supports the Inventory Amount, which calculation will be conclusive and binding on the Parties hereto, absent manifest error.

(c)     No Delivery of Inventory. The Sellers shall have no obligation to deliver any of the LTC and Hospice Inventory or Texas Inventory, which shall remain in the Leased Real Property in which the same are located on the Closing Date.

2.6     **Tax Treatment; Allocation of Purchase Price**. Attached hereto as Schedule 2.6 is a schedule allocating the Purchase Price and the Assumed Liabilities, in the aggregate, among the Purchased Assets, which allocation shall be (a) in accordance with Section 1060 of the Code as set forth on Schedule 2.6 and (b) binding among the Parties. To the extent the Purchase Price is adjusted pursuant to Section 2.6, the Buyer and the Sellers shall amend such allocation in accordance with Section 1060 of the Code to reflect such adjustments. Each Party shall file its Tax Returns (including IRS Form 8594 and any corresponding state or local Tax form) on the basis of such allocation, as it may be amended pursuant to the preceding sentence, and no Party shall thereafter take a position on any Tax Return, or in any Action that is inconsistent with such allocation except upon a final determination (which includes the execution of an IRS Form 870-AD or successor form) by a Taxing Authority.

2.7     **Withholding Tax**. The Buyer will be entitled to deduct and withhold from the Purchase Price all Taxes that the Buyer may be required to deduct and withhold under any provision of Tax Laws; provided, however, in advance of deducting or withholding any amount, the Buyer shall provide notice to the applicable recipient and permit such recipient to take reasonable measures to reduce or eliminate such deduction or withholding. All such withheld amounts will be treated as delivered to the Sellers hereunder.

2.8     **Allocation of Certain Items**. With respect to certain expenses incurred in the operation of the Business, the following allocations shall be made between the Sellers, on the one hand, and the Buyer, on the other hand:

(a)     Rent; Security Deposits. The Sellers shall pay all base rent and additional rent, including common area maintenance charges, for each Leased Real Property that is a Purchased Asset (collectively, "**Rent Charges**"), for the periods prior to the Closing Date and the Buyer shall pay all Rent Charges for the period from and following the Closing Date. At the Closing, Rent Charges payable with respect to each Leased Real Property that is a Purchased Asset shall be prorated between the Sellers, on the one hand, and the Buyer, on the other hand, as of the Closing Date, so that (i) the Buyer shall pay to the Sellers all prepaid Rent Charges for the then-current month as of the Closing Date, and (ii) the Buyer shall receive a credit against the Purchase Price for all unpaid Rent Charges as of the Closing Date. There shall be no prorations with respect to any insurance maintained by Sellers relating to each Leased Real Property that is a Purchased Asset.

(b)     Utilities. To the extent same is not included as a Rent Charge under the applicable Assumed Lease, water, gas, electric and other utility charges, sewer and wastewater charges and other similar charges with respect to each Leased Real Property that is a Purchased Asset shall be adjusted as of the Closing Date. If there are meters measuring the consumption of any utility or other service to a Leased Real Property that is a Purchased Asset, then the Sellers shall cause the meters to be read not more than three (3) Business Days before the Closing Date. For metered service, the Sellers shall pay the utility bills for service rendered prior to the readings and the Buyer shall pay the utility bills for services rendered after the readings.

2.9     <u>**Assumption/Rejection of Contracts**</u>.

(a)     The Sellers shall seek authority from the Bankruptcy Court to assume and assign the Assumed Contracts and the Assumed Leases in accordance with this <u>Section 2.9</u>. Subject to <u>Section 5.8</u>, the Assumed Contracts and the Assumed Leases shall be assumed by the Sellers and assigned to the Buyer, and the Buyer shall accept the assignment of the Assumed Contracts and the Assumed Leases, in each case, at the Closing pursuant to one or more Orders of the Bankruptcy Court in accordance with Section 365 of the Bankruptcy Code.

(b)     Subject to <u>Section 5.8</u>, at the Closing, unless otherwise agreed by the applicable counterparty, the Buyer shall pay any Cure Amounts due in connection with the assumption and assignment of the Assumed Contracts and Assumed Leases as set forth in the Sale Order or any other Order of the Bankruptcy Court for which all necessary consents required by the Bankruptcy Code to transfer have been obtained, and the Buyer will assume and agree to perform and discharge the Assumed Liabilities under the Assumed Contracts and Assumed Leases arising or that are otherwise payable from the time of and after the Closing.

(c)     From the date hereof until the Closing Date, the Sellers shall not seek approval from the Bankruptcy Court to reject any Assumed Contract or Assumed Lease unless and until such Assumed Contract or Assumed Lease is designated by the Buyer as an Excluded Asset or unless otherwise agreed to in writing by the Buyer. The Buyer may designate (i) any Contract as an Assumed Contract or Excluded Asset or change any designation as an Assumed Contract previously made to an Excluded Asset or (ii) any Lease as an Assumed Lease , in each case, by delivering written notice to the Sellers not less than seven (7) days prior to the Closing Date. Immediately following the Closing Date, the Sellers may further move to reject any Contract that is not an Assumed Contract and any Lease that is not an Assumed Lease.

(d)     If any Assumed Contract or Assumed Lease requires the payment of Cure Amounts in order to be assumed pursuant to Section 365 of the Bankruptcy Code, and such Cure Amounts are undetermined on the Closing Date because a non-Seller counterparty to such Assumed Contract or Assumed Lease proposed Cure Amounts in an amount that is different than the amount of Cure Amounts proposed by the Sellers and such difference will not be resolved prior to the Closing Date (each such Assumed Contract or Assumed Lease, a "***Disputed Amount Contract***"), then the Sellers shall provide the Buyer, not less than three (3) days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Amounts that has been proposed by each such non-Seller counterparty. If Sellers, with the written consent of the Buyer, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Amounts for such Disputed Amount Contract within five (5) Business Days following the Closing Date, solely upon the Buyer's written request, the Sellers shall, at the expense of the Buyer, seek to have the amount of Cure Amounts related to such Disputed Amount Contract determined by the Bankruptcy Court as promptly as possible. Upon final determination of such Cure Amounts, the Buyer may elect to redesignate such Disputed Amount Contract as an Excluded Asset. If such Disputed Amount Contract is not so redesignated, (i) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, promptly on delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Disputed Amount Contract, to cause such Disputed Amount Contract to be assumed by the applicable Seller and assigned to the Buyer, including by executing and delivering to the Buyer an assignment and assumption agreement with respect to such Disputed Amount Contract, and (ii) the Buyer shall pay the Cure Amounts with respect to such Disputed Amount Contract either (A) concurrently with the Sellers' assumption and assignment thereof to the Buyer or (B) as agreed in writing by the Buyer and the applicable counterparty to such Disputed Amount Contract, and execute and deliver to the applicable Seller an assignment and assumption agreement with respect to such Disputed Amount Contract. For the avoidance of doubt, the Buyer shall pay

and be solely responsible for all amounts that accrue and become due and owing under any Disputed Amount Contract from and after the Closing Date through the date that is three (3) Business Days after written notice from the Buyer designating such Disputed Amount Contract as an Excluded Asset in accordance with this <u>Section 2.9(d)</u>.

(e)     If the Buyer exercises the Buyer's right to designate any Contract or Lease as an Excluded Asset pursuant to <u>Section 2.9(c)</u> or <u>Section 2.9(d)</u>, the Purchase Price shall not be reduced as a result of such designation or change in designation. To the extent that the Buyer makes a valid designation with respect to any Contract or Lease pursuant to <u>Section 2.9(c)</u> or <u>Section 2.9(d)</u>, the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Person) to reflect such designation.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

Except as set forth on the disclosure schedules delivered by the Sellers to the Buyer in connection with this Agreement (the "***Disclosure Schedules***"), each of the Sellers represent and warrant to the Buyer as follows:

3.1     <u>**Organization; Good Standing; Capitalization**</u>. Each Seller is duly organized, validly existing and in good standing under the laws of its organization. Each Seller has full power and authority to carry on its businesses as it is now being conducted (and proposed to be conducted), and to own, operate and lease their respective properties and assets. <u>Schedule 3.1</u> sets forth a list of the jurisdictions in which each Seller is (a) organized and (b) duly qualified to transact business as a foreign limited liability company, which are the only jurisdictions in which each Seller's operations or the ownership of each Seller's properties and assets requires such qualification, except for those jurisdictions where the failure to be so qualified could not have a Material Adverse Effect. Each Seller has provided true, complete and correct copies of the organizational documents of such Seller to the Buyer.

3.2     <u>**Authorization; Binding Effect**</u>. Subject to approval by the Bankruptcy Court, this Agreement, and each Ancillary Agreement to which any Seller is a party, has been duly authorized by all requisite action on the part of such Seller, as the case may be, and, assuming due authorization, execution and delivery by the other parties thereto, constitutes the legal, valid and binding obligation of such Seller, as the case may be, enforceable in accordance with their respective terms, except to the extent limited by applicable bankruptcy, insolvency, creditors' rights and similar laws now or hereafter in effect, and except insofar as the availability of equitable remedies may be limited by applicable law (collectively, the "***Enforceability Exceptions***").

3.3     <u>**Non-Contravention**</u>.

(a)     Except as set forth on <u>Schedule 3.3(a)</u>, none of the execution and delivery by any Seller of this Agreement or the Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, termination or cancellation under, or result in the creation of any Lien (other than any Permitted Lien) upon any of the Purchased Assets under, any provision of (i) the organizational documents of any Seller, (ii) any Assumed Contract or Assumed Lease, (iii) any Order applicable to any Seller or by which any Purchased Assets are bound or (iv) any applicable Law, except in the case of clauses (ii) through (iv), to the extent such violation, default, acceleration, termination, cancellation, or creation of a Lien would not, individually or in the aggregate, be material to the Sellers taken as a whole.

(b)        Except as set forth on Schedule 3.3(b) and subject to approval by the Bankruptcy Court, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller in connection with the execution and delivery of this Agreement or the Ancillary Agreements or the compliance by any Seller with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, to avoid a breach or violation of, or any right of termination, cancellation or acceleration of any right or obligation under, or loss of any benefit under, any (i) Order applicable to any Seller or by which any Purchased Assets are bound, (ii) applicable Law or (iii) Permit, in each case, except to the extent such consent, waiver, approval, Order, Permit, authorization, declaration, filing, or notification would not, individually or in the aggregate, be material to the Sellers taken as a whole.

3.4        **Financial Statements**.

(a)        Schedule 3.4(a) sets forth (i) the unaudited balance sheet of each Seller (the "***Balance Sheets***") as of [June 30, 2025] and the related unaudited statements of income for the [six (6)-month] period then ended (together with the Balance Sheets, the "***Interim Financial Statements***") and (ii) the unaudited balance sheets of each Seller as of December 31, 2024, and the related reviewed statements of income, owner's equity and cash flows for the respective period then ended (together with the Interim Financial Statements, the "***Financial Statements***"). Except as set forth on Schedule 3.4(a), the Financial Statements (including the notes thereto) have been prepared from the books and records of the Sellers and present fairly, in all material respects, the respective financial condition of each Seller and the respective results of operations, owners' equity and cash flow at the dates or for the respective periods then ended, as applicable. The Financial Statements have been prepared in accordance with GAAP (applied on a consistent basis throughout the periods covered thereby), other than (with respect to the Interim Financial Statements) the absence of normal year-end adjustments and footnote disclosure (none of which could be material, either individually or in the aggregate). The books and records of the Sellers have been maintained in accordance with good business and bookkeeping practices and records of the Sellers have been maintained in accordance with statutory requirements. The internal controls and procedures of the Sellers are sufficient to ensure that the Financial Statements are accurate in all material respects.

