**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| PARTNERS PHARMACY SERVICES LLC, *et al.*,[1] | § | Case No. 25-34698 (CML) |
| | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
REGARDING THE PROPOSED SALE OF THE DEBTORS' ASSETS**
[Relates to Dkt. Nos. 54 & 156]

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of the above-captioned debtors and debtors-in-possession (the "Debtors") submits this objection (the "Objection") to the *Debtors' Motion for Entry of Orders (I)(A) Approving Bid Procedures, (B) Designating Stalking Horse Bidder, (C) Scheduling an Auction, Related Deadlines, and a Sale Hearing, and (D) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets, (B) Approving the Assumption and Assignment of Certain Contracts, and (C) Granting Related Relief* [Dkt. No. 54] (the "Sale Motion")[2] and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     The Debtors have unencumbered assets that are available to, and should, be monetized for the benefit of unsecured creditors.  Rather than acknowledging this value, the

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Arrow Envoy Holdings, LLC (5695); Arrow Pharmacy Holdings, LLC (0080); Partners of Connecticut, LLC (1828); Partners of Massachusetts, LLC (2604); Partners of New York, LLC (0039); Partners of Pennsylvania, LLC (0841); Partners Pharmacy of Florida, LLC (9364); Partners Pharmacy of Maryland, LLC (0961); Partners Pharmacy of Texas, LLC (2017); Partners Pharmacy of Virginia, LLC (6232); Partners Pharmacy Services, LLC (9038); Partners Pharmacy Shell Point, LLC (1616); Partners Pharmacy, L.L.C.  (4578); and Solutions Homecare, L.L.C.  (1583).  The Debtors' service address in these chapter 11 cases is 173 Bridge Plaza North, Fort Lee, NJ 07024.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion.

Debtors have capitulated to the demands of the insider DIP Lender, CS One, to make illegitimate stipulations regarding the validity of liens that do not exist to allow CS One to buy and bury all causes of action against itself and other insiders for a mere credit bid. The Committee intends to challenge the invalid liens and stipulations, and this Court should not allow CS One to acquire the unencumbered assets through its credit bid. Those assets must be left behind for unsecured creditors.

2.      Since its appointment, the Committee has complied with its mandate to ensure maximum value for general unsecured creditors. The Committee's initial endeavors were successful—resulting in the Final DIP Order[3] excluding from the DIP Collateral: (i) any of the Debtors' causes of action, including, without limitation, commercial tort claims and causes of action that could be brought pursuant to sections 544, 545, 547, 548 of the Bankruptcy Code, or any applicable state fraudulent transfer, fraudulent conveyance or voidable transaction statutes (the "Causes of Action"), and (ii) any assets of the Debtors that were not Senior Pre-Petition Collateral (the "Previously Unencumbered Assets", and together with the Causes of Action, the "Unencumbered Assets"). Those are the exact assets that CS One is improperly attempting to credit bid, which should be rejected by the Court.

3.      Despite black letter law prohibiting a party from credit bidding unencumbered assets, and despite the Debtors' and CS One's own admissions that they lack liens on the Unencumbered Assets,[4] the Debtors and CS One nonetheless continue to seek approval of CS

---

[3] The "Final DIP Order" refers to the *Final Order (I) Authorizing the Debtors to Obtain Post-Petition Financing and Use Cash Collateral; (II) Granting Adequate Protection; (III) Granting Related Relief* [Dkt. No. 117].

[4] *See Debtors' Responses and Objections to the Official Committee's First Request for Admission* (Oct. 9, 2025), attached hereto as Exhibit 1; *CS One's Responses and Objections to the Official Committee's First Request for Admission* (Oct. 10, 2025), attached hereto as Exhibit 2.

One's credit bid for the Unencumbered Assets through the Stalking Horse APA and Proposed Sale Order (defined below).  The credit bid for the Unencumbered Assets must be denied.

4.      Moreover, CS One cannot be permitted to acquire the Causes of Action with cash consideration.  The Debtors did not specifically market the Causes of Action during either their pre-petition or post-petition sales processes.[5]  The Debtors have put forth no evidence to establish the value of the Causes of Action—indeed, the Debtors have not engaged in any valuation of their assets—and they have not conducted any investigation of the value of the Causes of Action.[6]  Thus, the Causes of Action cannot be sold, and certainly cannot be sold to an insider against whom Causes of Action may be asserted, along with other affiliated insiders.  To permit the sale of the Causes of Action would deny unsecured creditors a potentially valuable, if not their only, source of recovery.

5.      Setting aside the law expressly prohibiting CS One's proposed credit bid, the Court should deny the sale to CS One for myriad other reasons.  First, these chapter 11 cases were initiated with one goal and one goal only: to create a vehicle by which Daniel Straus—an insider who controls not only CS One and the Debtors, but also Care Solutions, LLC (the Debtors' equity owner) and CareOne (collectively with its affiliated operators, the Debtors' largest customers)— could wash clean the Debtors and their assets as quickly and cheaply as possible, while paying nothing to unsecured creditors (including those holding 503(b)(9) claims) other than a few *di minimis* cure claims.  These cases are effectively a "bankruptcy foreclosure" solely for the benefit of Mr. Straus, CS One, and their insider affiliates, which should not be tolerated.  Mr. Straus's abuse of the bankruptcy process is further evidenced by restrictions imposed on the Debtors,

---

[5] SSG 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025, attached hereto as <u>Exhibit 3</u>.

[6] Exhibit 3, SSG 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

including, among other things, restricting the Chief Restructuring Officer's access to the Debtors' bank accounts to "view only" while allowing full access to non-debtor CareOne.[7]

6.      Second, approving the sale will leave behind an administratively insolvent estate. Taken together, the DIP Budget and proposed sale will transfer all estate value to CS One while leaving holders of 503(b)(9) Claims, and maybe other administrative claimants, with no assurance of payment.  Secured creditors seeking the benefits of a bankruptcy sale must "pay the freight," not abuse the bankruptcy process to maximize the value of their collateral, while unsecured creditors receive nothing.  The proposed sale is thus an impermissible distortion of the Bankruptcy Code and stands in contrast to the legitimate aims of the Chapter 11 process.

7.      Third, the Debtors bear the burden to prove that the proposed sale to CS One serves some legitimate bankruptcy justification beyond placating the desires of CS One.  Under the entire fairness standard (not the business judgment standard) applicable to transactions between debtors and insiders, the Debtors must demonstrate that the terms of the sale are fair, reasonable, or adequate given the underlying circumstances, or in the best interest of the Debtors' estates.  Given that the proposed sale yields no measurable benefit to unsecured creditors, the Debtors cannot satisfy this heavy burden.[8]

8.      Fourth, the Committee's investigation under the Final DIP Order remains ongoing, and the Challenge Period has not expired.  The Committee continues to review and evaluate potential claims against CS One, especially in light of the proposed credit bid by CS One.  The

---

[7] Debtors 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025, attached hereto as <u>Exhibit 4</u>.

[8] The Debtors acknowledged at deposition that unsecured creditors do not receive any recovery as part of the sale transaction. Exhibit 4, Debtors 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.  The Debtors also testified that the benefit to the estate from the sale is "satisfying the obligations of the Debtors," despite that only the secured lender gets paid (through the credit bid) from the proposed sale.  *Id.*  In other words, the Debtors' proffer of what is in the best interest of the Debtors' estates is that Mr. Straus gets paid and unsecured creditors are left with nothing.

Debtors' and CS One's belated document productions (which were just completed on Tuesday) have hindered the Committee's ability to scrutinize fully the Debtors' prepetition transfers and to analyze causes of action against CS One. The Committee has reason to believe, however, that there is sufficient evidence to state a colorable claim for recharacterization of CS One's debt to equity, and the Committee intends to file a motion requesting standing to pursue this claim prior to the expiration of the Challenge Period. Given that the Committee's investigation is ongoing, CS One's credit bid for the Debtors' business and assets required to operate the business under section 363(k) should, at minimum, be denied until expiration of the Challenge Period.

9.      For these reasons, and as discussed in detail below, the Committee respectfully requests that the Court enter an order (i) denying the Sale Motion and converting these cases to cases under chapter 7 of the Bankruptcy Code; or, (ii) alternatively, excluding the Unencumbered Assets from the assets sold to CS One and making other modifications to the sale as described herein.

## **BACKGROUND**[9]

### I.      **Procedural History and General Background**

10.      On August 13, 2025 (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases in this Court by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

11.      On August 28, 2025, the Office of the United States Trustee appointed five members to the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. *See* Dkt. No.