(b)        Except as set forth on Schedule 3.4(b), no Seller has any Liabilities (whether or not of a nature required to be reflected or reserved against in the Financial Statements in accordance with GAAP) other than: (i) Liabilities specifically set forth (and only to the extent set forth) in the Financial Statements, (ii) Liabilities set forth in the Material Contracts arising in the Ordinary Course of Business (other than arising by reason of any default or breach by any Seller thereunder), and (iii) Liabilities and obligations that have arisen after the Balance Sheet Date in the Ordinary Course of Business (none of which is a Liability resulting from breach of Contract, breach of warranty, tort, infringement or Action).

3.5        **Real Property**.

(a)        Except as set forth on Schedule 3.5(a), neither any Seller nor any of their respective Affiliates owns any real property. Schedule 3.5(a) contains a complete list of all leases, subleases or other agreements to occupy real property (the "***Leased Real Property***"), including all amendments thereto, pursuant to which any Seller is the licensee, lessee or sublessee (the "***Leases***"). The Sellers have provided to the Buyer true, complete and correct copies of all Leases. The Leases permit the current use by the Sellers of the applicable Leased Real Property.

(b)        Each applicable Seller has a valid and existing leasehold or other occupancy interest in each parcel of Leased Real Property pursuant to which it is subject to a Lease and the right to occupy and use the Leased Real Property that is the subject of each such Lease, together with the buildings, structures, fixtures and improvements thereon (the "***Improvements***" and, together with the underlying Leased Real Property, the "***Facilities***"). Each Lease is valid, binding and in full force and effect and, except

as set forth in <u>Schedule 3.3(a)</u> and <u>Schedule 3.3(b)</u>, will be valid, binding and in full force and effect following the transactions contemplated by this Agreement, and, except as set forth in <u>Schedule 3.5(b)</u>, neither any Seller nor, to the Sellers' Knowledge, any other party thereto are in breach or default thereunder, and no event has occurred or circumstance exists which, with notice or the lapse of time, or both, could constitute a breach or default by Sellers or permit termination, modification or acceleration thereunder. To Sellers' Knowledge, the Improvements are in good operating condition and repair, subject to ordinary wear and tear and scheduled maintenance and replacement in the Ordinary Course of Business. Except as otherwise set forth in <u>Schedule 3.3(b)</u>, there are no disputes, oral agreements or forbearance programs in effect as to any of the Leases, and, except as otherwise set forth in <u>Schedule 3.5(a)</u>, the Leases have not been assigned, subleased, transferred, mortgaged or encumbered by any Seller. The Facilities are supplied with utilities and other services necessary for the operation of the Facilities.

(c)     No Seller has received written notice that any Seller is in violation of any zoning, use, occupancy, building, Environmental Law, ordinance or other Law or requirement relating to the Facilities.

3.6     **<u>Intellectual Property</u>**.

(a)     <u>Schedule 3.6(a)</u> sets forth all (i) patented or registered Intellectual Property (or applications related thereto) owned by any Seller, and (ii) all other Intellectual Property that is owned or licensed by any Seller, or that is used in the conduct of the Business, and that is material to the conduct of the Business (other than off the shelf Intellectual Property or Intellectual Property subject to shrink wrap, click through or similar commercial license), and (iii) all software owned by any Seller (collectively, the "***Seller Intellectual Property***"). To the Sellers' Knowledge, the Sellers own or possess all right, title and interest in and to each item of the Seller Intellectual Property used by the Sellers in the operation of the Business, free and clear of all Liens, other than Permitted Liens. The Intellectual Property owned or licensed by any Seller is valid, effective and enforceable, and, together with the IP Licenses, constitutes in all material respects all of the rights necessary to the conduct of the Business as currently conducted and proposed to be conducted.

(b)     To the Sellers' Knowledge, no Seller has (i) received notice of any infringement by any Seller of the rights of any Person with respect to such Person's Intellectual Property or (ii) infringed, misappropriated or otherwise violated any Intellectual Property rights of any Person. To the Sellers' Knowledge, no Person has infringed, misappropriated or otherwise violated any Intellectual Property owned by the Sellers. No Action by any Person contesting the validity, enforceability, use, registration or ownership of any of the Intellectual Property owned by any Seller is pending or, to the Sellers' Knowledge, threatened.

(c)     All Intellectual Property owned by Seller was written, created, invented or developed solely by either (i) employees of any Seller acting within the scope of their employment and subject to an obligation, by agreement or Law, to assign all rights in the Seller Intellectual Property to any Seller, or (ii) third parties who have assigned all of their rights therein to any Seller through the execution of written agreements. No funding, facilities or personnel of any Governmental Authority were used, directly or indirectly, to develop or create, in whole or part, any of the Seller Intellectual Property.

(d)     All agreements related to Intellectual Property licensed by any Seller and material to the operation of the Business as currently conducted and proposed to be conducted (other than off-the-shelf Intellectual Property or Intellectual Property subject to shrink-wrap, click-through or similar commercial licenses) are listed on <u>Schedule 3.6(d)</u> (each, an "***IP License***," and collectively, the "***IP Licenses***"). The Sellers have provided the Buyer with true, complete and correct copies of all IP Licenses. All IP Licenses are valid and enforceable against the Sellers and each IP License is valid and enforceable against the other parties thereto, in each case, subject to the Enforceability Exceptions.

(e)     Except as set forth on Schedule 3.6(e), the Sellers collectively have good title to and otherwise owns all rights, title and interest in and to (i) all software and applications developed by or on behalf of the Sellers and intended for use in the Business, including all enhancements, versions, releases and updates of such products (the "***Sellers' Software***") and (ii) all Intellectual Property and documentation associated with the Sellers' Software, free and clear of any and all Liens (other than Permitted Liens). To the Sellers' Knowledge, there are no viruses, worms, Trojan horses, self-help code or similar programs that could restrict in any material respect the proper use or access to any code in the Sellers' Software identified on Schedule 3.6(e). The Sellers maintain and follow a disaster recovery plan designed to maintain access to the Sellers' Software and to prevent the unintended destruction of the Sellers' Software.

(f)     Each Person that has developed any Intellectual Property owned by any Seller has signed an agreement or acknowledgement requiring that such Person keep such information confidential.

(g)     To Sellers' Knowledge, no employee or former employee of any Seller is in default of any assignment of invention, non-compete or similar agreement between such employee and a third party.

(h)     To the Sellers' Knowledge, the Sellers' operation of the Business does not result in any interference with, infringement upon or misappropriation of any Intellectual Property rights of any other Person.

(i)     The Sellers collectively own or have the valid right or license to use, possess, sell or license, all Intellectual Property necessary or required for the conduct of the Business as currently conducted and as proposed to be conducted, and such rights to use, possess, sell or license are sufficient for the conduct of the Business and are free and clear of all Liens (other than those imposed by the documents evidencing the licenses with respect to such Intellectual Property). No Seller has authorized any other Person to use or otherwise exploit any Intellectual Property owned by or licensed to any Seller, except pursuant to a binding, written license.

3.7     **Title to Purchased Assets; Sufficiency and Condition of Purchased Assets**.

(a)     The Sellers collectively have good and marketable title to, or a valid leasehold interest in, all of the Purchased Assets, free and clear of all Liens, other than the Liens set forth on Schedule 3.7(a) (which Liens shall be terminated and released in connection with the Closing) and Permitted Liens.

(b)     The Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing, and constitute all of the rights, property and assets necessary to conduct the Business.

3.8     **Compliance with Laws; Licenses and Permits**. Except as set forth in Schedule 3.8, each Seller has been and currently is in material compliance with all applicable Laws and Orders relating to the Business and such Seller's operations, practices, provision of goods and services, claims and billings, structures, machinery, equipment and other property, and all other aspects of the Business. No Seller has received any notice of any violation of any applicable Laws or Orders. There is no Action pending or, to the Sellers' Knowledge, threatened, and no event has occurred or circumstance exists that (with, or without notice of lapse of time) would constitute or result in, a material violation by any Seller of, or a failure on such Seller's part to materially comply with, any applicable Laws or Orders.

3.9     **Litigation**. Except as set forth on Schedule 3.9, to the Sellers' Knowledge, (a) there are no Actions pending or threatened against or involving any Seller (at law or in equity, or before or by any Governmental Authority), any of the Sellers' properties or assets (including the Purchased Assets), or any

officer or employee of any Seller (in such Person's capacity as such), (b) there is no basis for any such Action, and (c) no Seller is identified as a party to, nor is any Seller subject to, any Order.

       3.10    **Employees**.

       (a)    (i) No Seller is a party or subject to or bound by any collective bargaining or other similar agreement, (ii) no current or former officers or employees of any Seller are a party to any employment agreement or union or collective bargaining agreement with such Seller, (iii) no union has been certified or recognized as the collective bargaining representative of any employees of any Seller; (iv) no union or group of employees has requested union recognition or filed for recognition or a petition for an election as to any employees of any Seller, (v) no unfair labor practice charge, work stoppage, picketing or other such activity relating to labor matters has occurred or is pending, (vi) to the applicable Sellers' Knowledge, no executive or key employee of any Seller or any group of employees of any Seller has any plans to terminate employment with such Seller; and (vii) to the Sellers' Knowledge, no employee of any Seller is subject to any noncompete, nonsolicitation, nondisclosure, confidentiality, employment, consulting or similar agreements relating to, affecting or in conflict with the present or proposed business activities of such Seller. There are no current or, to the Sellers' Knowledge, threats or attempts (and there have been no current or, to the applicable Sellers' Knowledge, threats or attempts within the two (2)-year period prior to the Signing Date) to organize or establish any labor union to represent any employees of any Seller.

       (b)    Except as set forth on <u>Schedule 3.10(b)</u>, each Seller has been and is in compliance in all material respects with all federal, state and local Laws or Orders governing the employee relationship that may be applicable to the Sellers, including without limitation equal employment and anti-discrimination Laws, wage and hour Laws, labor relations Laws, workers' compensation Laws and occupational safety and health Laws, and no Actions, grievances or controversies relating to any such Law or Order are pending or, to the applicable Sellers' Knowledge, have been threatened.

       (c)    Each Seller has withheld or collected from its employees the amount of all Taxes required to be withheld or collected therefrom and has paid the same when due to the proper Governmental Authority. <u>Schedule 3.10(c)</u> sets forth a correct and complete list of all employees of each Seller as of the Signing Date (excluding any such employees who resign or are terminated in accordance with the terms of this Agreement after the Signing Date, together with any employees hired by any Seller in accordance with the terms of this Agreement after the Signing Date who provide services primarily with the respect to the Business), including the name, position, exempt or non-exempt status, current annual base and incentive compensation, total accrued vacation and employment status (either full-time or part-time) for each such employee, and whether any such employee is absent from active employment, including but not limited to, leave of absence or short or long term disability.

       (d)    <u>Schedule 3.10(d)</u> sets forth all internal and external complaints of discrimination, harassment or pay equity made, whether written or oral, by any employee, individual and single-member entity independent contractor, individual and single-member entity consultant, or third party, whether or not found to have merit, and the resolution of each such complaint.

       (e)    Except as set forth in <u>Section 3.11</u> (Employee Benefits) and <u>Section 3.13</u> (Taxes), the representations and warranties set forth in this <u>Section 3.10</u> constitute the sole representations and warranties of the Sellers with respect to employment matters.

       3.11    **Employee Benefits**. <u>Schedule 3.11</u> sets forth a list of all Benefit Plans in effect as of the Signing Date (each, a "***Seller Benefit Plan***").