---

[9] The description in this background section remains subject to the Committee's continuing investigation and ongoing discovery. On October 16, 2025, the Committee took the depositions of corporate representatives of the Debtors, SSG, and CS One. Given the noon deadline to file this Objection, the Committee was unable to provide citations to any official deposition transcripts received prior to filing. The Committee will file an amended Objection upon receiving all official transcripts.

66.    The members of the Committee are: (i) McKesson Corporation, (ii) StatimRx, LLC, (iii) RemedyRepack, Inc., (iv) Medline Industries, LP, and (v) Omnicell, Inc.

12.    Additional information regarding the Debtors' businesses and operations, capital structure, and the events leading to the commencement of these cases can be found in the *Declaration of Ronald M. Winters in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 13] ("Winters Decl.").

## II.    The Debtors, CS One, and Affiliated Straus Entities

13.    The Debtors' corporate history and organizational structure begins with Mr. Straus.[10]  Mr. Straus indirectly owns all of the interests in the Debtors and the Debtors' primary customer—CareOne, LLC (together with CareOne Management, LLC and their affiliated senior care facilities operators, "CareOne").[11]  Mr. Straus also "solely and wholly owns all the interests of CS One, LLC"[12] who is the Pre-Petition Lender, the DIP Lender, and the Stalking Horse Bidder.[13]  These entities operate symbiotically, all under Mr. Straus's direction.

## III.    The Debtors' Capital Structure

14.    The Debtors entered into the Pre-Petition Credit Agreement on July 2, 2019. *Winters Decl.* at ¶ 20.  Under the Pre-Petition Credit Agreement, the Debtors were provided a revolving credit facility of up to $60 million, which was purportedly secured by a lien on substantially all of the Debtor's then-existing assets (the "Senior Pre-Petition Liens").  *Id.*  The

---

[10] Mr. Straus is a statutory insider of the Debtors as a "person in control of the debtor." 11 U.S.C. § 101(31)(B)(iii).

[11] CS One 30(b)(6) Dep. Page and Line Reference Forthcoming, October 16, 2025, attached hereto as Exhibit 5.

[12] Exhibit 5, CS One 30(b)(6) Dep. Page and Line Reference Forthcoming, October 16, 2025.

[13] CS One is a statutory insider of the Debtors as an "affiliate." 11 U.S.C. §§ 101(2), (31)(E).

Senior Pre-Petition Liens do not include any liens or security interests in the Unencumbered Assets.[14]

15.     Non-debtor Care Solutions, LLC, the direct or indirect equity owner of each of the Debtors, guaranteed payment and performance of the Debtors' obligations under the Pre-Petition Credit Agreement.[15]  As of November 2022, the Debtors were obligated under the Pre-Petition Credit Agreement in an amount of approximately $37 million. *Id*. at ¶ 37.

16.     In late 2022, the Debtors initiated a series of restructuring efforts that were unsuccessful, and as by the Debtors' own admission, "the Debtors remained cash flow negative." Sale Motion ¶ 11. The Debtors' negative cash flow resulted in the Debtor failing to pay its vendors, which led to the filing of multiple lawsuits and "mounting payment demands from vendors." *Id*.

17.     On February 21, 2023, Mr. Straus formed CS One, and funded approximately ▮▮▮▮ ▮▮▮▮ into CS One,[16] to enable CS One to purchase all then-outstanding obligations (approximately $34 million) under the Pre-Petition Credit Agreement from the prior lender following the occurrence and continuation of events of default under the Pre-Petition Credit Agreement.[17]

18.     Two days after forming CS One, on February 23, 2023, CS One entered into the Omnibus Assignment and Assumption Agreement and Waiver (the "Assignment Agreement"),

---

[14] *See* Exhibit 1, *Debtors' Responses and Objections to the Official Committee's First Request for Admission* (Oct. 9, 2025).

[15] *See* Guaranty Agreement, dated July 2, 2019, attached hereto as Exhibit 6. Under the Guaranty Agreement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* ¶ 10.

[16] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ April 8, 2025 text messages between the Debtors' Chief Restructuring Officer, Chief Operating Operator, Assistant General Counsel, and Chief Financial Officer, PPS662696, attached hereto as Exhibit 7.

[17] State of Delaware Certificate of Formation of Limited Liability Company for CS One, LLC, attached hereto as Exhibit 8.



pursuant to which ██████████████████████████████████████████
████████████████████████████████████████ [18] At the time CS One entered into the Assignment Agreement, CS One was aware that the Debtors were in default under the Pre-Petition Credit Agreement [19] ██████████████████████████████
████████████████ [20]

19.     Since the transfer of the Pre-Petition Credit Agreement to CS One, the loan has operated as a capital contribution rather than debt.  Indeed, the Pre-Petition Credit Agreement was immediately amended to provide that ████████████████████████████
████████████████████████████████ [21] ████████████████████████
██████████████████████████ [22] ████████████████████████████████
██████ [23] and finally extended to January 2, 2026, the current maturity date. [24]  The Pre-Petition Credit Agreement was also immediately amended to ████████████████████
██████████████████████████████. [25]  Each of the subsequent amendments further temporarily waived **all** defaults by the Debtors. [26]  Further, the Debtors have made no payments on the Pre-Petition Credit Agreement, allowing their obligations to balloon to over $44.5 million as of the Petition Date.  *Winters Decl.* ¶ 23.

---

[18] Omnibus Assignment and Assumption Agreement and Waiver, attached hereto as <u>Exhibit 9</u>.

[19] <u>Exhibit 5</u>, CS One 30(b)(6) Dep. Page and Line Reference Forthcoming, October 16, 2025.

[20] Email Correspondence dated February 23, 2023 at 6:19:05 PM, PPS_0453461, attached hereto as <u>Exhibit 10</u>.

[21] Amendment No. 2 to Credit Agreement and Limited Waiver, dated as of July 3, 2023, attached hereto as <u>Exhibit 11</u>.

[22] Amendment No. 3 to Credit Agreement and Limited Waiver, dated as of December 31, 2023, attached hereto as <u>Exhibit 12</u>.

[23] Amendment No. 4 to Credit Agreement and Limited Waiver, dated June 3, 2025, attached hereto as <u>Exhibit 13</u>.

[24] Winters Decl. ¶ 23.

[25] Exhibit 11, Amendment No. 2 to Credit Agreement and Limited Waiver, dated as of July 3, 2023.

[26] Each time the maturity date was extended, CS One temporarily waived events of default.  *See Winters Decl.* ¶ 23; *see also* Exhibits 11 – 13.

20.     In addition to the insider secured debt owed to CS One, the Debtors purchase 95% of their pharmaceuticals from Cardinal Health 110, LLC and Cardinal Health 112, LLC (collectively, "Cardinal") pursuant to a Prime Vendor Agreement, which purportedly grants Cardinal junior liens on substantially all of the Debtors' assets (the "Junior Pre-Petition Liens" and together with the Senior Pre-Petition Liens, the "Pre-Petition Liens"). *Id*. ¶ 24.  On information and belief, those pharmaceuticals are purchased from Cardinal through cash in advance, and then sold to CareOne and CareOne affiliates on terms.[27]  As of the Petition Date, the Debtors allegedly owe Cardinal no less than $20.4 million.  *Id.*  Based on the value of CS One's credit bid, Cardinal is undersecured and effectively an unsecured creditor.

21.     According to the Debtors, they owe approximately $53 million in unsecured debt, primarily to vendors who supply essential services, medical equipment, and pharmaceuticals, and contingent liabilities of an unknown amount, including liabilities based on litigation.  *Id*. ¶ 26. Including the Cardinal debt, there are approximately $73 million in unsecured claims.[28]

## IV.     The DIP Facility

22.     On August 14, 2025, the Court entered an interim order [Dkt. No. 29] (the "Interim DIP Order") approving the Debtors' *Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Adequate Protection, and (III) Granting Related Relief* [Dkt. No. 6] (the "DIP

---

[27] If the case is not converted to chapter 7, the Committee intends to investigate the terms of these insider sales, including whether the Debtor received reasonably equivalent value in exchange for the goods provided.  The Committee also intends to investigate the Debtors' recent admission that the Chief Restructuring Officer does not have anything more than "view" access to the Debtors' bank accounts and that the only party identified by the CRO with greater access is a non-debtor CareOne employee. *See* Exhibit 4, Debtors 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.  If the case is converted, the chapter 7 trustee should investigate these transfers and take control of the bank accounts.

[28] This amount does not include potential rejection damages claims.