(a)     Each Seller Benefit Plan (and each related trust, insurance contract or fund) complies in all material respects in form and, in administration, with the applicable requirements of ERISA, the Code and other Laws. All contributions required in connection with each Seller Benefit Plan by Law, by the terms of such Seller Benefit Plan (including all employer contributions and employee salary reduction contributions, if any) or any agreement relating thereto have been made. There are no material unfunded Liabilities or benefits under any Seller Benefit Plan that have not been properly reserved, accrued for, or otherwise reflected in, the Financial Statements. Each Seller Benefit Plan that is an employee pension benefit plan that is intended to be qualified under Section 401(a) of the Code is so qualified, and if so qualified, has received a favorable determination letter from the IRS, or may rely on a favorable opinion letter, as to its qualification under Section 401(a) of the Code.

(b)     As applicable with respect to each Seller Benefit Plan, each of the applicable Sellers have provided to the Buyer copies of the plan documents and summary plan descriptions, the most recent determination, letter or opinion letter received from the IRS, if any, the most recent Form 5500 Annual Report, actuarial reports and plan financial statements and all related trust agreements, insurance contracts and other funding arrangements that implement each such Seller Benefit Plan. The consummation of the transactions contemplated by this Agreement will not, in and of itself, result in any payments under any Seller Benefit Plan that could not be deductible as a result of Section 280G of the Code.

(c)     There are no actions or claims that are pending or, to the applicable Sellers' Knowledge, threatened, by or on behalf of any Seller Benefit Plan, or by or on behalf of any participants or beneficiaries of any Seller Benefit Plan (except for individual claims for benefits payable in the normal operation of the Seller Benefit Plans), alleging any violation of ERISA or other applicable law. To the Sellers' Knowledge, no Seller Benefit Plan is the subject of any pending investigation or audit by the Internal Revenue Service, the U.S. Department of Labor, the Pension Benefit Guaranty Corporation or any other regulatory agency.

(d)     With respect to each group health plan benefitting any current or former employee of any Seller or an ERISA Affiliate that is subject to Section 4980B of the Code, or was subject to Section 162(k) of the Code, each Seller and all ERISA Affiliates have complied with (i) the continuation coverage requirements of Section 4980B of the Code and Section 162(k) of the Code, as applicable, and Part 6 of Subtitle B of Title I of ERISA and (ii) HIPAA.

(e)     With respect to each Seller Benefit Plan that is a group health plan (as defined in Section 733(a) of ERISA), (i) such Seller Benefit Plan has at all times complied in all material respects with the applicable health insurance reform requirements added to Section 715 of ERISA by PPACA and the guidance issued thereunder and (ii) any such Seller Benefit Plan subject to the requirements of PPACA has, since January 1, 2015, accurately and timely complied with the mandatory employer reporting requirements of Section 6055 and 6056 of PPACA.

(f)     Neither any Seller nor any ERISA Affiliate has maintained or contributed to, or have been obligated to maintain or contribute to, any multiemployer plan, as defined in Section 3(37) of ERISA, and neither any Seller nor any ERISA Affiliate has maintained, contributed to or terminated an employee benefit plan subject to Title IV of ERISA and no potential Liability exists with respect to any such plans that were subject to Part 3, Subtitle B of Title I of ERISA or Title IV of ERISA.

(g)     Except as set forth in Schedule 3.11(g), no Seller is a party to any oral or written (i) agreement with any officer, manager or employee of Seller, (A) the benefits of which are contingent, or the terms of which are materially altered, upon the occurrence of a transaction involving any Seller of the nature of any of the transactions contemplated by this Agreement (including any change-in-control, retention or other similar Contract with any Person), (B) that provides any non-cancellable term of employment or (C) that provides severance benefits in excess of $25,000 or other benefits after the

termination of employment of such officer, manager or employee (other than as required by applicable Law), or (ii) agreement or plan with or covering any officer, manager or employee of Seller that will result in an increase, the vesting, or the acceleration of any benefit by the occurrence of any of the transactions contemplated by this Agreement.

(h)     No Seller Benefit Plan promises or provides retiree medical or other retiree welfare benefits to any person, except as required by applicable Law. Neither any Seller nor, to the Sellers' Knowledge, any plan fiduciary of any Seller Benefit Plan have engaged in any transaction in violation of Section 406(a) or (b) of ERISA or a "prohibited transaction" (as defined in Section 4975(c)(1) of the Code) that could subject any Seller to any Taxes, penalties or other Liabilities resulting from such prohibited transaction.

(i)     No Seller maintains nor has any obligation under a nonqualified deferred compensation plan within the meaning of Code Section 409A that fails to meet the requirements of paragraph (2), (3), or (4) of Code Section 409A(a) or that is not operated in accordance with a good faith interpretation of such requirements or with respect to which assets are subject to Code Section 409A(b). All (i) insurance premiums required to be paid with respect to, (ii) benefits, expenses, and other amounts due and payable under, and (iii) contributions, transfers, or payments required to be made to, any Seller Benefit Plan prior to the Closing Date will have been paid, made or accrued on or before the Closing Date.

(j)     Except as set forth in Section 3.10 (Employees) and Section 3.13 (Taxes), the representations and warranties set forth in this Section 3.11 constitute the sole representations and warranties of the Sellers with respect to Seller Benefit Plans.

3.12     **Insurance**. The Sellers currently have, and through the Closing Date will have, insurance contracts or policies (collectively, the "***Policies***") in full force and effect that provide for coverages that, in the applicable Sellers' reasonable determination, are reasonably adequate as to amount and scope for the applicable Sellers and their operations, including policies relating to liability or excess liability insurance. Schedule 3.12(a) sets forth the name of the insurer, the types, dates and amounts of coverages. Except as set forth on Schedule 3.12(b), all of the Policies remain in full force and effect through the Closing Date. No Seller has breached or otherwise failed to perform in any material respect its obligations under any of the Policies nor has any Seller received notice or communication from any of the insurers party to the Policies with respect to any such alleged breach or failure in connection with any of the Policies. All Policies are sufficient for material compliance with all applicable Laws and requirements pursuant to any Contract. All Policies to which any Seller is subject are, to the Sellers' Knowledge, valid, outstanding, collectible and enforceable, and will not in any way be affected by, or terminate or lapse by reason of, the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby. No Seller has been refused any insurance with respect to its assets or operations, nor has coverage ever been limited by any insurance carrier to which any Seller has applied for any Policy or with which any Seller has carried a Policy.

3.13     **Taxes**.

(a)     Except as otherwise disclosed on Schedule 3.13(a), the Sellers have filed all Tax Returns required to be filed by or on behalf of each Seller, all such Tax Returns are accurate, true and complete, and the Sellers have duly paid all Taxes due or payable (whether or not shown or required to be shown on any Tax Return).

(b)     Except as otherwise disclosed on Schedule 3.13(b), all Taxes that have been required to be withheld or collected by the Sellers, including, but not limited to, in connection with any amounts paid or owing to any employee, independent contractor, creditor, partner or other third party, have

been duly withheld or collected and, to the extent required, have been paid to the proper Taxing Authority or properly segregated or deposited as required by applicable Law.

(c)     Except as otherwise disclosed on Schedule 3.13(c), there are no Liens for Taxes upon any property or assets of any Seller, except for Permitted Liens.

(d)     The Sellers have not had in force any waiver of the statute of limitations on the right of the IRS or any other Taxing Authority to assess additional Taxes or to contest the income or loss with respect to any Tax Return.

(e)     Except as otherwise disclosed on Schedule 3.13(e), no Taxing Authority is now asserting in writing or, to the Sellers' Knowledge, threatening to assert against any Seller any deficiency or claim for additional Taxes or any adjustment of any Tax Return.

(f)     No issues have been raised in writing that are currently pending by any Taxing Authority in connection with any Tax Returns filed by or with respect to the income, assets or activities of any Seller. The Sellers have not been subject to an audit by a Taxing Authority with respect to any Seller.

(g)     None of the assets of any Seller constitutes tax-exempt bond financed property or tax-exempt use property within the meaning of Section 168 of the Code, and none of the assets of any Seller are subject to a lease, safe harbor lease or other arrangement as a result of which any Seller is not treated as the owner of such assets for federal income tax purposes.

(h)     No Purchased Asset constitutes stock in a corporate subsidiary or a joint venture, partnership, limited liability company interest, or other arrangement or contract which is treated as a partnership for U.S. federal income Tax purposes.

(i)     No Purchased Asset is subject to an arrangement that may cause a "tax-exempt use loss" under Section 470 of the Code for any year.

(j)     No Purchased Asset is subject to any "Section 467 rental agreement" within the meaning of Section 467(d) of the Code or Treasury Regulation Section 1.467-1(c).

(k)     Except as set forth in Section 3.10 (Employees) and Section 3.11 (Employee Benefits), the representations and warranties set forth in this Section 3.13 constitute the sole representations and warranties of the Sellers with respect to Taxes and Tax Laws.

3.14    **Material Contracts**.

(a)     Except as set forth on Schedule 3.14(a), no Seller is a party to or otherwise bound by any of the following:

(i)     any Contract or group of related Contracts with the same party, which, when aggregated, creates a non-cancellable future payment obligation for any Seller in excess of $25,000 in any calendar year;

(ii)     any employment, severance or consulting Contract with any manager, officer or employee of any Seller which is not terminable by the Seller at will;

(iii)     any Contract with another Person (A) limiting or restricting the ability of any Seller to enter into or engage in any market or line of business or (B) providing for the indemnification of such Person by any Seller (excluding any Contract already listed in another subsection of this Section 3.14 or any Contract which has indemnification obligations in the ordinary course of business);

(iv)     any Contract relating to (A) the provision of pharmacy services by any Seller or (B) the sale of any product, or the provision of any service, sold or offered for sale by any Seller;

(v)     any Contract for the sale of any of the assets of any Seller or the acquisition of the equity or the assets of another Person other than in the Ordinary Course of Business;

(vi)     any powers of attorney (other than to Tax professionals in connection with any Tax matters);

(vii)     any Contract under which any Seller has made advances or loans to any other Person (which shall not include advances made to an employee of any Seller in the Ordinary Course of Business for travel and similar business expenses);

(viii)     any Contract under which any Seller uses personal property that involves annual payments in excess of $25,000;

(ix)     any Contract involving Seller Intellectual Property, including any IP License;

(x)     any consulting, sales, commissions, distributor, dealer, advertising or marketing Contract;

(xi)     any Contract for the purchase, acquisition or supply to any Seller of Inventory and other property and assets (other than purchase orders issued in the Ordinary Course of Business);

(xii)     any Contract with a Governmental Authority;

(xiii)     any Contract providing for "take or pay" or other similar unconditional purchase or payment obligations;

(xiv)     any Contract with physicians, hospitals, home health agencies, hospices, long-term care facilities, or any other referral source; or

(xv)     any Contract that cannot by its terms be terminated by any Seller with less than thirty (30) days' notice without penalty or whose stated non-cancellable term continues beyond one (1) year after the Signing Date.

(b)     Each of the Contracts set forth (or required to be set forth) on Schedule 3.14(a) (collectively, the "*Material Contracts*") is the legal, valid and binding obligation of the Seller party thereto, enforceable against such Seller in accordance with its terms, subject to the Enforceability Exceptions. The Sellers have provided or made available to the Buyer true, complete and correct copies of all written Material Contracts, and true, complete and correct descriptions of material terms of all unwritten Material Contracts. Neither any Seller nor, to the Sellers' Knowledge, any other party thereto is in material breach or material default of any of the Material Contracts. Except as set forth in Schedule 3.14(b) or Schedule 3.3(a), no event has occurred or circumstance exists (including the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby), that (i) constitutes, or that with notice, the happening of an event and/or the passage of time could constitute, a material breach or material default of any Material Contract by any Seller, (ii) could give rise to the acceleration of any obligation under any Material Contract, or (iii) could give rise to any right or termination or cancellation of any Material Contract by any party other than any Seller. Except as set forth on Schedule 3.14(b), no Seller has received notice of

any breach or default or threat to terminate by any other party to a Material Contract, and no Seller has made such a claim with respect to any such breach or default.