Motion"). The Interim DIP Order authorized the Debtors, among other things, to draw up to $2.3 million from the DIP Facility on an interim basis.

23.     On September 3, 2025, one day after selecting counsel, the Committee provided counsel for the Debtors and DIP Lender with an issues list and informal objections to the DIP Motion (the "UCC Objections"). Shortly before the hearing on final approval of the DIP Motion, the Committee, the Debtors, and the DIP Lender consensually resolved the UCC Objections.[29]

24.     On September 15, 2025, the Court entered the Final DIP Order, authorizing the Debtors to draw up to $6.5 million from the DIP Facility on a final basis. The Final DIP Order, based on the agreement resolving the UCC Objections, provides that the Debtors do not grant to the DIP Lender DIP Liens on "(i) any of the Debtors' causes of action, including, without limitation, commercial tort claims and causes of action that could be brought pursuant to sections 544, 545, 547, 548 of the Bankruptcy Code, or any applicable state fraudulent transfer, fraudulent conveyance or voidable transaction statutes (the "Causes of Action"), and (ii) any assets of the Debtors that were not Senior Pre-Petition Collateral (the "Previously Unencumbered Assets")." Final DIP Order ¶ 8. Thus, by its terms, the Final DIP Order expressly excludes Causes of Action and Previously Unencumbered Assets from DIP Collateral.

25.     The Final DIP Order also contains certain stipulations by the Debtors—subject to the Committee's ability to challenge the stipulations—with respect to the Pre-Petition Obligations owed to CS One and Cardinal solely in their capacity as Pre-Petition Secured Parties. Final DIP Order ¶¶ G, H, 27. As to CS One, the Final DIP Order incorrectly stipulates that:

> o   The Debtors are party to . . . a Security Agreement, dated as of July 2, 2019, pursuant to which the Debtors pledged substantially all of their assets as collateral

---

[29] As part, but not all, of the parties' resolution of the UCC Objections, the Committee was designated as a consultation party in the sale process and obtained a professional fee budget to ensure it has the necessary resources and runway to fulfill its fiduciary and statutory obligations to evaluate the proposed sale process and bids and pursue alternative sources of recovery for unsecured creditors, all with the aim of maximizing value for unsecured creditors.

(the "Senior Pre-Petition Collateral") for their obligations under the Pre-Petition Credit Agreement."

- o "The Senior Pre-Petition Obligations are secured by valid, enforceable, properly perfected, first priority and unavoidable liens on and security interests (the "Senior Pre-Petition Liens") encumbering all or substantially all of the Debtors' assets existing immediately prior to the Petition Date."

- o "The Debtors have no claims, offsets, or other rights or causes of action against the Pre-Petition Lender that would in any manner impair, reduce or otherwise modify the Senior Pre-Petition Obligations or the validly perfected Senior Pre-Petition Liens."

Final DIP Order, ¶¶ G(1), (4) and (6).  As both the Debtors and CS One have now admitted,[30] CS One does not in fact have liens on or security interests in the Unencumbered Assets, despite the stipulations to the contrary.

26.     The budget attached to the Final DIP Order projected that the Debtors would fully exhaust the DIP Facility by the week of November 1, 2025—coinciding with the Debtors' anticipated closing date for the Sale—and leaving only $174,721 in the estates.  See Final DIP Order, Ex. 1.  The budget did not include a line item for 503(b)(9) claims or any reserve of funds to facilitate an orderly wind-down of the Debtors' estates.[31]  Although the Committee raised a right-sizing of the DIP Facility as part of the UCC Objections, the Debtors and CS One asserted that there was enough flexibility in the budget to include line-items for Committee professionals without increasing the amount of the DIP Facility.  The refusal to right-size the DIP Facility has resulted in a complete lack of flexibility in the sale timeline as well as financial pressure on the Debtors regarding the Committee's investigation and evaluation of the proposed sale.

---

[30] See Exhibit 1, *Debtors' Responses and Objections to the Official Committee's First Request for Admission* (Oct. 9, 2025); Exhibit 2, *CS One's Responses and Objections to the Official Committee's First Request for Admission* (Oct. 10, 2025).

[31] See Final DIP Order ¶ 30 ("Upon closing of the sale of the Debtors' assets, the net proceeds of the sale, less amounts required to fund the Debtors' plan of liquidation and the wind down of the Debtors' estates").  *But see* Exhibit 2 (Approved Budget) to the Final DIP Order, showing there is no line item in the budget for wind-down costs.

## V.       The Debtors' Sale Process

27.       Pre-petition, the Debtors had two failed attempts to sell its assets, once to PharMerica in June 2024 to April 2025, and thereafter to Specialty RX in May 2025 to August 2025. *See Winters Decl.* ¶¶ 42-46; Sale Motion ¶¶ 12-16.

28.       Following the Debtors' failed sale attempts, the Debtors initiated these cases, with SSG Advisors, LLC ("SSG") as their investment banker.  In general, SSG was retained to prepare an information memorandum describing the Debtors' assets; to assist in due diligence and developing a list of potential buyers; to engage in discussions with and receive offers from potential buyers; and to advise the Debtors in structuring and closing a sales transaction.  *See Debtors' Application for an Order Authorizing the Debtors to Retain and Employ SSG Advisors, LLC as Investment Banker to the Debtors Effective as of the Petition Date*, [Dkt. No. 50].  Notably, SSG was not engaged to provide valuation services to the Debtors or otherwise attempt to value specific assets.[32]

29.       Throughout these cases, SSG has marketed the Debtors' assets in accordance with this Court's order approving the Bid Procedures Motion (the "Bid Procedures Order").  *See* Dkt. No. 118.  According to the Debtors, SSG solicited numerous prospective bidders, some of whom were given access to a virtual data room and provided with a Confidential Information Memorandum ("CIM").  The CIM did not differentiate or separately market the Causes of Action from the sale of all or a portion of the Debtors' assets.  In fact, there is no mention at all in the CIM that Causes of Action were even being sold.

30.       The marketing process did not drive significant interest in the Debtors' assets, resulting in the Stalking Horse Bid being the only submitted bid.  In particular, prospective bidders

---

[32] Exhibit 3, SSG 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

were concerned about the amount of CS One's credit bid and the go-forward relationship with Mr. Straus and the Debtors' largest customer, CareOne.[33]  More specifically, prospective bidders were concerned that the large customer concentration in CareOne could affect the Debtors' valuation if a purchaser lost CareOne as a customer.[34]

31.     On October 10, 2025, following expiration of the Bid Deadline without a Qualified Bid other than the Stalking Horse Bid, the Debtors submitted the *Notice of Successful Bidder* [Dkt. No. 166] declaring CS One, in its capacity as Stalking Horse Bidder, as the Successful Bidder and the Stalking Horse Bid as the Successful Bid.

32.     The Stalking Horse Bid consists of a bid for the proposed sale of substantially all of the Debtors' assets to CS One pursuant to a stalking horse purchase agreement (the "Stalking Horse APA"). Sale Motion ¶¶ 20, 21. The PharMerica asset purchase agreement (the "PharMerica APA") served as the basis for the eventual asset purchase agreement with Specialty RX and, ultimately, for the Stalking Horse APA, although the Debtors allege that the Stalking Horse APA has "more debtor-favorable terms" due to its lack of bid protections.  *See* Sale Motion ¶ 17 n.8. The Stalking Horse APA was purportedly negotiated through Debtors' counsel, on the one hand, and CS One's counsel (including David Baruch, the Assistant General Counsel for the Debtors),

---

[33] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025; Exhibit 3, SSG 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025; *see also* Email Correspondence dated August 21, 2025 at 7:19 PM, PPS_0130488 (

); Email Correspondence dated September 9, 2025 at 3:03 PM, PPS_0133766 (

); Email Correspondence dated August 27, 2025 at 1:40 PM, PPS_0133875 (

); Email Correspondence dated August 28, 2025 at 5:33 PM, PPS_0132974 (

. The email correspondence is collectively attached hereto as Exhibit 14.