    3.15    **Healthcare Law Compliance**.

    (a)    Except as set forth on Schedule 3.15(a), to the Seller's Knowledge, each Seller is and has been in compliance with all Healthcare Laws and no event has occurred or circumstance exists that, with or without notice or lapse of time, could constitute or result in a violation by any Seller of, or a failure on such Seller's part to comply with, any Healthcare Law.

    (b)    Each Seller holds, and is in compliance with, all Permits required for the conduct of the Business, the provision of goods and services by such Seller, the billing of goods and services by such Seller, and the ownership of such Seller's assets and properties. Schedule 3.15(b) sets forth a list of all such Permits. Each such Permit is valid and in full force and effect and, to the Sellers' Knowledge, no suspension or cancellation of such Permit is threatened and there is no reasonable basis for believing that such Permit will not be renewable upon expiration. No notice from a Governmental Agency has been received by any Seller alleging the failure to hold any of the foregoing. The Sellers have provided to the Buyer true, complete and correct copies of the Permits.

    (c)    Except as set forth on Schedule 3.15(c), there are no pending or, to the applicable Sellers' Knowledge, threatened, material Actions, investigations, audits, reviews or other examination of (i) any Seller, (ii) to the applicable Seller's Knowledge, the Sellers' owners, members, directors, managers, employees, or agents, or (iii) the applicable Seller's business, assets or properties, or billing records or claims, and no Seller is subject to any Order, agreement, memorandum of understanding or other regulatory enforcement Action with or by any Governmental Authority or contractor having supervisory or regulatory authority with respect to any Seller or its business, assets or properties. No Seller has received notice of any investigation that has been commenced, or a request for information, concerning compliance with any Healthcare Law by any Seller or its respective owners, members, directors, managers, employees or agents. No notice has been received by any Seller alleging any violation of or Liability under any Healthcare Law. Neither any Sellers nor, to the Sellers' Knowledge, any of its respective directors, officers, or employees have been convicted of, charged with, or engaged in conduct that would constitute a violation of any Healthcare Laws, nor has any incident or event that would reasonably constitute material noncompliance with any Healthcare Laws occurred.

    (d)    No current or, to the Sellers' Knowledge, former, officer, director, member, manager or employee of any Seller, has (i) been suspended or excluded from participation in Medicare, Medicaid or any other state or federal healthcare program, (ii) been convicted of a criminal offense related to any Healthcare Law, or (iii) been convicted of a criminal offense relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct in connection with the delivery of a healthcare item or service, or in connection with a program operated by or financed in whole or in part by any Governmental Authority.

    (e)    The Sellers have duly filed with the proper authorities all reports and other information required by any Governmental Authority, and all such reports or other information were accurate and complete in all material respects when filed.

    (f)    All leases and service arrangements entered into by any Seller with any physician or any other actual or potential referral source (including any family member of a physician or other actual or potential referral source), or an entity in which a physician or other actual or potential referral source (or a family member of a physician or any other actual or potential referral source) has an ownership or investment interest, are in compliance with Healthcare Laws and Orders and include terms and conditions

negotiated at arms' length and contemplate the fair market value of the leased premises or the services rendered, as applicable.

(g)     To the Seller's Knowledge, all claims submitted or caused to be submitted by each Seller to any Payment Program have been for medically necessary services, are in accordance with all Payment Program requirements and applicable Law, and are not subject to recoupment by any Payment Program. The Sellers have filed all requisite claims and other reports required to be filed in connection with Medicare and Medicaid programs, as applicable, all of which are complete and correct in all material respects. To the Seller's Knowledge, there are no Actions pending before any Governmental Authority (or an agent or contractor thereof) with respect to any Medicare, Medicaid or other governmental reimbursement program claims filed by any Seller or any disallowances by any Governmental Authority (or an agent or contractor thereof) in connection with any audit or review of such claims, and the Sellers have provided to the Buyer true, complete and correct copies of any such claims, actions or appeals. Except as set forth on Schedule 3.15(c), no validation review, program integrity review, payor audit or other investigation related to any Seller has been conducted by any Governmental Authority in connection with Medicare, Medicaid, or other governmental reimbursement program, and no such reviews or investigations are scheduled, pending or, to the Sellers' Knowledge, threatened against or affecting any Seller or the Business or the consummation of the transactions contemplated by this Agreement.

(h)     Schedule 3.15(h)(A) sets forth an accurate and complete list of all Payment Programs under which each Seller is receiving any third-party payment or reimbursement for goods or services offered or provided by each Seller to patients or health care providers. No Seller has received notice of any threatened, pending or concluded investigation of any civil, administrative or criminal Action relating to any Seller or to any Seller's participation in any Payment Program. Except as described on Schedule 3.15(h)(B):

(i)     no Seller is subject to, nor has any Seller ever been subjected to, any pre-payment utilization review or other utilization review by any Payment Programs, except for such utilization review rights of the provider contained in any Contract;

(ii)     no Payment Program has requested or threatened any recoupment, refund or set-off from any Seller in connection with any Payment Program, and there is no, and there has not been any, basis for any claim or recoupment, refund or set-off from any Seller as to any Payment Program;

(iii)     no fine, penalty or sanction has been imposed by any Governmental Authority on any Seller or, to the Sellers' Knowledge, any employee of any Seller;

(iv)     neither any Seller nor any employee of any Seller has submitted to any Payment Program any false or fraudulent claim for payment;

(v)     neither any Seller nor any employee of any Seller on behalf of such Seller have violated any condition for participation, or any rule, Law, Order, policy or standard of, any Payment Program;

(vi)     all cost reports submitted to any Payment Programs for the period prior to the Closing Date have been accurately completed and timely filed in all material respects;

(vii)     no Seller has any Liability with respect to any Payment Program; and

(viii)     the Sellers conduct their operations in accordance with a compliance program covering all requirements of any applicable Healthcare Laws.

(i)        Each Seller has been and is currently complying with the applicable privacy, security, transaction standards, breach notification, and other provisions and requirements of HIPAA, HITECH and any comparable state Laws. The Sellers have established and implemented such policies, programs, procedures, contracts and systems as are necessary to comply with HIPAA and HITECH. No Seller has received notice from any Governmental Authority alleging that any Seller is not in compliance with HIPAA or HITECH. With regard to individually identifiable health-related information, to the Sellers' Knowledge, there has been no misuse, improper disclosure, access, or breach of "protected health information" or "security incident" (each as determined by reference to HIPAA, or state Law, as applicable) by any Seller, any facility of any Seller, or any Seller's agents, employees or contractors. All "protected health information" in the custody or control of the Sellers has been collected, used, stored, and disclosed in compliance with HIPAA in all respects. The Sellers have HIPAA-compliant business associate agreements with all third parties who qualify as "business associates" under HIPAA.

(j)        The Sellers have implemented reasonable physical, administrative and technical measures required by HIPAA and HITECH, contractual commitments, and written policies adopted by the Sellers, to protect the integrity, security and operations of the Sellers' information technology systems, data owned by any Seller or provided by any Seller's customers, including to detect, protect against, and respond to loss, damage, destruction, unauthorized or unlawful access, use, modification, disclosure or other misuse of the Sellers' data. Each Seller has required all third parties to which it provides protected health information or personal information and/or access thereto to maintain the privacy and security of such information, including by contractually obligating such third parties to protect such information from unauthorized access by and/or disclosure to any unauthorized third parties.

(k)        To the Sellers' Knowledge, each physician, nurse, pharmacist, or other healthcare professional employed or contracted by any Seller (each, a "***Provider***") is and has been in material compliance with all licenses and permits necessary to perform the services provided by such Providers on behalf of any Seller. No notices have been received by any Seller or, to the Sellers' Knowledge, by any Provider, alleging the failure to hold any required license or Permit. All such licenses and Permits held by Providers are valid and in full force and effect and will be valid and in full force and effect immediately after the Closing.

(l)        There are no Actions pending or, to the Sellers' Knowledge, threatened against or involving any Seller (at law or in equity, or before or by any Governmental Authority), any of the Sellers' properties or assets (including the Purchased Assets) or any officer or employee of any Seller, nor, to the Sellers' Knowledge, is there any basis for any such Action. No Seller is identified as a party to, nor is any Seller subject to, any Order. To the Seller's Knowledge, there is no proposed Order applicable to the Purchased Assets that would have a Material Adverse Effect on the Sellers (or any of them) or the Business.

(m)        The representations and warranties set forth in this <u>Section 3.15</u> constitute the sole representations and warranties of the Sellers with respect to Healthcare Laws.

3.16    **Environmental Law Compliance**.

(a)        Each Seller is complying and has complied in all material respects with all Environmental Laws. No event has occurred or circumstance exists that (with or without notice or lapse of time) (i) could constitute or result in a violation by any Seller of, or a failure on any Seller's part to comply with, any Environmental Law or (ii) could give rise to any obligation on the part of any Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature, in each case, that would be material, individually or in the aggregate, to the Sellers taken as a whole.

(b)        There has been no release or threat of release of any Hazardous Substance by any Seller or, to the Sellers' Knowledge, any other Person, on or in the Leased Real Property that is required to

be reported, investigated, assessed, cleaned up, remediated or requires any other type of environmental response action pursuant to any Environmental Law.

(c)     No Seller has used, generated, manufactured, refined, transported, treated, stored, handled, disposed of, arranged for the disposal of, released, distributed, exposed any Person to, transferred, produced or processed any Hazardous Substance, except in the Ordinary Course of Business in compliance with all applicable Environmental Laws. No Seller conducts any manufacturing operations in connection with the operation of the Business. Except as set forth in Schedule 3.8, no permits are required to operate the Business in compliance with applicable Environmental Laws.

(d)     (i) No Seller has received notice of any investigation that has been commenced or a request for information concerning Hazardous Substances or any Seller's compliance with Environmental Laws, (ii) to the Sellers' Knowledge, no Action or claim is threatened against any Seller alleging any violation or Liability under any Environmental Law and (iii) no notice has been received by any Seller alleging any violation of or Liability under any Environmental Law, or requiring or seeking to impose upon any Seller, or any operation of any Seller, any investigatory or remedial action or obligation under any Environmental Law.

(e)     The representations and warranties set forth in this Section 3.16 constitute the sole representations and warranties of the Sellers with respect to Hazardous Substances and Environmental Laws.

3.17     **Operations Since Balance Sheet Date**. Since the Balance Sheet Date, the Sellers have operated in the Ordinary Course of Business and there has not been a Material Adverse Effect. Since the Balance Sheet Date, no Seller has taken or omitted to take any action that, if taken or omitted to be taken during the Interim Period, could require disclosure under, or result in a violation of any covenant contained in, Section 5.3.

3.18     **Product Liability**. No Seller has any material Liability arising out of any injury to individuals or property as a result of the ownership, possession or use of any product manufactured, sold, leased or delivered by any Seller.

3.19     **Affiliate Transactions**. Schedule 3.19 sets forth a complete and accurate list, including the parties, of all Contracts to which any Seller, on the one hand, and any Affiliate of any Seller, on the other hand, is a party. Except as set forth on Schedule 3.19, no Seller has made any payments, loaned any funds or property or made any credit arrangement with any Affiliate of any Seller or any employee of any Seller except for the payment of employee salaries in the Ordinary Course of Business.