[34] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025; Exhibit 3, SSG 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025; *see also* Exhibit 14, Email Correspondence dated August 21, 2025 at 3:28 PM, PPS_0130488

.

on the other, for the sale and purchase of the same assets subject to the PharMerica APA for which David Baruch negotiated on behalf of the Debtors.[35]

33.    Pursuant to the Stalking Horse APA, the Debtors intend to sell substantially all of the Debtors' assets to CS One free and clear of all liens, claims, interests and encumbrances, and assume and assign certain executory contracts and unexpired leases to CS One.[36]  Most relevant to this objection, the Stalking Horse APA provides for the Debtors to sell the Purchased Assets (as defined therein) to CS One, which include "all causes of action, lawsuits, judgments, claims and demands relating to any of the [Assumed Liabilities] or the [Purchased Assets], whether arising by way of counterclaim or otherwise."  Stalking Horse APA, §§ 2.1(a)(vii), (b)(vii), (c)(vii).  While the Debtors are not selling to CS One Avoidance Actions "relating to any of the Excluded Liabilities or Excluded Assets", as those Avoidance Actions are Excluded Assets under the Stalking Horse APA (*Id.* § 2.2(d)), it is not clear from the Stalking Horse APA whether the Debtors are selling Avoidance Actions that do not relate to "to any of the Excluded Liabilities or Excluded Assets."  Representatives of the Debtors and CS One testified that CS One is seeking to acquire Avoidance Actions other than those that are Excluded Assets.[37]

34.    The Purchase Price under the Stalking Horse APA is limited to:

i.    "a credit bid pursuant to Section 363(k) of the Bankruptcy Code (the "<u>Credit Bid</u>") comprised of (i) the indebtedness held by Buyer pursuant to the Credit Agreement in an amount of $44,524,814 plus (ii) the full amount of the

---

[35] Exhibit 5, CS One 30(b)(6) Dep. Page and Line Reference Forthcoming, October 16, 2025.

[36] On October 8, 2025, the Debtors filed a list of potential executory contracts and unexpired leases that could be assumed and assigned to CS One.  *See* Dkt. No. 153.  The list, which included 172 executory contracts and unexpired leases, only included seven creditor contracts.  The majority of the contracts to be assumed are customer contracts, including those with insider CareOne.  Presumably, the creditor contracts not listed will be rejected, thus adding to the unsecured claims pool.

[37] *See* Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025 (testifying that CS One is seeking to acquire Avoidance Actions related to Purchased Liabilities and Purchased Assets); *see also* Exhibit 3, SSG 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025 (testifying that the Debtors are selling Avoidance Actions to CS One).

obligations of the Sellers under the DIP Facility in an amount of $6.5 million" and

    ii.   "the assumption of the Assumed Liabilities by the Buyer in accordance with the terms of this Agreement."

*Id*. at § 2.5(a).  Thus, CS One is seeking to acquire all or substantially all of the Debtors' assets, including assets not encumbered by liens of CS One, in exchange for only a credit bid with no cash consideration other than amounts necessary to cure contract defaults for assumed contracts.

35.    The Bid Procedures Order makes clear, however, that CS One is entitled to submit a credit bid ***only*** for the Debtors' assets that are subject to a valid and perfected lien.  *See* Bid Procedures Order ¶ 10 ("any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates . . . shall be permitted to submit a credit bid for all or a portion of ***the assets subject to such lien***.") (emphasis added).  Thus, pursuant to the terms of the Bid Procedures Order, CS One cannot acquire the Unencumbered Assets through its credit bid, and those assets must be left behind.

36.    On October 8, 2024, the Debtors filed their proposed *Order (A) Approving the Sale of the Debtors' Assets, (B) Approving the Assumption and Assignment of Certain Contracts, and (C) Granting Related Relief* [Dkt No. 156] (the "Proposed Sale Order").  The Proposed Sale Order contains several of the same infirmities present in the Final DIP Order.  Notably, the Proposed Sale Order repeats the incorrect stipulation that CS One has "valid, binding, perfected and enforceable, first priority liens over the Senior Pre-Petition Collateral (as defined in the Final DIP Order) that secure the Senior Pre-Petition Obligations (as defined in the Final DIP Order)." Proposed Sale Order, ¶ P (citing Final DIP Order, ¶ 24(G)).  As noted above, the Senior Pre-Petition Collateral is defined in the Final DIP Order as "substantially all" of the Debtors' assets, which includes the Unencumbered Assets.  *See supra* ¶¶ 24-25.  The Proposed Sale Order does

not modify the Stalking Horse APA, which improperly sweeps the Debtors' unencumbered assets into the dragnet of CS One's credit bid.[38]

37.     The Proposed Sale Order further attempts to cut short the Committee's Challenge Deadline (defined below).  Proposed Sale Order ¶ 8 ("the Challenge Period (as defined in the Final DIP Order) shall terminate and no party shall be permitted to assert any Challenge and all such Challenges shall be deemed forever waived, barred, and released.").  This provision is inconsistent with the Final DIP Order, which provides for the Committee's Challenge Period to remain in effect through and including October 27, 2025.

38.     Finally, the Proposed Sale Order improperly limits the liability of parties other than CS One following the Sale under the guise of cutting off successor liability.  For example, following the proposed sale, the Proposed Sale Order purports to release CS One and "***its affiliates, its present or contemplated members or shareholders***" for "***any liability whatsoever***" with respect to "***any rights or claims based on any successor or transferee liability.***"  Proposed Sale Order, ¶ S (emphasis added).[39]  While CS One may be able to obtain the assets free and clear of liens, claims, and encumbrances, it should not use the sale to obtain a backdoor release for any claims that the estate holds against CS One's affiliates, its present or contemplated members or shareholders, which may include alter ego or other successor liability claims that are unrelated to

---

[38] The Proposed Sale Order provides that the Stalking Horse APA may be modified, amended, or supplemented by agreement of the Debtors and CS One, without further action or order of the Court provided such waiver, modification, amendment, or supplement is not materially adverse to the Debtors' estates.  Proposed Sale Order, ¶ 43.  The Stalking Horse APA should not be modified without notice to the Committee and approval of this Court.

[39] *See* Proposed Sale Order ¶ 34 (no "Affiliate of the Purchaser [shall] be in any way liable or responsible, as a successor or otherwise, for any Liabilities of the Debtors in any way whatsoever, including any Liabilities relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the Closing Date").  The Proposed Sale Order also provides that the sale is free and clear of "Liens, Claims, and Interests," including with respect to the "Purchaser, and each of its affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders."  "Liens, Claims, and Interests" is not defined so it is not clear whether the Proposed Sale Order is seeking to cut off liability for any claims owned by the Debtors' estates in addition to claims that creditors have against the Debtors' estates.  *See also* Proposed Sale Order ¶ 33.

the purchase of the Debtors' assets.[40]   Similarly, the proposed findings in Paragraph AA should make clear that they are limited to the proposed transaction and not in any way intended to impact the Committee's investigation of claims against CS One that do not relate to the proposed transaction.

39.     Accordingly, the Proposed Sale Order cannot be entered absent modification.

**VI.     The Committee's Investigation**

40.     Immediately after its formation and retention of professionals, the Committee began fulfilling its fiduciary duties by analyzing the proposed sale to CS One and investigating, among other things, the validity of the Pre-Petition Liens and potential claims and causes of action. The Final DIP Order provides the Committee until October 27, 2025 (the "Challenge Deadline") to investigate and assert any challenge to (among other things) "the validity, extent, priority, perfection, enforceability and non-avoidability of the Pre-Petition Liens against the Debtors." *See* Final DIP Order ¶ 27.

41.     The Final DIP Order also provides that upon expiration of the Challenge Deadline, the Debtors' stipulations regarding the Pre-Petition Loan Documents, Assignment Agreement, Senior Pre-Petition Obligations, Junior Pre-Petition Obligations, the Pre-Petition Liens, Prime Vendor Agreement, Pre-Petition Collateral, and claims, offsets, or other rights or causes of action against the Pre-Petition Secured Parties are "binding upon the Debtors and all other persons, entities, and parties in all circumstances." *See* Final DIP Order, ¶ 26.  Following the expiration of the Challenge Deadline, the Final DIP Order bars any party, including the Committee, from challenging "the validity, extent, priority, perfection, enforceability, and non-avoidability of the

---

[40] A more appropriate finding that is consistent with section 363 of the Bankruptcy Code is in Paragraph V of the Sale Order, which provides that "[t]he Purchaser shall have no obligations with respect to any Liens, Claims, and Interests ***against the Debtors.***"   Proposed Sale Order ¶ V (emphasis added).