3.20     **Brokers**. Except as set forth on Schedule 3.20, no Seller nor any person acting on their behalf has become obligated to pay any fee or commission to any broker, finder or intermediary for, or on account of, the transactions contemplated by this Agreement.

3.21     **Exclusivity of Representations**. The representations and warranties expressly set forth in this Article III constitute the sole and exclusive representations and warranties of the Sellers to the Buyer in connection with the transactions contemplated hereby. Except as otherwise expressly set forth in this Article III, the Sellers expressly disclaim any representations or warranties of any kind or nature, express or implied. Further, the Sellers hereby expressly disclaim any other representations or warranties of any kind or nature, legal or contractual, express or implied, notwithstanding the delivery or disclosure to the Buyer or any of their representatives of any documentation or other information, except with regard to gross negligence or fraudulent misconduct.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Sellers as follows:

4.1     **Organization; Good Standing**. The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of [●] and is duly qualified to transact business as a foreign corporation in each jurisdiction where its operations or the ownership of its properties and assets requires such qualification, except for those jurisdictions where the failure to be so qualified could not have a material adverse effect on the Buyer.

4.2     **Authorization; Binding Effect**. This Agreement and the Ancillary Agreements to which the Buyer is a party have been duly authorized by all requisite action on the part of such Buyer and, assuming due authorization, execution and delivery by the other parties thereto, constitute the legal, valid and binding obligation of such Buyer enforceable in accordance with their respective terms, except to the extent limited by the Enforceability Exceptions.

4.3     **Non-Contravention**. The execution, delivery and performance of this Agreement and the Ancillary Agreements, when executed, and the consummation of the transactions contemplated hereby and thereby by the Buyer, does not and will not: (a) result in a breach of any provision of the charter, bylaws, articles of organization, operating agreement or other organizational documents of the Buyer; (b) violate any applicable Law or any Order applicable to the Buyer; (c) result in a breach of or default under, or give a third party the right to accelerate, terminate or suspend any obligations under, any material Contract to which the Buyer is a party, except to the extent as could not adversely affect such Buyer's performance under this Agreement or the consummation of the transactions contemplated hereby; or (d) require any Governmental Approval or any Third-Party Approval.

4.4     **Litigation**. There are no Actions that are pending or, to the Buyer' knowledge, threatened against or involving the Buyer, at law or in equity, or before or by any Governmental Authority, that could adversely affect the Buyer's performance under this Agreement or the consummation of the transactions contemplated hereby.

4.5     **Healthcare Regulatory Compliance Status**. Neither of the Buyer nor any of their Affiliates has (i) been indicted or convicted of a felony, (ii) been suspended or excluded from any healthcare programs, or (iii) failed to pass a character and competency or financial feasibility review by a Governmental Authority. No Healthcare Laws or lack of compliance therewith threaten the Buyer's ability to consummate the transactions contemplated by this Agreement.

4.6     **Financial Ability; Character; Competence**. The Buyer has, or will at the Closing have, the financial ability to consummate the transactions contemplated by this Agreement and to perform their obligations hereunder. To the Buyer' knowledge, neither of the Buyer nor any of their Affiliates are the subject of any criminal or other investigation, or any enforcement action regarding the Buyer's or its Affiliate's ownership or operation of a health care facility or concerning or relating to the delivery of, or reimbursement for health care services by the Buyer or their Affiliates. Immediately after giving effect to the transactions contemplated by this Agreement, the Buyer shall be solvent and shall (a) be able to pay its debts as they become due; (b) own property having a fair saleable value greater than the amounts required to pay debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of the Buyer. In connection with the transaction contemplated hereby, the Buyer has not incurred, nor does it plan to incur, debts beyond its ability to pay as they become absolute and matured.

      4.7    **Certain Arrangements**. There are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any of the Buyer, its Affiliates or its and their Representatives, on the one hand, and any member of the management of the Sellers or any Affiliate of the Sellers, any holder of equity or debt securities of the Sellers or any lender or creditor of the Sellers or any Affiliate of the Sellers, on the other hand, (a) relating in any way to the acquisition of the Purchased Assets or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of the Sellers or any of their Affiliates to entertain, negotiate or participate in any the transactions contemplated hereby.

      4.8    **Brokers**. Neither of the Buyer nor any Person acting on the Buyer's behalf has become obligated to pay any fee or commission to any broker, finder or intermediary for, or on account of, the transactions contemplated by this Agreement.

      4.9    **Exclusivity of Representations**. The representations and warranties expressly set forth in this Article IV constitute the sole and exclusive representations and warranties of the Buyer to the Sellers in connection with the transactions contemplated hereby. Except as otherwise expressly set forth in this Article IV, the Buyer expressly disclaim any representations or warranties of any kind or nature, express or implied. Further, the Buyer hereby expressly disclaim any other representations or warranties of any kind or nature, legal or contractual, express or implied, notwithstanding the delivery or disclosure to the Sellers or any of their representatives of any documentation or other information, except with regard to gross negligence or fraudulent misconduct.

**ARTICLE V**
**COVENANTS**

      5.1    **Employees**.[2]

      (a)    Prior to the Closing Date, the Sellers shall reasonably cooperate, subject to requirements of applicable Law, with the Buyer in its efforts to hire Sellers' employees, including by providing the Buyer and its Affiliates with reasonable access to such employees and any related records, documents, data, and other information relating to such employees as the Buyer may request, to the extent such information is under the possession or control of any of the Sellers. Without the prior written consent of any of the Sellers (which consent shall not be unreasonably withheld, delayed or conditioned), the Buyer will not communicate any terms of employment to any employee prior to the Closing Date or otherwise communicate directly with any employees.

      (b)    If the Buyer or one of its Affiliates maintains or establishes a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (the "***Buyer 401(k) Plan***"), the Buyer shall cause the Buyer 401(k) Plan to accept "direct rollovers" (within the meaning of Section 401(a)(31) of the Code) of distributions from a defined contribution plan of any Seller that includes a cash or deferred arrangement within the meaning of Section 401(k) of the Code (each, a "***Seller 401(k) Plan***") (including direct rollovers of outstanding loans and any promissory notes or other documents evidencing such loans), if such rollovers are elected in accordance with the terms of the applicable Seller 401(k) Plan and applicable Law by such employees.

      (c)    As of the Closing, the Buyer will assume all Liability for providing and administering all required notices and benefits under COBRA and all Liabilities under COBRA with respect to employees of the Sellers and their spouses and dependents for qualifying events on or after the Closing Date, including any Liabilities with respect to "M&A qualified beneficiaries" as defined under COBRA.

---

[2]    **Note to Draft**: Subject to ongoing review and discussion.

Seller will retain any and all Liabilities under COBRA for qualifying events that occurred prior to the Closing Date.

(d)     The provisions of this <u>Section 5.1</u> are for the sole benefit of the Parties to this Agreement and nothing herein, expressed or implied, is intended or shall be construed to (i) constitute an amendment to any of the compensation and benefits plans maintained for or provided to employees of the Sellers prior to or following the Closing Date or (ii) confer upon or give to any Person, other than the Parties to this Agreement and their respective permitted successors and assigns, any legal or equitable or other rights or remedies with respect to the matters provided for in this <u>Section 5.1</u> under or by reason of any provision of this Agreement. Nothing in this <u>Section 5.1</u> shall be construed to limit any rights that the Buyer or any of its Affiliates may have under any plan or arrangement to amend, modify, terminate or adjust any particular plan or arrangement.

5.2     **Performance of Agreement**. Subject to the terms of this Agreement, during the Interim Period, each Party shall use commercially reasonable efforts to take all actions and do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement as soon as practicable following the Signing Date.

5.3     **Interim Operations**. During the Interim Period, the Sellers shall continue to conduct their operations in the Ordinary Course of Business. In addition, during the Interim Period, the Sellers shall: (i) use commercially reasonable efforts to retain each Seller's employees and sales and other agents and generally preserve the same or better business relationships with each Seller's employees, customers and suppliers, and continue to compensate each Seller's employees and sales and other agents in accordance with past custom and practice; and (ii) maintain each Seller's books, accounts and records in accordance with past custom and practice. Notwithstanding the foregoing, except as contemplated or permitted by this Agreement or with the prior written approval of the Buyer, during the Interim Period, no Seller shall do any of the following with the consent of the Buyer, not to be unreasonably delayed, conditioned or withheld:

(a)     institute any increase in, amend, enter into, terminate or adopt any Seller Benefit Plan, other than as required by any such existing plan or by Law;

(b)     increase the compensation of the managers, officers or employees of any Seller other than annual raises consistent with past practice, and other changes required by existing employment agreements or by Law;

(c)     make any change in the accounting principles, methods, practices or policies applied in the preparation of the Financial Statements, unless such change is required by GAAP;

(d)     (i) invest in or otherwise purchase any interest in any other Person or (ii) create any subsidiaries;

(e)     sell, lease, transfer, license, pledge or otherwise dispose of tangible or intangible assets having a fair market value in excess of $10,000, individually, or $25,000 in the aggregate, in each case, other than sales or dispositions of Inventory in the Ordinary Course of Business;

(f)     amend its organizational documents;

(g)     enter into any employment, severance or similar Contract, other than Contracts for employment "at-will";

(h)     enter into any other transaction or Contract with any Affiliate of any Seller or enter into any collective bargaining agreement;

(i)      make any loan, advance or capital contribution to or cash investment in any Person, other than advances to employees in the Ordinary Course of Business for travel and similar business expenses;

(j)      write down or write up the value of any asset by more than $25,000, individually, or $50,000, in the aggregate, except as required by or in accordance with GAAP;

(k)      except as set forth on Schedule 5.3(k), commence, settle or consent to the entry of judgment with respect to, any Action in an amount more than $50,000;

(l)      amend, modify, extend, renew, terminate or enter into any Material Contract, except in the Ordinary Course of Business; or

(m)      enter into any Contract or agreement to do any of the actions described in clauses (a) through (m) above.

5.4      **Access**.

(a)      During the Interim Period, subject to the Parties' compliance with all applicable privacy Laws, including HIPAA, the Sellers shall permit representatives of the Buyer (including legal counsel and accountants) to have reasonable access after reasonable advance written notice to the Sellers (and at all reasonable times, and in a manner so as not to interfere with the normal business operations of the Sellers) to all premises, properties, personnel, books, records (including Tax records), Contracts, and documents of or pertaining to the Sellers; provided, however, that nothing herein shall require the Sellers to furnish to the Buyer or any of its representatives information that (x) the Sellers reasonably conclude is restricted by applicable Contract or Law, except in strict compliance with the applicable Contract or Law, or (y) that is subject to attorney-client privilege.

(b)      From and after the Closing Date, to the extent permitted by applicable Law and subject to the terms hereof, the Buyer shall provide to the Sellers reasonable access after reasonable advance written notice to the Buyer (and at all reasonable times, and in a manner so as not to interfere with the normal business operations of the Buyer) to (1) the employees of the Sellers that are hired by the Buyer and (2) all books and records related to the Purchased Assets, the Assumed Liabilities, and the employees of the Sellers (and the right to make copies therefrom, to the extent that such access related to a reasonable business or legal purpose), but solely to the extent such access is reasonably required (i) in connection with any requirements in the Bankruptcy Case (including in order for the Sellers to comply with applicable Law in connection with the Bankruptcy Case), (ii) in connection with the liquidation and winding up of the Sellers, (iii) for Tax reporting purposes, or (iv) in connection with the prosecution or defense by the Sellers of any Actions related to the Excluded Assets or any audit or investigation related to the Business; provided, however, that nothing herein shall require the Buyer to furnish to the Sellers or any of its representatives information that (x) the Buyer reasonably concludes is restricted by applicable Contract or Law, except in strict compliance with the applicable Contract or Law, or (y) that is subject to attorney-client privilege. The Buyer shall preserve such books and records related to the Purchased Assets and Assumed Liabilities, subject to compliance with applicable Law and customary record-keeping policies. With respect to any Action of the Sellers related to the Excluded Assets or Excluded Liabilities, the Buyer shall, at the Sellers sole expense, render all reasonable assistance that the Sellers or any successors to the Sellers (or such other Persons that the Sellers determine appropriate) may request in defending such Action and shall make available to the Sellers or any successors to the Sellers (or such other Persons that the Sellers determine appropriate), for and at reasonable times, the Buyer's personnel most knowledgeable about the matter in question.