Pre-Petition Secured Parties' validly perfected pre-petition claims and liens against the Debtors and the Pre-Petition Collateral." *Id.*

42.     The Committee's lien investigation has revealed that the Senior Pre-Petition Obligations are not secured by, the Senior Pre-Petition Liens do not encumber, and the Senior Pre-Petition Collateral does not include: (a) any assets owned by Debtor Partners Pharmacy Shell Point, LLC; (b) commercial tort claims; (c) causes of action that could be brought pursuant to sections 544, 545, 547, 548 of the Bankruptcy Code, or any applicable state fraudulent transfer, fraudulent conveyance or voidable transaction statutes; (d) any owned or leased real estate or any fixtures located thereon; (e) any vehicles for which CS One has not obtained the proper notations on the relevant certificates of title; (f) any money or currency that is on-hand at any Debtor; (g) any deposit accounts at any bank or financial institution that are not covered by a control agreement in favor of CS One or are not otherwise under the control of CS One; (h) any contracts of the type that require the consent of the counterparty under applicable law and for which there is no collateral assignment; and (i) any other assets not included in the security grant under the Pre-Petition Loan Documents.  All of this property is Unencumbered Assets.

43.     Notwithstanding the Proposed Sale Order's attempt to cut short the Committee's Challenge Deadline, the Challenge Deadline is five days after the sale hearing.  The result is a procedurally compressed timeline that places the Committee in the untenable position of conducting a fulsome lien review and investigating the Prepetition Liens and the Causes of Action in conjunction with an investigation of the propriety of the Sale and the adequacy of the Purchase Price/Credit Bid.

44.     As discussed, and subject to further investigation, the Committee's investigation thus far has revealed (in summary):

- The Credit Bid and Purchase Price are inadequate to the extent the Purchased Assets include the Unencumbered Assets because CS One does not have validly perfected liens on the Unencumbered Assets.

- Even outside a Credit Bid, CS One cannot purchase the Unencumbered Assets because the Debtors failed to market or value the Unencumbered Assets.

- Significant questions remain in respect of CS One's alleged secured debt and whether the debt to CS One under the Pre-Petition Credit Agreement should be recharacterized.

45.     For these reasons, and as discussed below, the Committee objects to the proposed sale and to entry of the Proposed Sale Order.

## <u>OBJECTION</u>

46.     The Debtors' proposed sale to CS One should be denied because: (1)  the Debtors' sale process was improperly designed entirely for the benefit of CS One and Mr. Straus, who seeks to abuse the bankruptcy process to wash clean the Debtors' assets as quickly and cheaply as possible, while paying nothing to unsecured creditors (including those holding 503(b)(9) claims), and the sale therefore does not hold up to heightened scrutiny; (2) CS One cannot credit bid on Unencumbered Assets; (3) the Unencumbered Assets, and especially the Causes of Action, were not specifically marketed or valued and thus cannot be sold for cash consideration; (4) CS One cannot be permitted to buy and bury the Causes of Action against itself and other insiders for little to no cash consideration; and (5) the Committee's Challenge Deadline has not expired and any challenge asserted by the Committee must be resolved prior to approval of the Stalking Horse APA.

47.     Courts have repeatedly cautioned that, where a debtor proposes a sale of substantially all of its assets in the absence of the procedural safeguards afforded by the plan confirmation process, such a sale warrants heightened judicial scrutiny.  *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Braniff Airways,*

*Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) (holding that debtor may not use 11 U.S.C. § 363 to sidestep the protection creditors have when it comes time to confirm a plan of reorganization). Nonetheless, the overarching goal of any proposed asset sale under section 363 of the Bankruptcy Code is to maximize the value of sale proceeds received by the debtor's estate. *See Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"). As discussed herein, the Debtors must uphold their fiduciary duties to protect and maximize the value of the estates for the benefit of all stakeholders—not just their secured lenders. *See In re GSC, Inc.*, 453 B.R. 132, 170 (Bankr. S.D.N.Y. 2011) (holding "the [Debtor] has a fiduciary obligation to the estate as a whole, not to the secured creditors to ensure their maximum recovery."). The proposed sale is structured to deliver recovery **only** to CS One, while providing no meaningful consideration for administrative creditors, no liquidity for a wind-down, and no path to a confirmable chapter 11 plan.

48.     If this trajectory continues unchecked, the likely outcome is a conversion to chapter 7—after CS One has received the benefits of the chapter 11 process and reaped all the benefits of the sale with the cost of the process borne by unpaid administrative and unsecured creditors. Rather than allow CS One's abuse of the chapter 11 process for its own benefit and to the detriment of all other constituents, the Court should deny the sale and convert these cases to cases under chapter 7, during which CS One may pursue its purchase from a chapter 7 trustee.

49.     If the Court is inclined, however, to proceed forward with the sale to CS One, the sale must exclude Unencumbered Assets—including estate-owned Causes of Action—from the Purchased Assets, and the Unencumbered Assets must be preserved for the benefit of general unsecured creditors, even if the case is converted to chapter 7 after the sale closes. CS One does

not hold a valid, perfected lien over the Unencumbered Assets, and the Causes of Action were not properly marketed or valued in these cases or pre-petition. Without such a marketing and valuation process, CS One cannot be permitted to acquire the Causes of Action, which must be left with the estates. The Debtors should additionally be required to establish an adequate reserve to fund all allowed administrative expense claims and to support an orderly wind-down.

## I.     The Sale Should Be Denied and These Cases Converted to Chapter 7 Cases

50.     These bankruptcy cases were filed to allow Mr. Straus to re-capture value from his capital contribution into the Debtors (through the purchase of the Pre-Petition Credit Agreement from the prior lenders, which Mr. Straus and CS One have treated as equity—not debt—since the purchase)[41] by washing the Debtors' assets clean in a section 363 process and shedding more than $50 million in unsecured debt. The Debtors filed these cases with no intention to continue the cases forward beyond a sale closing, as is evidenced by the budget attached to the Final DIP Order that runs out of funding on or about November 1, 2025. The Debtors' sales process was also doomed from the outset—two failed sales processes and the insider-nature of the CareOne-Partners Pharmacy-Care Solutions business umbrella soured the market and deterred potential bidders.[42] These cases should not be run on the backs of unsecured creditors, for the benefit of one party alone: CS One. The sale should be denied and the cases should be converted to cases under chapter 7.

51.     In general, a sale of substantially all of the assets of a Chapter 11 debtor should be pursued in the context of the process for the proposal and confirmation of a plan of reorganization. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063 (2d

---

[41] *See infra* ¶¶ 73-78.

[42] *See supra* n.33-34.

Cir. 1983). Nonetheless, courts have approved sales pursuant to Section 363(b) if the record reveals a "good business reason" for the proposed sale outside of the normal plan confirmation process. *See id.* at 1071; *accord Stephens Industries Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir. 1986) (adopting *Lionel*'s holding that a "bankruptcy court can authorize a sale of all of a Chapter 11 debtor's assets under Section 363(b)(1) when a sound business purpose dictates such action"); *In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1992) (affirming the judgment of courts below that a Section 363(b) sale prior to a plan was appropriate because "good business reasons" exist for such sale). The concern raised by pre-confirmation sales is that such a sale could deny creditors the statutory protections they would otherwise receive through the plan confirmation process by establishing the terms of a *sub rosa,* or perhaps more accurately, *de facto,* plan in connection with the sale. *See, e.g.*, *In re Braniff Airways, Inc*., 700 F.2d 935, 940 (5th Cir. 1983) (holding that debtor may not use 11 U.S.C. § 363 to sidestep the protection creditors have when it comes time to confirm a plan of reorganization).

52.     Section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 govern the sale of assets outside the ordinary course of business. Section 363(b)(1) provides, in relevant part, that a debtor may, after notice and hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1) and (f). When considering offers for the purchase of assets, the primary concern of the bankruptcy court is to ensure that the sale maximizes the value of the asset sold. *In re Fam. Christian, LLC*, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015).

53.     Factors that courts should consider when deciding whether to approve proposed sales outside the ordinary course of debtor's business are:

> a)   whether there is evidence of a need for speed, *e.g.*, based on perishable nature of assets or looming, adverse market conditions;

22

b)   whether there is business justification for sale and sale process, as well as for having the sale process proceed apart from confirmation process, or, in the case of insiders, whether the proposed sale stands up to strict scrutiny;

c)   whether the case is sufficiently mature that parties in interest have received adequate notice, have obtained appropriate information, and have been able to participate;

d)   whether the proposed sales process is sufficiently straightforward to facilitate competitive bids;

e)   whether the assets have been aggressively marketed in an active market;

f)   whether the fiduciaries that control debtor are truly disinterested, so that court can have faith in their business judgment, or, in the case of insiders, whether the insiders' business judgement is appropriately deferred to;

g)   whether the proposed sale includes all of debtor's assets or the "crown jewel" of such assets;

h)   whether the purchaser will receive any extraordinary protections;

i)   burdens of the proposed sale as part of plan confirmation process;

j)   who will benefit from sale;

k)   whether any special adequate protection measures are necessary or possible; and

l)   whether the hearing on the proposed sale was true adversary presentation.