5.5     **Governmental Approvals**. During the Interim Period, the Buyer shall use commercially reasonable efforts to obtain all Permits, Third-Party Approvals, Government Approvals, and Healthcare Regulatory Consents (including, without limitation, any other license, registration, certificate, accreditation, provider or supplier number, payer enrollment, NCPDP/NABP number, DEA and state controlled-substance registration, state pharmacy license, and any other authorization required for any Government Authority or third party) as may be necessary for the Buyer to lawfully and in an uninterrupted fashion operate the Business following the Closing in the same manner as currently operated by the Sellers, and the Sellers shall provide all commercially reasonable cooperation to the Buyer as may be necessary for such purpose (it being acknowledged that Buyer is primarily responsible for all of the foregoing). Such efforts by Buyer shall include the submission or filing of any notices, applications, or requests for other approvals necessary for the transition of the Permits, including all Healthcare Regulatory Consents, to the Buyer or the procurement by the Buyer of new Permits, in each case as a result of the transactions contemplated by this Agreement (including, without limitation, those Permits set forth on Schedule 3.8), and Seller will cooperate with the foregoing. The Parties shall not take any action that could reasonably be expected to have the effect of delaying, impairing or impeding the receipt of any required authorizations, consents, orders and approvals, and shall promptly respond to any requests for additional information required for any filings or requested by any Governmental Authority in respect thereof. The Buyer shall file, or cause to be filed, all necessary notices, applications and requests for approvals promptly following the Signing Date and shall diligently pursue the same. Buyer shall pay all associated fees, costs, penalties, cure amounts and assessments, and take all commercially reasonable actions necessary to ensure that every required approval is effective no later than 12:01 a.m. on the Closing Date so that no interruption in dispensing, reimbursement, or other operations of the Business occurs. The Sellers and the Buyer shall keep the other apprised of the status of matters relating to the foregoing. Buyer shall indemnify, defend and hold harmless Seller and its Affiliates from and against any Losses arising out of or relating to (i) Buyer's failure to obtain or maintain any required approval, (ii) any gap, suspension or denial of billing or reimbursement caused by such failure, or (iii) any fines, penalties, claw-backs, recoupments or interest imposed by any Governmental Authority or payor in connection therewith. This Section 5.5 and the foregoing indemnity shall survive the Closing indefinitely.

5.6     **Confidentiality**. From and after the Closing, for three (3) years from the Closing Date, the Sellers shall, and shall cause their respective Affiliates to, hold, and shall use their reasonable best efforts to cause their respective directors, officers, employees, consultants, counsel, accountants, and other agents ("***Representatives***") to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that the Sellers can demonstrate via written documentation that such information: (a) is generally available to and known by the public through no fault of any Seller, any of their Affiliates, or their respective Representatives; or (b) is lawfully acquired by any Seller, any of their Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. Notwithstanding the foregoing, if any Seller, or any of their Affiliates or their respective Representatives are requested or required to disclose any information by Order or Law, the Sellers shall, to the extent legally permissible, promptly notify the Buyer in writing and shall disclose only that portion of such information which is requested or required to be disclosed, provided that, at the Buyer' request and expense, the Sellers shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

5.7     **Tax Matters**.

(a)     General. Prior to the Closing, without the prior written consent of the Buyer, which consent shall not be unreasonably withheld, the Sellers shall not make or change any election, change an annual accounting period, adopt or change any accounting method, file any amended Tax Return (unless such amendment is supported by substantial authority within the meaning of Section 6662(d)(2)(B)(i) of

the Code, or with respect to non-income or state and local Taxes, a substantially similar level of authority), enter into any closing agreement, settle any state or local Tax Claim or assessment relating to the state and local Taxes of any Seller, surrender any right to claim a refund of state or local Taxes, consent to any extension or waiver of the limitation period applicable to any state or local Tax Claim or assessment relating to any Seller, or take any other similar action, or omit to take any action relating to the filing of any state or local Tax Return or the payment of any state or local Tax.

(b)     Refunds or Credits. Any refunds or credits of Taxes (and any interest thereon) that relate to a Pre-Closing Tax Period that are received by the Buyer will be paid over to the applicable Seller within five (5) Business Days of receipt. Any refunds or credits of Taxes (and any interest thereon) that relate to both (i) the Business or Purchased Assets and (ii) a Post-Closing Tax Period, and that are received by any Seller, any Affiliate of any Seller will be paid by the receiving party to the Buyer within five (5) Business Days of receipt by such receiving party.

(c)     Prorations of Certain Taxes. Except for Transfer Taxes, with respect to any non-income Tax Liability for a Straddle Period, such Taxes will be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period in the following manner: (i) real property Taxes and personal property Taxes will be prorated based on the number of days in each of the Pre-Closing Tax Period and the Post-Closing Tax Period and (ii) all other non-income Taxes will be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period based on an interim closing of the books of the Business as of the close of business on the Closing Date. To the extent that actual Tax bills for the Straddle Period are not available prior to Closing, Taxes will be prorated at Closing utilizing the most recent ascertainable Tax bills. The Buyer and the Sellers will re-prorate the Taxes at issue upon the Buyer' receipt of the actual Tax bill for the Tax year in question, if any. If one Party remits to the appropriate Taxing Authority payment for Taxes, which are subject to proration under this Section 5.7(c) and such payment includes the other Party's share of such Taxes, such other Party will promptly reimburse the remitting Party for its share of such Taxes.

(d)     Bulk Transfer Taxes. The Parties agree to waive compliance with the provisions of any so-called "bulk transfer law", "bulk sales law", or any similar Tax Law (including any Tax clearance or certification of Tax compliance Law) of any jurisdiction that may be applicable with respect to the sale of the Purchased Assets as contemplated by this Agreement. Any Liabilities arising out of the failure of the Sellers to comply with the requirements and provisions of any so-called "bulk transfer law," "bulk sales law," or any similar Tax Law (including any Tax clearance or certification of Tax compliance Law) of any jurisdiction shall not constitute Assumed Liabilities and shall be treated as Excluded Liabilities.

(e)     Transfer Taxes.

(i)     The Buyer shall be liable for, and shall indemnify and hold the Sellers harmless against, any sales, use, transfer, value added, stock transfer, stamp or similar Taxes (including real property transfer and gains taxes) and any transfer, recording, registration or other fees (collectively, "***Transfer Taxes***") imposed or payable in connection with the transactions contemplated by this Agreement, and each shall file such applications and documents as shall permit any such Tax to be assessed and paid in accordance with this Agreement. Each Party shall execute and deliver all instruments and certificates necessary to enable the other Parties to comply with the foregoing.

(ii)     The Buyer and the Sellers agree, upon request, to use their reasonable efforts to provide or obtain any certificate or other document from any Party, any Taxing Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax (including, but not limited to, any Tax with respect to transactions contemplated by this Agreement) that could be imposed with respect to the Business or the Purchased Assets.

(f)     _Employment Taxes_. With respect to the preparation and filing of employment Tax Returns, the Buyer and the Sellers will follow (or cause their respective Affiliates to follow) the Standard Procedure specified in Revenue Procedure 2004-53, 2004-2 C.B. 320, Sec. 4, whereby, among other things, (i) the Sellers will be responsible for and perform all employment Tax withholding, payment and reporting duties with respect to any wages and other compensation paid by, or on behalf of, any Seller to its employees or other Persons in connection with the operation of the Business on or prior to the Closing Date and (ii) the Buyer will be responsible for and perform all employment Tax withholding, payment and reporting duties with respect to any wages and other compensation paid by the Buyer to the employees of the Sellers that are hired by the Buyer in connection with the operation of the Business after the Closing Date.

(g)     _Post-Closing Taxes_. Except to the extent that a Seller or the Buyer is liable for Taxes under the provisions of this Agreement, the Buyer shall be liable for Taxes attributable to or imposed on the Business or Purchased Assets for the Post-Closing Tax Period.

(h)     _Assistance and Records_. The Parties shall provide each other with such assistance as each may reasonably request in connection with (i) the preparation of Tax Returns required to be filed with respect to each Seller, (ii) any audit or other examination by any Taxing Authority, (iii) any judicial or administrative Action relating to Liability for Taxes or (iv) any claim for refund in respect of such Taxes. Such assistance shall include making employees available to the other Parties and their counsel, providing additional information (including executed powers of attorney), explaining any material to be provided and furnishing to, or permitting the copying by, any Party or its counsel of any records, returns, schedules, documents, work papers or other relevant materials that might reasonably be expected to be used in connection with any of the foregoing matters. Nothing herein is a waiver of any attorney-client, attorney work product or other privileges by any Party.

(i)     _Notices_. If any Taxing Authority or other Person asserts a Tax Claim, then the Party first receiving notice of such Tax Claim promptly shall provide written notice to the other Parties hereto.

(j)     _Deferred Payments_. For United States federal and applicable state and local Tax purposes, any payment to any Seller or an Affiliate of any Seller following the year in which the Closing Date occurs will be treated as deferred contingent purchase price eligible for installment sale treatment under Section 453 of the Code and any corresponding provision of foreign, state or local law, as appropriate, and will be subject to imputation of interest under Section 483 or Section 1274 of the Code, if required. Neither the Buyer nor the Sellers shall take a position in any Tax Return or examination or other administrative or judicial proceeding relating to any Tax that is inconsistent with such treatment.

5.8     **Consents**. Subject to the terms and conditions of this Agreement, nothing in this Agreement shall require any Seller to assign to the Buyer any Assumed Contract, Assumed Lease, or Permit, in either case, (x) that is terminated by a Seller (with the prior written consent of the Buyer) or by a counterparty thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption or (y) for which a necessary consent or payment is required and not obtained by the Sellers prior to the Closing (a "***Non-Assignable Contract***"). The Parties shall, during the remaining term of each Non-Assignable Contract, use commercially reasonable efforts to (a) obtain the consent of the third parties required thereunder, (b) to the extent permitted under the Non-Assignable Contract, make the benefit of such Non-Assignable Contract available to the Buyer so long as the Buyer fully cooperates with the applicable Seller and promptly reimburses the applicable Seller for any payments made or expenses incurred by the applicable Seller in connection therewith and (c) enforce, at the request of the Buyer and at the sole expense and for the account of the Buyer, any right of the applicable Seller arising from such Non-Assignable Contract against the other party or parties thereto (including the right to elect or terminate any such Non-Assignable Contract in accordance with the terms thereof). With respect

to any such Non-Assignable Contract as to which the necessary approval or consent for the assignment or transfer to the Buyer is obtained following the Closing, the applicable Seller shall transfer, or cause to be transferred, such Non-Assignable Contract to the Buyer by execution and delivery of an instrument of conveyance reasonably satisfactory to the Buyer within five (5) Business Days following receipt of such approval or consent; provided that the Buyer shall be responsible for any and all Cure Amounts in connection with any such Non-Assignable Contract. Nothing in this Section 5.8 shall require the Buyer to pay any amount to the applicable Seller or any other Person in order to obtain any consent required under any Non-Assignable Contract not obtained by the applicable Seller prior to the Closing, subject to the payment by the Buyer of any Cure Amount in accordance with this Agreement.