*In re Gulf Coast Oil Corp.,* 404 B.R. 407, 423 (Bankr. S.D. Tex. 2009).

54.     The proposed sale to CS One fails all of these factors.  As an insider sale, the proposed sale to CS One is subject to higher scrutiny, and the Court cannot appropriately defer to the Debtors' business judgment because the Debtors and CS One are both controlled by Mr. Straus. *See In re Gulf Coast Oil Corp.*, 404 B.R. at 424 (if the sale will benefit an insider entity that controls the debtor, "the court must carefully consider whether it is also appropriate to defer to their business judgment."); *see also In re Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir. 1991) (an insider's dealings with a bankrupt corporation are ordinarily subject to "rigorous" or "strict" scrutiny); *In re Texas Standard Oil Co.*, Case No. 08-34031-H4-11, 2008 WL 5479114, at *9

23

(Bankr. S.D. Tex. Nov. 12, 2008) ("insider transactions are subject to heavy scrutiny in bankruptcy court"). Courts apply this more exacting standard because insiders "usually have greater opportunities for . . . inequitable conduct." *Fabricators, Inc.*, 926 F.2d at 1465; *In re Latam Airlines Group S.A.*, 620 B.R. 722, 769 (Bankr. S.D. N.Y. 2020) (transactions with insiders are "inherently suspect because 'they are rife with the possibility of abuse.'") (internal citations omitted)). Indeed, the insider nature of the sale proposed here is suspicious. For example, throughout these cases, the Chief Restructuring Officer—Ron Winters—has had restricted "view only" access to the Debtors' bank accounts, while full access remains with Straus's non-debtor entity, CareOne.[43]

55.    Moreover, the speed at which these cases are proceeding only benefits Mr. Straus and his desire to purchase the Debtors' assets as quickly, cleanly, and cheaply as possible while prohibiting any true marketing or valuation process and while curtailing the Committee's investigation of actions against him or his affiliates. *In re Gulf Coast Oil Corp.*, 404 B.R. at 424 (finding no need for speed where there was no evidence that the assets were perishable or that any value would be lost through delay to permit plan confirmation); *In re Flour City Bagels, LLC*, 557 B.R. at 80 (denying sale and finding that ongoing expenses of operating in chapter 11 and depreciation of assets does not alone demonstrate an exigent need for speed) (citing *In re Gulf Coast Oil Corp.*, 404 B.R. at 423)). The Debtors did not adequately market or value the Causes of Action or take steps to assuage potential purchasers' concerns about the insider-nature of the Debtors' business.[44] Rather, the Proposed Sale Order requests approval of an extremely expedited

---

[43] Exhibit 4, Debtors 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[44] *See supra* n. 33-34; *see also* Exhibit 3, SSG 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025 (testifying that although SpecialtyRx did re-engage with SSG, indicating they would be interested in revisiting their proposal, SpecialtyRx was not able to meet the due diligence requirements to get a bid submitted due to "religious holidays until the latter part of October once their principals were back from holiday.").

sale to an insider purchaser who is the only party who stands to benefit, and who—under the terms of the Stalking Horse APA and Proposed Sale Order—would receive a full release from any causes of action asserted by the Debtors, their estates, or their creditors. The Committee intends to set forth evidence at the sale hearing that the sale transaction was not the result of arms'-length negotiations (indeed, David Baruch negotiated both sides of the asset purchase agreement—once for the Debtors with respect to the PharMerica APA and again for CS One, opposite the Debtors, with respect to the Stalking Horse APA, which was based on the form of the PharMerica APA),[45] and that the Debtors cannot bear their burden to show that the sale is "entirely fair."

56.     Further, the Debtors cannot show that the proposed sale recognizes the fiduciary duties owed by the Debtors to the estates' creditors. CS One, as the insider entity that the Debtors' principal controls, should not be the sole beneficiary from the sale of the Debtors' assets. *Gulf Coast,* 404 B.R. at 424; *In re Flour City Bagels, LLC,* 557 B.R. 53, 84 (Bankr. W.D.N.Y. 2016) (denying proposed sale because "[t]his is a situation where the insider was both the buyer and the entity in complete control of the seller."). The Debtors' attempts at a marketing process—which did not occur *at all* with respect to the Causes of Action, as discussed below—cannot cleanse a tainted process. *In re Abbotts Dairies*, 788 F.2d 143, 149 (3rd Cir. 1986) (purported auction conducted for debtor's assets could not establish that amount paid was fair and valuable consideration without a finding that assets were purchased in good faith, where bankruptcy court did not receive evidence of asset's value).

57.     In the absence of any carveout for unsecured creditors (which must include, at a minimum, the Unencumbered Assets), it is clear that the proposed sale will *not* aid in the Debtors' reorganization or serves any legitimate bankruptcy purpose. Indeed, the Debtors have not

---

[45] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

adequately demonstrated why the estates would not have been better served by a Chapter 7 liquidation or a non-bankruptcy foreclosure. *See Gulf Coast Oil*, 404 B.R. at 427 ("The [section] 363(b) movant should be prepared to prove, not just allege, why it is appropriate to provide extraordinary bankruptcy authority and remedies solely for the benefit of a party whose contract under state law does not provide those remedies and benefits."); *In re Encore Health Assocs.,* 312 B.R. 52, 57-58 (Bankr. E.D. Pa. 2004) (denying a bidding procedures motion because the court would not approve the sale, "the sole purpose of which was to liquidate assets for the benefit of the secured creditor," and noting instead that an "asset sale can easily be accomplished outside of bankruptcy either with the consent of the secured creditor or by abandoning the asset to the secured creditor to sell on its own"); *In re Flour City Bagels, LLC,* 557 B.R. at 84 (sale could not be approved that sought to achieve on behalf of secured lender that which it could not achieve in an Article 9 sale).

58.     CS One and the Debtors' insiders should not be permitted to avail themselves of the chapter 11 process to liquidate or foreclose on their collateral for their sole benefit, without any commensurate benefit to the general unsecured creditors.  Accordingly, the Debtors cannot meet their burden and the proposed sale must be denied.  To hold otherwise undermines the processes and creditor protections set forth in chapter 11 to prevent the exact abuse of process that is occurring through Mr. Straus's actions in these cases.  Mr. Straus and CS One are free to purchase assets from a chapter 7 trustee, following conversion.

## II.     If the Sale to CS One is Approved, It Must Exclude the Unencumbered Assets

59.     If the Court is inclined to approve the sale in any event, the Stalking Horse APA must be modified to exclude the Unencumbered Assets from the Purchased Assets.  CS One cannot purchase the Unencumbered Assets through a credit bid, due to CS One's lack of valid liens on the Unencumbered Assets.  Further, the Purchase Price does not include any cash component for

26

the Unencumbered Assets (nor should it, with respect to the Causes of Action, due to the lack of marketing and valuation of such assets), and therefore the Unencumbered Assets must be excluded from the sale.

### A.    CS One May Not Credit Bid the Unencumbered Assets

60.    Section 363(k) of the Bankruptcy Code provides that:

> At a sale under subsection (b) of this section of ***property that is subject to a lien that secures an allowed claim***, unless the court for cause orders otherwise, the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k) (emphasis added).  Under a plain reading of the statute, CS One may only credit bid for assets of the estates encumbered by CS One's liens (*i.e.*, the collateral that secures its claim).  *See In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014) ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien.").  This aligns with the purpose of section 363(k), which is "to protect a creditor against the risk that ***its collateral*** will be sold at a depressed price" and "enable[ ] the creditor ***to purchase the collateral*** for what it considers the fair market price (***up to the amount of its security interest***) without committing additional cash to protect the loan." *RadLax Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644, n.2 (2012) (emphasis added).

61.    CS One, as the entity asserting an interest in property of the estates, has the burden of proof on the issue of the validity, priority, or extent of its liens.  11 U.S.C. § 363(p)(2).  If CS One fails to demonstrate it has a valid, properly perfected security interest in the Purchased Assets for which it seeks to credit bid, then CS One may not credit bid against those assets.  *See In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 806 (Bankr. E.D. Va. 2014) (denying the secured lender's credit bid to purchase assets that did not secure the creditor's claim); *see also Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 679–80 (D. Mass. 2000) (affirming bankruptcy

court's denial of credit bid because the sale transaction was not a sale of property subject to the secured creditor's lien).