5.9     **Use of Business Name**. Following the Closing Date, with the consent of the Buyer, to be held in its sole discretion, each Seller shall immediately cease to use or do business, and cease to allow any Affiliate of any Seller to use or do business, under the names "Avantum", "Avantum Hospice", "Avantum Hospice Pharmacy", "Arrow Pharmacy & Nutrition Center", "Partners", "Partners Pharmacy", "Partners Pharmacy Services", "Aveta Pharmacy Services" or any other name that, in the reasonable judgment of the Buyer, is substantially similar to any of the foregoing names.

5.10     **Wrong Pockets**.

(a)     If, at any time following the Closing, the Buyer or any Seller becomes aware of any Purchased Asset that should have been transferred to, or any Assumed Liability that should have been assumed by, the Buyer pursuant to the terms of this Agreement and that was not transferred to or assumed by the Buyer as contemplated by this Agreement, then, as the case may be, unless the same is disputed in good faith by the other Party: (i) the applicable Seller shall promptly transfer or otherwise return, or cause their Affiliates to transfer or otherwise return, such Purchased Asset to the Buyer for no additional consideration and at such Seller's sole expense, and (ii) the Buyer shall promptly assume or cause its Affiliates to assume such Assumed Liability with no adjustment to the Purchase Price.

(b)     If, at any time following the Closing, the Buyer or any Seller becomes aware of any Excluded Asset or Excluded Liability that, in either case, should have been retained by any Seller pursuant to the terms of this Agreement and that was transferred to or assumed by the Buyer, then, as the case may be, unless the same is disputed in good faith by the other Party: (i) the Buyer shall promptly transfer or cause its Affiliates to transfer such Excluded Asset to the applicable Seller for no consideration and at such Buyer's sole expense, and (ii) such Seller shall promptly assume or cause its Affiliates to assume such Excluded Liability.

5.11     **No Transition Services**. The Parties acknowledge and agree that, except as expressly provided in this Agreement, the Sellers shall have no obligation to provide, and the Buyer shall have no right to receive, any transition services, technical assistance, personnel support, systems access, data migration services, or other post-Closing support of any kind, whether or not related to any Purchased Assets or Assumed Liabilities.

## ARTICLE VI
## CONDITIONS TO CLOSING

6.1     **Conditions to the Buyer' Obligations**. The obligation of the Buyer to consummate the transactions contemplated by this Agreement is subject to the completion, satisfaction or, at the Buyer's option, waiver of the following conditions on or prior to the Closing Date:

(a)     The representations and warranties in Article III shall be true and correct in all material respects at and as of the Signing Date and at and as of the Closing Date, in each case, except to the extent that such representations and warranties (i) are qualified by the term "material," "materially" or

contain terms such as "Material Adverse Effect," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the Signing Date and at and as of the Closing Date and (ii) specifically related to an earlier date, in which case such representations and warranties will be true and correct as of such earlier date;

(b)     Each of the covenants and obligations of the Sellers to be performed at or before the Closing Date will have been performed in all material respects at or before the Closing Date;

(c)     There shall not be any Action or Order in effect preventing consummation of any of the transactions contemplated by this Agreement;

(d)     The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, vacated, or reversed as of the Closing Date; and

(e)     The Sellers shall have delivered, or caused to be delivered, to the Buyer each of the items listed in <u>Section 8.4(a)</u>.

6.2     **Conditions to the Sellers' Obligations**. The obligation of the Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions at or prior to the Closing:

(a)     The representations and warranties in <u>Article IV</u> shall be true and correct in all material respects at and as of the Signing Date and at and as of the Closing Date, in each case, except to the extent that such representations and warranties (i) are qualified by the term "material," materially" or contain terms such as "Material Adverse Effect," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the Signing Date and at and as of the Closing Date and (ii) specifically related to an earlier date, in which case such representations and warranties shall only be true and correct as of such earlier date;

(b)     Each of the covenants and obligations of the Buyer to be performed at or before the Closing Date shall have been performed in all material respects at or before the Closing Date;

(c)     There shall not be any Action or Order in effect preventing consummation of any of the transactions contemplated by this Agreement;

(d)     The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, vacated, or reversed as of the Closing Date;

(e)     The Buyer shall have delivered, or caused to be delivered, evidence reasonably satisfactory to the Sellers of the creditworthiness of the Buyer and any guarantors it may have; and

(f)     The Buyer shall have delivered, or caused to be delivered, to the Sellers each of the items listed in <u>Section 8.4(b)</u>.

**ARTICLE VII**
**NON-SURVIVAL**

7.1     **Non-Survival**. With respect to each Party to this Agreement, (a) except in the case of fraud, the representations and warranties made by such Party contained herein and in any certificate delivered pursuant hereto shall not survive the Closing and shall terminate at the Closing and be of no further force or effect at and after the Closing (and no Party shall have Liability thereunder at or after the Closing), (b) any covenants and agreements contained herein that by their terms contemplate performance on or prior to

the Closing, to the extent such terms so contemplate performance on or prior to the Closing, shall not survive the Closing and shall terminate at the Closing and be of no further force or effect at and after the Closing (and no Party shall have Liability thereunder at or after the Closing unless such Party was in breach of its obligations under such covenant or agreement), and (c) any covenants and agreements contained herein that by their terms contemplate actions or impose obligations following the Closing, only to the extent such terms so contemplate actions or impose obligations following the Closing, shall survive the Closing and remain in full force and effect until such covenant or agreement is fully performed or expires in accordance with its terms.

## ARTICLE VIII
## TERMINATION AND CLOSING

8.1    <u>Termination</u>. This Agreement may be terminated prior to the Closing only as follows:

(a)    by the mutual written consent of the Buyer and the Sellers;

(b)    by the Buyer if (i) there has been a breach by any Seller of a representation or warranty contained in this Agreement that would give rise to the failure or the condition set forth in <u>Section 6.1(a)</u> or (ii) there has been a breach, failure to comply with or non-fulfillment of a covenant by any Seller set forth in this Agreement that would give rise to the failure or the condition set forth in <u>Section 6.1(b)</u> and, in either case, such breach, failure to comply or non-fulfillment has not been cured within the earlier of (x) ten (10) days after written notification thereof by the Buyer to the Sellers and (y) three (3) Business Days prior to the End Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 8.1(b)</u> shall not be available to the Buyer if the failure of the Buyer to fulfill any of its obligations under this Agreement has been the primary cause of, or primarily resulted in, such breach, failure to comply or non-fulfillment or the Buyer is in material breach of any of its representations, warranties, covenants or agreements contained herein such that the conditions set forth in <u>Section 6.2</u> cannot be satisfied;

(c)    by the Sellers if (i) there has been a breach by the Buyer of a representation or warranty contained in this Agreement that would give rise to the failure or the condition set forth in <u>Section 6.2(a)</u> or (ii) there has been a breach, failure to comply with or non-fulfillment of a covenant by the Buyer set forth in this Agreement that would give rise to the failure or the condition set forth in <u>Section 6.2(b)</u> and, in either case, such breach, failure to comply or non-fulfillment has not been cured within the earlier of (x) ten (10) days after written notification thereof by the Sellers to the Buyer and (y) three (3) Business Days prior to the End Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> shall not be available to the Sellers if the failure of the Sellers to fulfill any of their obligations under this Agreement has been the primary cause of, or primarily resulted in, such breach, failure to comply or non-fulfillment or the Sellers are in material breach of any of their representations, warranties, covenants or agreements contained herein such that the conditions set forth in <u>Section 6.1</u> cannot be satisfied;

(d)    by the Buyer or the Sellers, in each case, if the transactions contemplated hereby have not been consummated by [●] (the "***End Date***"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 8.1(d)</u> shall not be available to any Party (i) who is in material breach of this Agreement that would give rise to the failure of any of the conditions specified in <u>Article VI</u> or (ii) whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to be consummated by the End Date;

(e)    by the Sellers or the Buyer, upon written notice to the other Party, if the Bankruptcy Court enters an Order approving an Alternative Transaction; or

(f)     by the Buyer by written notice to the Sellers if:

(i)     the Bidding Procedures Order or the Sale Order is modified in any material respect without the prior written consent of Buyer;

(ii)     the Bankruptcy Court enters an Order approving a standalone plan of reorganization for the Sellers involving the retention of a material part of the Purchased Assets, the dismissal of the Bankruptcy Case, the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or the appointment of a trustee for any Seller under Chapter 11 of the Bankruptcy Code; or

(iii)     the Bankruptcy Court enters an Order that otherwise precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

8.2     **Effect of Termination**. In the event of termination of this Agreement by the Buyer or the Sellers as provided above, this Agreement will forthwith terminate and have no further force and effect, except that (a) the covenants and agreements set forth in Section 5.6 (Confidentiality), this Section 8.2 (Effect of Termination), Section 10.5 (Expenses), and Article X (Miscellaneous) will survive such termination indefinitely and (b) nothing in this Section 8.2 will be deemed to release any Party from any liability for any willful breach by such Party of the terms and provisions of this Agreement or to impair the right of any Party to compel specific performance by another Party of its obligations under this Agreement.

8.3     **Closing; Effective Time**.

(a)     The closing of the transactions contemplated by this Agreement (the "***Closing***") will take place remotely via the exchange of electronic signatures on (i) the second (2nd) Business Day following the day on which the last of the conditions set forth in Article VI is satisfied or waived in accordance with this Agreement (other than conditions that by their terms may only be satisfied at the Closing) or (ii) at such other time, date or place as the Parties may mutually agree upon in writing (the "***Closing Date***").

(b)     All documents and other instruments required to be delivered at the Closing will be regarded as having been delivered simultaneously, and no document or other instrument will be regarded as having been delivered until all have been delivered. The Closing will be deemed to be effective as of 11:59 p.m. Eastern time on the Closing Date.

8.4     **Closing Deliveries**.

(a)     At the Closing, the Sellers shall deliver, or cause to be delivered, to the Buyer each in the form attached to this Agreement as an Exhibit or in form and substance acceptable to the Buyer, as applicable:

(i)     a certificate duly executed by an officer of each Seller, certifying that each of the conditions set forth in Section 6.1(a) and Section 6.1(b) has been satisfied in all respects and dated as of the Closing Date;

(ii)     a bill of sale (the "***Bill of Sale***"), duly executed by each Seller;

(iii)     an assignment and assumption agreement (the "***Assignment and Assumption Agreement***"), duly executed by each Seller;

(iv)      intellectual property assignments (collectively, the "**IP Assignments**"), duly executed by each Seller; and

(v)      a duly completed IRS Form W-9 from each Seller.

(b)      At the Closing, the Buyer shall deliver, or cause to be delivered, to the Sellers the following items, each in the form attached to this Agreement as an Exhibit or in form and substance reasonably acceptable to the Sellers, as applicable:

(i)      a certificate duly executed by an officer of the Buyer, certifying that each of the conditions set forth in <u>Section 6.2(a)</u> and <u>Section 6.2(b)</u> has been satisfied in all respects and dated as of the Closing Date;

(ii)      the Assignment and Assumption Agreement, duly executed by the Buyer; and

(iii)      the IP Assignments, duly executed by the Buyer.

### ARTICLE IX
### BANKRUPTCY MATTERS

9.1      **Sale Order**. Subject to the Buyer being designated as the Successful Bidder, unless the Sellers have determined to pursue an Alternative Transaction in accordance with the Bidding Procedures Order, the Sellers shall use commercially reasonable efforts to cause the Bankruptcy Court to promptly enter the Sale Order as soon as possible following the Auction.