62.     Moreover, the Court may deny CS One's credit bid "for cause" because a bona fide dispute exists over the validity and extent of CS One's alleged liens with respect to the Unencumbered Assets.  *See In re Akard St. Fuels, L.P.*, Case No. 3:01-CV-1927-D, 2001 WL 1568332, at *3 (N.D. Tex., Dec. 4, 2001) (affirming bankruptcy court's denial of credit bid for cause due to the committee's challenge to creditor's alleged liens but without prejudice to the creditor's right to bid at the auction with cash and later recover the cash if it proved its liens); *In re Weiss Multi-Strategy Advisers LLC*, 665 B.R. 578, 593 (Bankr. S.D.N.Y. 2024) (denying opportunity to credit bid where the validity of the creditor's alleged lien was "hotly contested"); *In re Daufuskie Island Props., LLC*, 441 B.R. 60, 63-64 (Bankr. D.S.C. 2010) (denying secured creditor the right to credit bid because its mortgage and claim were both challenged by the trustee).

63.     The Committee has obtained binding admissions from the Debtors and CS One regarding the lack of valid liens in the Unencumbered Property—including the Causes of Action— and the Committee intends to seek standing to pursue an adversary complaint invalidating such liens, to the extent they exist.  Accordingly, a bona fide dispute exists.

64.     Further, even in the absence of the Debtors' and CS One's admissions, the Pre-Petition Credit Agreement and CS One's financing statements are insufficient under New York law to perfect security interests in commercial tort claims, and CS One could not have had pre-petition liens on Avoidance Actions (and did not obtain post-petition DIP Liens on Avoidance Actions).  Under New York law, a security interest in a commercial tort claim is unperfected unless the security agreement and financing statement provide a sufficiently specific description of the claim.  *See* NY U.C.C. § 9-108(e)(1).  Breach of fiduciary duty claims and other tort claims owned

by the estates undoubtedly qualify as "commercial tort claims." *See* NY U.C.C. § 9-102(a)(13) (defining "commercial tort claim" as a "claim arising in tort" where "the claimant is an organization"); *Sergeants Benevelent Ass'n Annuity Fund v. Renck*, 19 A.D.3d 107, 100 (N.Y. App. Div. 2d Dep't 2005) (finding that "breach of fiduciary duty is a tort").

65.     Neither the security agreement nor financing statements pertaining to the Pre-Petition Credit Agreement identify commercial tort claims as Senior Pre-Petition Collateral, let alone sufficiently describe such claims.  The estates' Avoidance Actions also are not subject to CS One's Senior Pre-Petition Liens, as courts have uniformly held that avoidance claims are not subject to a secured creditor's lien by operation of section 552 of the Bankruptcy Code.  *See, e.g.*, *In re Residential Capital, LLC*, 497 B.R. 403, 414-15 (Bankr. S.D.N.Y. 2013) (holding that avoidance actions under the Bankruptcy Code, including those arising under state law, only arise post-petition and can only be brought by the trustee post-petition, and therefore could not have been encumbered or assigned pre-petition to the secured creditor).  In addition, the Final DIP Order makes clear that DIP Collateral excludes the Unencumbered Assets—namely, the Causes of Action (including Avoidance Actions) and any Previously Unencumbered Assets.  CS One therefore does not hold valid liens or security interests in the Unencumbered Assets, and such assets cannot be purchased through the proposed credit bid.

### B.     CS One Cannot Pay Cash for the Causes of Action

66.     The Debtors' failure to properly value the Causes of Action requires that they be excluded from the sale to CS One.  The Causes of Action, and other Unencumbered Assets, may be the primary (or only) source of recovery for unsecured creditors.  It is imperative that these assets be protected for the benefit of the estates—not for CS One.  Any proposed sale must exclude the Causes of Action and allow them to be left for the benefit of unsecured creditors.

67.     The Debtors have not demonstrated that the sale of the Causes of Action meets strict scrutiny required to satisfy the entire fairness standard.  Specifically, the Debtors have produced no evidence that the sale of these potentially valuable assets "are being sold for the highest price attainable" or that the sale of the Causes of Action (including those against CS One and other insiders) "is the result of bona fide arm's length transactions and not driven by other factors."  *In re Tempnology, LLC*, 542 B.R. 50, 65 (Bankr. D.N.H. 2015); *In re Fitzgerald*, 428 B.R. 872, 883 (B.A.P. 9th Cir. 2010) (reversing bankruptcy court's sale order where trustee did not present sufficient evidence of value of sale of causes of action to defendant to meet strict scrutiny).

68.     First, the Debtors are unable to show the price received in exchange for the Unencumbered Assets (including the Causes of Action)—$0.00—is fair and reasonable.[46] Notably, the Debtors may have Causes of Action against CS One, Mr. Straus, and other insider Debtor-affiliates and their former or current officers, directors, employees, and representatives. The value of these Causes of Action (and the surrender thereof) is unknown based upon the Debtors' evidence.  No evidence has been offered regarding the existence or non-existence of claims held by the estates, the amount in controversy, or the likelihood that the Debtors would prevail.  *See In re Flour City Bagels, LLC,* 557 B.R. at 79 (holding a sale under section 363 could not be approved without evidence of value of releases and causes of action to be sold); *In re On–Site Sourcing, Inc.*, 412 B.R. 817, 825 (Bankr. E.D. Va. 2009) (finding that the lack of information about the claims being released, their value, and the likelihood that the Debtor would succeed on them shows the lack of a sound business reason).  Without evidence that surrender of potentially

---

[46] Exhibit 3, SSG 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025 (SSG did not discuss potential commercial tort claims, avoidance actions, or any sort of cause of action with potential buyers).

valuable Causes of Action is given in exchange for proper consideration, the Debtors cannot demonstrate the strict scrutiny required to sell the Causes of Action to CS One under section 363 of the Bankruptcy Code.

69.     Second, the Debtors' estates receive no benefit from the sale of the Unencumbered Assets (including the Causes of Action).  Therefore, the Debtors fall woefully short of their duties to their creditors.  *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).  After all, the objective of a section 363 sale is to maximize value for the debtors' estates.  *See Cadle Co v.  Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010); *In re STAR Dynamics Corp.,* 520 B.R. 679, 683 (Bankr. S.D. Ohio 2014) (debtor could not articulate sound business purpose where sale would only benefit insiders and, therefore lacked good faith).

70.     In light of the sale being run solely for the benefit of CS One—while general unsecured creditors are projected to receive no recovery—the Stalking Horse APA if approved must expressly carve out and preserve the Causes of Action for general unsecured creditors.  Given the high likelihood of administrative insolvency in these cases (given that there is budget for given that there is no budget for 503(b)(9) claims), the Causes of Action, and other Unencumbered Assets, may represent the only viable source of value for unsecured creditors.  Allowing them to be sold to CS One in a "buy and bury" scheme would unfairly deprive unsecured creditors of their last remaining avenue for recovery.

**III.     If a Sale is Approved, There Must Be Adequate Assurance of Administrative Solvency**

71.     The Debtors' sale process was tailored exclusively to benefit CS One.  Indeed, the sale to CS One is almost certain to render the estates administratively insolvent, with no viable mechanism to satisfy 503(b)(9) claims or other unpaid administrative claims and no prospect of recovery for general unsecured creditors.  This outcome is fundamentally at odds with the principles of chapter 11, as discussed above.  *In re WestPoint Stevens, Inc.*, 333 B.R. 30, 52

(S.D.N.Y. 2005) (stating that "it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures") (citing *Clyde Bergemann, Inc. v. Babcock and Wilcox Co. (In re The Babcock & Wilcox Co.)*, 250 F.3d 955, 960 (5th Cir. 2001) ("[T]he provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.")); *In re Flour City Bagels, LLC,* 557 B.R. at 79-80 (Bankr. W.D.N.Y. 2016) (despite additional cash component, sale would render debtor administratively insolvent and structure of the sale was not reasonable or supported by a good business justification).