9.2      **Bankruptcy Process**. Unless the Buyer is in material breach of this Agreement or this Agreement has been terminated, the Sellers covenant and agree that if the Sale Order is entered, the terms of any plan submitted by the Sellers to the Bankruptcy Court for confirmation or otherwise supported by the Sellers shall not conflict with, supersede, abrogate, nullify, or restrict the terms of this Agreement or the rights of the Buyer hereunder, or prevent or materially interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Sale Order. If the Sale Order or any other Order of the Bankruptcy Court relating to this Agreement shall be appealed or any petition for certiorari or motion for rehearing or re-argument shall be filed with respect thereto, the Sellers agree to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion, and the Buyer agrees to cooperate in such efforts, and each Party agrees to use its reasonable efforts to obtain an expedited resolution of such appeal.

9.3      **Approval**. The Sellers' obligations under this Agreement and in connection with the transactions contemplated by this Agreement are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require the Sellers or its Affiliates or Representatives to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

9.4      **Stalking Horse Bidder**. The Sellers have selected the Buyer to serve as the Stalking Horse Bidder subject to higher or better competing bids in respect of the Purchased Assets (whether in combination with other assets of the Sellers or otherwise) in accordance with the terms of the Bidding Procedures Order.

9.5      **Auction**.

(a)     This Agreement and the sale of the Purchased Assets are subject to higher and better bids and approval by the Bankruptcy Court. The Buyer acknowledges that the Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice to the creditors of the Sellers and other interested parties, providing information about the Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an Auction.

(b)     If an Auction is conducted, and the Buyer is not the prevailing party at the conclusion of such Auction (such prevailing party, the "**Successful Bidder**") but is the next highest bidder at the Auction, the Buyer shall be required to serve as a back-up bidder (the "**Back-Up Bidder**") and keep the Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) in accordance with the Bidding Procedures Order. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to have the new prevailing bid, and the Sellers may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(c)     The Buyer shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assumed Contracts and Assumed Leases. The Buyer will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assumed Contracts and Assumed Leases, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Representatives of the Buyer available to testify before the Bankruptcy Court. The Buyer shall not take any direct or indirect action that would have the effect of causing the Bankruptcy Court to refuse to approve the transactions contemplated by this Agreement.

## ARTICLE X
## MISCELLANEOUS

10.1   **Entire Agreement**. This Agreement, the Sale Order, the Disclosure Schedules, the Exhibits referred to herein and the documents delivered pursuant hereto contain the entire understanding of the Parties with regard to the subject matter contained herein or therein, and supersede all other prior agreements, understandings, term sheets, heads of terms or letters of intent among the Parties. In the event of an inconsistency, ambiguity, or conflict between this Agreement, or any Ancillary Agreement, on the one hand, and the Sale Order, on the other, the Sale Order shall control to the extent of any such inconsistency, ambiguity, or conflict.

10.2   **Invalidity**. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected thereby and, to such end, the provisions of this Agreement are agreed to be severable.

10.3   **Specific Performance**. Each of the Parties acknowledges and agrees that each of the other Parties could be damaged irreparably if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached. Accordingly, in addition to any and all other remedies that may be available at law or in equity, the Parties agree that each of the other Parties will be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any Action instituted in any court in the

United States or in any state having jurisdiction over the Parties and the matter, in addition to any other remedy to which such Party may be entitled pursuant hereto.

10.4    **Amendment; Extension; Waiver**. This Agreement may not be amended, modified or supplemented except by written agreement of the Buyer and the Sellers. At any time prior to the Closing Date, with the consent of the other Party as outlined below, each Party may (a) extend the time for the performance of any of the obligations or other acts of the other Parties, (b) waive any inaccuracies in the representations and warranties of any other Party contained herein or in any document, certificate or writing delivered pursuant hereto or (c) waive compliance by any other Party with any of the agreements or conditions contained herein. Any agreement on the part of any Party to any such extension or waiver will be valid only if set forth in an instrument, in writing, signed on behalf of such Party. The failure of any Party to assert any of its rights hereunder will not constitute a waiver of such rights.

10.5    **Expenses**. Except as otherwise provided herein, each Party shall pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel, accountants, advisors and consultants.

10.6    **Public Announcements**. All press releases or other public communications of any nature whatsoever relating to the transactions contemplated by this Agreement, and the method of the release for publication thereof, will be subject to the prior mutual approval in writing of the Buyer and the Sellers. Notwithstanding anything herein to the contrary, the Buyer have the right to publicly disclose this Agreement and the transactions contemplated hereby as required by applicable Laws (including securities Laws) without the prior written approval of the Sellers.

10.7    **Notices**. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and will be deemed to have been duly given upon receipt) by delivery in person, by electronic transmission, by nationally recognized overnight courier or by registered or certified mail (postage prepaid, return receipt requested) to each other Party as follows:

If to any Seller, to:

c/o Partners Pharmacy Services, LLC
173 Bridge Plaza North
Fort Lee, NJ 07024
Attention: Legal
Email: dbaruch@care-one.com

with a copy (which copy shall not constitute notice) to:

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019-6131
Attention: Patrick Potter; Dania Slim; Lillian Kim
Email:  patrick.potter@pillsburylaw.com
            dania.slim@pillsburylaw.com;
            lillian.kim@pillsburylaw.com

If to the Buyer, to:

[●]

with a copy (which copy shall not constitute notice) to:

Glenn Agre Bergman & Fuentes LLP
1185 Avenue of the Americas
New York, New York 10035

Such notice will be deemed to be received when delivered if delivered personally, or the next Business Day after the date sent if sent next Business Day service by a United States national overnight delivery service, or three (3) Business Days after the date mailed if mailed by certified or registered mail, or upon receipt of confirmation of delivery if sent by electronic transmission. Any notice of any change in such address shall also be given in the manner set forth above. Whenever the giving of notice is required under this Agreement, the giving of such notice may be waived in writing by the Party entitled to receive such notice.

10.8 **Successors and Assigns; No Third-Party Beneficiaries**. The rights of a Party under this Agreement are not assignable by such Party without the written consent of the other Parties; provided, however, that the Buyer may, without the prior written consent of any other party hereto, assign all or any portion of its rights under this Agreement to one or more of its Affiliates; provided that no such assignment shall discharge or relieve the Buyer of their obligations hereunder or under any agreement referenced herein. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement, expressed or implied, is intended to or will be construed to confer upon any Person any right, remedy or claim under or by reason of this Agreement (other than the Non-Recourse Persons pursuant to Section 10.15).

10.9 **Disclosure Schedules**. Any item or matter disclosed on a particular section of the Disclosure Schedules shall be deemed to have been disclosed for purposes of any other section of this Agreement, to the extent reasonably apparent on its face that such information applies to such other section of this Agreement.

10.10 **Interpretation**.

(a) Titles and headings to articles, sections and subsections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

(b) For the purposes of this Agreement, (i) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires, (ii) the terms "hereof," "herein" and "herewith" and words of similar import shall be construed to refer to this Agreement and the Disclosure Schedules in their entirety and not to any particular provision, unless otherwise stated, (iii) the term "including" shall mean "including, without limitation," (iv) unless otherwise stated, the term "day" means a calendar day, and (v) references in this Agreement to dollar amount thresholds shall not, for purposes of this Agreement, be deemed to be evidence of materiality or a Material Adverse Effect.

(c) Disclosure of any matter, fact or circumstance on a schedule shall be deemed to be disclosure thereof for purposes of any other schedule.

10.11 **Governing Law**. This Agreement and any disputes hereunder will be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that could cause the application of laws of any jurisdiction other than those of the State of Delaware.

10.12   **Jurisdiction; Waiver of Jury Trial**. The Parties agree that the Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Agreement and the transactions contemplated herein, the Bidding Procedures Order, and the Sale Order. The Parties expressly and irrevocably (a) consent and submit to the personal jurisdiction of the Bankruptcy Court in connection with this Agreement and the matters contemplated herein, and (b) waive any claim or defense based on any alleged lack of personal jurisdiction, improper venue, or *forum non conveniens* or any similar basis. EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY. Each Party agrees to accept service of any summons, complaint or other initial pleading made in the manner provided for the giving of notices in <u>Section 10.7</u>. Nothing in this <u>Section 10.12</u> will affect the right of any Party to serve such summons, complaint or initial pleading in any other manner permitted by Law.

10.13   **Further Assurances**. Each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver any additional document, instrument, conveyance or assurance, and take any further action, as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Agreements.

10.14   **Execution in Counterparts**. This Agreement may be executed in multiple counterparts (including electronically-transmitted counterparts), each of which will be considered an original instrument, but all of which will be considered one (1) and the same agreement, and will become binding when one (1) or more counterparts have been signed by each of the Parties and delivered to the other Parties.

10.15   **Non-Recourse**. Notwithstanding anything in this Agreement to the contrary, (a) this Agreement may be enforced against, and any Action arising out of or based upon this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby ("***Agreement Dispute***") may be brought against, only the Buyer and the Sellers and any of their respective successors or assigns, and not against any other Persons (each of the foregoing, a "***Recourse Party***"), (b) no Person who is not a Recourse Party, including any director, officer, employee, incorporator, member, partner, manager, unitholder, stockholder, Affiliate, agent, attorney or other Representative of, and any financial advisor or lender to, any Party (each, a "***Non-Recourse Person***") will have any Liability (whether in contract, tort, equity, or otherwise) for any of the representations, warranties, covenants, or agreements in this Agreement or any Ancillary Agreement, or any other Liabilities for any Agreement Dispute, and (c) in no event shall any Non-Recourse Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions or omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any Recourse Party. The Non-Recourse Persons are intended third party beneficiaries of this <u>Section 10.15</u> and shall be entitled to enforce this <u>Section 10.15</u>.

10.16   **No Right of Set-Off**. The Buyer, on its own behalf and on behalf its Affiliates and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that the Buyer, its Affiliates and its and their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by the Buyer pursuant to this Agreement or any Ancillary Agreement.

*[Signatures on the Following Pages]*

IN WITNESS WHEREOF, the Parties have executed, or caused to be executed, this Agreement, as of the Signing Date.

**BUYER:**

[●]

By:_____
　　　　Name:
　　　　Title:

**SELLERS:**

**PARTNERS PHARMACY SERVICES, LLC**

By:_____
    Name:
    Title:

**PARTNERS PHARMACY, LLC**

By:_____
    Name:
    Title:

**PARTNERS OF CONNECTICUT, LLC**

By:_____
    Name:
    Title:

**PARTNERS OF MASSACHUSETTS, LLC**

By:_____
    Name:
    Title:

**PARTNERS OF NEW YORK, LLC**

By:_____
    Name:
    Title:

**PARTNERS OF PENNSYLVANIA, LLC**

By:_____
    Name:
    Title:

*[Signature Page to Asset Purchase Agreement]*

**PARTNERS PHARMACY OF FLORIDA, LLC**

By:_____

     Name:
     Title:

**PARTNERS PHARMACY OF MARYLAND, LLC**

By:_____

     Name:
     Title:

**PARTNERS PHARMACY OF TEXAS, LLC**

By:_____

     Name:
     Title:

**PARTNERS PHARMACY OF VIRGINIA, LLC**

By:_____

     Name:
     Title:

**SOLUTIONS HOMECARE, L.L.C.**

By:_____

     Name:
     Title:

**ARROW PHARMACY HOLDINGS, LLC**

By:_____

     Name:
     Title:

[*Signature Page to Asset Purchase Agreement*]

**ARROW ENVOY HOLDINGS, LLC**

By:_____
    Name:
    Title:

*[Signature Page to Asset Purchase Agreement]*