72.     Bankruptcy courts regularly recognize that a secured lender cannot leverage a section 363 sale for its own benefit without bearing the associated costs (*i.e.*, they must "pay the freight"). *See* Bankruptcy Local Rule 4002-1(f) ("The debtor must not incur administrative and priority expenses unless funds are reasonably expected to be generated to pay them."); *see also, e.g.*, *In re SmileDirectClub, Inc.*, Jan. 26, 2024 Hr'g Tr. at 196:1-4 [Dkt. No. 619], Case No. 23-90786 (Bankr. S.D. Tex. Jan. 26, 2024) (denying a credit bid and proposed sale to insider-DIP lenders, and converting cases to chapter 7, where the estate was administratively insolvent and there were no recoveries to unsecured creditors); *id.* at 206:24-207:1 ("When entities are administratively insolvent, ***the options are dismiss or convert***.  That's what the code says to do.") (emphasis added); *In re Family Christian, LLC*, Apr. 14, 2015 Hr'g Tr. at 100:17-20, Case No. 15-00643 (JTG) (Bankr. W.D. Mich. Apr. 14, 2015) ("I think we'll have a problem at the Sale Hearing if the administrative expenses are not to be paid in connection with the sale."); *In re Golden Cnty. Foods, Inc.*, June 22, 2014 Hr'g Tr. at 11:22–24 [Dkt. No. 175], Case No. 15-11062 (KG) (Bankr. D. Del. June 22, 2014) (requiring that sale proceeds in excess of postpetition financing obligations be available to pay administrative expense claims prior to the payment of

certain alleged prepetition secured debt); *In re NEC Holdings Corp*., July 13, 2010 Hr'g Tr. at

23:25–24:1, Case No. 10-11890 (KG) (Bankr. D. Del. July 13, 2010) (secured creditors have "got

to the pay the freight, and . . . the freight is certainly an administratively solvent estate."); *In re*

*Encore Healthcare Assocs*., 312 B.R. at 54–55 (finding that section 363 sale served no legitimate

business purpose where lenders were utilizing the chapter 11 process to arrange a section 363 sale

to be followed by a conversion to chapter 7, all while not providing for payment of all chapter 11

administrative expense claims); *In re Braniff Airways, Inc*., 700 F.2d at 940 ("The debtor and the

Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for

confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection

with a sale of assets."); *In re Gulf Coast Oil Corp*., 404 B.R. at 427 (The Court sees no authority

to provide the benefits of the Congressional scheme in this case without compliance with the

Congressional requirements.").   Accordingly, if the Court is inclined to approve the sale to CS

One, it should require CS One to also bear the cost of preserving the integrity of the estates through

administrative solvency.   Absent such protections, the sale leaves unpaid administrative

creditors—some of whom are trade vendors entitled to priority under section 503(b)(9)—with no

recovery and no recourse.

### IV.   Approval of Any Sale Should Not Occur Prior to the Expiration of the Committee's Challenge Period and Resolution of the Committee's Challenge

73.     As stated above, the Committee's Challenge Period does not expire until October

27, 2025—five days after the scheduled sale hearing.  The Committee intends to seek standing to

challenge CS One's credit bid on two grounds:  *first*, CS One maintains no security interest in or

lien on the Causes of Action and Previously Unencumbered Assets, and therefore such assets are

unencumbered assets of the Debtors' estates; *second*, CS One's asserted secured claims are

unenforceable as debt and should instead be treated as insider equity contributions.

74.     With respect to the first, the Committee refers the Court to its prior argument in this Objection regarding the Unencumbered Assets.  *See supra* ¶¶ 60-65.  The Committee is willing to stipulate that the Unencumbered Assets are not CS One's collateral and has proposed a stipulation to CS One that would resolve this issue.

75.     With respect to the Committee's recharacterization claim, the Committee's investigation to date—which remains ongoing—has revealed that CS One did not behave as a conventional lender to the Debtors and did not purchase the debt under the Pre-Petition Credit Agreement for purposes of collection or enforcement against the Debtors.  Rather, CS One (using Mr. Straus's personal funds) purchased the debt at a discount price as an investment in the Debtors, despite their insolvency.  Mr. Straus formed and used CS One to keep the Debtors under his umbrella of companies so that they could continue to serve the related Straus-entities (such as CareOne and its related facilities) despite mounting "debt" that Mr. Straus never intended to be repaid.[47]  Although the Pre-Petition Credit Agreement and its related amendments recited maturities, amortization, and interest provisions, none of those obligations were honored or enforced in practice:  payments were deferred, interest was routinely capitalized or ignored, and every default was waived at CS One's discretion.

76.     When questioned about the Pre-Petition Credit Agreement, CS One described ordinary features of the agreement in place with the prior lenders:  daily cash sweeps, financial reporting requirements, positive and negative covenants, and requirements to pay interest.[48]  When the Debtors defaulted numerous times on the Pre-Petition Credit Agreement, the prior lenders began to "get[ ] aggressive," by restricting cash flow, which CS One believed could have harmed

---

[47] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025 (testimony regarding CS One wanting to purchase the loan to help turn the Debtors around and allow them to perform better).

[48] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

the Debtors.[49]  CS One therefore purchased the Debtors' outstanding obligations to avoid the prior lenders foreclosing or exercising rights and remedies under the agreement, rather than to enforce to collect the debt.[50]

77.     After entering into the Assignment Agreement, the Debtors did not make a single payment to CS One.[51]   Rather, CS One immediately entered into an amendment to the Pre-Prepetition Credit Agreement with the Debtors on terms more akin to an equity relationship than a lender relationship:

- CS One converted the interest provisions to payment-in-kind;[52]

- CS One stopped daily cash sweeps;[53]

- CS One did not require the debtors to make payments under the loans;[54]

- CS One removed financial covenants and reporting requirements;[55]

- CS One waived all existing defaults for a six-month period (later extended in one-year increments);[56]

- CS One extended the loan termination date (again, for six-month or year-long periods);[57] and

- CS One did not take any actions against Care Solutions as the guarantor.[58]

---

[49] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[50] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[51] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[52] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[53] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[54] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[55] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[56] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[57] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[58] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

CS One's explanation for the repeated amendments to the Pre-Petition Credit Agreement was that each prior amendment "was expiring or terminating according to its terms, so it was time to amend it because the loan was still outstanding."[59]   And all the Debtors had to provide to CS One in exchange was their "consent and signature on those agreements."[60]

78.     For these reasons, and as will be more fully set forth in the Committee's forthcoming standing motion and adversary complaint, CS One's secured claim is more properly characterized as equity in the Debtors.  CS One's true intent—along with the Debtors'—was that its purchase of the Debtors' obligations was an equity infusion into the Debtors to allow them to continue operating while relieving them from principal and interest payment obligations and the threat of default remedies being exercised against them.  CS One's conduct belies the existence of a bona fide debtor-creditor relationship.  CS One's credit bid thus should not be permitted until the Committee's recharacterization challenge is determined.

### RESERVATION OF RIGHTS

79.     The Committee reserves all of its rights to supplement or amend this Objection at or prior to the sale hearing.  The Committee also reserves all of its rights with respect to any filing by any party prior to the sale hearing.   Nothing contained in, or omitted from this Objection constitutes an admission or stipulation by the Committee, any member of the Committee or any other party with respect to any alleged claims against the Debtors, the Pre-Petition Secured Parties, or any other parties as applicable, including but not limited to the amount, validity, enforceability of any alleged claims against the Debtors, the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' Assets, or any money damage causes of action.

---

[59] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

[60] Exhibit 5, CS One 30(b)(6) Dep., Page and Line Reference Forthcoming, October 16, 2025.

WHEREFORE, the Committee respectfully requests that the Court enter an order denying the proposed sale and converting these cases to chapter 7, or, alternatively, approving the sale only on the modified terms as set forth herein.

*[Remainder of Page Intentionally Left Blank]*

Dated:   October 17, 2025

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

By: */s/ Kristian W. Gluck*
Kristian W. Gluck (SBT 24038921)
Jason I. Blanchard (SBT 24130197)
Stephanie Assi (SBT 24096737)
Michael Berthiaume (SBT 24066039)
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Tel: (214) 855-8210
Email: kristian.gluck@nortonrosefulbright.com
        jason.blanchard@nortonrosefulbright.com
        stephanie.assi@nortonrosefulbright.com
        michael.berthiaume@nortonrosefulbright.com

- and -

Paul Trahan (SBT 24003075)
Julie Goodrich Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1550 Lamar, Suite 2000
Houston, TX 77010
Tel: (713) 651-5151
Email: paul.trahan@nortonrosefulbright.com
        julie.harrison@nortonrosefulbright.com
        maria.mokrzycka@nortonrosefulbright.com

- and -

Robert M. Hirsh (SDTX 24727)
1301 Avenue of the Americas
New York, NY 10019-6022
Tel: (212) 318-3060
Email: robert.hirsh@nortonrosefulbright.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 17, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Kristian W. Gluck*
Kristian W. Gluck